Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

JEAN LUBKEN and WILLIAM          )
LUBKEN, husband and wife         )
and their marital                )
community,                       )   No. 3:24-CV-05811-JCC
                                 )
            Plaintiffs,          )
                                 )
      vs.                        )
                                 )
FRED MEYER STORES, INC., an      )
Ohio corporation doing           )
business in the State of         )
Washington; THE KROGER CO.,      )
an Ohio corporation doing        )
business in the State of         )
Washington; GATEKEEPER           )
SYSTEMS, INC., a California      )
corporation doing business       )
In the State of Washington,      )
                                 )
            Defendants.          )
_____

VIDEOCONFERENCE VIDEOTAPED DEPOSITION

UPON ORAL EXAMINATION OF

ANGELA PADILLA
_____

Taken at 909 "A" Street, Suite 700

Tacoma, Washington

DATE TAKEN:   JULY 23, 2025

REPORTED BY:  LAURA L. OHMAN, RPR, CCR 3186

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 18

Q.   Okay.  And so I understand sometimes as a way to discourage theft, you create the appearance to the customer that they're being recorded, and so at Fred Meyer in December of 2023, do you remember certain screens that showed customers on camera but footage was not being recorded?

        MS. FRANCO:  Objection to form.

    I just want to remind you she's here in her personal capacity.  She's not --

        MR. ULMER:  Understood.

        MS. FRANCO:  Okay.  I just --

BY MR. ULMER:

    Q.   Your knowledge.  I understand you don't --

        MS. FRANCO:  Yeah.

BY MR. ULMER:

    Q.   -- work in LP.

        MS. FRANCO:  I just wanted to state for the record.  Thank you.

        THE WITNESS:  As far as I know, those aren't recorded.

BY MR. ULMER:

    Q.   I asked just because I got -- I received in this case three security tapes from three different security cameras as far as I understand them.

        There were other cameras depicting customers

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                          Angela Padilla

Page 19

that I did not receive footage for, and I'm wondering, to the extent you know, if footage was not reported from some of the cameras that were showing customers their face on camera.

A.   Yeah, I -- so the world of loss prevention is a secretive world because not only are they watching customers, they're also watching employees.  So you don't know when they arrive.  You don't know when they leave.  You know, you don't know what they're watching.

Q.   Understood.  My question was --

A.   Or what they're -- or what they're recording, I should say.

Q.   Okay.  Who in December of 2023 was sort of running the loss prevention, if you remember?

A.   I think it was Alex at the time.

Q.   What was the last name for him?

A.   I know it, but I can't quite remember it, and it's really hard to pronounce.  He's there now.

Q.   Okay.

A.   He's the one there.

Q.   Does Fred Meyer have its own internal loss prevention department, or do they contract with a third party security company?

        MS. FRANCO:  Object to form.

BY MR. ULMER:

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                                    Angela Padilla

Page 20

Q.    To the extent you know.

A.    They have their own.

Q.    Okay.  And to be clear, occasionally counsel will object.  Unless you're instructed not to answer, you can go ahead and answer once the objection is made.

My question was just to the extent you know if, you know, a third party company like Allied Security was hired by Fred Meyer to track security footage or operate security.

Do you remember if there was some other company --

A.    No.

Q.    -- at that time in December of 2023?

A.    No.

Q.    Okay.

A.    They hire out, but they're not even allowed to see anything.

Q.    Okay.

A.    But it is only loss prevention that is Fred Meyer.

Q.    All right.  So I'm going to play some footage.  I have a note to myself on where to start.

All right.  So we're going to look at Exhibit 5.  I'm going to take us to timestamp 1:45 p.m.

(Exhibit No. 5 marked.)

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                                    Angela Padilla

Page 31

that's for categories of records.

Have you seen this document before?

A.    This one?

Q.    Yeah.

A.    Yeah.  I was served with it.

Q.    Okay.  And it asks for categories of things, documents, footage, et cetera.

Do you know if you personally have any responsive documents or footage or photos that relate to the three topics listed in Exhibit A?

A.    I do not.

Q.    Okay.  We received a number of documents and videos in this case produced by counsel for Fred Meyer.

Did you yourself play a role in obtaining things to produce in this case?

A.    The only thing that I did was at the time of the incident, I had the customer fill out the paperwork, and then I sent it into our insurance, Sedgwick.  That is -- and then left the part for the video with the LP.

Q.    And you're -- correct me if I'm wrong, you're not exactly certain who the employee working LP was on that day?  You think it's Alex?

A.    Alex is the manager for the LP.  I don't believe there was anyone working that day.  At least when I called, no one answered, but that doesn't always mean.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 49

Q.   And do you know if any of those cameras had the footage recorded?

A.   I do not.

Q.   Okay.  And so you go and you meet Jean, and she's on the floor.

What do you remember about what she was first telling you?

A.   She said that her cart locked up.  I do remember reading this, that she said it fell on her.  Again, I asked her if she could get up.  That was -- that's basically what she told me, that her cart locked up and she fell and the cart fell on her.

