# SEAN S. KOHLES, PhD, EIT, FBMES, FAIMBE
## KOHLES BIOENGINEERING CORP
### AN OREGON BENEFIT CORPORATION

**4520 Meares Avenue NW**
**Tillamook, Oregon**
**97141-9325**
**503-516-7528**
**ssk@kohlesbioengineering.com**

28 April 2026

Andy S. Ulmer
Pfau Cochran Vertetis Amala PLLC
909 A Street, Suite 700
Tacoma, WA 98402
Phone: (253) 948-0232
Email: aulmer@pcvalaw.com; jmeadows@pcvalaw.com

RE:     *Consumer product failure analysis and injury biomechanics: Analysis and conclusions*
        Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.
        In the United States District Court, Western Division, Washington
        Case # 3:24-CV-05811-SKV

Thank you for contacting me regarding the above-named case. I have reviewed among other documents, incident reports, video recordings, medical records/reports, deposition transcripts, previous consumer complaint reports, etc., as well as documents from a concurrent lawsuit (Larocque v. The Kroger Co., et al.). These and all available document folders are listed in Appendix A. In addition, I participated in a direct inspection of the incident Fred Meyer Store #390 in Tacoma, Washington. This inspection included direct examination and testing of incident grocery carts and theft protection devices. In further support of this review, my analysis, and my conclusions, I researched cart and theft protection device specifications as well as queried the engineering and medical literature.

The purpose of the following report is to provide a consumer product failure analysis as an influence on injury biomechanics associated with at-issue event. This report includes my perspective on the incident and the resulting trauma leading to the diagnosed injuries experienced by the plaintiff. My opinions were formed through a more probable than not reconstruction of the consumer product influences on the injury mechanisms of which occurred on 23 December 2023.

My conclusions are provided to a reasonable degree of engineering, biomedical, and scientific probability and/or certainty. My qualifications to provide opinions concerning the matters herein, particularly reconstructive collision mechanics, evidence-based, retrospective injury biomechanics, and clinical science are summarized as follows.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

**EXPERT QUALIFICATIONS**

I am a biomechanical engineer with fundamental training in engineering mechanics and bioengineering, disciplines that apply mathematics, physics, and engineering technologies toward the study of human and device function. I have been recognized by the American Institute for Medical and Biological Engineering (AIMBE) as one the top 2% in my field "for innovative contributions to biomechanics through theoretical and applied physics characterizing the mechanical behavior of tissues and forensic injury mechanisms." I am the owner and principal investigator of Kohles Bioengineering Corp (Kohles BioCor), which I founded in 1987 as a small-business entity providing a professional and registered framework wherein I pursue independent research, analytics, engineering design, and expert consulting opportunities. As a Small Business (IRS Chapter S-Corp), Oregon Benefit Corporation (ORS 60.754 B-Corp), Kohles BioCor is dedicated to making a positive impact on society through environmentally sustainable business practices, advancements in health science & engineering, and public safety advocacy.

My current academic appointments are as a Research Professor within both the Department of Emergency Medicine (School of Medicine) as well as the Department of Oral Rehabilitation and Biosciences, Division of Biomaterials & Biomedical Sciences (School of Dentistry) at the Oregon Health & Science University (OHSU), Portland, OR. I also joined the faculty of Human Physiology and the Knight Campus for Accelerating Scientific Impact at the University of Oregon, Eugene, OR, as a Courtesy Professor, assisting in their Bioengineering Programs. These part-time research faculty appointments allow me to pursue federally funded research in biomechanical engineering as well as advise and train basic-science/engineering graduate students, medical/dental students, medical/dental residents, and collaborate with academic faculty.

In my professional practice, I maintain active certifications in Emergency Medicine, Crash Reconstruction, and Medical Device Regulation, among other credentialling. I recently joined the Tillamook Fire District through the Tillamook Volunteer Firefighter's Association (TVFA) as a First Responder and Firefighter. I am currently pursuing hands-on training in support of a Firefighter 1 (FF1) certification through the National Fire Protection Association (NFPA), having passed the classroom examination portion of the credentialing. In addition, I am concurrently training as an Emergency Medical Responder (EMR) through the Oregon Health Authority (OHA), Emergency Medical Services (EMS) Program. To date, I have responded to multiple vehicle collisions, medical events, and structure fire calls.

