UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

```
JEAN LUBKEN and WILLIAM LUBKEN,  )
husband and wife and their       )
marital community,               )
                                 )
                                 )
                 Plaintiffs,     )
                                 )  CASE No.
                                 )  3:24-cv-05811-SKV
        vs.                      )
                                 )
                                 )
                                 )
FRED MEYER STORES, INC., etc.,   )
et al.,                          )
                                 )
                                 )
                 Defendants.     )
_____)
```

Remote Deposition via Zoom videoconference of

JEAN LUBKEN, taken on behalf of Defendant Gatekeeper

Systems, Inc., at University Place, Washington,

commencing at 10:04 a.m., Tuesday, July 8, 2025, before

Marivon H. Christine, CSR No. 3735.

APPEARANCES OF COUNSEL:


    For the Plaintiffs:

        PFAU COCHRAN VERTETIS AMALA, PLLC
        BY:  ANDREW S. ULMER, ESQ.
        909 A Street
        Suite 700
        Tacoma, Washington  94802
        aulmer@pcvalaw.com

            and

        LOMBINO MARTINO, PS
        BY:  JOSEPH M. LOMBINO, ESQ.
        9315 Gravelly Lake Drive SW
        Suite 201
        Lakewood, Washington  98499
        joey.lombino@lombinomartino.com

    For the Defendant Gatekeeper Systems, Inc.:

        THE AGUILERA LAW GROUP, APLC
        BY:  SCOTT LaSALLE, ESQ.
        23046 Avenida De La Carlota
        Suite 300
        Laguna Hills, California  92653
        Slasalle@aguileragroup.com


    For the Defendants Fred Meyer Stores, Inc.,
    and The Kroger Company:

        SCHEER LAW, PLLC
        BY:  AHBRA FRANCO, ESQ.
        701 Fifth Avenue
        Suite 3860
        Seattle, Washington  98104
        ahbraf@scheer.law


ALSO PRESENT:


        Gigi Fadich, Videographer
        Andrew Koumas, Zoom Administrator

                         I N D E X


DEPONENT                    EXAMINED BY              PAGE

JEAN LUBKEN                    MR. LaSALLE              5

                              MR. ULMER              109


EXHIBITS FOR IDENTIFICATION:

2    Defendant Gatekeeper Systems, Inc.'s              23
     Interrogatories to Plaintiff Jean Lubken
     with Answers Thereto

3    St. Joseph Hospital Emergency Department          74
     Note

4    No Document was Marked

5    Wage and Tax Statements                           89

UNIVERSITY PLACE, WASHINGTON

TUESDAY, JULY 8, 2025; 10:04 A.M.


THE VIDEOGRAPHER:  Good morning.  This is the remote deposition of Jean Lubken, taken remotely on Tuesday, July 8, 2025, in the matter of Jean Lubken versus Fred Meyer Stores, Incorporated, et al., Case No. 3:24-cv-05811-SKV.  This case is being heard in the United States District Court, Western District of Washington.

This deposition is on behalf of the Defendant. My name is Gigi Fadich, legal videographer, contracted through Dean Jones Legal Videos, Incorporated, of Los Angeles and Santa Ana, California.  Because we are not in person I will have to interrupt the proceedings if the deponent drifts out of frame or should any connectivity issues occur.

This deposition is commencing at 10:04 a.m. Pacific Time.

Would all present please identify themselves beginning with the deponent?

MR. ULMER:  That is Andrew Ulmer on behalf of the Plaintiffs.

MR. LOMBINO:  Joey Lombino here on behalf of the Plaintiffs.

MS. FRANCO:  Ahbra Franco on behalf of The Kroger Company and Fred Meyer Stores.

MR. LaSALLE:  Scott LaSalle on behalf of Gatekeeper.

THE VIDEOGRAPHER:  Ms. Lubken, can you please identify yourself?

10:05

THE WITNESS:  Yes.  I'm Jean Lubken.

THE VIDEOGRAPHER:  Would the court reporter please introduce yourself and administer the oath?

THE COURT REPORTER:  My name is Marivon Christine.  I am a California certified stenographic reporter.  My CSR number is 3735.

May I have a stipulation that this California Certified Shorthand Reporter may swear in this out-of-state witness?

MR. ULMER:  So stipulated by Plaintiffs.

