Hon. John C. Coughenour

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community,

Plaintiffs,

vs.

FRED MEYER STORES, INC., an Ohio corporation doing business in the State of Washington; THE KROGER CO., an Ohio corporation doing business in the State of Washington; GATEKEEPER SYSTEMS, INC., a California corporation doing business in the State of Washington,

Defendants.

Case No.: 3:24-cv-05811-SKV

**DEFENDANT GATEKEEPER SYSTEMS, INC.'S DISCLOSURE OF FACT AND EXPERT WITNESSES, INCLUDING REBUTTAL EXPERT WITNESSES**

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

Defendant GATEKEEPER SYSTEMS, INC. herein makes the following fact and expert witness disclosures, including expert witness disclosures as required by FRCP Rule 26(a)(2)(A). These disclosures are not intended to limit information beyond anything that has been previously disclosed by Gatekeeper or any other party. These disclosures are based on the information currently available to Gatekeeper at this time. Accordingly, Gatekeeper reserves the right under

DEFENDANT GATEKEEPER SYSTEMS, INC.'S DISCLOSURE OF FACT AND EXPERT WITNESSES - Page 1

THE AGUILERA LAW GROUP, APLC
1201 PACIFIC AVE, STE. 600
TACOMA, WA 98402

the Federal Rules of Civil Procedure to supplement these disclosures should additional information become available. Gatekeeper does not waive the right to object to the production of any document or tangible thing disclosed or produced herein on the basis of any privilege, including the attorney-client privilege, work product doctrine, undue burden, or any other objection.

**A.    WITNESSES**

a. Greg Meisenzahl and/or Zach Ball will testify as to the anti-theft wheel locks, the schematics of the anti-theft system at the Fred Meyer store at 4505 19th Street in Tacoma ("Store"), and the service/maintenance of the anti-theft system at the Store. Francisco and/or Vincent will testify as to the service/maintenance of the anti-theft system at the Store. Mr. Meisenzahl, Mr. Ball, Francisco and Vincent can be contacted through Gatekeeper's counsel of record.

b. Ethan Bowie, Alex Sidoff, Angela Padilla and/or Keneth Smittling will testify as to the maintenance of the shopping carts at the Store, the alleged incident involving plaintiff on December 23, 2023 ("Incident"), any reporting or recording or the incident, inspection of the cart involved in the Incident, and the current whereabouts of the cart involved in the Incident.

c. Jean Lubken and William Lubken will testify as to the allegations against defendants, and the damages alleged.

d. Treating providers regarding plaintiff Jean Lubken's prior medical condition and medical treatment and condition following the Incident.

**B.    EXPERT WITNESSES**

1.    Thomas J. Kulaga, P.E.
Rimkus
21002 N. 19th Avenue, Suite 120
Phoenix, AZ  85027
(480) 489-9962

Mr. Kulaga is a licensed mechanical engineer with over 20 years of experience. He is knowledgeable regarding the Gatekeeper anti-theft wheel locks and the anti-theft system at the store. He may testify regarding the mechanics of the cart and the anti-theft wheel lock and system

DEFENDANT GATEKEEPER SYSTEMS,
INC.'S DISCLOSURE OF FACT AND
EXPERT WITNESSES
- Page 2

THE AGUILERA LAW GROUP, APLC
1201 PACIFIC AVE, STE. 600
TACOMA, WA 98402

and respond to any engineering opinions expressed by plaintiffs' retained experts Sean S. Kohles, Ph.D. and/or Joseph G. Welsh.  A copy of Mr. Kulaga's report and CV are attached.

    2.    Christopher Chen, Ph.D., P.E.
Rimkus
6221 Dean Martin Drive
Las Vegas, NV  89118
(702) 470-0232

Dr. Chen is a biomechanical engineer and licensed mechanical engineer with over 30 years of experience.  He is knowledgeable regarding the Gatekeeper anti-theft wheel locks and the anti-theft system at the store.  He may testify regarding the mechanics of the Incident and respond to any biomechanical opinions expressed by plaintiffs' retained experts Sean S. Kohles, Ph.D. and/or Joseph G. Welsh.  A copy of Dr. Chen's report and CV are attached.

    3.    Cameron W. Schick, M.D.
Physician Direct Services
406 Yauger Way SW, Suite A
Olympia, WA  98502
(360) 867-4188

Dr. Schick is a licensed orthopedic surgeon with over 10 years of experience who has performed a record review of plaintiff Jean Lubken's medical treatment prior to and after the Incident.  He may testify regarding his finding, diagnosis, prognosis and disability related to the injury, mitigation of damages and reasonableness and necessity of past and future treatments and respond to any opinions expressed by plaintiff Jean Lubken's treating providers and/or plaintiffs' retained expert Gary R. Schuster, M.D.  A copy of Dr. Schick's report and CV are attached.

## C.    <u>RESERVATIONS</u>

Gatekeeper reserves the right to call any witnesses identified in Plaintiffs' and/or Fred Meyer/Kroger's disclosures of witnesses. In addition, Gatekeeper reserves the right to call any witness that Plaintiffs and/or Fred Meyer/Kroger call to testify. By identifying possible witnesses, Gatekeeper is not conceding or admitting that the witness's testimony is entirely admissible. Gatekeeper fully reserves the right to move to exclude any witness's testimony, either in whole or in part.

Gatekeeper reserves the right to call and elicit expert opinions from Plaintiffs' and/or Fred Meyer/Kroger's experts, consistent with the experts' records, and/or depositions and other testimony.

Gatekeeper reserves the right to add lay and/or expert witnesses in response to Plaintiff's and/or Fred Meyer/Kroger's disclosures of possible witnesses and/or disclosures of possible rebuttal witnesses.

Gatekeeper reserves the right to call document custodians or other witnesses that may be necessary to lay a sufficient foundation to authenticate any document produced by any party in this matter.

Gatekeeper reserves the right to supplement this disclosure of possible primary witnesses with additional lay and/or expert witnesses whose knowledge may become relevant during the course of discovery and/or as may be necessary after Gatekeeper has had an opportunity to conduct further discovery and reserves the right to call any and all witnesses whose names are referenced in the depositions.

Gatekeeper expressly incorporates by reference the witnesses disclosed by all other parties in this action and reserves the right to call any witnesses listed in any other parties' disclosures, either in their case-in-chief or as rebuttal witnesses, regardless of whether the witnesses are or are not called to testify at trial by the party designating the witness. This witness disclosure is not intended as a complete description of the expected testimony of any witness and is not intended as a substitute for deposition testimony. If necessary, a final list of witnesses will be compiled upon conclusion of discovery against Plaintiff and/or Fred Meyer/Kroger.

Gatekeeper reserves the right to amend and/or supplement this disclosure as the discovery continues.

Gatekeeper reserves the right to disclose additional witnesses as the discovery progresses. In addition to the foregoing witnesses, defendant may rely upon the testimony of witnesses identified by Plaintiff and/or Fred Meyer/Kroger and therefore incorporates these witnesses by reference.

Gatekeeper reserves the right to omit witnesses identified in this disclosure.

DEFENDANT GATEKEEPER SYSTEMS,
INC.'S DISCLOSURE OF FACT AND
EXPERT WITNESSES
- Page 4

THE AGUILERA LAW GROUP, APLC
1201 PACIFIC AVE, STE. 600
TACOMA, WA 98402

Gatekeeper reserves the right to amend its expert disclosures as the discovery progresses. As such, Gatekeeper reserves the right to supplement these disclosures after receiving Plaintiff's and/or Fred Meyer/Kroger's experts' opinions through deposition testimony.

Gatekeeper reserves the right to replace any of the above witnesses should they become unavailable to testify for any reason.

Dated this 18th of May, 2026

THE AGUILERA LAW GROUP, APLC

By: _____
Scott LaSalle, WSBA # 57862
1201 Pacific Ave., Suite 600
Tacoma, WA 98402
Telephone: (714) 384-6605
slasalle@aguileragroup.com

*Attorneys for Defendant, GATEKEEPER SYSTEMS, INC.*

DEFENDANT GATEKEEPER SYSTEMS,
INC.'S DISCLOSURE OF FACT AND
EXPERT WITNESSES
- Page 5

THE AGUILERA LAW GROUP, APLC
1201 PACIFIC AVE, STE. 600
TACOMA, WA 98402

# EXHIBIT "1"



16932 Woodinville-Redmond Road NE, Suite A 105
Woodinville, WA 98072
(206) 623-0630

# Report of Findings - Mechanical

Gatekeeper Systems, Inc./Lubken Biomechanical Evaluation/Mechanical
Evaluation
Claim Number: EUB2303
Style: Jean Lubken/William Lubken v Fred Meyers Stores, Inc./The Kroger
Co./Gatekeeper Systems, Inc.

Rimkus Matter No: 100336805

Prepared For:
The Aguilera Law Group
23046 Avenida De La Carlota, Suite 300
Laguna Hills, CA 92653

Attention:
Mr. Scott LaSalle



EXPIRES:12-31-26

Thomas J. Kulaga, P.E.
Engineering Number 52968
Principal Consultant

May 18, 2026

## TABLE OF CONTENTS

I.    Introduction                                                                  1

II.   Conclusions                                                                  2

III.  Discussion                                                                    3

  • Background

  • Video Surveillance

  • Observations

  • Gatekeeper System

  • Analysis

  • Welsh Report

  • Kohles Report

IV.   Basis of Report                                                          22

V.    Attachments                                                              23

  A.    Photographs

  B.    Curriculum Vitae

May 18, 2026

## Section I

## INTRODUCTION

On December 23, 2023, Ms. Jean Lubken was pushing a grocery cart while shopping when an anti-theft wheel on the cart reportedly locked and braked the cart to an unexpected stop, causing her to fall.  The reported incident occurred at a Fred Meyer's store located at 4505 South 19th Street in Tacoma, Washington.  The anti-theft wheel was manufactured by Gatekeeper Systems (Gatekeeper).

Rimkus was retained to evaluate the anti-theft wheel and system.

This report was prepared for the exclusive use of The Aguilera Law Group and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Mr. Paul G. Phillips, Principal Consultant.

## Section II
## CONCLUSIONS

1. The cause of the subject incident could not be determined based on the available evidence.

2. The subject incident could not have been caused by a lockup of the anti-theft wheel(s) on the cart.

3. Opinions offered by the Welsh Report regarding the operation or malfunction of the wheel were unsupported and incorrect:

   a. The Welsh Report incorrectly classified the malfunction of the wheel as a fact, rather than an unproven hypothesis in need of rigorous analysis based on the available evidence. No such analysis was provided.

   b. The Welsh Report mischaracterized incident reports as having been similar to the subject incident and applicable to the analysis.

   c. The Welsh Report improperly concluded that the subject cart experienced a wheel malfunction, providing no analysis or basis for the conclusion.

4. The Kohles Report failed to properly identify that Ms. Lubken was using a small cart at the time of the incident.

5. Opinions offered by the Kohles Report regarding the operation or malfunction of the wheel were unsupported and incorrect:

   a. The Kohles Report provided no engineering analysis of the anti-lock wheel, its internal configuration, or the means by which it was controlled. It offered no theory of failure that explained how the wheel could engage the brake without having received a lock command.

   b. Of the hypothetical defects listed in the Kohles Report, none of them would lead to an inadvertent locking of the wheel.

   c. The testing described in the Kohles Report never produced the inadvertent wheel lock event, which is the specific defect being alleged by the plaintiff.

## Section III
## DISCUSSION

**Background**

Rimkus reviewed the deposition testimony of Ms. Lubken. According to her testimony, she went to the store for the sole purpose of purchasing a hand mixer. She testified that she initially selected a shopping cart at the entrance to the store but abandoned it because it would not move. She selected a different cart and continued her shopping trip by making her way to the part of the store that offered hand mixers for sale.

She testified about the subject event, saying:

> *"Q. And at some point I understand from your interrogatory responses that the cart stopped; correct?*
>
> *A. Abruptly.*
>
> *Q. What happened when the cart stopped abruptly?*
>
> *A. When the cart stopped, I continued my motion forward, and it pushed me back because it just – just because it had stopped. So at that point my right foot heel interacted with the cart, and it caused me then to fall to the right side to the floor onto my right side into the side aisle.*
>
> *Q. Okay. So when the cart stopped, was it your impression that it had stopped at one of the wheels in the front or the back or it was all together the whole thing?*
>
> *A. I'm not a person who's designed to know about shopping carts, but I know that that cart stopped on the spot, and I was jolted."*

Ms. Lubken testified that there was no one else present during the incident:

> *"Q. Did you see someone else come up and contact the cart or was it just you and the cart?*
>
> *A. It was the cart and myself. At that point there was no one else."*

Ms. Lubken testified that she lay on the floor for "A good two minutes" before another customer saw her and lifted the cart off her before summoning store staff to the scene.

Ms. Lubken testified that she did not evaluate the cart after the incident, and that she didn't see anything on the ground:

> *"Q. At any point during that time did you ever check your shopping cart to see what it was that caused it to stop?*
>
> *A. I was not interested in the shopping cart at that time, no.  I was looking to not further have any more harm.*
>
> *Q. So you never checked the shopping cart to see if there was anything wrong with it?*
>
> *A. That was not my emphasis at that time. It was my safety.*
>
> *Q. All right. And did you check the ground to see if there was anything that the shopping cart might have hit, like, anything on the ground or any kind of gravel or sand or anything at all?*
>
> *A. There was nothing that I saw that would indicate that to be the case."*

Ms. Lubken testified that she could not confirm that the anti-theft wheel on the cart had activated its braking mechanism:

> *"Q. Do you know why the cart stopped?*
>
> *A. The system locked.*
>
> *Q. And you checked that?*
>
> *A. I was not in a position to be looking at whether that was the case. I was falling.*
>
> *Q. So how do you know that the system locked?*
>
> *A. It was unable to move, and I was propelled to the ground."*

Rimkus reviewed the deposition testimony of Ms. Angela Padilla.  Ms. Padilla was a store employee who was working the day of the incident and interacted with Ms. Lubken

afterwards. Her testimony confirmed that she did not witness the incident and was only called to the scene after it occurred.

Ms. Padilla's testimony confirmed that the subject cart was small, but she could not confirm any details about the wheels of that cart:

> *"Q. Okay. Do you remember if it was the normal-size cart or the smaller one?*
>
> *A. Small.*
>
> *…*
>
> *Q. Okay. The cart that Jean had used had the antitheft wheel?*
>
> *A. I -- I don't recall if I looked at the wheels. … It's not that heavy, but I don't remember if the wheels – I assume they're locked up. The wheels will also get stuff caught in them and then it makes them slow down."*

Ms. Padilla testified that she did not recall inspecting or evaluating the subject cart, but confirmed that it had to be moved out of the aisle:

> *"Q. Do you remember taking a look at the cart that Jean had used? And to clarify, when I say take a look, did you kind of push it around or kind of --*
>
> *A. I did not.*
>
> *Q. Okay. What do you remember about what happened with the cart?*
>
> *A. I don't recall. I know it had to have been taken out of the aisle, pushed out of the aisle. I don't recall exactly anything specifically about that at this point."*

Rimkus reviewed the deposition testimony of Mr. Chad Peterson, store manager for Fred Meyer. Mr. Peterson was not present during the incident and did not interact with Ms. Lubken on that date, but was able to confirm some aspects of the cart anti-theft system at the subject store:

> *"Q. And is it your understanding that those wheel locks are on all of the carts, or just some of the carts?*

*A. The goal is for them to be on all the carts. I do know that some carts do not have them."*

**Video Surveillance**

Rimkus reviewed video surveillance footage taken from the subject store on the date of the incident. The video depicted multiple locations around the store. One video covered the store entrance that Ms. Lubken entered prior to the incident.



Figure 1 – Surveillance video from store entrance.

The video depicted Ms. Lubken attempting to move a small cart near the entrance, then leaving the frame without a cart (**Figure 1**). This was consistent with her testimony that she was unable to move the first cart she chose. The video did not depict her selecting or moving the cart that was later involved with the incident. None of the provided videos depicted Ms. Lubken interacting with any other cart.

Another video depicted Aisle 86, where the incident occurred. That camera was not pointing at Aisle 86 at the moment of the incident, but later panned over and recorded the area. It depicted Ms. Lubken and various store staff who responded to the incident. Of note in the Aisle 86 video was the presence of a small cart (**Figure 2**).



