# EXHIBIT "A"

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community,<br><br>Plaintiffs,<br><br>vs.<br><br>FRED MEYER STORES, INC., etc., et al.,<br><br>Defendants. | CASE No. 3:24-cv-05811-SKV |

Remote Deposition via Zoom videoconference of JEAN LUBKEN, taken on behalf of Defendant Gatekeeper Systems, Inc., at University Place, Washington, commencing at 10:04 a.m., Tuesday, July 8, 2025, before Marivon H. Christine, CSR No. 3735.

APPEARANCES OF COUNSEL:

For the Plaintiffs:

PFAU COCHRAN VERTETIS AMALA, PLLC
BY: ANDREW S. ULMER, ESQ.
909 A Street
Suite 700
Tacoma, Washington 94802
aulmer@pcvalaw.com

and

LOMBINO MARTINO, PS
BY: JOSEPH M. LOMBINO, ESQ.
9315 Gravelly Lake Drive SW
Suite 201
Lakewood, Washington 98499
joey.lombino@lombinomartino.com

For the Defendant Gatekeeper Systems, Inc.:

THE AGUILERA LAW GROUP, APLC
BY: SCOTT LaSALLE, ESQ.
23046 Avenida De La Carlota
Suite 300
Laguna Hills, California 92653
Slasalle@aguileragroup.com

For the Defendants Fred Meyer Stores, Inc., and The Kroger Company:

SCHEER LAW, PLLC
BY: AHBRA FRANCO, ESQ.
701 Fifth Avenue
Suite 3860
Seattle, Washington 98104
ahbraf@scheer.law

ALSO PRESENT:

Gigi Fadich, Videographer
Andrew Koumas, Zoom Administrator

Q So you were still looking for the hand mixer aisle; correct?
A Yes.
Q And at some point I understand from your interrogatory responses that the cart stopped; correct? 11:39
A Abruptly.
Q What happened when the cart stopped abruptly?
A When the cart stopped, I continued my motion forward, and it pushed me back because it just -- just because it had stopped. 11:39
So at that point my right foot heel interacted with the cart, and it caused me then to fall to the right side to the floor onto my right side into the side aisle.
Q Okay. So when the cart stopped, was it your impression that it had stopped at one of the wheels in 11:40 the front or the back or it was all together the whole thing?
A I'm not a person who's designed to know about shopping carts, but I know that that cart stopped on the spot, and I was jolted. 11:40
Q Okay. So it just stopped on the spot, and then you were continuing forward, and you bumped into the handle of the cart?
A Well, I still had my hands on the cart so that part was attached. The part I was saying to you about my 11:40

there to maneuvering myself up the shelving to maneuvering my heels forward to get to the merchandise cart.

I felt that I was going to be more securely supported by that cart, and that there would be a good chance that by waving at the surveillance camera I would get some assistance. 11:53

Q At any point during that time did you ever check your shopping cart to see what it was that caused it to stop? 11:53

A I was not interested in the shopping cart at that time, no. I was looking to not further have any more harm.

Q So you never checked the shopping cart to see if there was anything wrong with it? 11:54

A That was not my emphasis at that time. It was my safety.

Q All right. And did you check the ground to see if there was anything that the shopping cart might have hit, like, anything on the ground or any kind of gravel or sand or anything at all? 11:54

A There was nothing that I saw that would indicate that to be the case.

Q Okay. So you start to wave into the camera in the hope that someone would see you and come to help you; 11:54

Q Have you ever seen that photo?
A Yes.
Q Did you turn it over to your attorneys?
A I did.
Q Maybe we'll get it one day. 11:58
Did anyone else take photographs that you're aware of?
A At that moment not that I'm aware of.
Q Did you see any of the store employees check the shopping cart that you had been using? 11:58
A At that moment, no, sir, because I was pretty much in shock and the focus of the conversation did not go to care of me or having me checked out or having 911 called or any kind of support.
It went to, "How are you going to get home?" And 11:58 I typically am a person who would be initiating things, somebody call 911, giving direction or being the respondent to that.
In this situation, I believe myself to be in shock that I just followed the line of conversation about 11:59 how am I going to get home? And so I said, "Well, I don't know. Let me call and see if my husband can come to get me."
Q So you did not see any of the store employees check the cart? 11:59

A I personally did not see the cart being checked at all.

Q Okay. Did you see or hear from any of the store employees that they checked the cart that you had been using? 11:59

A I was in the hospital having had surgery. However, my husband did go to the store the next day and asked to see the cart, and he was told that it had been put back into circulation.

Also asked for a copy of the accident report and was told that that was not available because it had been sent to corporate. 12:00

Also asked for copies of the video and was told that those would not be available, but they did say that the accident report would be available, and we would be hearing from Fred Meyer within 24 hours, which we did not hear for weeks to months. 12:00

Q So your husband went to the store the next day to ask about the cart; correct?

A That's correct. 12:00

Q And he was told that the cart had been put back into the circulation. Was he told anything else that he shared with you about whether they did check the cart, if they did so, if they found anything wrong with the cart or anything at all? 12:01

for?

Q For you to answer.

So other than you experiencing that the cart halted are you aware of any other information that the cart in any way malfunctioned? 12:32

MR. ULMER: Same objection.

Go ahead.

THE WITNESS: And when we say that, who is to go ahead?

BY MR. LaSALLE: 12:32

Q You.

A Okay. That's where I was confused.

What? The cart did malfunction. The cart did halt. The cart did lock.

Q Other than the cart halting what caused you to believe that the cart malfunctioned? 12:33

A Because it locked, and I couldn't move it, and then I had the following fall.

Q You said you couldn't move the cart?

A Yes. 12:33

Q So the cart halted and then you subsequently tried to move it?

A The cart locked. As I said before I was pushing the cart forward and it locked.

Q Right. The cart came to a halt? 12:33

A Okay. Let's please do. I'm pushing the cart. The cart wheel locked. The cart itself locked. I don't know. I'm not an engineer as to whether it malfunctioned or what word you're having trouble with there, but I was in a situation where the cart locked and that is what happened ahead of the fall. 12:34

Q Okay. So the cart came to a stop, but you don't know why, and --

A Actually --

MR. ULMER: I object as to form. Misstates her testimony. 12:35

Go ahead.

THE WITNESS: Um-hum.

BY MR. LaSALLE:

Q Do you know why the cart stopped? 12:35

A The system locked.

Q And you checked that?

A I was not in a position to be looking at whether that was the case. I was falling.

Q So how do you know that the system locked? 12:35

A It was unable to move, and I was propelled to the ground.

Q Okay. All right. So we're back at the hospital now. We're back at the emergency department encounter note. 12:35

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, Marivon H. Christine, Certified Shorthand Reporter, Certificate No. 3735, for the State of California do hereby certify:

That the foregoing proceeding was taken remotely before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof;

I hereby certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have subscribed my name this date: July 16, 2025.

MARIVON H. CHRISTINE, CSR
Certificate No. 3735

Marivon H. Christine, Certified Shorthand Reporter, CSR No. 3735, hereby certify:

The foregoing is a true and correct copy of the original transcript of the proceedings taken by me as thereon stated.

Dated: July 16, 2025

MARIVON H. CHRISTINE, CSR, RPR
Certificate No. 3735