Q.   At the -- at the point where you contact -- where you met her, did -- was the cart nearby?

A.   It was.

Q.   Meaning, was she near the cart, or did she move away from it?

A.   I don't -- I remember the cart was standing there, but -- and she was sitting on the ground.  Where the cart was specifically, it was somewhere off -- I don't remember exactly the location, but it was I would say more towards me as I walked up to the aisle to the left-hand side.  She was sitting on the right-hand side.

Q.   When you were speaking with her and kind of understanding from her what had happened, did she point

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 50

at the cart?

A.   I don't recall that.

Q.   In speaking with her, though, did you identify where -- which cart she had used?

A.   Yes.

Q.   Okay.  Do you remember if it was the normal-size cart or the smaller one?

A.   Small.

Q.   Both the normal sized and smaller carts have the antitheft wheel on it; correct?

A.   Yes, they do.

Q.   All carts have the antitheft wheel?

A.   That's what we strive for.

Q.   Okay.  The cart that Jean had used had the antitheft wheel?

A.   I -- I don't recall if I looked at the wheels. To be quite honest, it's a small cart.  I got kind of a chuckle out of that it's a tiny cart that it fell. Not -- okay.  That didn't come out correct at all.  Boy. It's not a heavy cart, so that was like I got -- and it was standing up when I got there, and so I didn't know if it had been on her, and so I'm kind of that person that questions, was that cart really on her?  It's not that heavy, but I don't remember if the wheels -- I assume they're locked up.  The wheels will also get

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 51

stuff caught in them and then it makes them slow down.

Q.   Okay.  And so the -- when you -- at some point when you're talking with Jean, you were able to identify which cart she had been using; right?

A.   Yes.

Q.   Okay.  And do you know if before -- and, again, you were the first employee that had spoken to her?

A.   Yes.

Q.   Do you --

A.   No.

Q.   Do you --

A.   She --

Q.   Who else, to your knowledge, spoke to her after she fell but before you talked to her?

A.   The person that radioed me.  I believe somebody walked by the aisle, she waved them down.  If I remember correctly, that person told someone with a walkie-talkie, Hey, there's someone down, and then they radioed me.

Q.   Do you know if the -- well, let me -- let me ask this:  Do you know if the person that had been the first to put a dispatch on the radio, if they had spoken to Jean?

A.   I believe -- I don't believe they were the ones that spoke to her.  If I remember correctly, somebody

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 52

walked by, and it could have been another customer.

Somebody walked by, but they're not the one that radioed

me because then they went and told someone, and that's

who radioed me, and so most likely, it was the person

who was up at U-scan is probably because they couldn't

go, so they radioed.  That's what -- that's kind of what

I was thinking.  That's why it seems familiar.

Q.  So you didn't witness it, and you -- you know,

so you don't personally have, you know, have seen it,

but your understanding is a customer saw Jean and then

told an employee who then sent the dispatch on the

radio?

A.  Yes.

Q.  Okay.  And so, again, when you were meeting with

Jean, what do you remember her saying about how the fall

happened?

A.  She -- what she stated was she was walking, the

wheel locked up, and she fell on her hip, and that the

cart had fallen on top of her.

Q.  When you went to see Jean, the cart was

standing?

A.  Yes.

Q.  Okay.  Do you know who had lifted it back onto

its top?

A.  I don't recall that.

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                          Angela Padilla

Page 53

Q.   Okay.  Jean was sitting on the floor with her back to the aisle, or how would you describe the position she was in?

A.   She was sitting like this with her back to the aisle.

Q.   Do you -- what do you remember her saying to you about what she was feeling?  If she said anything, what do you remember about that?

A.   I don't specifically recall.

Q.   Okay.  I'm going back to page 1 of Exhibit 1.

We see under claimant name, we see caller name, Angela Padilla.

Do you know if on that day you were the only person who spoke with a Sedgwick representative?

A.   Yes.

Q.   And the caller phone number there, is that the number to the store?

A.   Yes, it is.

Q.   Okay.  It says, "Client Number 1978."

Do you know what that means?

A.   I do not.

Q.   Okay.  And do you know if that is Kroger is the client or Fred Meyer is the client, if that's the client number for the purposes --

MS. FRANCO:  Object to form.

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 54

BY MR. ULMER:

Q.    -- of Kroger, if you know?

A.    I do not know.

Q.    Okay.  Loss date, it happened in Washington; right?

A.    Yes.

Q.    Under here, it says, "Check for duplicate claim."

Loss date, Saturday December 23, 2023, that's the date that the incident happened on; right?

A.    Yes.

Q.    Lost time is reported at 1:55 p.m.

To your memory, does that seem roughly about the time it happened?

A.    I remember it was in the afternoon.

Q.    Okay.  It says reported by phone, and so that's you calling in the claim?

A.    Yes.

Q.    It says, "Reporter type:  Store manager."

That's Sedgwick's description of your title, you were the assistant home manager; correct?