I previously held local faculty appointments as an Adjunct Professor of Biology and Mechanical & Materials Engineering at Portland State University, Portland, OR. Before relocating to the northwest, I held tenure-track faculty positions in Biomedical Engineering, Mechanical Engineering, and Biology & Biotechnology at Worcester Polytechnic Institute, Worcester, MA. At the time, I also held adjunct faculty appointments in Orthopedics and Physiology at the University of Massachusetts Medical School, Worcester, MA, as well as Clinical Science at the Tufts University School of Veterinary Medicine, Grafton, MA. I have a doctoral degree in Bioengineering (PhD -

28 April 2026                                                    Kohles Bioengineering Corp, page 2 of 18

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

1994) which included medical school coursework followed by postdoctoral training in Orthopedic Biomechanics (Postdoc - 1995). My Accreditation Board for Engineering and Technology (ABET) accredited bachelors of science (BS - 1987) and masters of science (MS - 1988) degrees are both in Engineering Mechanics, including undergraduate credentials in engineering (EIT, professional engineer-in-training license) and pre-medicine pathway coursework, all at the University of Wisconsin, Madison, WI.

I have published over 250 journal articles, conference papers, and book chapters describing my research in cell, tissue, joint, biomaterials, implant, device, body, and injury biomechanical engineering addressing various perspectives of engineering and clinical science applied to living and non-living systems including those addressed in a forensic setting. My scholarly works have been cited over 3,000 times according to the citation indexes *Google Scholar*, the *Web of Science*, *Research Gate*, and *Scopus*. I have served as a peer-reviewer for more than 20 journals. This service has extended to membership on multiple Editorial Boards including the *Journal of Biomechanics* and the *Journal of Biomechanical Engineering*. I am currently serving as a Board Member for the *Annals of Biomedical Engineering*, having won numerous editorial awards, as well as a Guest Co-Editor for *Frontiers in Bioengineering and Biotechnology.* I have acquired federal and private funding awards in support of my research programs as a Principal Investigator or Co-Investigator; including support from both the National Science Foundation and the National Institutes of Health. I am an active member of the American Society of Mechanical Engineers (ASME), Biomedical Engineering Society (BMES), American Society of Biomechanics (ASB), Orthopaedic Research Society (ORS), Society for Experimental Mechanics (SEM), American Society of Engineering Education (ASEE), and Sigma Xi Scientific Honor Society. I was elected to the grade of Fellow within the BMES (FBMES credential suffix) having made significant contributions to the biomedical engineering community, specifically "for achievements in the application of fundamental mechanics towards characterizing the mechanical behavior of tissues, contributing to the editorial management of scholarly works, and providing medicolegal injury biomechanics expert testimony." As mentioned above, I was also peer-nominated, peer-reviewed, and peer-elected for induction into the AIMBE College of Fellows (FAIMBE credential suffix). These Fellow Grade acknowledgements are among the highest professional distinctions accorded to engineers and scientists.

I have trained nearly 1,200 students in over 30 lecture-based courses relevant to biomechanical engineering including fundamental mechanical engineering courses such as Engineering Dynamics as well as basic to advanced courses in Bioengineering and Clinical Science, specifically addressing topics on human factors and environmental interactions including those leading to biomechanical injury. My teaching addresses public health issues, focusing on the interface between biomechanical, biochemical, and bioelectric phenomena at multiple scales, i.e., living system function. My research team has included 125 undergraduate and graduate students over the years each addressing individualized project-based design and/or research experiences in biomechanical engineering leading to published senior, masters, and doctoral theses/dissertations.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

My forensic practice has led to opinions in disputed matters addressing crash/incident reconstruction, injury/death biomechanics, medical device failure, consumer product failure, mass tort, medical negligence, and intellectual property. I am routinely qualified as an expert in mechanical & materials engineering, biomedical engineering, bioengineering, biomechanics, and clinical science in both civil and criminal courts at the circuit and federal levels (USA and Canada). Please see my curriculum vitae (CV) and Federal Rule 26 testimony disclosure for further details.

**INCIDENT SUMMARY**

*Location and Facilities*

This matter concerns a consumer shopping-related injury, which occurred at ~2:04 pm on Saturday, 23 December 2023. The location of the incident was within the Fred Meyer store owned by the co-defendant, The Kroger Co., Store #390 located at 4505 South 19th Street in Tacoma, Washington (see below, overhead image, Apple Maps v3.0, and store interior layout schematic). At the time of the incident, the store was outfitted with small and large grocery carts (Technibilt brand) as a convenience for consumers when purchasing and transporting of purchased goods within and outside of the store. The store, including each cart, incorporated co-defendant, Gatekeeper Systems Inc., theft-prevention system. The details and functionality of the facility arrangement and the cart-specific, theft-prevention system be addressed in later sections.