MR. LaSALLE:  Agreed by Gatekeeper.

MS. FRANCO:  Kroger also stipulates.

THE COURT REPORTER:  And Mr. Joey Lombino?

MR. ULMER:  He's with Plaintiffs.

10:06

MR. LOMBINO:  I'm with Plaintiffs.

THE COURT REPORTER:  But do you stipulate --

MR. LOMBINO:  Yes, I stipulate.

///

///

JEAN LUBKEN,

having been placed under oath remotely, was examined

and testified as follows:


EXAMINATION

BY MR. LaSALLE:

Q    Ms. Lubken, we were introduced previously before we started.  My name is Scott LaSalle.  I'll be taking your deposition today.  I'll be asking you some questions.  Some of the other counsel on the screen may have some questions for you afterwards.  Are you ready to proceed?    10:06

A    Yes.

Q    Okay.  Have you had your deposition taken before?

A    I have.

Q    How many times?    10:06

A    Two.

Q    When was the last time?

A    Oh, gosh.  It would have been approximately 1998 when I was working with Tacoma schools.

Q    Because that was over 25 years ago what I'm going to do is go through with you the admonitions we normally give at the beginning of a deposition.  You may remember those perfectly from over 25 years ago, but we're going to quickly go through them today.    10:07

The oath that you have taken here is the same    10:07

happened on December 23rd of 2023; correct?

A    Correct.

Q    How many times had you been to that store before then?

A    A number of times over the years as it was across the street from the high school where I worked.     11:33

Q    Was it a store you went to a couple times a week? couple times a month?  couple times a year?

A    With some fluctuation.  Probably -- well, what I mean by that is it would not be my routine store to go to     11:33 because there is another grocery store closer to my home, but because of the proximity to where I would be coming and going during the day I would go there at least monthly, and I would say at least once every three weeks but not weekly.     11:34

Q    Okay.  So you went approximately monthly for a number of years?

A    Correct.

Q    Okay.  And in that time you were aware that they had some security features on the shopping carts so that     11:34 they couldn't be taken from the parking lot; correct?

A    Correct.

Q    And on that particular day, December 23rd, you drove yourself to the store?

A    I did.     11:34

Q    Approximately what time?

A    Between 1:45 and 1:50 p.m.

Q    And it was your intention to purchase what?

A    A hand mixer.

Q    Was it you were going to just get that or do some other grocery shopping, as well?

A    I only had the intent of buying a hand mixer.

Q    And you selected the shopping cart; correct?

A    I did.

Q    And how long were you in the store before you got to the aisle where you fell?

A    Well, I'm thinking five to ten minutes.  As I entered the store there were carts there.  I did not take the first cart because it wouldn't move.  I went on and selected a cart.  I ended up seeing friends and we chatted for a few minutes.  I asked where I might be going in the store to find a hand mixer and then made my way to the aisle and proceeded down the aisle in the direction of where the hand mixers are kept.

Q    And the friends that you saw, who was that?

A    Anastasia Church and her significant other.

Q    Did you see them again after your fall or was it only before?

A    Only before.

Q    And you were wearing tennis shoes?

A    No.  I was wearing black boots that had wooden heels.

Q    And as you were pushing the shopping cart to get to the aisle where the hand mixers were had you put anything in the cart?

A    I had my purse I was carrying with me, and I had set the purse itself in the upper basket and wrapped my hand through the -- through the purse handle onto the grocery cart as we had been warned that there was a lot of theft happening pre-Christmas and women not to leave their handbags unattended and closely watched by you.

So at the time that happened the only thing in the upper -- well, the only thing in the cart in the upper basket was my purse.

MR. LaSALLE:  Marivon, are you able to transcribe this?

THE COURT REPORTER:  I'm getting a little lag, but so far it's not a problem.

BY MR. LaSALLE:

Q    I ask this, Jean, because your voice is coming through a little choppy.  I want to make sure Marivon can understand everything you're saying, so if she's okay, we'll proceed.

A    Just let me know if you need on me to sign out, again.

Q    So let me make sure I understand what it is you did with your purse.

So you set the purse in the upper basket, and you secured your purse strap around your wrist; correct?

A    Yes.  By making sure that, you know, you put the purse handle over the cart handle, and then put my hand onto the cart so that my purse was held in place by my hand.