**Figure 2** – Surveillance video from Aisle 86.

The small cart was presumably the subject cart. It remained at the scene throughout the video; no other store patrons moved or attempted to use it, and store staff moved it multiple times to clear it from the immediate area near Ms. Lubken. As a result of the staff moving the cart, it was possible to assess its mobility and resistance to movement. **Figures 3 and 4** are sequential frame grabs from the video. **Figure 3** represents a 16-second segment, and **Figure 4** represents a 19-second segment. In both segments, the cart is moved by a store employee with relative ease. It is seen pivoting on both the left and right rear wheels at different times. Most notably, the cart is moved by a store employee using only one fully stretched arm in **Figure 4**, which is indicative of the relative effort required to move the cart.



**Figure 3** – Surveillance video from Aisle 86 – 16 seconds elapsed.



**Figure 4** – Surveillance video from Aisle 86 – 19 seconds elapsed.

At no point did the surveillance video depict anyone using any device to unlock any of the wheels on the cart. The video also did not depict the wheels of the subject cart at any time.

**Observations**

Rimkus participated in a joint inspection of the store and exemplar carts on March 30, 2026. The subject cart was not available for inspection. Based on the testimony

described above, the cart was not preserved and was instead returned to circulation at the store, and could not be identified from the full cart inventory.

An exemplar "small" cart is depicted in **Photograph 1**. It was roughly the same width and height as a typical 'normal' shopping cart, but was substantially shorter and was equipped with a shallower basket. It was constructed of welded metal wire and framing, with two swiveling caster wheels on the front and two fixed wheels on the back. The rear left and front right wheels were anti-theft wheels manufactured by Gatekeeper (**Photographs 2 and 3**).

An exemplar 'normal' cart is depicted in **Photograph 4**. It was constructed in the same manner and from the same materials as the small cart. The front left and rear right wheels were anti-theft wheels manufactured by Gatekeeper (**Photograph 5**). Note that the installation position of the anti-theft wheels was reversed from the small cart.

Rimkus inspected Aisle 86, where the subject incident occurred. **Photograph 6** is taken from the same end of the aisle as the surveillance video discussed above, although from a lower altitude and shallower angle. The condition of the floor in Aisle 86 was generally smooth, with the only notable deviation being an approximate 1/4-inch vertical step that followed a seam in the concrete floor (**Photograph 7**).

Comparing the position of Ms. Lubken in the surveillance video to the configuration of the aisle during the inspection indicated that she had fallen directly in front of the "Mixer" portion of the aisle (**Photograph 8**).

At the center of the Mixer shelf section were hand mixers (**Photograph 9**). Recall from the testimony that Ms. Lubken was at the store with the specific purpose of purchasing a hand mixer. Also notable was the presence of boxes protruding from the end of the shelf and out into the aisle walkway.

**Gatekeeper System**

Rimkus is aware of and understands the operational configuration of the Gatekeeper anti-theft system based on previous experience. The purpose of the system is to reduce losses to theft. Shopping carts are equipped with special wheels that will engage a brake ("lock up") if it is pushed out of an exit or beyond the perimeter of a parking lot if it has not received "permission" from a source inside the store. For instance, if a shopper fills a cart

with goods and heads out of an exit without stopping at a register to pay for the items, the wheels will lock at the exit.  If a shopper does pass through a register, a special permission-granting device will allow the cart to exit the store without the wheels locking.

The system consists of multiple parts, including:

- Anti-theft locking wheels that are installed on shopping carts

- Permission-granting transmitters installed at registers and other locations

- A "lock loop" installed at exits and/or around the parking lot perimeter

The system operates on a "permission" paradigm and communicates via radio-frequency signals on multiple frequency bands.  Using the radio-frequency network, the wheels are granted permission to ignore lock commands when various conditions are satisfied. Without an active grant of permission, the wheel will lock whenever it receives a lock command.  The wheel includes a radio-frequency receiver that can receive signals from other devices that will either grant the wheel controller permission to ignore locking signals for a limited time or issue a lock command that turns on an electric motor that tightens a band brake, stopping the wheel from rotating freely.  The motor and internal circuitry are powered by a battery in the wheel.  The wheel will not lock autonomously and requires the lock command to engage the brake.  Similarly, the wheel will not unlock itself and instead requires a device to issue an unlock command before a locked brake will release.

Signals sent to the wheel were generated by multiple different devices shown on the system drawings produced by Gatekeeper (Bates GATE 000070-000082):

- A "lock loop", which consists of a radio frequency antenna embedded in the floor or ground at the store entrance/exits.  Any wheel passing over the loop would receive a command to engage the band brake.  These were the only fixed devices that could trigger a wheel locking event.

- A "permission loop" just outside the store entrance/exits. This is similar to the lock loop but sends a signal that grants a 2-minute permission for a wheel to ignore commands from a lock loop, thereby preventing brake activation.  This device permits carts to enter the store and temporarily ignore the lock loop while doing so.

- A Short-Range Transmitter (SRT). This was a signal emitter installed at check-out lanes and other locations. Any wheel passing within range and meeting the programmed criteria would receive a permission signal that would grant a time-limited permission to ignore lock commands.

- A Long-Range Transmitter (LRT). These are similar to the SRTs, but with a greater range.

- A handheld device that can manually issue either lock or unlock commands as desired when triggered by a human operator.

The system is configured with a set of rules that restrict any grant of permission until the rules are satisfied. For instance, at the self-checkout stations, permission would not be granted until the wheel stayed within range of the signal for at least 20 seconds of "dwell time" and experienced fewer than 250 rotations during that time. It is important to note that the handheld device is the only source of an unlock command. A locked wheel that receives a permission command will not unlock.

In default conditions, the Gatekeeper wheel will only lock whenever it receives a lock command, either by passing over a lock loop or when commanded by a handheld device. Interaction with any of the permission-granting emitters will permit a wheel to ignore a lock loop for a limited time. In practice, the system would allow shoppers to push shopping carts across the lock loop installed at the store exit without issue, so long as they either passed through a staffed checkout lane or spent sufficient time at a self-checkout lane. The net effect and intent of the system is to impede attempts to push a cart full of unpurchased items, i.e., a cart that had not been through the checkout process, out of the store.

**Analysis**

The cause of the subject incident could not be determined based on the available evidence. The subject cart was not available for inspection, and therefore, it was impossible to determine:

- Whether the cart was equipped with anti-theft wheels.

- The number of anti-theft wheels installed on the cart (if any).

- The position of the anti-theft wheel(s) (if any) on the cart.

- The condition of the anti-theft wheel(s) on the cart.

- The condition of the normal wheels on the cart.

- The presence of debris or obstacles on the floor at the time of the incident.

- The presence of debris fouling the cart wheels.

Lack of this knowledge prevented the determination of a cause. Per the testimony of Mr. Peterson, not all carts in the store were equipped with anti-theft wheels. Ms. Lubken did not evaluate the wheels at the time of the incident. None of the available testimony identified any specific defect or condition that would have resulted in an abrupt stop of the cart. The unavailability of the subject cart for inspection prevented any after-the-fact investigation from identifying a cause.

Multiple potential causes fit the available evidence. For instance, an obstacle or debris (such as a small rock) may have been present that caused the cart to stop, but was knocked away from the area as a result of Ms. Lubken's fall and not detected by any party. Of particular note was the location of the incident: Directly in front of the mixer shelves. Ms. Lubken testified that she was in the store to buy a hand mixer. It was reasonable to presume that her attention was focused on the hand mixers on the shelf instead of looking in the direction of her travel, and as a result, she failed to detect an obstacle. Note also, the protrusion of the boxes on the mixer shelves depicted in **Photograph 9**. It was possible that the cart struck a protruding box, causing it to stop abruptly.

The subject incident could not have been caused by a lockup of the anti-theft wheel(s) on the cart. As discussed above, the design and function of the wheels require the reception of a lock command before the anti-theft wheel will engage its brake. The brake mechanism is a motor-driven band brake, which requires the application of electrical power to the motor for a period of time long enough to tighten the brake (generally 1 to 2 seconds). The wheel brakes cannot simply fall into a closed state; they must be driven over time into that state. As such, the design failure mode will be to fail to brake when commanded, not to brake without being commanded. Also note that none of the evidence confirmed that the subject cart was even equipped with anti-theft wheels.

Further, consider the video of Aisle 86 discussed above. In that video, store employees can be seen moving the cart around without difficulty, indicating that the wheels are not locked. The cart was easily moved by one hand. The video does not depict any store employee using a handheld device to unlock a wheel on the subject cart. Neither Ms. Lubken nor any of the store employees testified that a handheld device was needed to unlock a cart wheel.

Compare this to the video of Ms. Lubken trying to move a locked cart at the store entrance. She fails to move the cart, even with two hands. Other wheel lock events experienced by other customers are visible in the same video. In all cases, the carts with locked wheels are visibly very resistant to motion, even to the point of tilting instead of sliding forward. This substantial disparity in resistance to motion and the lack of evidence that a handheld device was needed to unlock a wheel confirm that the subject cart wheels did not lock in Aisle 86.

**Welsh Report**

Rimkus reviewed an undated expert report signed by Joseph Gray Welsh of Joseph Welsh Consulting (Welsh Report). The report addressed the subject incident from the perspective of store operations rather than the engineering of the anti-theft wheel, but did touch on technical and factual issues, offering statements and opinions that were at odds with the evidence. Opinions offered by the Welsh Report regarding the operation or malfunction of the wheel were unsupported and incorrect. For instance, in a section titled "Factual Background of Case," the report stated:

> *"While shopping on aisle 86, Plaintiff Lubkens' shopping cart, suddenly and without warning, experienced a wheel malfunction (abrupt locking) …*
>
> *The shopping cart had an 'anti-theft' wheel locking mechanism furnished by Defendant Gatekeeper, which malfunctioned, and was unmaintained by Defendant Fred Meyer (Kroger). This malfunction had happened many times…"*

The malfunction of the wheel was not confirmed, and per the opinions offered by Rimkus could not have occurred at all. It was improper to consider the malfunction to be a "fact", and at best is a conclusion in need of a basis. The Welsh Report did not provide such a basis, nor did it provide an engineering analysis of the wheel or the subject incident. As such, the Welsh Report incorrectly classified the malfunction of the wheel as a fact, rather

than an unproven hypothesis in need of rigorous analysis based on the available evidence.  No such evidence or analysis was provided.

The Welsh Report mischaracterized incident reports as having been similar to the subject incident and applicable to the analysis.  From the Welsh Report:

> *"During discovery, I was furnished dozens and dozens (nearly 60) incident reports all related to 'Wheel Locking' incidents and at Fred Meyer (Kroger) stores."*

The Welsh Report failed to note that, in those cases where the incident location was provided, the vast majority of the incidents occurred as patrons were pushing carts out of the store exits, precisely where the lock loops are installed, and precisely where lock commands can be issued to Gatekeeper wheels.  This is markedly and critically different from the subject incident, which occurred well away from and out of range of any source of lock commands.  This key difference meant that the majority of the incident reports should have been discarded as they were not applicable to the subject incident.  This conclusion is supported by the testimony of the Fred Meyer employees who did not recall locking events occurring in the aisles of the store, and instead typically occurred at the entrance/exits.

Further, the Walsh Report failed to consider the possibility that some or all of the lock events described in the incident reports may have indeed been evidence of proper operation instead of a malfunction.  A cart that has not received a permission signal is expected and intended to lock when passing over the lock loop at an exit.  It was entirely possible that the lock event was intentional and proper in some or all of the exit lockup incidents, and impossible to assess that potential based on the descriptions provided in the incident reports.

The Welsh Report improperly concluded that the subject cart experienced a wheel malfunction, providing no analysis or basis for the conclusion.  It was instead an assertion not grounded in the evidence.  From the Welsh Report:

> *"Lubken, while pushing a shopping cart, experience[d] the wheels on the cart locking abruptly, which 'jerked her', and she fell and was injured by no fault of her own. Based on the testimony from all parties and available video, this is undisputed.*

*The shopping cart wheels, which are meant to lock up once the building is exited improperly, malfunctioned on the sales floor (aisle 86) and injured Lubken."*

The Welsh Report described no inspection of the subject cart or its wheels, obviously because the cart had not been preserved, and could not be inspected. The report offered no technical analysis of the Gatekeeper system, its design, likely failure modes (and related causes), or configuration. No basis for these opinions other than the testimony of non-technical, non-experts was provided, and no contextual analysis of that testimony was performed. As such, these opinions were unsupported and were instead simple assertions.

**Kohles Report**

Rimkus reviewed a report produced by Sean S. Kohles of Kohles Bioengineering dated April 28, 2026 (Kohles Report). That report discussed the subject incident from a biomechanical perspective, although it dealt extensively with technical subjects outside that discipline.

The Kohles Report failed to properly identify that Ms. Lubken was using a small cart at the time of the incident. From the report:

*"She eventually identified and utilized a mobile cart within the store, but it is not known whether it was a small or large cart product."*

This was at odds with both testimony and the available evidence. Ms. Padilla specifically testified that Ms. Lubken was using a small cart and described having to move it out of Aisle 86 after the incident. The video surveillance footage showed Ms. Lubken selecting (but then abandoning) a small cart at the store entrance, revealing her preference. She testified that she was only in the store to buy a hand mixer and would have had no need for a normal cart. The video surveillance of Aisle 86 showed a small cart being moved around the area outside the aisle by store employees. That collection of evidence made it reasonable to conclude that Ms. Lubken was using a small cart.

The Kohles Report incorrectly concluded that the aisle was clear of debris or obstruction based only on Ms. Lubken's testimony, failing to recognize that her testimony was unclear and that she did not pay particular attention to the cart wheels after the incident.

From the report:

> *"She recalled that no debris or external influence affected the cart's wheels."*

That statement was a misrepresentation of the testimony.  As noted above, Ms. Lubken's testimony on the topic was:

> *"Q. At any point during that time did you ever check your shopping cart to see what it was that caused it to stop?*
>
> *A. I was not interested in the shopping cart at that time, no.  I was looking to not further have any more harm.*
>
> *Q. So you never checked the shopping cart to see if there was anything wrong with it?*
>
> *A. That was not my emphasis at that time. It was my safety.*
>
> *Q. All right. And did you check the ground to see if there was anything that the shopping cart might have hit, like, anything on the ground or any kind of gravel or sand or anything at all?*
>
> *A. There was nothing that I saw that would indicate that to be the case."*

She testified that she didn't see anything.  She did not testify that nothing was there.  There is a distinct difference between those two positions.  Further, she testified that her "emphasis" was on her personal safety, not on examining either the floor or the cart wheels.  The Kohles Report was unjustified in interpreting Ms. Kohles' testimony to be that the floor was clear of debris or obstacles.

Importantly, the Kohles Report does not describe any inspection of the subject cart or its wheels and could not have provided such a description because the cart was not available for inspection.  It was impossible to confirm the condition or presence of anti-theft wheels on the cart, and therefore, opinions offered by the Kohles Report regarding the operation or malfunction of the wheel were unsupported and incorrect.

Consider the investigation and resultant findings summarized by The Kohles Report as follows:

*"At issue is an overall question specifically related to injury biomechanics:*

- *What flaws in the inspection, repair, and maintenance of the grocery cart theft-prevention system influenced its functional failure?*

- *What specific design, manufacturing, and functional flaws were present in the grocery cart theft-prevention system making it highly susceptible to predictive failure?*

- *Was the prevalence of failure commonly known and could simple design, manufacturing, and maintenance alterations have improved product safety by either eliminating, guarding from, or warning of the hazard?*

- *Were Ms. Lubken's diagnosed and surgically treated injuries directly caused by the product failure?"*

The scope of work described by the Kohles Report as "specifically related to injury biomechanics" more realistically should have been categorized as related to electromechanical devices for the most part. Of the four bullet points listed in the report, three involved a purely electromechanical device (the anti-theft wheel) and involved no biological elements. Granted, the potential effects of a defect in an electromechanical device include injury, at which point biomechanical expertise may be of value. But the initial stage of the investigation, determining whether an electromechanical device was defective, falls into a different category of expertise.