A.    Yes.

Q.    Okay.  Yeah, it says, "Location:  Look up Contract No. 1978.  Client:  The Kroger Company.  Unit name:  Tacoma, Stevens address, 4050 South 19th."

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 55

That's the address for that Fred Meyer store; correct?

A.   Yes.

Q.   Okay.   Turning the page.

Under "Reporter information," it identifies you as the home store manager; correct?

A.   Yes.

Q.   Down under there at the last line of page 2 of Exhibit 1, it says, "Loss description:  The customer was pushing cart when the wheel locked," next page up, "causing the customer to fall.  The customer fell on her right hip and the cart fell on top of the customer.  The customer has pain in her right hip joint, neck, and right hand.  It is unknown if the customer sustained any injuries.  The customer did not seek medical treatment."

Do you recall if this summary was something that you wrote that Sedgwick put in this claim form?

A.   Yes.

Q.   Okay.  As the summary is described, does this seem like a summary you wrote?

A.   Yes.

Q.   Okay.  And so in the summary, it says, "Customer has pain in her right hip joint, neck, and right hand."

Do you know if those are the -- if that was a description that Jean shared with you?

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                          Angela Padilla

Page 56

A.    Yes, actually, I do remember that.

Q.    Okay.  Do you remember if Jean mentioned if she could stand or if she communicated if standing was difficult?  What do you remember --

A.    She --

Q.    -- about that?

A.    That's why I got her the chair.  She did say that -- I don't recall if she said she couldn't stand or if it was difficult.  It was somewhere along those, Well, okay, let's get you a chair.

Q.    Do you remember if Ken was the one that got the chair?

A.    It was Ken that got the chair.

Q.    Where did the chair come from?  Was it in the office or in the back?

A.    Furniture pad.

Q.    Okay.  It's a computer chair with wheels?

A.    No.

Q.    Okay.

A.    I don't think it was.  It might have been one of the desk chairs.  I know it came from the furniture pad, and it could have been -- I don't recall.

Q.    When you say "furniture pad," is there a section where --

A.    We sell furniture.

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 60

same day; correct?

A.    Yes.

Q.    It says, "Time reported to Sedgwick:  5:16 p.m."

Do you know if that's the time that -- or let me ask this instead:  What time do you remember faxing the incident report that you filled in -- or if you don't remember the specific time, you know, how long after you had filled it out that you faxed it?

A.    I don't recall, but something like that, if I can't get to it right away to call them, because it does take a little bit to talk to them, then I'll do it right before I leave, so... (Pause.)

Q.    When you made the call to Sedgwick, was this after Jean had left?

A.    Yes.

Q.    Okay.  And so the loss time was reported at 1:15 p.m., and you said there had been interactions with Jean, and she was there for approximately 20 or so minutes?

A.    (Witness nods head.)

Q.    Would you say it was about half an hour from when she fell to when she's getting picked up by her husband?

A.    I would say it was probably around a half an hour.

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 93

Meyer about whether anyone knew if the cart worked or not that Jean had used?

MS. FRANCO:  Object to form.

THE WITNESS:  No.

MR. ULMER:  Okay.  I'm going to go off record for two minutes.

THE VIDEOGRAPHER:  Going off the record at 11:33.

(A break was taken from
11:33 a.m. to 11:35 a.m.)

THE VIDEOGRAPHER:  We're back on the record at 11:35.

BY MR. ULMER:

Q.   The purpose of filing the incident report to the carrier is, you know, in the -- in anticipation of possible litigation relating to an injury claim; right?

MS. FRANCO:  Object to form.

THE WITNESS:  I'm sorry.  I missed the whole question.

BY MR. ULMER:

Q.   That's fair.

A.   I'm... (Pause.)

Q.   The reason for notifying Sedgwick of the personal injury claim is anticipation of possible litigation; right?

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73

Lubken v. Fred Meyer Stores, Inc.                    Angela Padilla

Page 94

MS. FRANCO:  Same objection to form.

THE WITNESS:  Yes.

BY MR. ULMER:

Q.  Okay.  Those are all the questions from me. Thank you.  Some of the other attorneys, including the computer attorney may have a question.

MS. FRANCO:  You just made the comment the computer is going to do questions.

MR. ULMER:  She's not AI.  She's real.

MS. FRANCO:  She's a computer attorney actually.

THE COURT REPORTER:  Before we go off record, do you have any questions?

MS. FRANCO:  I will have a few.

THE COURT REPORTER:  Okay.

MS. FRANCO:  Just a few.

MR. ULMER:  Brittney might have questions. Go ahead, Brittney.

MS. RODRIGUEZ:  I don't have any questions. Thank you.

MS. FRANCO:  All right.

E X A M I N A T I O N

BY MS. FRANCO:

Q.  Okay.  Just a few to clarify some stuff. So when you spoke with Ms. Lubken, was she able

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

0ce60d6c-aaa0-4727-8fa4-c3dd6388fd73