*Consumer Shopping*

The plaintiff, Jean Lubken, had entered the store via the southeast, front entrance at ~1:47 pm on the day of incident (see below left, still security image of Ms. Lubken within the door-frame). She initially attempted to utilize a small cart of which the wheel braking system had deployed (see below middle image of Ms. Lubken to the left of the door mat). She then proceeded into the store sans cart (below right image). She eventually identified and utilized a mobile cart within the store, but it is not known whether it was a small or large cart product. She then continued to shop with only her purse, secured in the upper cart basket.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

  

### Injury Event

The incident occurred when she entered Aisle #86 traveling westward with her normal walking gait. At some point within Aisle #86, the Gateway wheel braking system become engaged. She recalled that no debris or external influence affected the cart's wheels. As the cart's trajectory (speed and orientation) changed, her right lead leg continued in its swing phase. She then planted her right foot on or near the right rear wheel. The sole of her boot and wooden heel caused her foot to supinate and roll laterally until she lost her balance. She then fell to her right, falling to the concrete floor. She attempted to maintain her balance by grasping the cart which was then pulled down on top of her upon impacting the floor. She ultimately landed on her right hip as her right hand and arm prevented any head contact with the floor. A fellow customer eventually came to her assistance until store personnel arrived (see still images below). Ms. Lubken's complex body, joint, and limb motions and loading will be explored in detail within this report. Overall, she experienced impulsive contact biomechanics during the unexpected fall event.

 

### Medical Conditions

Ms. Lubken immediately experienced pain in her right hip. She was unable to self-ambulate and was eventually transported to the front of the store by Fred Meyer personnel in an office chair. Her husband soon arrived at the store and transported her to a local emergency room via their personally owned vehicle (POV). Initial medical imaging, including computed tomography (CT) and radiography (x-ray), identified an acute sub-capital, right femoral neck fracture. On 24 December 2023, Stephen On, DO, surgically implanted a cephalomedullary nail into Ms. Lubken's right hip.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

Ms. Lubken's medical history has included posterior cervical spine fusion at C1/C2 on 12 February 2022, a right total knee replacement on 10 March 2023, and more recently, a left total knee replacement on 22 April 2024. The painful conditions experienced by the plaintiff, including pain, ongoing limited function, and psychological issues, have resulted in negative ramifications to her personal life.

**BIOMECHANICAL ENGINEERING CONCLUSIONS**

My forensic objective here was to examine the causal mechanisms of traumatic injury resulting from the incident collision.[1,2] My conclusions are based on fundamental physics applying engineering principles, traumatic injury biomechanics, forensic epidemiology, and clinical science. The methodology described in this report represents the standard practice for biomechanical engineers quantifying collision mechanics and injury biomechanics as accepted by my professional societies, credentialling agencies, and the peer-reviewed literature in-which I publish. At issue is an overall question specifically related to injury biomechanics:

- *What flaws in the inspection, repair, and maintenance of the grocery cart theft-prevention system influenced its functional failure?*
- *What specific design, manufacturing, and functional flaws were present in the grocery cart theft-prevention system making it highly susceptible to predictive failure?*
- *Was the prevalence of failure commonly known and could simple design, manufacturing, and maintenance alterations have improved product safety by either eliminating, guarding from, or warning of the hazard?*
- *Were Ms. Lubken's diagnosed and surgically treated injuries directly caused by the product failure?*

My mechanical engineering, biomedical engineering, biomechanics, and clinical science conclusions are the following, as provided within a reasonable degree of biomechanical engineering and scientific certainty:

1) Inspection, repair, and maintenance flaws associated with the grocery cart theft-prevention system included:
   a. Degradation associated with environmental exposures,
   b. Inconsistent wheel battery charge,
   c. Worn and damaged wheels including rolling surfaces,
   d. Worn and damaged wheel brake mechanisms,
   e. Spurious wireless signals throughout the store,
   f. No evidence of wheel functional status inspection,

---

[1] Freeman MD, Centeno CJ, Kohles SS. A systematic approach to clinical determinations of causation in symptomatic spinal disk injury following motor vehicle crash trauma. Physical Medicine & Rehabilitation, 1(10):951-6, 2009.
[2] Freeman MD, Kohles SS. An evaluation of applied biomechanics as an adjunct to systematic specific causation in forensic medicine. Wiener Medizinische Wochenschrift. 161(19-20):458-68, 2011.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

      g.   Inconsistent basic wheel performance including rolling and swiveling freedom;