Q    Right.  So did you wrap the purse strap around the cart handle, as well, or just around your wrist?

A    It was not wrapped around the handle.  Over the top of the handle, and then I put my hand in place to hold on to the cart.  So my purse was secured and not wrapped.

Q    So let me make sure I understood.

So if you were to lift your hand up, would you be able to just lift it up with your purse or would it be secured to the cart, as well?

A    It was not secured to the cart itself.

Q    Okay.  Got it.  Other than your purse was there anything else you had put into the cart?

A    No.

Q    Okay.  All right.  And do you believe you were in the hand mixer aisle when this occurred?

A    No.

11:38

11:38

11:38

11:39

11:39

Q    So you were still looking for the hand mixer aisle; correct?

A    Yes.

Q    And at some point I understand from your interrogatory responses that the cart stopped; correct?    11:39

A    Abruptly.

Q    What happened when the cart stopped abruptly?

A    When the cart stopped, I continued my motion forward, and it pushed me back because it just -- just because it had stopped.    11:39

So at that point my right foot heel interacted with the cart, and it caused me then to fall to the right side to the floor onto my right side into the side aisle.

Q    Okay.  So when the cart stopped, was it your impression that it had stopped at one of the wheels in    11:40 the front or the back or it was all together the whole thing?

A    I'm not a person who's designed to know about shopping carts, but I know that that cart stopped on the spot, and I was jolted.    11:40

Q    Okay.  So it just stopped on the spot, and then you were continuing forward, and you bumped into the handle of the cart?

A    Well, I still had my hands on the cart so that part was attached.  The part I was saying to you about my    11:40

right shoe is that in taking that step forward it was to the right side of the right back wheel, and then I became involved in the fall.

Q    Okay.    Let me make sure I understand exactly what happened here.

Earlier you said when the cart stopped, it pushed you back.

A    Yes.

Q    Okay.    Was that you pushing into the back of the cart or did the cart actually push you backward into your stride?

A    Okay.    Let's construct this.

I'm holding on to the cart.    I'm walking in a normal pace.    The cart blocks.    My body motion continues, and then when it stopped, my body motion reversed.    Still holding on to the cart, my right foot proceeded forward, and on the right-hand side of the right back wheel is where the contact with the cart was made, and that is at that point I fell to the right-hand side onto the side aisle.

Q    Okay.    How many steps did you take after the cart stopped?

A    Counting steps was certainly not on my mind.    It was a reflex action that it was, as far as I can recall, the only one before the fall transpired.

Q    Okay.  So you took one step that you're aware of after the cart stopped, and that was with your right foot; correct?

A    Correct.

Q    And when you stepped forward, you stepped on the wheel or on the back of the cart or where was it that you stepped?

A    My foot was to the right side of the wheel, and the wheel and the part of the heel connected, and that propelled me to fall to the side aisle.

Q    So the heel of your shoe stepped down onto the rear right wheel of the cart?

A    To the side.  It was right to the side.  There was contact, but it was not on top of.  It was to the side.

Q    Okay.  And then --

A    It may have been a contact there, but it was not on top of any wheel.

Q    Okay.  So there was contact between your right foot and the right rear wheel of the cart, but you're just not sure how?

A    I'd say that is correct.

Q    Okay.  You start to fall to your right; correct?

A    Um-hum.

Q    Yes?  Is that a "yes"?

11:42

11:43

11:43

11:43

11:43

A    Yes.

Q    And you fell onto your right side onto the tile floor?

A    Correct.

Q    What portion of your body struck the floor?

A    I hit my side -- I put my hand to protect my neck and so my elbow, all of this area, and I had my hand underneath my head when I was laying there.

Q    Okay.  And did you let go of the cart?

A    Oh, yeah.

Q    All right.  And did the cart fall over, as well, or did it just stay where it was?

A    The cart fell on top of me.  I'm laying there in the aisle with the cart on top of me.

Q    Did you pull the cart down on top of you?

A    No.  No.

Q    Okay.  How did it fall over?

A    How would I know?

Q    I understand that the cart stopped.

A    Yes.

Q    You fell?

A    Right.

Q    Did you see someone else come up and contact the cart or was it just you and the cart?

A    It was the cart and myself.  At that point there

was no one else.  I had my -- I had -- the purse was in there.  I had my hand in such a way that the purse flew out.  The cart fell over, and I'm laying there underneath the cart.  I did not pull it down.