This distinction becomes important when the next part of the Kohles Report is considered:

*"My mechanical engineering, biomedical engineering, biomechanics, and clinical science conclusions are the following, as provided within a reasonable degree of biomechanical engineering and scientific certainty:*

1. *Inspection, repair, and maintenance flaws associated with the grocery cart theft-prevention system included:*

   a. *Degradation associated with environmental exposures,*

   b. *Inconsistent wheel battery charge,*

   c. *Worn and damaged wheels including rolling surfaces,*

   d. *Worn and damaged wheel brake mechanisms,*

   e. *Spurious wireless signals throughout the store,*

   f. *No evidence of wheel functional status inspection,*

   g. *Inconsistent basic wheel performance including rolling and swiveling freedom;*

2. *Design, manufacturing, and functional flaws within the grocery cart theft-protection system included:*

   a. *Inconsistent wireless signal responsiveness,*

   b. *Delayed master to slave wheel interactions,*

   c. *Inconsistent placement of lockable wheels,*

   d. *Inconsistent permission time periods for cart use,*

   e. *Differing normal and brake wheel material properties including wear resistance,*

   f. *Lack of weatherproofing of brake wheel hubs;*

3. *The overall inconsistent nature of the grocery cart theft-prevention system created a consumer product that has been shown to cause injuries within any population of users;*

4. *Proper maintenance of an improved alternative design could have mitigated the hazardous nature of the at-issue product;"*

All of these conclusions were related to the wheels alone. There was no biological aspect to any of them. And most importantly, the Kohles Report provided no engineering analysis of the anti-lock wheel, its internal configuration, or the means by which it was controlled. It offered no theory of failure that explained how the wheel could engage the brake without having received a lock command.

Further, of the hypothetical defects listed in the Kohles Report, none of them would lead to an inadvertent locking of the wheel.  Dealing with each of the hypothesized defects in turn:

- A weak or discharged battery will not be able to drive the motor that engages the brake.  This will result in a failure to lock, not an inadvertent lock event.

- If the wireless signal is inconsistent, the wheel would occasionally not receive a valid lock command, preventing a valid lock event.  It would not lock inadvertently.

- If there were a delay in braking events between master and slave wheels, the lock event would become more gradual and less abrupt, with the delay causing braking power to be applied over a longer period of time.  This does not produce an inadvertent lock event.

- The placement of the wheels is entirely unrelated to the transmission and reception of the lock command or the actuation of the brake and has no bearing on the subject incident.

- Permission time periods have no bearing on the subject incident, as Plaintiff had not passed a register and the wheel had no opportunity to receive a permission command.

- Differences in wheel material properties have no bearing on the subject incident, as the material condition would only affect coefficients of friction, not the actuation of the brake.

- Lack of wheel weatherproofing has no bearing on the subject incident, as no evidence exists to indicate that weather intrusion into the subject wheel had any effect.

None of these alleged defects will result in an inadvertent actuation of the wheel brake, and no theory of inadvertent brake actuation rooted in the available facts has been presented.  It should also be noted that many of them are entirely without support from the physical evidence.  For instance, the subject cart was never inspected by any expert after the incident, and it was impossible to confirm battery strength, presence of environmental damage, weather intrusion, or even whether an anti-theft wheel was

installed at all. As regarded the wireless signals, the Kohles Report offered this testing option:

> "Many electronic technologies exist to assess the strength and reach of wireless signals. My laboratory utilizes a radio frequency electromagnetic strength meter (Model 480846, Extech Instruments) to assess this issue. This and similar devices could confirm wheel battery strength, test communicating signals between wheels (master to slave), assess doorway location signal strengths as well as wheel triggering efficiency, and identify spurious triggering signals throughout the store. These signal checks could be done as a component of routine maintenance."

But the Kohles Report described no such testing being performed, nor any results of signal measurements. Remarkably, the diagnostic recommended to Fred Meyer to ensure proper operation of the Gateway system by the Kohles Report itself was never, in fact, described as having been performed in the Kohles Report to prove that any spurious signals were present. Their failure to use their own recommended technique would indicate a failure to fully investigate the incident using standards and methods that they themselves described and recommended. Regardless, no evidence exists that "spurious" wireless signals were present, or that the anti-theft wheel could be induced to lock inadvertently if those signals did exist.

The potential for spurious wireless signals in the modern world is virtually guaranteed. Cellular signals alone are present in all but the most remote areas. Network "Wi-Fi" signals are similarly present in many buildings. Such signals do not, in the main, present a risk to the function of unrelated wireless devices. At most, a strong undesired signal can overpower or "jam" a desired signal, much like a room full of people shouting will drown out a person whispering. Such situations are rare because federal regulations restrict the transmitting power of wireless devices to tolerable levels, reducing the risk of signal interference. In the subject instance, even if such a strong signal was present, it would drown out a legitimate lock command and prevent the anti-theft wheel from receiving the command and activating the brake. It would not induce an inadvertent lock event.

The testing described in the Kohles Report and witnessed by Rimkus consisted of measuring the braking performance of exemplar carts after a lock command was deliberately issued. Such testing presumes that a lock event did occur at the start of the

subject incident, though there was no evidence that justified that presumption. Most importantly, none of the testing described by the Kohles Report investigated the means by which a wheel could lock inadvertently. The failure to investigate or test for this specific scenario indicates an assumption that the wheel did lock, rather than an investigation of whether such a lock was possible. This was a critical flaw in the investigation described by the Kohles Report, as the investigation simply accepted Plaintiff's allegation as fact, rather than trying to independently determine the actual events that caused the subject incident.

The Kohles Report does not identify any testing in which the cart instantly stopped, nor did Rimkus observe any such testing while present at the site inspection on March 30, 2026. Critically, none of the testing described by the Kohles Report resulted in a wheel that locked without receiving a lock command. To be clear, the testing described in the Kohles Report never produced the inadvertent wheel lock event that is the specific defect being alleged by the plaintiff. Indeed, the Kohles Report required the use of the handheld remote key to initiate lock events for the testing that was performed in Aisle 86 (where the incident reportedly occurred). Other testing described in the Kohles Report that occurred at the store exit did not require the handheld key to initiate a lock event, as a lock loop was installed and issuing lock commands at that location.

## Section IV
## BASIS OF REPORT

1. On March 30, 2026, Thomas J. Kulaga participated in a joint exam of the subject store and exemplar shopping carts.

2. The following documents were reviewed:

   a) Transcript of deposition of Ms. Jean Lubken taken July 8, 2025.

   b) Transcript of deposition of Ms. Angela Padilla taken July 23, 2025.

   c) Transcript of deposition of Mr. Chad Peterson taken November 7, 2025.

   d) Transcript of deposition of Mr. Kenneth Smittling taken November 10, 2025.

   e) Bates-numbered documents GATE 000001-000003, 000065-000082, 000348-000470.

   f) A set of three security camera recordings taken at the subject store on the date of loss.

   g) Motion for Summary Judgement dated April 9, 2026.

   h) Plaintiff's Response to Motion for Summary Judgment dated February 10, 2026.

   i) Undated expert report with exhibits signed by Mr. Joseph Gray Welsh of Joseph Welsh Consulting.

   j) Report produced by Mr. Sean S. Kohles of Kohles Bioengineering dated April 28, 2026.

## Section V

## ATTACHMENTS

A. Photographs

B. Curriculum Vitae

## Section V
## ATTACHMENT A

# Photographs

Photographs taken during our inspection, including photographs that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Exemplar small cart.



**Photograph 2**
Exemplar small cart left rear wheel.



**Photograph 3**
Exemplar small cart right front wheel



**Photograph 4**
Exemplar normal cart.



**Photograph 5**
Exemplar normal cart wheels.



**Photograph 6**
Aisle 86.



**Photograph 7**
Concrete seam in Aisle 86.



**Photograph 8**
Signage in Aisle 86.



**Photograph 9**
Mixer shelves, hand mixers circled in red, protruding boxes indicated by arrows.



## Section V
## ATTACHMENT B

# Curriculum Vitae





## Thomas J. Kulaga, P.E.

Principal Consultant

21002 North 19th Avenue, Suite 120
Phoenix, AZ 85027

(480) 489-9962

tjkulaga@rimkus.com

## Background

Mr. Thomas Kulaga holds a B.S. in Mechanical Engineering and is a Licensed Mechanical Engineer in Arizona and New Mexico.

Mr. Kulaga's experience includes over 20 years of performing a wide range of mechanical engineering design and analysis work, including fluid dynamics, thermal, structural, and optical design and analysis.

He is well-versed in many manufacturing technologies, including machining, casting, injection molding, stamping, extruding, and others. He has led teams of over 20 engineers to execute major design projects and develop new technologies from concept to production.  His product design background has resulted in 10 patents in fields ranging from cell station combiner networks to LED lighting to bioreactors used in green energy production.

During his career, he has developed several innovative multi-physics analysis techniques to evaluate designs as small as a microchip to as large as a 100kW solar thermal collection system.  His broad range of experience allows him to analyze a wide variety of failures and accidents, including mechanical, electro-mechanical, thermal, and fluid systems.

## Professional Engagements

- **Engineering Design/Development**
  - Commercial-Scale Outdoor Photobioreactor – Gilbert, AZ (2011- 2013), Managed design, build, and startup of Heliae Development's outdoor algae cultivator.
  - CIRCE Optical Analysis Software GUI – Albuquerque, NM (2010-2011), Developed a graphical user interface to simplify and streamline the use of Sandia National Laboratories CIRCE optical analysis software. Interface drastically reduced time-to-solution and simplified training.
  - Solar Dish Concentrator Model – Tempe, AZ (2006-2010), Developed multi-physics computer model including CFD, structural, and optical physics, producing a more efficient design and major cost reductions over conventional dish concentrator.
  - Solar Thermal Structures – Tempe, AZ (2006-2010), Managed R&D engineering programs to develop solar thermal structures, mirror alignment systems, energy capture systems, and engine durability programs, >$5M total revenue.



- Vibratory Pile Foundation – Tempe, AZ (2006-2010), Developed and executed test regimen to achieve code compliance for solar dish concentrator foundation.
- Products/Parts Design – Tempe, AZ (2006-2010), Routinely performed mechanical design and analysis of machined, cast, sheet metal, and injection molded parts for heavy truck/bus, defense, consumer products, alternative energy, and other industries.
- LED Bulb Design – Gilbert, AZ (2003-2005), Designed ground-breaking new LED light engine and LED bulb (patented). LED bulb design won "Best of What's New - 2004" award from Popular Science.
- Autotuning Combiner Design – Meriden, CT (1999-2003), Performed all thermal and mechanical design for smallest 860MHz autotuning combiner in the industry, including significant contribution to critical new IP allowing major reductions in size while improving performance and ease of tuning (US Pat. 6,812,808).
- TF-40 Isolator Bank Redesign – Meriden, CT (1999-2003), Engineered a new isolator bank that required less space than conventional system and cost 40% less with no degradation in performance.

## Forensic Engagements

- **System and Equipment**
  - Southwest (2013-2018), Evaluated range of systems, including domestic water heaters, domestic and commercial fire risers and sprinkler heads, chillers, cooling towers, fluid coolers, furnaces, air conditioning units, heat pumps, pumps, laundry washers, dishwashers, refrigerators, water filtration systems, and water softening systems.
  - Southwest (2013-2018), Performed failure analyses for pipes, tubing, fittings, plumbing connectors, valves, crimps, tanks, heating and cooling coils, toilet fill valves, dryers, and exhaust fans.
  - Southwest (2013-2018), Failure analysis of equipment involving software, electronics, and mechanisms, such as computer-controlled machine tools, factory automation equipment, and robots.

- **Information Technology**
  - Southwest (2013-2018), Failure analysis of servers and other IT equipment damaged by fire, water, and mechanical impact (shipping and handling).

- **Power/Energy**
  - Southwest (2013-2018), Failure analysis of utility-scale solar power plants damaged by weather events (high winds). Utilized finite element analysis and Computational Fluid Dynamics software tools to identify and explain failure mechanisms. Participated in failure analysis of conventional steam turbine failures related to weather events.

- **Fire**
  - Southwest (2013-2018), Evaluated electrical equipment and appliances to determine potential fire causes and origins.

- **Finite Element Analysis**
  - Modeled oscillating loads on steam strainer basket to confirm the cause of fatigue failure.
  - Modeled footstep loading on an acrylic plastic skylight that failed, resulting in a fall injury.
  - Modeled static loads and stress concentrations in a plastic water filter cartridge to predict creep and catastrophic failure.
  - Modeled static and dynamic forces on multiple utility-scale solar arrays exposed to high winds and aero-elastic flutter (galloping).



- Modeled multiple impact scenarios on a steel bumper to calculate total energy imparted and change in vehicle speed ("delta-V") to permit injury evaluations.
- Modeled semi-truck fifth wheel, frame, and kingpin loading during overturning event to evaluate the performance of welds.
- Modeled impact of tornado-propelled debris to assess the design and performance of a biological containment vault door.
- Modeled bending and failure loading for a window shade bracket that failed, resulting in an injury.
- Modeled support structure load response for a cement silo that collapsed while being loaded.

- **Computational Fluid Dynamics**
  - Modeled wind flows over natural gas turbine building to permit assessment of debris (sand and dust) transport and entry into inlet structure.
  - Modeled dynamic, unsteady pipe and steam strainer flow characteristics to evaluate the cause of damage to power plant natural gas turbine blades.
  - Evaluated opposing expert model of airflows in refrigerated truck/storage room to assess carbon-monoxide buildup and transport.
  - Modeled transient and dynamic airflows over utility-scale solar arrays to detect aeroelastic flutter (galloping) frequencies and amplitudes that resulted in catastrophic failure of the arrays.

- **Vehicle Component Failure**
  - Southwest (2013-2018), Evaluated vehicle components such as sensors, controls, welded structures, and others to determine causes of vehicle accidents or vehicle-related injuries.

## Professional Experience

- **Rimkus**                                                                  **2013 – Present**
  - Principal Consultant
    Responsible for industrial accident analysis and mechanical failure analysis.  Provide expertise regarding the safety, design, and operation of material handling and processing equipment. Determine cause and origin analyses for system and equipment failures (e.g., cooling towers, fire risers, dishwashers) and products and components (e.g., pipes, fittings, valves).

- **Heliae Development, LLC**                                                 **2011 – 2013**
  - Director – Engineering Group
    Responsible for establishing the company's engineering unit from the ground up, including hiring staff, establishing processes, instituting document control systems, and selecting/deploying software systems. Standardized engineering project tracking system, which included custom database logging and reporting functions, was later adopted by other departments. Once formed, directed the cross-functional engineering team with over $2M budget, supporting R&D in the development of algae cultivation and processing systems. Executed several major projects, developing algae growth systems, processing equipment, and culture treatment technologies.

- **SolutionStream Engineering, LLC**                                         **2009 – 2011**
  - Owner/Principal Engineer
    Provided mechanical engineering design and analysis services to customers in transportation, consumer product, and alternative energy industries.



- **ESG Engineering**                                                                                                            **2005 – 2009**
  - Project Manager/Senior Engineer
  Performed Project Management duties for engineering services contracts with customers in alternative energy, transportation, aerospace, DoD, and consumer product industries. Performed structural, fluids, thermal, and optical analysis (classical and FEA) and component design work for engineering services customers. Routinely performed mechanical design and analysis of machined, cast, sheet metal, and injection molded parts. Developed and maintained expertise in a wide range of analysis and design software.

- **Enlux LED**                                                                                                                         **2003 – 2005**
  - Senior Mechanical Engineer
  Performed thermal applications engineering duties employing heat sinks, thermoelectric coolers, heat pipes, sheet metal and machined part design, and similar technologies. Performed all design activities in the development of an innovative LED light bulb, including thermal, mechanical, and electrical subsystems.

- **Radio Frequency Engineer**                                                                                            **1999 – 2003**
  - R&D Mechanical Engineer
  Supported Radio Frequency Engineers with thermal analysis and sheet metal and machined parts design and GD&T detail drawings for RF combiners, filters, and amplifiers.

- **Wells-CTI, Inc.**                                                                                                                **1998 – 1999**
  - Manufacturing Engineer
  Supported Radio Frequency Engineers with thermal analysis and sheet metal and machined parts design and GD&T detail drawings for RF combiners, filters, and amplifiers.

- **U.S. Air Force**                                                                                                                  **1991 – 1995**
  - Tactical Air Command and Control Specialist
  Served alongside U.S. Army combat units, acting as liaison between Army and USAF close air support assets, planned missions with Army counterparts, and controlled close air support missions to support Army ground commander's objectives. Held Secret clearance; honorably discharged in 1995.