2) Design, manufacturing, and functional flaws within the grocery cart theft-protection system included:

      a.   Inconsistent wireless signal responsiveness,

      b.   Delayed master to slave wheel interactions,

      c.   Inconsistent placement of lockable wheels,

      d.   Inconsistent permission time periods for cart use,

      e.   Differing normal and brake wheel material properties including wear resistance,

      f.   Lack of weatherproofing of brake wheel hubs;

3) The overall inconsistent nature of the grocery cart theft-prevention system created a consumer product that has been shown to cause injuries within any population of users;

4) Proper maintenance of an improved alternative design could have mitigated the hazardous nature of the at-issue product;

5) Minimal warnings were evident representing the hazardous nature of spontaneous cart wheel braking situations;

6) The biomechanical motions and forces experienced by Ms. Lubken including a dynamic impact load of ~903 pounds during her fall to the floor were directly responsible for causing her diagnosed traumatic injuries.

In summary, my opinion is that the plaintiff's body experienced such trauma during the grocery cart's unexpected deviation from its pathway and her subsequent fall so as to have loaded her musculoskeletal and nervous tissues in a manner consistent with known injury mechanisms. These injury mechanisms apply to Ms. Lubken specifically as well as a general population having similar physical characteristics. Further, my opinion is that multiple inspection, repair, and maintenance flaws by The Kroger Co. made the grocery cart theft-prevention system unsafe and directly contributed to the hazardous incident. Compounding these failures, my opinion is that the Gatekeeper Systems Inc. designed and manufactured a product with functional flaws which also directly contributed to the hazardous incident.

This overall misleading product gave the plaintiff a false sense of reliability and security during previous uses. Based upon the high volume of similar complaints, the product poses an unreasonable and unsafe hazard to any user. If a full failure mode effects analysis had been conducted on the present functionality within the subject shopping environment prior to any hazardous event and in response to the many reported failures, the at-issue braking malfunction could have been predicted.

In support of the expressed conclusions, I performed an analysis of the incident mechanics and injury biomechanics as described below. These analyses included a direct inspection of exemplar grocery carts and store environment as well as an exploration of the statistical variances and sensitivities associated with the known and assumed contributing variables. Overall, this approach demonstrated that the physical exposure to an inconsistently performing consumer product as

RE: *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

described herein represented traumatic events and human responses that cause injuries.[3]

**INSPECTION RESULTS**

The inspection event provided opportunities to examine and assess multiple elements that influenced the at-issue event, including: the incident store's security arrangement and layout, exemplar cart conditions and performance, aisle and floor conditions, etc. Attendees included the legal and technical representatives for the plaintiff and defendants. The following sections review the qualitative and quantitative details gathered for the subsequent forensic analyses.

***Exemplar Cart Weights and Geometries***

Basic physical specifications were gathered from multiple exemplar carts as shown in the representative photos below. The table below summarizes those parameters associated with cart performance, measured with tape measures as well as tension (Heeta) and compression (Newline) scales.

|  | Small Cart | Large Cart |
|---|---|---|
| **Weight (lb)** | 39 | 57 |
| **Weight Distribution (%) Front:Back** | 45:55 | 40:60 |
| **Wheelbase (in)** | 24 1/8 | 30 1/2 |
| **Front Wheel Width (in)** | 9 3/8 | 11 1/8 |
| **Rear Wheel Width (in)** | 20 3/4 | 22 3/8 |
| **Wheel Diameter (in)** | 5 | 5 |
| **Handle Height (in)** | 39 3/4 | 41 1/8 |

As noted in the photos (below), each cart was outfitted with two Gateway wheels (darker hubs) typically placed on opposite sides of the front and back wheel sets. The placements of the theft-prevention wheels on either left or right sides, front or back, were inconsistent amongst the tested carts.

---

[3] Kohles SS, McClaren JW. A stochastic model validated with human test data causally associating target vehicle Delta V, occupant cervicocranial biomechanics, and injury during rear-impact crashes. Journal of Forensic and Legal Medicine. 91: 102431, 2022.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*



### *Exemplar Cart Functionality and Performance*

<u>Cart Kinematics</u>

In an effort to assess cart kinematic performance during free-rolling and controlled wheel braking, testing was conduced within the at-issue Aisle #86 (see below). Dimensions of the aisle were noted as 20.25 feet long and 5.4 feet wide. The flooring surface appeared to be polished concrete. A store-owned, Gateway Cart Key was used to engage the wheel brakes at prescribed moments (shown below with the theft-prevention warning marker). A velocity sensor (Stalker Sport Pro3 Radar Gun) was used to accurately determine cart release speeds at the moment of controlled wheel braking.