Q   As soon as the cart stopped you let go of the cart; correct?                                                         11:45

A   I was in motion to the fall.

Q   Okay.  You began to fall, and as you began to fall you let go of the cart; correct?

A   At some point.                                                  11:45

Q   Okay.  And, then, you fell down on your right side?

A   Correct.

Q   Okay.  And then the cart came down on top of you?

A   Correct.                                                        11:45

Q   Okay.  What part of your body did the cart make contact with?

A   My right thigh, my right leg.  I'm laying there as two people walked by, and I was looking -- I was pretty shocked.  I was kind of traumatized by the whole       11:46 thing, and they just continued.  They looked over and just walked on by.

Q   Before we get to the people afterward --

A   Okay.

Q   -- so you fell onto your right side onto the tile       11:46

floor; correct?  Is that right?

A    Yes.  The tile is cement.

Q    Okay.  Sure.  A hard surface?

A    Yes.

Q    So when the cart came down on top of you, did the cart hit your right leg on the inside of your leg or the outside of your leg?    11:46

A    It hit my left side.  I'm laying on the floor at this point, and the cart is on top of me.

Q    Sure.  Okay.  So the cart came down on your left side?    11:47

A    Correct.

Q    Got it.  You said that there were two people that were there afterward.  Were they there when the cart fell or do you believe they came shortly, thereafter?    11:47

A    They looked surprised to see me laying there, but they didn't stop.  So I do not believe they saw it happen.  I do not believe they did.  They gave me no mind and turned their heads and kept on shopping.

Q    Did you say anything to those people at all?    11:47

A    Not to those people.  I was not doing well at that point.

Q    All right.  So how long were you laying there on the ground with the shopping cart on top of you?

A    A good two minutes until another singleton lady    11:47

shopper came across me, and she was coming down the same aisle that I had been before the fall.  And she looked over and she said, "Oh, my gosh.  Do you want me to get the shopping cart off of you?"  And I said, "Yes.  Would you please?"

She did, and then she informed me she was going to let a cashier know immediately that I was in the aisle, and I needed assistance.  And she left me, and then she returned to me --

Q    Before we go there, did you say anything to her other than, "Yes.  Please take this cart off me"?

A    When she did, I said, "Thank you."

Q    Okay.  All right.  So she left?

A    To go to the cashier.

Q    To go to the cashier.  And you said she returned?

A    She did.

Q    How long was it before she returned?

A    Oh, less than two minutes.

Q    Okay.

A    She was not gone long.

Q    And she returned with the cashier?

A    No.  She returned by herself and said she had made the report and that she was informed that help was coming to me right away.  No one came --

Q    Okay.

there to maneuvering myself up the shelving to maneuvering my heels forward to get to the merchandise cart.

I felt that I was going to be more securely supported by that cart, and that there would be a good chance that by waving at the surveillance camera I would get some assistance.

Q    At any point during that time did you ever check your shopping cart to see what it was that caused it to stop?

A    I was not interested in the shopping cart at that time, no.  I was looking to not further have any more harm.

Q    So you never checked the shopping cart to see if there was anything wrong with it?

A    That was not my emphasis at that time.  It was my safety.

Q    All right.  And did you check the ground to see if there was anything that the shopping cart might have hit, like, anything on the ground or any kind of gravel or sand or anything at all?

A    There was nothing that I saw that would indicate that to be the case.

Q    Okay.  So you start to wave into the camera in the hope that someone would see you and come to help you;

A    I personally did not see the cart being checked at all.

Q    Okay.  Did you see or hear from any of the store employees that they checked the cart that you had been using?

A    I was in the hospital having had surgery. However, my husband did go to the store the next day and asked to see the cart, and he was told that it had been put back into circulation.

Also asked for a copy of the accident report and was told that that was not available because it had been sent to corporate.

Also asked for copies of the video and was told that those would not be available, but they did say that the accident report would be available, and we would be hearing from Fred Meyer within 24 hours, which we did not hear for weeks to months.

Q    So your husband went to the store the next day to ask about the cart; correct?

A    That's correct.

Q    And he was told that the cart had been put back into the circulation.  Was he told anything else that he shared with you about whether they did check the cart, if they did so, if they found anything wrong with the cart or anything at all?

for?