## Education and Certifications
- **Mechanical Engineering, B.S.:** Northern Illinois University (1998)
- **Registered Professional Engineer:** Arizona and New Mexico

## Continuing Education
- **Coursework:** Essentials of Project Management; Maximizing Team Effectiveness; PMP Exam Prep; Introduction to ANSYS CFX; ANSYS CFX Fluid-Structure Interaction; SolidWorks Essentials

## Patents
- Modular tubular bioreactor: **Pat. #US10876087**, December 29, 2020.
- Balanced mixotrophy method: **Pat. #US10240120**, March 26, 2019.
- Modular tubular bioreactor: **Pat. #US10053659**, August 21, 2018.
- Omega 7 rich compositions and methods of isolating omega 7 fatty acids: **Pat. #US9200236**, December 1, 2015.



- Mixotrophic, phototrophic, and heterotrophic combination methods and systems: Pat. **#US975875B2**, Sept. 12, 2017.
- Submersible High Illumination LED Light Source: **Pat. #US8100560B2**, Jan. 24, 2012.
- Methods and apparatus for an LED light engine: **Pat. #US7431477B2**, Oct. 7, 2008.
- Light bulb: **Pat. #USD528227S1**, Sept. 12, 2006.
- Methods and apparatus for an LED light: **Pat. #US6982518B2**, Jan. 3, 2006.
- Methods and apparatus for an LED light engine: **Pat. #US6942360B2**, Sept. 13, 2005.
- Aperture coupled output network for ceramic and waveguide combiner network: **Pat. #US6812808B2**, Nov. 2, 2004.

EXHIBIT "2"



16932 Woodinville-Redmond Road NE, Suite A 105
Woodinville, WA 98072
(206) 623-0630

# Report of Findings

Lubken Incident Investigation and Biomechanical Analysis

Cause Number: 3:24-CV-05811-JCC

Style: Jean Lubken/William Lubken vs. Fred Meyers Stores Inc./Gatekeeper Systems Inc.

Rimkus Matter No: 100336805

Prepared For:

The Aguilera Law Group

23046 Avenida De La Carlota, Suite 300

Laguna Hills, CA 92653

Attention:

Scott LaSalle, Esq.

Christopher T. Chen, Ph.D.
Principal Consultant

May 15, 2026

## TABLE OF CONTENTS

I.      Introduction                                                                  1

II.     Conclusions                                                                   2

III.    Discussion                                                                    3

- Incident Report and Statements

- Surveillance Videos

- Incident Site Inspection

- Medical Records of Ms. Jean A. Lubken

- Report from Kohles Bioengineering Corp

- Biomechanical Analysis

IV.     Basis of Report                                                             14

V.      Attachments                                                                 16

A.      Photographs

B.      Figures and Tables

C.      Curriculum Vitae

May 15, 2026

## Section I

## INTRODUCTION

On December 23, 2023, an incident occurred in the Fred Meyer store (the "Fred Meyer") located at 4505 South 19th Street in Tacoma, Washington.  Ms. Jean A. Lubken, a guest of the Fred Meyer, was shopping for a hand mixer.  Reportedly, Ms. Lubken lost her footing and fell onto her right side when her shopping cart stopped suddenly at Aisle 86. The (small) shopping cart (the Cart) was equipped with the anti-theft wheel (s), manufactured by Gate-keeper Systems (the Gatekeeper).  Ms. Lubken reported that she sustained injuries from the subject incident.

Rimkus was retained to reconstruct the dynamics of this incident and to determine the motions/mechanisms that Ms. Lubken would have sustained in the subject incident in relation to the reported injuries, as well as to respond to the findings from a report issued by Kohles Bioengineering Corp.

Rimkus was also retained to inspect the incident site and to evaluate the involvement of anti-theft wheels and system in this incident, which would be addressed by Mr. Thomas J. Kulaga in a separate report.

This report was prepared for the exclusive use of the Aguilera Law Group and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Ming Xiao, Ph.D., Practice Leader.

## Section II
## CONCLUSIONS

1. Subcapital femoral neck fracture cannot be ruled out for a female with Ms. Lubken's height and weight to fall on her hip in the subject incident.

2. According to the testimony from the store manager and employees of the Fred Meyer store, no instance of wheel lockup has been reported in the store's aisles, where the claim of locking wheels by Ms. Lubken in the subject incident has not been verified.

3. Based on the recorded video of guest shoppers on the date of the subject incident and an exemplar shopper during the staged tests, all their feet and heels were located in the area between the two rear wheels and behind the stopped carts in the lockup events.  There was no visible evidence that any shopper stepped on the rear wheel of the stopped cart, as reported by Ms. Lubken.

4. The base of support (or stride width) in adults during normal walking was approximately 2 to 5 inches, less than the gap / width between the Cart's rear wheels (21 inches).  With the hands on the handle of the Cart, the right heel of the shopper was at least 6 inches away from the right-rear wheel during the lockup event.  An entanglement of right heel with the right (outer) portion of Cart's right-rear wheel would not be expected.

5. The lockup dynamic of the exemplar Cart tested in the Kohles Report showed that the shopping cart equipped with anti-theft wheels would stop slowly in the subject Aisle with skid marks up to 52 inches.  Their findings indicated that Ms. Lubken's claim of "abruptly stop" was not consistent with the lockup dynamic of the shopping cart in the subject incident.  With the moderate decelerations, the distance of stride length would reduce, but a trip by rear wheels, as claimed by Ms. Lubken in the subject incident would not be expected.

## Section III
## DISCUSSION

### Incident Report and Statements

Incident Report and the Subject Cart.

The incident occurred at Fred Meyer Store #390, which was located at 4505 South 19th Street in Tacoma, Washington, and owned by Kroger Co (**Figure 1**). According to the Kroger incident report number 4A2312Q4C20001, the subject incident occurred in Aisle number 86 by the mixers at approximately 1:55 p.m. on Saturday, December 23, 2023. The report stated that Ms. Angela Padilla was the manager on duty at the time of the incident. The report indicated that Ms. Lubken was the only known witness to the subject incident.

The report stated that Ms. Patty Pickett (with the nickname "Patty P.") was the staff member to contact Ms. Lubken initially, with the description of the subject accident as follows: "*Customer stopped me as I was passing Aisle # 86 and told me that she injured herself because her cart locked up and fell on her. I called another assoc. to get mgr. assist. I did not witness this incident, but the customer indicated that another customer witnessed the incident. Mgr. came & assisted w/ customer*."

The report also provided the description provided by Ms. Lubken as follows: "*I was pushing the cart, wheel locked. I took a step and fell when the cast did not move. I fell onto my right hip. The cart fell on top of me. A shopper saw me, asked if I wanted her to lift up the cart. She did and went to inform an employee after she saw that I could stand. I needed support to hold onto a non-moving structure.*"

Statements of Ms. Angela Padilla

In the deposition, dated July 23, 2025, Ms. Padilla testified that Ms. Lubken was sitting on the floor when she arrived at Aisle 86 for the housewares. She stated that she did not witness the incident and that the subject Cart was upright when she arrived, and she did not notice any debris or hazards on the floor. Ms. Padilla testified that Ms. Lubken declined medical help when asked. She stated that Mr. Kenneth Smittling helped Ms. Lubken gather information for an incident report and brought Ms. Lubken a computer chair to assist her in exiting the store. Ms. Padilla testified that Kroger's claims administrator (Sedgwick) was notified on the same day to open a claim with a reported lockage of the

cart's wheel, a fall, and injuries to the hip, neck, and hand.  Ms. Padilla stated that the carts, equipped with anti-theft locking wheels manufactured by the Gatekeeper system, would be locked if a customer exited the store without proceeding to the register for checkout.  The anti-theft wheels could be unlocked by using a handheld "key" device.  Ms. Padilla repeatedly stated she was not aware of anyone who had inspected the cart after the subject incident to verify whether the anti-theft locking wheel in the subject cart was defective.  But she had not seen any carts locked inside the store or in the aisles.

Statements of Mr. Kenneth Smittling

In the deposition, dated November 10, 2025, Mr. Smittling stated that he had very limited memory of the subject incident.  He testified that he may have assisted generally, but he did not witness the fall.  Mr. Smittling also stated that two locking wheels were installed on the shopping carts, typically one in the front and one in the opposite rear, making the carts difficult to move once locked at the store exit equipped with perimeter sensors.  He testified that he did not recall whether anyone inspected the subject cart and did not know what happened to it after the incident.  Mr. Smittling stated that he could neither confirm nor refute Ms. Lubken's account that the subject cart was abruptly locked in Aisle # 86.  But Mr. Smittling testified that he had neither seen nor known that any cart was locked in the store aisles.

Statements of Mr. Chad Peterson

In the deposition dated November 7, 2025, Mr. Peterson stated that he was the store manager and had been working at the current Fred Meyer since 2021 or 2022, when the anti-theft wheels had already been installed in the shopping carts.  He testified that he had no direct involvement in the design, installation, or maintenance of the anti-theft carts and had minimal firsthand knowledge of the subject incident.  Mr. Peterson stated that, according to his understanding, the anti-theft wheels would lock at the store exit if the carts did not pass through the register for checkout in the presence of a cashier.  He testified that damaged carts would be sent to the "cart graveyard" behind the store and that the repair process would begin when there were approximately 30 carts.  Mr. Peterson also testified that he was not aware of any instance of malfunctioning locks in the aisles and did not know of any systemic issue with anti-theft wheels.

Statements of Ms. Jean A. Lubken

In the "Defendant Gatekeeper Systems, Inc.'s Interrogatories to Plaintiff Jean Lubken with Answers Thereto" dated January 14, 2025 (Response to Interrogatory No. 6), Ms. Lubken provided her recollections of the subject fall:

"I was at the Fred Meyer Store on 19th and Stevens, Tacoma, WA to buy a hand mixer. I selected a shopping cart and proceeded toward the appropriate aisle to select a hand mixer.  As I was walking down the center of the aisle, the wheel on the right side of the cart abruptly stopped. My body continued forward and, as I took a step forward, the cart wheel tripped me, resulting in my falling into a side aisle on the right. I was holding onto the handle of the cart. The cart fell on top of me.  I fell on my right side with my hip striking the floor before the rest of my body."

In the deposition taken on July 8, 2025, Ms. Lubken stated that she went to Fred Meyer only to buy a hand mixer.  She testified that she put her purse on the top basket of the shopping cart and wrapped her hand through the purse strap onto the subject cart. Ms. Lubken stated that she was wearing black boots with wooden heels.  She testified that the shopping cart abruptly stopped when she was pushing the subject cart in Aisle 86 with her hands.  Ms. Lubken stated that as the cart stopped, her motion continued forward, where her right foot heel interacted with the cart, and it caused her to fall to the right side to the floor onto my right side into the side aisle. She testified that she fell when her right shoe took a step forward to the right side of the right back wheel.

Ms. Lubken admitted that she did not know the mechanisms for locking and did not inspect the subject cart, but she repeatedly stated that the locking wheels account for the subject Cart "halted" suddenly.  Ms. Lubken testified that Mr. Lubken, her husband, returned to the store the next day and was told that the subject cart had been returned to circulation.  Ms. Lubken stated that she received a surgical procedure to repair right hip fracture on December 24, 2023.  Ms. Lubken testified that she had preexisting knee problems (osteoarthritis) and had one fall in 2021 due to knee instability.  Ms. Lubken received a joint replacement for her right knee in March of 2023, as well as a neck fusion in 2022.  She had the following statements about the subject incident:

"I only had the intent of buying a hand mixer. *[Q: And how long were you in the store before you got to the aisle where you fell?]* I'm thinking five to ten minutes. As I entered the store, there were carts there. I did not take the first cart because it wouldn't move.

I went on and selected a cart. I ended up seeing friends, and we chatted for a few minutes. I asked where I might be going in the store to find a hand mixer, and then made my way to the aisle and proceeded down the aisle in the direction of where the hand mixers are kept…  I was wearing black boots that had wooden heels…  I had my purse I was carrying with me, and I had set the purse itself in the upper basket and wrapped my hand through the purse handle onto the grocery cart as we had been warned that there was a lot of theft happening pre-Christmas and women not to leave their handbags unattended and closely watched by you.  So at the time that happened the only thing… in the upper basket was my purse." (Page 50 Line 7 through page 51 Line 14)

"*[Q: You were still looking for the hand mixer aisle?]* Yes… *[Q: And at some point I understand from your interrogatory responses that the cart stopped; correct?]* Abruptly… When the cart stopped, I continued my motion forward, and it pushed me back because it just because it had stopped. So at that point my right foot heel interacted with the cart, and it caused me then to fall to the right side to the floor onto my right side into the side aisle. *[Q: So when the cart stopped, was it your impression that it had stopped at one of the wheels in the front or the back or it was all together the whole thing?]* I'm not a person who's designed to know about shopping carts, but I know that that cart stopped on the spot, and I was jolted…. Well, I still had my hands on the cart, so that part was attached. The part I was saying to you about my right shoe is that in taking that step forward, it was to the right side of the right back wheel, and then I became involved in the fall. (Page 53 Line 1 through page 54 Line 3)

"I'm holding on to the cart. I'm walking in a normal pace. The cart blocks. My body motion continued, and then when it stopped, my body motion reversed. Still holding on to the cart, my right foot proceeded forward, and on the right-hand side of the right back wheel is where the contact with the cart was made, and that is at that point I fell to the right-hand side onto the side aisle. (Page 54 Line 13 through Line 20)

In summary, Ms. Lubken was the only known witness to the subject fall.  She testified that her right heel contacted the cart when the shopping cart stopped abruptly and that she fell to the right as her right foot moved forward and contacted the right-hand side of the right back wheel.  Ms. Lubken repeatedly stated that the locking wheels caused the subject Cart to "halted" suddenly, although she admitted she did not know the mechanisms for locking and did not inspect the subject cart.

Ms. Padilla, Mr. Smittling, and Mr. Peterson all testified that the anti-theft wheels would lock only at the exit. They also testified that they were not aware of any instances of malfunctioning wheel locks in the store's aisles, where the locking wheels reported by Ms. Lubken in the subject incident have not been verified.

## Surveillance Videos

Three surveillance videos, recorded for the store entrance/exit and Aisle 86, from the subject store on the date of the incident, were reviewed. These videos showed at least 5 lockup events occurring at the store entrance/exit. The videos also showed that Ms. Lubken walked normally with a typical stride width and a typical stride length.

Lockup Events at Store Entrance/Exit

The footage from the store entrance/exit showed at least 5 lockup events, when these exemplar shoppers pushed the shopping cart out of the store. Three of the lockup events were described as follows:

At 1:05:21 p.m., an unknown female shopper pushed a small cart out of the store entrance/exit as shown in **Figure 2.** The feet of this shopper were located within the area between the two rear wheels behind the stopped small cart. There was no visible evidence that the female shopper was stepping on the rear wheel of the small cart.

At 1:40:57 p.m., an unknown guest shopper pushed a large cart out of the store entrance/exit as shown in **Figure 3.** The feet of this shopper were located within the area between the two rear wheels behind the large cart. The video showed that the shopper was slowing down before stopping.

At 2:54:06 p.m., an unknown senior shopper pushed a large cart out of the store entrance/exit as shown in **Figure 4.** The feet of this senior shopper were located within the area between the two rear wheels behind the stopped cart. There was no visible evidence that the senior shopper stepped on the rear wheel of the large cart.

Based on the recorded video of guest shoppers on the date of the subject incident, the feet of all the shoppers were located within the area between the rear wheels behind the stopped carts. There was no evidence that any shopper stepped on the rear wheels of the stopped cart, as reported by Ms. Lubken.

<u>Gait Pattern of Ms. Lubken</u>

The footage from the store entrance/exit also showed that Ms. Lubken entered the store at approximately 1:47:20 p.m.  She walked with a typical stride width and length similar to other shoppers without any evidence of zigzag or wide-based gait patterns (**Figure 5**).  After entering the store, Ms. Lubken selected a small cart, whose wheels were locked and had been left near the entrance earlier by another shopper.  She put her purse on the top basket of the small cart and attempted to move it (**Photograph 1**).  Ms. Lubken was unable to move the small cart she chose first, as stated in her testimony.  She then left the entrance area and walked with a typical stride width and length, as shown in **Figure 6**.  Together, Ms. Lubken walked normally with a typical stride width and a typical stride length.