Approximately 12 total rolling tests were run from a random selection of three different small and large carts each. Carts were manually pushed down the aisle perpendicular to a floor marker and released just prior to that marker. Subjective cart speeds were maintained as consistently as possible in the range of ~2.5 to 3.5 miles per hour (3.7 to 5.1 feet per second). The overall

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

inconsistent braking of a front wheel, back wheel, or both wheels led to variable skid distance results:

-Small Cart frictional skidding (braking): 47 to 52 inches
-Large Cart frictional skidding (braking): 34 to 51 inches.

During the brake and skid phase of motion, each cart consistently veered its movement pathway generally towards the side of the front Gateway wheel, whether mounted on the left or right side of the cart. Video and audio records of each test also identified individual wheel braking responses.

A representative end of test position is shown below. As the moving aligned cart reached the blue tape line traveling towards radar gun and camera, the Cart Key 'lock' button was pressed, leading to the rotated orientation upon stopping a distance past the blue tape.



Cart Kinetics

In addition to these dynamic kinematic results, the forces needed to push or pull the representative carts from a static position into dynamic sliding, while the two Gateway wheels were set to brake, were identified as:

-Small Cart push or pull force: ~8 pounds
-Large Cart push or pull force: ~15 pounds.

This approach associated the pushing or pulling frictional force ($F_f$) and the cart weight ($W_c$) as a means to identify the Coulomb frictional coefficient ($\mu$):

$$F_f = \mu W_c$$

The effort characterized the surface interaction between the plastic wheel material and the polished concrete floor while two of the four wheels were in brake mode. The resulting coefficient of friction was determined to be $\mu \approx 0.2$ to $0.3$, consistent with smooth walking surfaces.[4]

---

[4] Chang WR, Lesch MF, Chang CC, Matz S. Contribution of gait parameters and available coefficient of friction to perceptions of slipperiness. Gait Posture. 41(1):288-90, 2015.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

### *Overall Theft-Prevention System Layout*

A review of the security room as well as an entrance arrangement also identified how the theft-prevention system was arranged. The intended wheel brake deployment of any particular cart-wheel would occur at the exits as a would-be thief would attempt to remove a cart beyond or without the system's 'permission' time period (left photo below). This triggering would then likely occur as the cart passed over an inlayed wire inductance loop recessed within the concrete flooring (right photo below). A signal transmission from a wheel braking engagement trigger would then likely be sent as an alert to security.

 

The inspection results and at-issue details were extended towards quantifying the occupant's physical responses to the altered grocery cart's mechanics. The following sections explore the biomechanical mechanisms of traumatic injury applying injury biomechanics.

### PRODUCT SAFETY ASSESSMENTS

### *Post-Market Monitoring*

The objective of monitoring a product after it enters the market (post-market surveillance) is to capture information about a consumer product, whether that information is deemed good, bad, or indifferent. Post-market monitoring generally addresses three types of outcomes.[5] The first prong addresses the product performance during consumer usage. The second prong assesses information from sales and marketing. The third prong collects all quality related information and material from the technical knowledge base such as consumer complaints.

Ensuring end-user safety should be the highest priority for manufacturers, distributors, and sellers of consumer products. This effort requires a systematic procedure to review experiences gained from product use in the postproduction phase. At issue is whether manufacturers and distributors such as Gatekeeper Systems Inc sufficiently consider and support the safe use of their products by all types of users in consumer settings. Four approaches need to be considered when addressing end-user safety, including the following:[6]

---

[5] Ogrodnik PJ. *Medical Device Design: Innovation from Concept to Market*. 1st Edition. Elsevier, Ltd., 2013.
[6] Hilbers ES, de Vries CG, Geertsma RE. Medical technology at home: safety-related items in technical documentation. *Int J Technol Assess Health Care*. 2013;29(1):20-6.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

- Adequate adaption of risk analyses and instructions for independent use of the product;
- Mutual coherence between risk analyses and user information;
- Active collection of independent experiences in the postproduction phase as a component of post-market surveillance;
- Continual instruction and training including during each design modification.