Q    For you to answer.

So other than you experiencing that the cart halted are you aware of any other information that the cart in any way malfunctioned?

MR. ULMER:  Same objection.

Go ahead.

THE WITNESS:  And when we say that, who is to go ahead?

BY MR. LaSALLE:

Q    You.

A    Okay.  That's where I was confused.

What?  The cart did malfunction.  The cart did halt.  The cart did lock.

Q    Other than the cart halting what caused you to believe that the cart malfunctioned?

A    Because it locked, and I couldn't move it, and then I had the following fall.

Q    You said you couldn't move the cart?

A    Yes.

Q    So the cart halted and then you subsequently tried to move it?

A    The cart locked.  As I said before I was pushing the cart forward and it locked.

Q    Right.  The cart came to a halt?

A    Correct.

Q    And then you fell over and the cart fell over; correct?

A    Yes.

Q    Okay.  Did you ever receive or obtain any information that the cart locked in any way?

MR. ULMER:  Object as to form.

Go ahead.

THE WITNESS:  I know that the cart locked because I was the one experiencing it, and when it did so, I then could not move forward.

BY MR. LaSALLE:

Q    So the cart came to a stop and then you tried to move forward, again?

MR. ULMER:  I object as to form.

Go ahead.

THE WITNESS:  I repeat.  I was walking with the cart.

BY MR. LaSALLE:

Q    Right.  We know all that.

MR. ULMER:  Counsel, do not interrupt the witness, and you're misstating her testimony.  Please let her finish.

BY MR. LaSALLE:

Q    Okay.  We can go ahead.  We can keep going.

A    Okay.  Let's please do.  I'm pushing the cart. The cart wheel locked.  The cart itself locked.  I don't know.  I'm not an engineer as to whether it malfunctioned or what word you're having trouble with there, but I was in a situation where the cart locked and that is what happened ahead of the fall.

Q    Okay.  So the cart came to a stop, but you don't know why, and --

A    Actually --

MR. ULMER:  I object as to form.  Misstates her testimony.

Go ahead.

THE WITNESS:  Um-hum.

BY MR. LaSALLE:

Q    Do you know why the cart stopped?

A    The system locked.

Q    And you checked that?

A    I was not in a position to be looking at whether that was the case.  I was falling.

Q    So how do you know that the system locked?

A    It was unable to move, and I was propelled to the ground.

Q    Okay.  All right.  So we're back at the hospital now.  We're back at the emergency department encounter note.

12:34

12:35

12:35

12:35

12:35

speaking outside of the store about that specific cart that I had been using.

Q    On the day of the incident; correct?

A    Correct.

MR. ULMER:  Okay.  No further questions.  Thank you.

MR. LaSALLE:  I think -- any more, Ahbra?

MS. FRANCO:  No.

MR. LaSALLE:  Okay.  I think we're done.

THE VIDEOGRAPHER:  The video deposition is off the record at 1:44 p.m. Pacific Time.  The deposition is concluded on July 8, 2025, Media 1 of 1 of today's deposition.  Thank you.

(The proceedings concluded at 1:44 p.m. Pacific Time.)

01:44

01:44

DECLARATION UNDER PENALTY OF PERJURY

I hereby declare under penalty of perjury that the foregoing is my deposition under oath including the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this _____day of _____, _____.

_____

JEAN LUBKEN

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER


I, Marivon H. Christine, Certified Shorthand Reporter, Certificate No. 3735, for the State of California do hereby certify:

That the foregoing proceeding was taken remotely before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof;

I hereby certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have subscribed my name this date: July 16, 2025.

_____
MARIVON H. CHRISTINE, CSR
Certificate No. 3735

Marivon H. Christine, Certified Shorthand Reporter, CSR No. 3735, hereby certify:

The foregoing is a true and correct copy of the original transcript of the proceedings taken by me as thereon stated.

Dated:  July 16, 2025

MARIVON H. CHRISTINE, CSR, RPR
Certificate No. 3735

# CORRECTION SHEET

**Case:  Lubken vs. Fred Meyer Stores, Inc.**
**Deponent:  Jean Lubken**
**Date:  July 8, 2025**

| PAGE/LINE | ERROR | CORRECTION |
|-----------|-------|------------|
|           |       |            |

**Abrams, Mah & Kahn Reporting Service**