<u>Incident at Aisle 86</u>

Footage taken at Aisle 86 showed that a small shopping cart was next to Ms. Lubken and used store staff members, where an item was placed in the upper basket of the small cart (**Photograph 2**). This footage shows that the subject cart was a small shopping cart with an upper basket, the same style as Ms. Lubken's first attempt to use near the entrance (**Photograph 1**).

## Incident Site Inspection

Mr. Thomas J. Kulaga of Rimkus participated in a joint inspection of the store, incident site, and exemplar carts on March 30, 2026.  The details of the inspection related to the activation and locking mechanisms of anti-theft wheels were described in Mr. Kulaga's report of Rimkus.

As aforementioned, surveillance video showed a small shopping cart that was next to Ms. Lubken and used store staff members at the time of the subject incident.  An exemplar 'small' cart was inspected by Mr. Kulaga, as shown in **Photographs 3 and 4**.  The exemplar small shopping cart was approximately 40 inches tall, 23 inches wide, and had a distance between the rear wheels of approximately 21 inches.

Rimkus inspected Aisle 86, where the subject incident occurred.  The condition of the floor in Aisle 86 was generally smooth.  The position of Ms. Lubken in the surveillance video (**Photograph 2**), in relation to the configuration of the aisle during the inspection,

indicated that Ms. Lubken would have fallen in Aisle 86, which was for the hand mixers, as shown in **Photograph 5**.  There were some boxes with a depth greater than the shelves' depth and extending into the walking area, as indicated by a red arrow (**Photograph 5**).

## Medical Records of Ms. Jean A. Lubken

Medical records for Ms. Lubken were reviewed to determine the injuries diagnosed in her medical records, the nature of the injuries, and the potential contribution of pre-existing conditions to tissue tolerances.  This follows the methodology for a biomechanical assessment outlined in peer-reviewed and widely accepted literature (e.g., Nahum and Gomez 1994).  A biomechanical engineering assessment would not typically include a physical examination because the diagnoses of the medical providers are considered at face value.  Instead, biomechanics seeks to determine whether the appropriate mechanisms to result in the diagnosed injuries were present in the subject incidental event.

According to the records reviewed, Ms. Lubken was 54 years old.  She stood 5 feet 5 inches tall and weighed approximately 142 pounds at the time of the incident.  Ms. Lubken had a medical history of bilateral knee osteoarthritis, senile osteopenia, iron deficiency anemia, hypertension, hyperlipidemia, chronic lower back pain, and a history of falling.  She received a neck surgery in 2009, a total joint replacement for her right knee in March of 2022, and was scheduled for left knee replacement on January 9, 2024.

On December 23, 2023, a few hours after the subject incident, Ms. Lubken visited St. Joseph Medical Center for her hip pain.  Radiographs of her right hip were taken and read by Daniel N. Heller, M.D., who indicated closed minimally displaced right subcapital neck fracture.  Ms. Lubken was interviewed by Luciana F de Oliveira, M.D. and diagnosed with closed right acute subcapital femoral neck fracture.

On December 23, 2023, Ms. Lubken was transferred to Franciscan Medical Clinic. computed tomography (CT) scans of her lower extremity were performed at Franciscan Medical Clinic and interpreted by Nicholas Z Conley, M.D., who indicated acute subcapital right femoral neck fracture with minimal anterior displacement, impaction, and apex anterior angulation, along with a small right hip joint effusion.  She was interviewed by Stephen F. Ou, D.O. and diagnosed with right Pauwels type 3 nondisplaced subcapital

femur fracture.   On December 24, 2023, Ms. Lubken received Open Reduction and Internal Fixation (ORIF) for right hip fracture using cephalomedullary nail, performed by Dr. Ou.  Ms. Lubken was discharged on December 28, 2023.

## Report from Kohles Bioengineering Corp

A report from Kohles Bioengineering Corp authored by Sean S. Kohles, Ph.D., EIT, FBMES, FAIMBE, was issued on April 28, 2026 (Kohles report).  In the Kohles report, staged lockup tests were performed to determine the dynamics of the large and small shopping carts in response to the lockups of the anti-theft wheels during the joint inspection on March 30, 2026.

In the lockup tests at the exit, the feet of exemplar shopper were located behind the shopping cart and within two rear wheels, similar to other guest shoppers in the lockup events recorded in the videos (**Photograph 7**).  The lockup test also showed that the shopping carts with locked wheels were slowing down in the carpet area at the exit.

Lockup Dynamics of the Shopping Cart

In the Kohles report, 12 total rolling lockup tests were conducted on small and large carts in the incident site (Aisle 86) with a polished concrete floor.  The exemplar carts were pushed forward at speeds of 2.5 to 3.5 mph.  The findings showed 47 to 52 inches of frictional skidding (braking) marks from the small lockup carts, and 34 to 51 inches for large lock up carts (**Photograph 8**).   The forces required to push the lockup carts from a static position into dynamic sliding were approximately 8 and 15 pounds for the small and large lockup carts, respectively.   The surface interactions between the plastic wheel material and the polished concrete floor had a resulting coefficient of friction of 0.2 to 0.3, which was lower than that of between plastic wheels and a carpet (0.4 to 0.6)

The test results shown in the Kohles report indicated that a lockup cart did not stop abruptly in the aisle with a polished concrete floor.  Instead, a lockup cart would indue frictional skidding (braking) marks on the aisle and travel up to 52 inches after the initiation of the locked wheel signal.  These findings showed that Ms. Lubken's claim of "abruptly stopped cart resulted from the locked anti-theft wheels in the subject incident" was not consistent with the dynamics of a lockup cart.   These findings also showed that the subject Cart would induce resisting forces to slow down the motion of the shoppers.  In

the subject incident, Ms. Lubken would have enough time to respond to a slowing cart, the misstep on rear wheels, and an entanglement with rear wheel would not be resulted.

## Biomechanical Analysis

<u>Fall and Subcapital Fracture</u>

The records indicated an overall body height of 5 feet and 5 inches for Ms. Lubken.  This body height for an adult female was approximately 65 percentiles for age 30 to 69 years old, according to the report from the United States National Center for Health Statistics (**Table 1**).  For the female at 65 percent tile, the buttock height was approximately 35.6 inches (**Table 2**).  For the female at 65 percent tile, the functional grip reach was approximately 30.1 inches (**Table 3**).

Considering that Ms. Lubken fell from her hip/buttock height (35.6 inches) in a free-fall. the velocity at the time of contact with the ground would be approximately 9.4 mph. With a contact time of 0.05 to 0.1 seconds, the contact force would be approximately 610 to 1,220 pounds.  Considering that Ms. Lubken was diagnosed with senile osteopenia before the subject's fall, where bone strength and properties were weaker than those of a normal healthy bone.   Taken together, the contact forces resulting from a fall on the right hip in a female of Ms. Lubken's height and weight indicated subcapital femoral neck fracture cannot be ruled out in the subject incident.

<u>Misstep and Entanglement with the Rear Wheel</u>

Ms. Lubken testified that her right shoe took a step forward to the right side of the right rear wheel of the subject cart, where her right foot was entangled with the right wheel.  As shown in the recorded videos of all lockup events, the shoppers' feet were in the area between the two rear wheels and behind the stopped carts.   There was no visible evidence that any shopper stepped on the rear wheel of the stopped cart, as reported by Ms. Lubken.

The typical stride base for adults was 2 to 5 inches wide, which was much less than the distance between the rear wheels (21 inches).  Ms. Lubken testified that her hands were on the cart at the time of the subject accident handle, her torso would be located near the center of the shopping cart, where her feet/heel would be at least 6 inches away from the rear wheel, during normal walking.  According to the recorded video before the subject incident, Ms. Lubken walked with a typical gait pattern, with a regular stride base and

stride length, similar to a typical shopper with no visible zig-zag patterns or wide-stride gait. Furthermore, the rear wheel, along with the cart, would need to rotate clockwise at least 30 degrees for her right foot or heel to make contact with the right side of the rear wheel, which would not be expected, especially with her hand on the cart. Together, the entangle of her right foot heel and the right wheel would not be expected. Similarly, the misstep on the rear wheels of a stopped cart during a typical gait with hands on the Cart's handle would not be expected.

Circumstances of Abrupt Stopped Cart

As aforementioned, the description of an abrupt stopped cart as described by Ms. Lubken was not consistent with dynamics of a lockup cart as shown in the Kohles report. Other scenarios could account for an abrupt stopped cart: the blockage of shopping by a protruded box as shown in **Photograph 6**.

Summary of Biomechanical Analysis

In summary, the right heel of the shopper was at least 6 inches away from the right-rear wheel during the lockup event. An entanglement of right heel with the right (outer) portion of Cart's right-rear wheel would not be expected. Although the subcapital femoral neck fracture cannot be ruled out for a female with Ms. Lubken's height and weight to fall on her hip in the subject incident, the subject fall was not induced by a locked anti-theft wheels. The description of an abrupt stopped cart as described by Ms. Lubken was not consistent with dynamics of a lockup cart as shown in the Kohles report.

Methodology

The opinions expressed in this report are offered to a reasonable degree of probability within the accident reconstruction, biomechanics, and scientific fields. The methods used and studies cited in this report are relevant to the biomechanics of human motion and injury mechanisms resulting from accidental events. Biomechanics is the application of principles and methods of engineering mechanics to the study and solution of problems arising in biology and medicine. The science of injury biomechanics is fundamentally different from that of medicine in that it does not offer diagnoses, treatment, or prognoses, but instead addresses the relationships between events and tissue damage by studying the physics of accidental events, the properties of tissues, and the application of loads to tissues during such events. In this particular case, the application of biomechanics

principles explains Ms. Lubken's motions.  These methods have been tested and have yielded consistent results in the articles cited in the **Basis of Report** and others.  The methods used and results expressed in these reports can be verified experimentally.

## Section IV
## BASIS OF REPORT

The following materials were reviewed and tasks were performed during the course of our work:

1.  A Kroger incident report number 4A2312Q4C20001, was reviewed.

2.  3 security camera recordings taken at the subject store on December 23, 2023 were reviewed.

3.  Inspections of the site and exemplar carts were performed by Thomas J. Kulaga, P.E., of Rimkus on March 30, 2026.

4.  A report authored by Thomas J. Kulaga, P.E., dated May 18, 2026, was reviewed.

5.  Transcript of deposition of Ms. Jean Lubken taken July 8, 2025, was reviewed.

6.  Transcript of deposition of Ms. Angela Padilla taken July 23, 2025, was reviewed.

7.  Transcript of deposition of Mr. Chad Peterson taken November 7, 2025, was reviewed.

8.  Google Map/Earth Pro and StreetView around the site of the incident were reviewed.

9.  Transcript of deposition of Mr. Kenneth Smittling taken November 10, 2025.

10. Report produced by Sean S. Kohles of Kohles Bioengineering dated April 28, 2026, was reviewed.

11. Medical records for Ms. Jean A. Lubken were reviewed.

12. Various legal documents were reviewed, including the following:

    - Complaint

    - Plaintiff's Response to Defendant Gatekeeper's Interrogatories

    - Plaintiff's Response to Defendant Fred Meyer's Interrogatories

    - Defendant Gatekeeper's Response to Plaintiff's Interrogatories

    - Defendant Fred Meyer's Response to Plaintiff's Interrogatories

- Lombino's Spoilation letter

- Motion for Summary Judgement dated April 9, 2026.

- Plaintiff's Response to Motion for Summary Judgement dated February 10, 2026.

13. Various materials were referenced as follows:

a. :Nahum, A.M. and Gomez, M.A., Injury Reconstruction: The Biomechanical Analysis of Accidental Injury, SAE paper, 1994.

b. Whiting, W.C., Zernicke, R.F., Biomechanics of Musculoskeletal Injury, Human Kinet-ics, 1998.

c. Schmitt, K.U., Niederer, P., and Walz, F., Trauma Biomechanics: Introduction to Ac-cidental Injury, Springer-Verlag, 2004.

d. Gordon, et. al, Anthropometric Survey of U.S. Army Personnel: Summary Statistics, Interim Report for 1988.  March 1989.

e. Anderson DE, Madigan ML. Healthy older adults have insufficient hip range of motion and plantar flexor strength to walk like healthy young adults. J Biomech. 2014 Mar 21;47(5):1104-9)

## Section V
## ATTACHMENTS

A. Photographs

B. Figures and Tables

C. Curriculum Vitae

**Section V**

**ATTACHMENT A**

# Photographs

Photographs taken during our inspection and reviewed in this report, including photographs and videos that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**

Still image from the surveillance video at 1:47:34 p.m. showed that Ms. Lubken put her purse on the top basket of the small cart and attempted to move it, but could not, as indicated by a white arrow.



**Photograph 2**
Still image taken at Aisle 86 showed that a small cart was used next to Ms. Lubken and store staff members (2:06:52 p.m.), where an item was placed in the upper basket of the small cart, as indicated by a green arrow.



**Photograph 3**
A left front view of an exemplar small shopping cart, designed the same as the subject cart used by Ms. Lubken and staff members at the time of the subject incident, as shown in **Photograph 2.**



**Photograph 4**

A left top view of an exemplar small shopping cart with measurements: The width of the exemplar small shopping cart was approximately 23 inches, where the distance between the rear wheels was approximately 21 inches.



**Photograph 5**

A lateral view of the shelves for the hand mixers, taken at the time of joint inspection. The section was for mixers, including hand mixers. The number 86 was shown as compared to **Photograph 2**.



**Photograph 6**

A lateral view of the shelves for the hand mixers, taken at the time of joint inspection. There were some boxes bigger than the depth of the shelves and extended into the aisle walking area, as indicated by a red arrow.



**Photograph 7**

The staged tests performed by Kohles Bioengineering Corp, at the time of joint inspection on March 30, 2026.  The exemplar shopper's feet were behind the shopping cart and within the area between the two rear wheels, similar to other guest shoppers after the shopping cart was locked and stopped



**Photograph 8**

The staged tests were performed by Kohles Bioengineering Corp during the joint inspection on March 30, 2026.  The exemplar Cart took about 4 feet to stop after lockup was initiated.



**Section V**

**ATTACHMENT B**

# Figures

**Figure 1**
Google Map aerial 3D view of the Fred Meyer.  The yellow arrow indicated the entrance / exit of the store.



**Figure 2**
Still images from the surveillance video showed an unknown senior shopper pushing a large cart out of the store entrance at approximately 1:47:34 p.m. The feet of this shopper were located within the area between the two rear wheels behind the stopped carts; there was no visible evidence that the person's foot stepped on the rear wheel of the large cart.



**Figure 3**
Still images from the surveillance video showed an unknown shopper pushing a large cart out of the store entrance at approximately 1:40:57 p.m. The feet of this shopper were located within the area between the two rear wheels behind the stopped carts, there was no visible evidence that the person's foot misstep on the rear wheel of the large cart.



**Figure 4**

Still images from the surveillance video showed an unknown senior shopper pushing a large cart out of the store entrance at approximately 2:54:05 p.m. The feet of this shopper were located within the area between the two rear wheels behind the stopped carts, there was no visible evidence that the person's foot misstep on the rear wheel of the large cart.



**Figure 5**

Still images from the surveillance video showed that Ms. Lubken entered the store at approximately 1:47:34 p.m., then walked to the left with a typical stride width and length similar to those of other shoppers.



**Figure 6**

Still images from the surveillance video showed that Ms. Lubken left the entrance area and walked with a typical stride width and length (1:47:41 to 44 p.m.)



**Table 1**

Cumulative distribution of population by height and gender from Center for Disease Control and Prevention.