### *Risk Versus Utility Evaluation*

A risk versus utility assessment would extend the commitment of assuring product safety. This approach further addresses the product's safety implications from the public's perspective as actively engaged consumers. This hazard analysis builds off of the post-market surveillance and would include the following issues:

- The perception of the usefulness and in-turn desirability of the product;
- The known or assumed risk or likelihood of injury;
- The availability of safer, substitute products;
- Perceived or actual efforts by the manufacturer to improve the product's safety without impairing its usefulness or accessibility;
- The user's contribution towards maintaining safe functionality;
- Anticipated awareness of the product's hazards due to obvious conditions or the existence of suitable warnings/instructions.

These approaches to known risks could have been addressed by either The Kroger Co or Gatekeeper Systems Inc in response to the many consumer complaints preceding this matter. In addition, a recent published study, which queried the US Consumer Product Safety Commission's National Injury Surveillance System (NEISS) database, identified 21,731 physical contact-related injuries occurring inside retail stores in 2012.[7] Of those reported incidents, shopping carts were involved in 29.4% of the injury narratives with cart-related fractures referenced in 23.4% of those incidents.

An analogous approach which has addressed occupational hazards has been outlined by regulating governing agencies such as the National Institute of Occupation Safety and Health (NIOSH). A hierarchical response representing the least effective solution which can be made towards improving worker safety (bottom) while progressing towards the most effective modes of safety (top). This representation can be extended to the range of responses needed to address the at-issue product safety issues.

---

[7] Kim R, Crump C, Harley E, Nauhaus G, Yigit-Elliot S. Store-related injuries to children and adults. Proceedings of the Human Factors and Ergonomics Society. 59(1):1457-1461, 2015.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*



### Safety Testing

Certainly, compliance with consumer product safety standards, such as those supported by the American National Standards Institute (ANSI), Underwriters Laboratories (UL) would be necessary to minimize risks such as personal injury. Creating tripping or gait hazards should have been identified as a flagrant failure and noncompliance of that basic functional standard. However, even if basic tests associated with the standard were passed, the evidence of an underlying hazardous element as reported by many consumers should have suggested that this standard was not sufficient to reveal fundamental design, manufacturing, and maintenance flaws. A more rigorous engineering assessment and follow-up redesign would still be needed to assure consumer safety.

Many safety evaluation approaches exist at various levels of rigor. The defendants could have applied any of these as tangible means to improve the theft-prevention product. What is apparent from the evidence in this matter is that no such effort was made by the defendants to either fix the wheel braking system, guard the user from the known tripping hazard, or provide stern warnings of the cart impact injury or subsequent fall possibility.

### IMPROVED SAFE DESIGN RECOMMENDATIONS

### Consistent Wireless Signals

Much of the inconsistent wheel braking performance appears to derive from the design, manufacturing, and maintenance of the wheels themselves. Many electronic technologies exist to assess the strength and reach of wireless signals. My laboratory utilizes a radio frequency electromagnetic strength meter (Model 480846, Extech Instruments) to assess this issue. This and similar devices could confirm wheel battery strength, test communicating signals between wheels (master to slave), assess doorway location signal strengths as well as wheel triggering efficiency, and identify spurious triggering signals throughout the store. These signal checks could be done as a component of routine maintenance. Additional features include multi-frequency optimization, non-directional (isotropic) measurements with a three-channel (triaxial) measurement probe, and an audible user alert threshold making the signal assessment protocol accessible to store personnel.

### Improved Wheel Hub Braking Mechanics

Currently, the wheels are set to brake instantly upon triggered deployment. This feature then

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

becomes more variable and less controlled as the brake and wheel surface experiences wear and degradation, along with weakening individual battery strength. A tapered brake load response could still assure eventual full-stop braking but over a longer distance and distance. This redesign suggestion could give the unsuspecting consumer an opportunity to cognitively alter their gait pattern in order to avoid injury, while still deterring theft of the cart and contents.