[Data are based on National Health and Nutrition Examination Survey (NHANES), a sample of the civilian noninstitutional population. For this survey, the respondent participates in an interview and a physical examination. For persons 20 years old and over. Height was measured without shoes. Based on sample and subject to sampling variability; see source]

| Height | Males | | | | | | Females | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 20–29 years | 30–39 years | 40–49 years | 50–59 years | 60–69 years | 70–79 years | 20–29 years | 30–39 years | 40–49 years | 50–59 years | 60–69 years | 70–79 years |
| Percent under— | | | | | | | | | | | | |
| 4'10" ........ | – | – | – | (B) | – | – | – | [1] 1.7 | – | [1] 1.0 | – | [1] 3.3 |
| 4'11" ........ | – | – | – | (B) | (B) | – | [1] 2.6 | 3.1 | [1] 1.6 | 2.1 | [1] 3.6 | 8.7 |
| 5' .......... | (B) | – | – | (B) | (B) | – | 5.7 | 6.0 | 5.0 | 8.0 | 9.0 | 16.0 |
| 5'1" ........ | (B) | (B) | (B) | (B) | [1] 0.4 | (B) | 12.3 | 11.6 | 10.8 | 16.7 | 14.7 | 26.0 |
| 5'2" ........ | (B) | (B) | (B) | (B) | (B) | (B) | 20.8 | 19.7 | 19.8 | 23.3 | 23.4 | 36.9 |
| 5'3" ........ | (B) | [1] 3.1 | [1] 1.9 | (B) | [1] 2.3 | (B) | 30.4 | 31.3 | 30.8 | 36.3 | 38.4 | 51.9 |
| 5'4" ........ | 3.7 | [1] 4.4 | 3.8 | [1] 4.3 | 4.4 | 5.8 | 43.5 | 46.6 | 46.0 | 50.7 | 52.8 | 69.9 |
| 5'5" ........ | 7.2 | 6.7 | 5.6 | 7.6 | 7.8 | 12.8 | 54.1 | 61.2 | 58.0 | 68.4 | 66.6 | 82.8 |
| 5'6" ........ | 11.6 | 13.1 | 9.8 | 12.2 | 14.7 | 23.0 | 72.4 | 74.0 | 72.2 | 79.7 | 83.3 | 89.3 |
| 5'7" ........ | 20.6 | 19.6 | 19.4 | 18.6 | 23.7 | 35.1 | 82.3 | 84.9 | 83.0 | 88.4 | 93.3 | 95.4 |
| 5'8" ........ | 33.1 | 32.2 | 30.3 | 30.3 | 37.7 | 47.7 | 90.3 | 91.8 | 91.2 | 95.2 | 97.0 | 98.4 |
| 5'9" ........ | 42.2 | 45.4 | 40.4 | 41.2 | 50.2 | 60.3 | 94.1 | 96.1 | 94.7 | 97.3 | 97.8 | 99.6 |
| 5'10" ....... | 58.6 | 58.1 | 54.4 | 54.3 | 65.2 | 75.2 | 97.6 | 98.9 | 97.8 | 98.9 | 99.6 | 99.6 |
| 5'11" ....... | 70.7 | 69.4 | 69.6 | 70.0 | 75.0 | 85.8 | 99.6 | 98.9 | 99.4 | 100.0 | 99.8 | 100.0 |
| 6' .......... | 79.9 | 78.5 | 79.1 | 81.2 | 84.3 | 91.0 | 100.0 | 99.4 | 99.5 | 100.0 | 99.9 | 100.0 |
| 6'1" ........ | 89.0 | 89.0 | 87.4 | 91.6 | 93.6 | 94.9 | 100.0 | 99.9 | 99.5 | 100.0 | 99.9 | 100.0 |
| 6'2" ........ | 94.1 | 94.0 | 92.5 | 93.7 | 97.8 | 98.6 | 100.0 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 |
| 6'3" ........ | 98.3 | 95.8 | 97.7 | 96.6 | 99.9 | 100.0 | 100.0 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 |
| 6'4" ........ | 100.0 | 97.6 | 99.0 | 99.5 | 100.0 | 100.0 | 100.0 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 |
| 6'5" ........ | 100.0 | 99.4 | 99.4 | 99.6 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 6'6" ........ | 100.0 | 99.5 | 99.9 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

– Represents zero. B Base figure too small to meet statistical standards of reliability of a derived figure. [1] Figure does not meet standard for reliability or precision.

Source: U.S. National Center for Health Statistics, unpublished data, <http://www.cdc.gov/nchs/nhanes.htm>.

**Table 2**

Cumulative distribution of the Buttock Height from Gordon, *et. Al,* Anthropometric Survey of U.S. Personnel: Summary Statistics Interim Report.  March 1989.

**Buttock Height**



| FEMALE | | | MALE | | |
|---|---|---|---|---|---|
| N = 2208 | | | N = 1774 | | |
| **Centimeters** | | **Inches** | **Centimeters** | | **Inches** |
| 83.83 | Mean | 33.01 | 88.74 | Mean | 34.94 |
| 4.52 | Std Dev | 1.78 | 4.71 | Std Dev | 1.85 |
| 102.20 | Maximum | 40.24 | 111.40 | Maximum | 43.86 |
| 65.30 | Minimum | 25.71 | 71.50 | Minimum | 28.15 |
| | **Percentiles** | | | **Percentiles** | |
| 73.89 | 1st | 29.09 | 78.43 | 1st | 30.88 |
| 75.02 | 2nd | 29.53 | 79.71 | 2nd | 31.38 |
| 75.73 | 3rd | 29.81 | 80.48 | 3rd | 31.68 |
| 76.69 | 5th | 30.19 | 81.48 | 5th | 32.08 |
| 78.18 | 10th | 30.78 | 82.98 | 10th | 32.67 |
| 79.20 | 15th | 31.18 | 83.99 | 15th | 33.07 |
| 80.01 | 20th | 31.50 | 84.79 | 20th | 33.38 |
| 80.72 | 25th | 31.78 | 85.49 | 25th | 33.66 |
| 81.36 | 30th | 32.03 | 86.13 | 30th | 33.91 |
| 81.96 | 35th | 32.27 | 86.74 | 35th | 34.15 |
| 82.54 | 40th | 32.50 | 87.32 | 40th | 34.38 |
| 83.10 | 45th | 32.72 | 87.89 | 45th | 34.60 |
| 83.66 | 50th | 32.94 | 88.47 | 50th | 34.83 |
| 84.23 | 55th | 33.16 | 89.06 | 55th | 35.06 |
| 84.81 | 60th | 33.39 | 89.66 | 60th | 35.30 |
| 85.42 | 65th | 33.63 | 90.30 | 65th | 35.55 |
| 86.07 | 70th | 33.88 | 90.99 | 70th | 35.82 |
| 86.77 | 75th | 34.16 | 91.75 | 75th | 36.12 |
| 87.57 | 80th | 34.48 | 92.61 | 80th | 36.46 |
| 88.51 | 85th | 34.85 | 93.62 | 85th | 36.86 |
| 89.71 | 90th | 35.32 | 94.93 | 90th | 37.37 |
| 91.50 | 95th | 36.02 | 96.89 | 95th | 38.14 |
| 92.67 | 97th | 36.48 | 98.15 | 97th | 38.64 |
| 93.53 | 98th | 36.82 | 99.06 | 98th | 39.00 |
| 94.86 | 99th | 37.35 | 100.46 | 99th | 39.55 |

**Table 3**

Cumulative distribution of the Functional Grip Reach from Gordon, *et. Al,* Anthropometric Survey of U.S. Personnel: Summary Statistics Interim Report.  March 1989.

**Functional Grip Reach**

| FEMALE N = 2208 | | | MALE N = 1774 | | |
|---|---|---|---|---|---|
| Centimeters | | Inches | Centimeters | | Inches |
| 68.61 | Mean | 27.01 | 75.07 | Mean | 29.55 |
| 3.39 | Std Dev | 1.33 | 3.68 | Std Dev | 1.45 |
| 83.20 | Maximum | 32.76 | 92.10 | Maximum | 36.26 |
| 57.50 | Minimum | 22.64 | 62.60 | Minimum | 24.65 |
| | Percentiles | | | Percentiles | |
| 61.51 | 1st | 24.22 | 67.26 | 1st | 26.48 |
| 62.12 | 2nd | 24.46 | 68.04 | 2nd | 26.79 |
| 62.55 | 3rd | 24.63 | 68.55 | 3rd | 26.99 |
| 63.19 | 5th | 24.88 | 69.28 | 5th | 27.28 |
| 64.26 | 10th | 25.30 | 70.45 | 10th | 27.74 |
| 65.03 | 15th | 25.60 | 71.27 | 15th | 28.06 |
| 65.66 | 20th | 25.85 | 71.93 | 20th | 28.32 |
| 66.22 | 25th | 26.07 | 72.52 | 25th | 28.55 |
| 66.72 | 30th | 26.27 | 73.05 | 30th | 28.76 |
| 67.19 | 35th | 26.45 | 73.54 | 35th | 28.95 |
| 67.64 | 40th | 26.63 | 74.02 | 40th | 29.14 |
| 68.08 | 45th | 26.80 | 74.49 | 45th | 29.33 |
| 68.51 | 50th | 26.97 | 74.95 | 50th | 29.51 |
| 68.95 | 55th | 27.15 | 75.42 | 55th | 29.69 |
| 69.40 | 60th | 27.32 | 75.90 | 60th | 29.88 |
| 69.86 | 65th | 27.50 | 76.40 | 65th | 30.08 |
| 70.34 | 70th | 27.69 | 76.92 | 70th | 30.29 |
| 70.87 | 75th | 27.90 | 77.50 | 75th | 30.51 |
| 71.46 | 80th | 28.14 | 78.15 | 80th | 30.77 |
| 72.15 | 85th | 28.41 | 78.91 | 85th | 31.07 |
| 73.03 | 90th | 28.75 | 79.87 | 90th | 31.45 |
| 74.36 | 95th | 29.27 | 81.31 | 95th | 32.01 |
| 75.24 | 97th | 29.62 | 82.25 | 97th | 32.38 |
| 75.90 | 98th | 29.88 | 82.94 | 98th | 32.65 |
| 76.97 | 99th | 30.30 | 84.03 | 99th | 33.08 |

## Section V
## ATTACHMENT C

# Curriculum Vitae



## Christopher T. Chen, Ph.D., P.E.
Principal Consultant

6221 Dean Martin Drive
Las Vegas, NV 89118



(702) 470-0232

cchen@rimkus.com

## Background

Dr. Christopher Chen received an M.S. and Ph.D. from the University of Wisconsin-Madison for studying musculoskeletal tissue mechanics/medical devices and gained postdoctoral training from Cornell University in the fields of joint mechanics, orthopedics, tissue engineering, and musculoskeletal biochemistry/histology. Dr. Chen is also a registered professional engineer in multiple states with significant expertise in design and computer simulation/modeling of mechanical systems.

Dr. Chen's experience includes orthopedic biomechanics, traumatic (sub-traumatic) injuries, and musculoskeletal tissue regeneration such as orthopedic surgical repair of soft tissues (cartilage, ligament/tendon, meniscus, and spinal disc), bone fracture/healing, as well as soft tissue injuries. He has contributed to more than 100 scientific papers in the field of orthopedics, sports medicine, tissue mechanics, and bioengineering and continues to be involved with teaching biomechanics to graduate/medical students, residents, and orthopedic surgeons. His studies were supported by the National Institutes of Health (NIH), the Department of Defense (DoD), and numerous research foundations (ANRF, AOSSM, and OREF).

Dr. Chen's primary areas of consulting expertise include biomechanical/injury consistency, accident reconstruction, medical device product liability, and medical technology. He uses computer simulations and mathematical models to analyze vehicle dynamics and to perform biomechanical analysis on cases involving in low-speed accidents, sport injuries, and other accidental events.

## Education and Certifications
- **Mechanical Engineering, B.S.:** National Taiwan University
- **Mechanical Engineering, M.S.:** University of Wisconsin - Madison
- **Bioengineering (Mechanical Engineering/Mechanics), Ph.D.:** University of Wisconsin - Madison
- **Postdoctoral Training in Orthopedic Mechanics/Tissue Engineering:** Cornell University
- **Professional Engineer:** Arizona, California, Colorado, Nevada, New Mexico, Texas, Utah, and Wisconsin
- **Certified Bosch© CDR Tool Technician by IPTM**
- **Remote Pilot for Drone/UAS by FAA**
- **Certified Forensic Engineer by National Academy of Forensic Engineers (NAFE):** Senior member



## Professional Engagements

- **Orthopedics and Musculoskeletal Research**
  - University of Texas Southwestern Medical Center – Dallas, TX (2010-2017), Assessing integrity and functions properties in bone samples with osteoporosis and diabetics, cartilage degeneration/regeneration, spine/intervertebral disc impact injury, rotator cuff injury and repair using animal models, and lung regeneration and performing orthopedic surgeries for small animals for shoulder repairs, bone fracture healing/regeneration, and cartilage repair/degeneration.
  - Hospital for Special Surgery/Cornell Medical Center – New York, NY (2001-2010), Assessing biomechanical/biochemical properties of regenerated, repaired, and diseased cartilage; tissue engineering; cartilage/knee mechanics; shoulder (rotator cuff) injury; and shoulder joint mechanics, and performing orthopedic surgeries for small animals for cartilage repair/degeneration.
  - Hospital for Special Surgery/Cornell Medical Center – New York, NY (1999-2001 fellowship), Cartilage injury, cartilage tissue mechanics (biphasic/permeability), and knee mechanics.
  - Cornell University – Ithaca, NY (1996-1999), Cartilage impact injury, cartilage mechanics.
  - University of Wisconsin – Madison, WI (1992-1996), Studied interstitial fluid flows and tissue behavior in normal and diseased ligament and tendon; investigated ligament/tendon tissue mechanics (poroelasticity) and knee mechanics; and performed CFD simulations and FEA analysis.
  - University of Wisconsin – Madison, WI (1991-1994), Studied interbody cage design/test for spinal fusion.

- **Computation Analysis and Modeling**
  - Hospital for Special Surgery/Cornell Medical Center – New York, NY (2001-2009), Biphasic and poroelastic modeling for cartilage biomechanical properties.
  - University of Wisconsin – Madison, WI (1992-1996), Computation fluid modeling of interstitial fluid flow in ligament and tendon.

- **Medical Device and Design**
  - Hospital for Special Surgery / Cornell Medical Center - New York, NY (2003-2004), FT-IRIS device: designing the probe for determining biochemical properties of cartilage using FTIR.

## Forensic Engagements

- **Biomechanical Assessments**
  - Biomechanical assessment of injuries related to sports events, as well as slip/trip/fall.

- **Forensic Assessments for Motor Vehicle Accident**
  - Vehicle accident reconstruction and event data (Airbag Control Module) analysis.
  - Occupant motion analysis and biomechanical assessment of the consistency for injuries in head, shoulder, neck, lumbar spine, knee, and ankle.

- **Motion Studies**
  - Gait analysis and biomechanical analysis in slip, trip, misstep, and fall.
  - Complex sports injury in competitive sports events.

- **Device Operation and Failure**
  - Design and operations and failure of medical devices, industrial devices, furniture, gates, and car seatbacks.



## Professional Experience

- **Rimkus**  **2018 – Present**
  - Principal Consultant
  Evaluates and analyzes biomechanical systems, including voluntary and involuntary human motions, for insurance carriers, law firms, and corporate clients. With computer and physical models, evaluates human injury impact from vehicular accidents, amusement park ride accidents, and cases involving falls or falling objects including occupant motion analysis to determine injury potential/causation (e.g., seatbelt use, the effects of airbag interaction, occupant positions). Uses both computer and physical models to reconstruct accidents and measure load and injury levels.

- **University of Texas Southwestern Medical Center**  **2010 – 2017**
  - Assistant Professor - Orthopedic Surgery and Mineral Metabolism Center
  - Director of Orthopedic Research (Orthopedic Surgery)
  - Director of Core Facility for Bone Histomorphometry and Musculoskeletal Assessment
  Primary tasks and works from multiple aspects of orthopedics, musculoskeletal research, and bone quality assessment: 1) Integrated all aspects of research processes to address basic, applied, and clinical orthopedic topics; 2) Performed collaborative research with other intramural departments and outside academic and industrial institutions and implemented in the clinical setting; 3) Lectured medical students, orthopedic surgery residents, and biomedical engineering graduate students; 4) Incorporated orthopedic surgeons into the research process from identifying study topics, designing experiments, performing surgeries, testing, and data analyses to publication; 5) Taught courses of biomechanics and biomaterials.

- **Cornell Medical Center School/Hospital for Special Surgery**  **1999 – 2010**
  - Assistant Scientist – Research Division/ Orthopedic Soft Tissue Research Program
  Performed collaborative research with other intramural departments and outside academic institutions related to musculoskeletal injury, tissue regeneration and repair; performed mechanical tests for soft tissues (cartilage, meniscus, and spinal disc); Performed simulations using biphasic and poroelastic theories. Provided lectures to medical students, orthopedic surgery residents, and physical therapy students; supervised/mentored engineering/medical students, residents for collaborative research; and trained and supervised undergraduate and graduate students.