**BODY ANTHROPOMETRICS**

Ultimately, the incident analyses addressed the human factors and physical interactions between the consumer, a consumer product, and the built environment. Knowing Ms. Lubken's height, weight, gender, and age at the time of the incident, and a reference to published static anthropometric properties, I created the following table summarizing key body segment weights and dimensions.[8,9] These values were applied in the incident mechanics and injury biomechanics.

| Ms. Lubken's Anthropometrics DOB: 18 May 1949; **Gender:** Female | | | Notes: |
|---|---|---|---|
| Standing Height | 65.0 in | 165.1 cm | Medical records |
| Seated Height | 33.8 in | 85.9 cm | Top of head to buttocks; calculated |
| Torso Length | 18.7 in | 47.5 cm | Shoulder to hips; calculated |
| Upper Body CM Location | 12.4 in | 31.4 cm | ~Sternum to hips; calculated |
| Full Body CM Location | 29.0 in | 73.6 cm | Top of head to ~L4/L5/S1; calculated |
| Total Leg Length | 34.4 in | 87.5 cm | Hip to heel; calculated |
| Total Arm Length | 21.6 in | 55.0 cm | Shoulder to wrist; calculated |
| | | | |
| Body Weight/Mass (BW) | 142 lb | 64.4 kg | Medical records |
| Upper CM Weight/Mass | 71 lb | 32.2 kg | Half BW; calculated |
| Partial Body Weight/Mass | 96 lb | 43.7 kg | BW minus legs; calculated |
| Head+Neck Weight/Mass | 7 lb | 3.3 kg | Head to C7/T1; calculated |
| Leg Weight/Mass | 23 lb | 10.4 kg | Hip to toes; calculated |
| Arm Weight/Mass | 7 lb | 3.2 kg | Shoulder to fingers; calculated |
| | | | |

Units and definitions: DOB = date of birth; CM = center of mass; in = inches; ft = feet; cm = centimeters; lb = pounds; kg = kilograms

**BIOMECHANICAL INJURY ANALYSES**

In this phase of the analysis, I examined the sequence of injury mechanisms produced within the harmful event. This approach applied fundamental scientific and engineering principles characterizing the external influences on the affected tissues and joints. When a person falls, their body segments accelerate inertially and then decelerate due to the impact (**a** as related to g) as a response to dramatic speed or velocity changes ($\Delta$**v**) over increments of time ($\Delta$t). The action/reaction described by Newton's 3rd Law (equal and opposite forces) is extended to

---

[8] Winter DA. Biomechanics and Motor Control of Human Movement. 2nd edition, John Wiley, NY, pp11–139, 1990.
[9] Anthropometry and Biomechanics, NASA, 1990. See msis.jsc.nasa.gov/Volume1.htm

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

Newton's 2nd Law (where kinetics are related to kinematics), where the inertial and contact forces applied to the plaintiff's body can be calculated due to the corresponding impulsive accelerations and decelerations of which she experienced, such that:

$$\mathbf{F} = m \times \mathbf{a} = m \times \left(\frac{\Delta \mathbf{v}}{\Delta t}\right)$$

where bold variables represent vectors with magnitude and direction. By applying the tabulated anthropometric parameters (body segment masses, m), a stepwise calculation identified the applied forces to her injured hip. This analysis specifically addressed the injury mechanisms and the need for surgical intervention.

### *Fall Injury Biomechanics*

This approach provided a foundation to calculate the biomechanical kinematics (motions) and kinetics (loads) experienced by Ms. Lubken. Based upon her anthropometrics and body position as she stepped forward with her right leg and rolled her ankle on the cart's right rear wheel, the fall distance (y) from her right hip to the ground was ~34.4 inches. Her body would have accelerated downwards unhindered, due to gravitational acceleration (g). The fall time (t) was governed by the equation of motion:[10]

$$y = \tfrac{1}{2}g \times t^2$$

Thus, her fall to the concrete floor would have occurred in ~0.42. The unexpected nature of the grocery cart wheel's braking along with an altered cart pathway limited any protective user reaction. In comparison, the quickest average time a non-distracted driver can evasively react to a roadway situation has been reported to be ~0.4 seconds.[11] Thus, the comparative time-frames would have limited Ms. Lubken's response time when controlling the cart to a similar time as her fall to the floor. Her instinctive reaction to continue grasping the grocery cart would not have prevented, slowed, or buffered her fall.

---

[10] Hibbeler RC. Engineering Mechanics Dynamics. 11th Edition. Pearson Prentice Hall, 2007.
[11] Consiglio W, Driscoll P, Witte M, Berg WP. Effect of cellular telephone conversations and other potential interference on reaction time in a braking response. Accident Analysis & Prevention. 35(4):495-500, 2003.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*



An applied impact restitution or deceleration time of ~0.045 seconds was incorporated due to the nature of the interaction between her boney hip and the concrete floor.[12] A dynamic load of ~903 pounds was then applied to her right hip, representing 6.4 times her body weight. These body kinematics (motions) and kinetics (loads) would have had biomechanical concentration at her right hip leading to the diagnosed femoral neck fracture (see the virtual anatomic image, VisibleBody v2019.1.12). Overall, her biomechanical experience was complex, unexpected, and beyond her capacity for self-control.