- **Cornell University**  **1996 – 1999**
  - Postdoctoral Fellow/Design Engineer – Baker Institute for Animal Health
  Designed apparatus to test the structural failure and biological changes of articular cartilage injuries due to impact loading or cyclic sub-fracture impact loading, critical for the initiation of post-traumatic osteoarthritis. The paper (Chen et al., 1999) was presented in the meeting of American Society of Biomechanics and awarded for the best paper in Bone/Orthopedics (MSRC Biomechanics Award).

- **University of Wisconsin, Madison**  **1991 – 1996**
  - Research Assistant – Mechanical Engineering Dept.
  Studied the effects of loading on interstitial fluid and solid interactions inside patellar tendon and spine/IVD using various computational tools/models such as finite element analysis (poro-viscoelastic model), Monte Carlo simulation, and Computational Fluid Dynamics (CFD models). Performed biomechanical testing for the behaviors and failure of ligament and tendon under various loading conditions such as cyclic fatigue load-to-fail. Performed biomechanical tests to determine lumbar vertebrae motion and segment stability with or without spinal cage(s) and/or external fixation.

## Continuing Education

- **Center for Public Safety at Northwestern University (NUCPS):**
  - Traffic Crash Reconstruction 2 (2018)
  - Crash Investigation 1 (2018);
  - Crash Investigation 2 (2019);
- **Engineering Dynamics Corporation:** EDC 2019 HVE Forum (2019)
- **IPTM:** Event Data Recorder Use in Traffic Crash Reconstruction (2022)
- **FAA:** Part 107 Small UAS Part 61 (2022, 2024)
- **Excel Tribometers** XL Tribometrist (2018)

## Professional Affiliations and Services

- **Memberships**
  - 1991 - American Society of Mechanical Engineers (ASME)
  - 2000 - Orthopaedic Research Society (ORS)
  - 2022 - Society of Automotive Engineers (SAE)
  - 2024 - National Academy of Forensic Engineers (NAFE)
  - 2024 - National Association of Professional Accident Reconstruction Specialists (NAPARS)

## Honors

- **ASME Ph.D. Paper Competition:** Finalist, Mechanical, Bioengineering Division
- **MSRC Biomechanics Award in Bone/Orthopedics:** American Society of Biomechanics
- **Herodicus Award:** Herodicus Society, American Orthopaedic Society for Sports Medicine
- **Fellow:** National Arthritis Research Foundation (2004)
- **Founder's Award:** Eastern Orthopaedic Society (2007)

## University Activities

- **Course Taught at Graduate and Undergraduate Levels**
  - Biomechanics in Human Disease
  - Biomaterials and Biocompatibility
  - An Introduction to Bioengineering
  - Introduction of Tissue Engineering and Drug Delivery
  - Human Physiology for Engineers

## Research Grant Reviewer

- 2007-2022 Reviewer, Orthopaedic Research Education Foundation
- 2003-2006 Reviewer, Cellular Biology Study Section - Arthritis Foundation
- 2009-2011 Ad hoc reviewer, Netherland ZonMw Foundation
- 2010-2011 Ad hoc reviewer, Skeletal Biology Structure & Regeneration Study Section NIH
- 2010-2013 Ad hoc reviewer, North Carolina Biotechnology Center
- 2011-2012 Ad hoc reviewer, Kentucky Science & Engineering Foundation
- 2011-2012 Ad hoc reviewer, Alberta Heritage Foundation of Research
- 2014-2015 Reviewer, Posttraumatic Osteoarthritis Study Section (PRMRP) - DoD-CDMRP

## Journal Editor

• **Journal of Clinical & Experimental Orthopaedics**

## Ad hoc Reviewer

• **Annuals of Biomedical Engineering** (2002-Present)
• **Clinical Orthopaedic and Related Research** (2005-Present)
• **Journal of Biomechanical Engineering** (2000-Present)
• **Journal of Biomechanics** (2001-Present)
• **Journal of Cellular Physiology** (2004-Present)
• **Journal of Orthopaedic Research** (2000-Present)
• **Journal of Biotechnology and Bioengineering** (2006-Present)
• **Osteoarthritis and Cartilage** (2005-Present)

## Publications (selection from 100+ scientific/engineering articles)

• **"A biomechanical analysis of biotenodesis screw versus bone tunnel methods to restore function of chronic ruptured Achilles tendon by flexor hallucis longus transfer."** Journal of Foot and Ankle Surgery 2017; 56(4):813-816.
• **"Type 2 Diabetes and Metformin Influence on Fracture Healing in an Experimental Rat Model."** Journal of Foot and Ankle Surgery, 2016; 55(5):955-60.
• **"Tissue Explant Models."** In the book of Post-Traumatic Arthritis: Pathogenesis, Diagnosis and Management, Ed. by Steve Olson and Farshid Guilak, of Springer Science, New York, 2015.
• **"Relationship Between Serum Uric Acid and Bone Mineral Density in the General Population and in Rats with Experimental Hyperuricemia."** Journal of Bone and Mineral Research. 2015; Jun;30(6):992-9.
• **"Full-thickness supraspinatus tears are associated with more synovial inflammation and tissue degeneration than partial-thickness tears."** Journal of Shoulder and Elbow Surgery 2011; 20:917-27.
• **"Are joint structure and function related to medial knee OA pain? A pilot study."** Clinical Orthopaedic and Related Research. 2011; Oct; 469(10):2866-73.
• **"Musculoskeletal effects of obesity."** Current Opinion in Pediatrics, 2009, Feb 21(1):65-70.
• **"Development of Experimental Model for Pressure Ulcers in Human Skin."** Wound Repair and Regeneration 2009; 17 (2), A24-A24.
• **"Biochemical and biomechanical properties of lesion and adjacent articular cartilage after chondral defect repair in an equine model."** American Journal of Sports Medicine, 2005; Nov 33(11):1647-53.
• **"Time, stress, and location dependent chondrocyte death and collagen damage in cyclically loaded articular cartilage."** Journal of Orthopaedic Research, 2003; 21:888-898.
• **"Matrix fixed charge density as determined by magnetic resonance microscopy of bioreactor-derived hyaline cartilage correlates with biochemical and biomechanical properties."** Arthritis & Rheumatism 2003; 48(4): 1047-56.
• **"Transient and cyclic responses of strain-generated potential in rabbit patellar tendon are frequency and pH dependent."** Journal of Biomechanical Engineering, 2000;122(5):465-70.
• **"A fiber matrix model for interstitial fluid flow and permeability in ligament and tendon."** Biorheology 1998; 35:103-118 (Cover highlighted article).

EXHIBIT "3"



*"Representing Quality Physicians"*
**Corporate Office**
406 Yauger Way SW Suite A
Olympia, WA 98502
Phone (360) 867-4188
Fax (360) 867-0466
pds@physiciandirectservices.com

# Cameron W. Schick, MD
Board Certified Orthopaedic Surgeon

## EMPLOYMENT

Proliance Orthopaedics & Sports Medicine
3101 Northrup Way, Suite 201
Bellevue, WA 98004
(425) 455-3600

## EDUCATION

Undergraduate:     University of Iowa
Iowa City, Iowa
Bachelor of Science in Biology
1999 – 2003

Medical School:     University of Texas Medical Branch
Galveston, Texas
Doctor of Medicine with Honors
2005 – 2009

## POSTGRADUATE TRAINING

Residency:     Orthopaedic Surgery
University of Iowa Hospitals and Clinics
Department of Orthopaedics and Rehabilitation
Iowa City, Iowa
2009 – 2014

Fellowship:     Indiana Upper Extremity Fellowship
Indiana Hand to Shoulder Center
Indianapolis, Indiana
2014 – 2015

## HONORS AND AWARDS

1999 – 2003        Four-time Letter-winner Men's Gymnastics
Four-time All-Big Ten Award
Four-time Board in Control of Athletics Award
*University of Iowa*

1999 – 2000        All-America Scholar Athlete
University of Iowa Most Improved Gymnast
*University of Iowa*

2001 – 2002        Marshall Stewart Scholarship
*University of Iowa*

2002 – 2003        Nissen-Emery Most Outstanding Collegiate Gymnast Nominee
University of Iowa Outstanding Senior Gymnast
Captain for University of Iowa Men's Gymnastics
Lester Bookey Memorial Scholarship
All-America Scholar Athlete
*University of Iowa*

2008 – 2009        Alpha Omega Alpha Honor Society
Gold Humanism Honor Society
*University of Texas Medical Branch*

2013        National Orthopaedic Leadership Committee Resident
Representative for the State of Iowa
*University of Iowa*

## PROFFESIONAL LICENSURE AND CERTIFICATION

2009 – 2014        State of Iowa Resident Physician License, R – 8686

2009 – Present        Basic Life Support for Healthcare Providers

2009 – Present        Advanced Trauma Life Support

2014 – 2015        State of Indiana Physician License, 01073635a

2015- Present        State of Washington Physician License, MD60552138

## EDITORIAL BOARDS

2012 – 2013        Editor-in-chief, *The Iowa Orthopaedic Journal*, Volume 33

PROFESSIONAL SOCIETIES

2008 – Present        Alpha Omega Alpha Honor Medical Society

2008 – Present        Gold Humanism Honor Society

2009 – Present        American Academy of Orthopaedic Surgery

2012 – Present        American Society for Surgery of the Hand


SCIENTIFIC PRESENTATIONS AND TEACHING

1. *Comparison of Pre and Post-Shelf PODCI Scores in the Treatment of Perthes*
   Intern Data Mining Project
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   October 2010

2. *Suture Reaction after Total Knee Arthroplasty*
   Quality Improvement and Patient Safety Conference
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   November 2010

3. *Pediatric ACL Injuries*
   Sports Medicine Conference
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   January 2011

4. *Physical Examination of the Upper Extremity*
   Lecture Series for 3rd and 4th year medical students
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   January – February 2012

5. *Mortality after Hip Fracture Surgery*
   Quality Improvement and Patient Safety Conference
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   May 2012

6. *Brown Tumor of the Spine*
   Orthopaedic Grand Rounds
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   July 2012

7. *Principles of Open Fracture Management*
   Orthopaedic Fracture Conference
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   July 2012

8. *Wrong Level Spine Surgery*
   Quality Improvement and Patient Safety Conference
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   October 2012

9. *Osteochondral Defect of the Talus*
   Orthopaedic Grand Rounds
   University of Iowa Hospitals and Clinics
   Department of Orthopaedics
   November 2012

10. *Stress Fractures in Athletes*
    Sports Medicine Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    January 2013

11. *High Tibial and Distal Femur Osteotomy*
    Sports Medicine Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    January 2013

12. *Femur Fracture after Corticotomy*
    Quality Improvement and Patient Safety Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    February 2013

13. *Instability and Alignment of the Knee*
    Sports Medicine Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    February 2013

14. *Closed Tibial Shaft Fractures*
    Orthopaedic Fracture Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    February 2013

15. *Recurrent Infection of the leg after HTO*
Quality Improvement and Patient Safety Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
May 2013

16. *Principles of Management of Soft Tissue Tumor Recurrence*
Pathology Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
May 2013

17. *Acute Infection after Total Hip Arthroplasty*
Quality Improvement and Patient Safety Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
May 2013

18. *Extraskeletal Ewing Sarcoma*
Pathology Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
May 2013

19. *Midfoot Fractures/Dislocations*
Fracture Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
June 2013

20. *Chondrosarcoma*
Pathology Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
June 2013

21. *Constrained Total Knee Arthroplasty*
Grand Rounds
University of Iowa Hospitals and Clinics
Department of Orthopaedics
July 2013

22. *Anterior Hip Dislocation after THA*
Quality Improvement and Patient Safety Conference
University of Iowa Hospitals and Clinics
Department of Orthopaedics
September 2013

23. *Floating Knee*
    Grand Rounds
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    November 2013

24. *Fat Embolism Syndrome*
    Quality Improvement and Patient Safety Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    December 2013

25. *Early Complications after Open Treatment of Distal Radius Fractures*
    AAHS National Meeting
    Grand Hyatt Kauai
    January 2014

26. *Early Onset Scoliosis*
    Grand Rounds
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    January 2014

27. *Os Acromiale*
    Grand Rounds
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    March 2014

28. *Elbow Osteochondritis Dissecans*
    Sports Medicine Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    March 2014

29. *Hamstring Avulsion Injury*
    Sports Medicine Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    April 2014

30. *Early Complications after Open Treatment of Distal Radius Fractures*
    Mid-America Orthopaedic Association Regional Meeting
    La Cantera San Antonio
    April 2014

31. *Thromboembolism Following Shoulder Arthroscopy: A Retrospective Review*
    Senior Research Day
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    June 2014

32. *Femoral Shaft Fractures*
    Fracture Conference
    University of Iowa Hospitals and Clinics
    Department of Orthopaedics
    June 2014

33. *Nerve and Tendon Anatomy*
    Overlake Symposium: Arthritis and the Upper Extremity
    Overlake Hospital
    Bellevue, WA
    November 2014

34. *Operative Treatment of Purulent Flexor Tenosynovitis*
    Tri-State Research Meeting
    Kleinert Kutz Hand Center
    Louisville, KY
    June 2015

RESEARCH

2009 – 2010    Cameron Schick, MD, Fred Dietz, MD; Department of Orthopaedics, University of Iowa; Comparison of Pre- and Post-Shelf PODCI Scores in the treatment of Perthes. Intern mining project.

2011 – 2014    Cameron Schick, MD, Brian Wolf, MD; Department of Orthopaedics, University of Iowa; Multicenter analysis of DVT/PE following shoulder arthroscopy. Clinical analysis of multiple variables during shoulder arthroscopy to determine risk factors that may contribute to DVT/PE post-operatively. IRB obtained. Abstract Submitted.

2012 – 2014    Cameron Schick, MD, Todd McKinley, MD; Department of Orthopaedics, University of Iowa; Traumatic dislocation of the hip in patients with hip dysplasia. Multiple acetabular measurements were performed to determine if mild dysplasia is a risk factor for hip dislocation.

2012 – 2014          Cameron Schick, MD, Nick Noiseux, MD; Department of Orthopaedics, University of Iowa; Fixed vs. Mobile bearing knees: A cadaveric study. Cadaver study comparing patellofemoral tracking in fixed and mobile bearing knees after placing tibial components in internal rotation.

2013 – 2014          Cameron Schick, MD, Brian Adams, MD; Department of Orthopaedics, University of Iowa; Risk Factors for Complications After Distal Radius Fracture Surgery.

2013 – Present       Cameron Schick, MD, Stuart Weinstein, MD; Department of Orthopaedics, University of Iowa; Cost Analysis of MRIs of the Upper Extremity.

2014 – Present       Cameron Schick, MD, Tom Kaplan, MD; Operative Treatment of Purulent Flexor Tenosynovitis: Efficacy and Cost Savings with an Outpatient Treatment Approach.


## PUBLICATIONS

Akoh, Schick, Otero, Karam. Fat Embolism Syndrome After Femur Fracture Fixation: A Case Report. Iowa Orthop J. (2014) vol. 34 pp. 55-62.

Schick, Koehler, Martin, Pugley, Gao, Shah, Adams. Risk Factors for 30-Day Postoperative Complications and Mortality Following Open Reduction Internal Fixation of Distal Radius Fractures. Journal of Hand Surgery (2014) vol. 39 (12) pp. 2373-2380.

Schick, Westerman, Gao, ACESS Group, Wolf. Thromboembolism Following Shoulder Arthroscopy: A Retrospective Review. Ortho Journal of Sports Medicine. November 2014 vol. 2 no. 11.

Graves, Schick, Weinstein. Physician Owned MRI More Cost Effective Than Hospital Owned Imaging. PENDING


## ACTIVITIES

1999 – 2003          University of Iowa Scholarship Gymnast

2001 – 2003          University of Iowa Student Athlete Advisory Committee Member and Chairman

2002 – 2003          Team Captain for University of Iowa Men's Gymnastics

2005 – 2009          Phi Beta Pi Medical Fraternity

2012                    Pediatric medical mission trip to Jamaica. Provided medical care
                        for over 700 children in need.