**TEMPORALITY AND STRENGTH OF ASSOCIATION**

I also examined the timeframe of the exposure of the fall event along with the diagnosed injuries as well as her medical history. As a general rule, the diagnosed ailments must start after the trauma and within a reasonable amount of time, noting that many tissues and physiologic systems simply have minimal healing potential, such as nervous and cartilaginous tissues, especially when injured beyond their regenerative capacity.[13] For these criteria, I reviewed the plaintiff's medical records and reports. Despite a previous total knee replacement and cervical spine fusion, Ms. Lubken was fully functional with no restrictions in her daily activities. In fact, her reactive response during the incident was protective in nature. She experienced traumatic injury symptoms including hip pain at the time of the incident as well as the need for immediate surgery. The time sequence of events as supported by her medical records indicated a more likely than not temporal relationship between the forceful injury mechanism and the injury itself.

I finally explored alternatively plausible influences on the disrupted cart pathway as associated with the traumatic event. No other biomedically plausible influences on her at-issue injury mechanisms were present, including previous knee or spine surgeries or any associated altered joint function. In addition, no other mechanically plausible influences on the cart's abrupt braking or swerving were present, including floor debris, displaced shopping items, or random wheel hub resistance. The only reasonably plausible cause of the at-issue traumatic event was the hazard posed by the product itself.

---

[12] Gildea K, Hall D, Cherry CR, Simms C. Forward dynamics computational modelling of a cyclist fall with the inclusion of protective response using deep learning-based human pose estimation. Journal of Biomechanics. 163:111959, 2024.

[13] Mason SS, Kohles SS, Zelick RD, Winn SR, Saha AK. Three-Dimensional Culture of Cells and Matrix Biomolecules for Engineered Tissue Development and Biokinetics Model Validation. Journal of Nanotechnology in Engineering & Medicine. 2(2):25001-25007, 2011.

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

**POSTSCRIPT**

The preceding conclusions were provided to a reasonable degree of engineering, biomedical, and scientific probability and/or certainty. I hereby certify that I have no interest, financial or otherwise, in the outcome of this case. The entirety of my engineering and scientific approach is described within this document. Various exhibits, demonstratives, and models may be used in trial to help clarify the incident and resulting injuries.

The conclusions expressed herein are based on my background, education, training, and experience applying an analysis of the information provided to me or discovered to date. I reserve the right to amend any of my opinions should new information come to light.

Best regards,

Sean S. Kohles, PhD, EIT, FBMES, FAIMBE

RE:  *Jean & William Lubken v. Fred Meyer Stores Inc., Gatekeeper Systems Inc. et al.*

**APPENDIX A**

- 📁 2026-03-30 Site Inspection
- 📂 Complaint & Answers
  - 📄 2024-09-03 -- Lubken -- Complaint.pdf
  - 📄 2024-10-18 -- Lubken -- Def Gatekeepers Answer to Plfs Complaint.pdf
- 📂 Depositions
  - 📄 2025-11-10 -- Lubken -- Dep of Kenneth Smittling - Condensed.pdf
  - 📁 Lubken, Jean
  - 📁 Lubken, William
  - 📁 Padilla, Angela
- 📂 Discovery
  - 📁 Disc to Def
  - 📁 Disc to Plfs
- 📂 Docs from Larocque Lawsuit
  - 📁 Fred Meyer
  - 📁 Gatekeeper
  - 📄 Larocque Complaint.pdf
- 📁 FredMeyer
- 📂 Gatekeeper
  - 📄 2025 11 26 Def Gatekeeper's Resp to 1st RFAs.pdf
  - 📄 2026 01 02 Def Gatekeeper's 2nd Supp Resp to 1st ROGs & RFPs.pdf
  - 📂 2026 01 02 Production
    - 📄 GK_0079.pdf
  - 📄 2026-04-09 -- Lubken -- Def Gatekeeper's Notice of Mot & MSJ or MPSJ.pdf
- 📁 Initial Disclosures
- 📄 Lubken - Jul 29 2025 - 12-39 PM.pdf
- 📁 Medical Records
- 📁 Previous Fred Meyer Incident Reports