*"Representing Quality Physicians"*

**Corporate Office**
406 Yauger Way SW Suite A
Olympia, WA 98502
Phone (360) 867-4188
Fax (360) 867-0466
pds@physiciandirectservices.net

# Cameron W. Schick, M.D.
## Board Certified Orthopaedic Surgeon

May 18, 2026

Scott Lasalle
Attorney at Law
The Aguilera Law Group, APLC
1201 Pacific Ave Suite 600
Tacoma, Washington 98402

| | |
|---|---|
| Claimant: | **Jean Lubken** |
| Date of Loss: | **December 23, 2023** |
| Date of Evaluation: | **May 8, 2026** |

Dear Mr. Lasalle:

Please review the enclosed **Independent Medical Record Review** report which was produced to document the review that was performed by Cameron W. Schick, M.D., Board Certified Orthopaedic Surgeon.

Please review the following report:

**<u>RECORDS REVIEWED</u>:**

1. Complaint
2. Deposition
3. Interrogatories
4. Miscellaneous legal
5. Police report
6. Prior IME reports
    a. Gary Schuster, M.D.

**Scott Lasalle**                                                    **Re: Jean Lubken**
**Attorney at Law**                                                          **Page #2**
**May 18, 2026**

7.  Medical records
    a.  Epic Physical Therapy
    b.  CHI Franciscan Health
    c.  Robert Yarnall, PT
    d.  Kathryn Murray, OT
    e.  Virginia Mason Medical Center

## CHART REVIEW:

### Complaint

Complaint for damages regarding an incident that happened at Fred Meyer on December 23, 2023. Was pushing a shopping cart where the anti-theft wheel locked up causing Jean Lubken to fall on the floor.

### Deposition

July 8, 2025. Deposition of Jean Lubken. Discusses falling on April 3, 2025, resulting in injuries to the hand while walking a dog. Date of birth is May 18, 1949. This is the first fall since the accident in December of 2023. Husband Bill is a periodontist. Enjoys to garden, involved in social events. Discusses difficulty with kneeling and walking. Had a right knee replacement prior to the accident and left knee replacement after, and discusses needing a neck fusion. Entire deposition reviewed.

### Interrogatories

Interrogatory #1 describes injuries as a result of the incident including a fractured right hip, injuries to the neck and pain on the right side of the body, and discusses difficulties in life. All interrogatories reviewed.

### Miscellaneous Legal

Reviewed.

### Police Report

December 23, 2023. Incident was described as a wheel locking up falling onto right hip, with cart falling on top of me. Complaining of right hip pain, reflecting up to right side including neck and right hand.

Scott Lasalle                                                    Re: Jean Lubken
Attorney at Law                                                         Page #3
May 18, 2026


**Prior IME Reports – Gary Schuster, M.D.**

September 15, 2025. Current complaints include right hip pain along lateral hip to mid thigh. Medical exam completed by Dr. Schuster with a diagnosis of right subcapital femoral neck fracture, status post open reduction and internal fixation of the right hip. Discussed risk of avascular necrosis, osteoarthritis, and potential need for hip replacement.

**Medical Records**

**Epic Physical Therapy**

April 29, 2021. Complaining of pain in the neck with electric shock sensations. Was heading up the stairs of the house when she lost balance, hitting her head, and was seen for multiple visits regarding neck pain prior to the incident.

On June 30, 2021, describes another fall at a friend's house. Complaining of neck pain and tightness.

On July 21, 2021, had another fall while taking care of weeds falling onto rear end resulting in neck pain. Discussion of the issues with dizziness.

There is a visit on April 4, 2022. Discusses having posterior spinal fusion at C1-C2 on February 17, 2022.

Had a therapy visit of September 21, 2022. Has a referral for bilateral knee, pre-op rehab for bilateral total knee replacements.

On visit of March 20, 2023, it was 10 days after right knee replacement.

On March 24, 2023, reports having a trip and fall and having increased pain after her knee replacement. Was recovering well after the right knee replacement and was preparing for left knee replacement prior to fall.

On visit of February 21, 2024, reports only left knee pain and the nagging pain in the right upper thigh was gone.

All therapy visits reviewed through August of 2024.

**Scott Lasalle**                                                                  **Re: Jean Lubken**
**Attorney at Law**                                                                         **Page #4**
**May 18, 2026**

**CHI Franciscan Health**

December 23, 2023. ER visit at St. Joseph Medical Center. HPI: She is a 74-year-old female, presents with right hip pain and inability to bear weight after a fall onto right hip. Fell in grocery store while pushing a cart and cart malfunctioned. Denies any other injuries and states severe right hip pain. Neck had normal range of motion, no tenderness. Right hip has decreased motion due to pain and tenderness in the lateral hip. X-ray of the knee and right hip were obtained. Plan for CT and discussed with orthopedics who agreed to admission and for surgery the next day. CT showed an acute subcapital right femoral neck fracture with minimal anterior displacement. All records surrounding this admission were reviewed.

Operative note on December 24, 2023, reviewed for open treatment of right hip fracture with cephalomedullary nail by Dr. Ou, D.O. Reassured cephalomedullary nail was placed. No complications reported. Plan for weightbearing as tolerated. Was admitted to the rehab hospital on December 28, 2023. Inpatient rehab notes reviewed with principal problem of hip fracture, hypertension and anemia. No complaints of other orthopedic problems during inpatient rehab stay. All records surrounding inpatient rehab reviewed and was discharged on January 4, 2024, to home.

January 8, 2024. Orthopedic progress note by PA, James McPherson. 74-year-old post-op right hip IM cephalomedullary nail. Discontinuing physical therapy and discharged from inpatient rehab facility. Ambulating with a walker with no concerns or complaints of pain. X-rays were reviewed of the right femur and pelvis with fracture site showing good interval healing.

August 31, 2024. X-rays of the right fourth finger showing no acute fracture or dislocation with advanced fourth DIP degenerative joint changes with central erosions due to superimposed erosive osteoarthritis and degenerative changes of the partially imaged third DIP joint.

**Robert Yarnall, PT**

December 26, 2023. Initial evaluation for inpatient physical therapy. Pain assessment of his right hip pain.

**Kathryn Murray, OT**

Initial evaluation December 27, 2023. Initial evaluation for inpatient occupational therapy.

**Scott Lasalle**                                                           **Re: Jean Lubken**
**Attorney at Law**                                                              **Page #5**
**May 18, 2026**


**Virginia Mason Medical Center**

January 12, 2024. Primary care visit for after hip fracture, doing well.

April 17, 2024. Visit with PA Jovanovich for planned left tonal knee arthroplasty. No complaints or concerns regarding the right hip.

April 22, 2024. Admission records reviewed for left total knee arthroplasty.

May 14, 2024. Primary care visit for anemia and neck pain.

May 16, 2024. Cervical spine x-rays revealed status post C1-C2 fusion and C6-C7 ACDF without evident hardware complication. No acute osseous abnormality. Also present is multilevel disk degeneration worse at C3-C4 with ankylosis across C4, C5 facet joints.

May 20, 2024. Outpatient orthopedic clinic note with PA Lee. Four weeks status post left total knee arthroplasty. Still having knee pain. It was felt that her recovery was on track with x-rays reviewed. No other complaints were documented.

All records surrounding left total knee on April 22, 2024 reviewed.

November 1, 2024. X-rays of the lumbar spine showed no acute bony abnormality. Mild multifocal degenerative changes, most notable at L5-S1.

November 1, 2024. Evaluation of primary care for lower back pain that has been going on for one week. States unable to kneel for prayer. On examination, he is able to ambulate without apparent pain, able to transfer to and from exam table without significant discomfort.

**Billing**

Billing is reviewed and appears appropriate.

**Miscellaneous**

Miscellaneous records reviewed.

Scott Lasalle                                                    Re: Jean Lubken
Attorney at Law                                                        Page #6
May 18, 2026


**DIAGNOSTIC TESTS:**

**St. Joseph Medical Center**

December 23, 2023. CT of the right lower extremity visualizes a minimally displaced femoral neck fracture. Also, there appears to be some degenerative changes in the lower lumbar spine and sacrum region.

December 23, 2023. X-rays of the right hip and pelvis show a non-displaced fracture of the femoral neck. No significant arthritis seen in the hip.

December 23, 2023. X-rays of the right knee show a right knee replacement is well placed. No acute fractures, no signs of loosening or hardware failure.

December 24, 2023. Fluoro films from operating room show cephalomedullary nail with two screws in the femoral neck and head region and one distal locking screw. Implants appear well placed.

January 8, 2024. Postoperative films show stable appearing fixation of the nail. No evidence of fracture collapse, no evidence of hip arthritis.

August 31, 2024. X-rays of the right fourth finger show no acute findings, severe arthritis of the DIP joint of the ring finger and visible middle finger DIP joint.

**Virginia Mason**

October 28, 2019. X-rays of the cervical spine show a previous fusion at what appears to be C6-C7 with degenerative changes throughout the cervical spine, most notable at C3-C4 and C5-C6.

October 28, 2019. Three views of the right ankle show hardware at the base of the fifth metatarsal.

November 20, 2019. MRI of the cervical spine shows significant degenerative changes throughout the neck.

November 21, 2019. Fluoro shots of ACDF fusion plate in the cervical spine.

April 6, 2023. X-rays of the right knee show total knee replacement with well-placed implants. No evidence of loosening.

**Scott Lasalle**                                                    **Re: Jean Lubken**
**Attorney at Law**                                                              **Page #7**
**May 18, 2026**

May 16, 2024. X-ray of the cervical spine show fusion at C1-C2, and previous fusion at C6-C7.

May 20, 2024. X-rays of the left knee show total knee replacement with no evidence of failure or loosening.

August 27, 2024. X-rays of the hip show well-healed femoral neck fracture with stable appearing hardware. No evidence of hip arthritis.

November 1, 2024. X-rays of the lumbar spine show degenerative changes, most notable at L5-S1.

## DIAGNOSTIC IMPRESSION:

1.  Right femoral neck (hip fracture), in my opinion, on a more-probable-than-not basis, directly related to the incident on December 23, 2023, healed.
2.  Lumbar spine degenerative joint disease, in my opinion, on a more-probable-than-not basis, is pre-existing and unrelated to the incident on December 23, 2023.
3.  Cervical spine degenerative joint disease, in my opinion, on a more-probable-than-not basis, is pre-existing and unrelated to the incident.
4.  Bilateral knee degenerative joint disease, status post total knee arthroplasty, in my opinion, is pre-existing and unrelated to the incident on December 23, 2023.

## DISCUSSION:

Ms. Lubken had a fall resulting in a right femoral neck fracture that underwent appropriate treatment with open reduction and internal fixation with a cephalomedullary nail. Prior to the incident on December 23, 2023, Ms. Lubken was having issues with recurrent falls and dizziness. It appears that Ms. Lubken was dealing with issues related to her cervical and lumbar spine, as well as bilateral knee arthritis, which may have been a factor in her issues with her falling. The appropriate treatment was completed for her right hip and based on postoperative x-rays, this healed well with no signs of arthritis confirmed by an x-ray eight months following the surgical treatment. Any current issues related to falls, in my opinion, are unrelated to the incident that happened on December 23, 2023.

The fall that occurred at the grocery store resulting in a right femoral neck fracture, in my opinion, on a more probable-than-not basis, was directly related to the incident and the appropriate treatment was completed for this injury. It appears that this injury healed and that no further treatment would be needed. Due to the fact that the fracture healed and there are no signs of arthritis, I would not expect there to be a risk of developing

**Scott Lasalle**                                               **Re: Jean Lubken**
**Attorney at Law**                                                    **Page #8**
**May 18, 2026**

avascular necrosis or osteoarthritis of the hip resulting in a hip replacement surgery. The risk of avascular necrosis leading to osteoarthritis is particularly for displaced fracture patterns or for those with failed fixation, neither of which was the situation for Ms. Lubken. I would expect Ms. Lubken to continue without any issues without a risk for any need for further treatment moving forward.

This report was prepared by me and is true and correct to the best of my knowledge. The opinions and conclusions stated therein are more probable than not based upon reasonable medical probability.

I, Cameron W. Schick, M.D., declare under the penalty of perjury under the laws of the State of Washington that the following is true and correct:

1.  I am over the age of 18 years, I am competent to testify, and have personal knowledge of the facts contained herein in this declaration.

2.  I declare that the attached Record Review report of Jean Lubken was prepared by myself and is true and correct to the best of my knowledge.

3.  I reviewed Jean Lubken's medical records.

4.  The opinions and conclusions stated herein are stated on a more-probable-than-not basis and to a reasonable degree of medical certainty.

Thank you for allowing me to participate in the evaluation of this particular individual. If I can be of any further assistance, please contact me through Physician Direct Services.

Sincerely,



_____
Cameron W. Schick, M.D.
Board Certified Orthopaedic Surgeon

CERTIFICATE OF SERVICE

I, Juana Huber, declare as follows:

I am employed in the County of Orange, State of California.  I am over the age of 18 and am not a party to the within-action.  My business address is 23046 Avenida de la Carlota, Suite 300, Laguna Hills, CA 92653.  On **May 18, 2026**, I served a copy of the following documents:

DOCUMENT(S) SERVED:

**DEFENDANT GATEKEEPER SYSTEMS, INC.'S DISCLOSURE OF FACT AND EXPERT WITNESSES, INCLUDING REBUTTAL EXPERT WITNESSES**

SERVED UPON:              **SEE ATTACHED SERVICE LIST**

☐  (BY ELECTRONIC FILING WITH THE U.S. DISTRICT COURT)  I certify that on **May 18, 2026**, I electronically transmitted the attached document to the United States District Court and/or the US District Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants/recipients registered with the United States District Court according to Federal District Court Rules requirements.

☒  (ONLY BY ELECTRONIC TRAMSMISSION) Only by e-mailing the document(s) to the persons at the email address(es) listed based on notice provided on **May 18, 2026,** that during the Coronavirus (COVID-19) pandemic, this firm is working remotely, not able to send physical mail as usual, and is, therefore, using only electronic mail.  No electronic message or other indication that the transmission was unsuccessful was received within a reasonable time after the transmission.

☒  (FEDERAL)  I declare that I am employed in the office of a member of the bar of this court, at whose direction this service was made.

Executed on **May 18, 2026**, at Laguna Hills, CA.

_____
Juana Huber

1

**SERVICE LIST**
Jean Lubken, et al. vs. Fred Meyer Stores, Inc., et al.
United States District Court Washington – Western Division
Case No. 3:24-cv-05811-SKV

| Recipient: | Manner of Service: |
|---|---|
| Darrell L. Cochran, Esq.<br>Andrew S. Ulmer, Esq.<br>Alexander G. Dietz, Esq.<br>**PFAU COCHRAN VERTETIS AMALA PLLC**<br>909 A Street, Suite 700<br>Tacoma, WA 98402<br><br>*Attorneys for Plaintiffs* | ☐ BY U.S. MAIL<br>☐ BY HAND DELIVERY<br>☐ BY OVERNIGHT DELIVERY<br>☐ BY FACSMIILE:<br>☒ BY EMAIL:<br>darrell@pcvalaw.com<br>aulmer@pcvalaw.com<br>adietz@pcvalaw.com<br>jmeadows@pcvalaw.com<br>hannahgrant@pcvalaw.com |
| Joseph J.M. Lombino, Esq.<br>Joseph M. Lombino, Esq.<br>**LOMBINO MARTINO PS**<br>9315 Gravelly Lake Drive SW, Suite 201<br>Lakewood, WA 98499<br><br>*Attorneys for Plaintiffs* | ☐ BY U.S. MAIL<br>☐ BY HAND DELIVERY<br>☐ BY OVERNIGHT DELIVERY<br>☐ BY FACSMIILE:<br>☒ BY EMAIL:<br>j.lombino@lombinomartino.com<br>joey.lombino@lombinomartino.com |
| Jennifer L. Crow, Esq.<br>Ahbra Franco, Esq.<br>**SCHEER.LAW PLLC**<br>2101 Fourth Avenue, Suite 830<br>Seattle, WA 98121<br><br>*Attorneys for Defendants Fred Meyer Stores, Inc. and The Kroger Co.* | ☐ BY U.S. MAIL<br>☐ BY HAND DELIVERY<br>☐ BY OVERNIGHT DELIVERY<br>☐ BY FACSMIILE:<br>☒ BY EMAIL:<br>jen@scheer.law<br>ahbraf@scheer.law<br>adriennek@scheer.law<br>sarahc@scheer.law<br>schuylert@scheer.law |

2