# EXHIBIT "C"

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community,<br><br>Plaintiffs,<br><br>vs.<br><br>FRED MEYER STORES, INC., an Ohio corporation doing business in the State of Washington; THE KROGER CO., an Ohio corporation doing business in the State of Washington; GATEKEEPER SYSTEMS, INC., a California corporation doing business in the State of Washington,<br><br>Defendants. | No. 3:24-cv-05811-SKV<br><br>(Pages 1 - 179) |

Videotaped deposition of JOSEPH G. WELSH, taken on behalf of Defendant Fred Meyer Stores, Inc., The Kroger Co., and Gatekeeper Systems, Inc. via Zoom videoconference, commencing at 10:02 a.m., on Thursday, June 4, 2026, stenographically reported by Kathleen Mary O'Neill, Certified Shorthand Reporter 5023, RPR.

you're working on currently?
A. About seven.
Q. Okay.
And is that an estimate?
A. It is. It's a ballpark. 10:09:15
We have, you know, intake every week, and some of the projects are at different stages of the project itself. Some are incompletions. Some are being vetted. It just varies. That would be a floating number, so to say. 10:09:38
Q. Sure. I appreciate you providing an estimate. Estimates are fine.
Are you actively consulting with retail operations as part of that number of seven cases?
A. Every day. 10:09:52
Q. Okay.
And we established that you also do expert work; is that correct?
A. Correct.
Q. In this case specifically, are you opining as a business retail operations and retail safety expert? 10:10:00
A. Yes.
Q. Please explain briefly -- so I kind of want a snapshot, and I may ask questions along the way. 10:10:16

THE WITNESS: Yeah. If we had that cart and they hadn't gotten rid of it or commingled it in other places or whatever they did with it, then we would have an opportunity to determine that further.

Q. BY MS. CAMPBELL: Sure. I understand what you're saying. 11:38:41

But your opinion is that there was a hazardous and dangerous condition for the shoppers; correct?

A. No doubt there was. 11:38:49

Q. And you believe that that was a wheel locking up on a shopping cart; correct?

A. Well, it's an assortment of wheels locking up. You have to remember here, there's 60 other incidents from these other -- these other incidents gave notice to Fred Meyer and Kroger that they had an issue with this system.

Q. But I'm just speaking about Ms. Lubken because that's the opinion that I'm focusing in on today is that ultimately you said that it caused plaintiff to be thrown from her standing position onto the concrete floor and become injured; correct? 11:39:15

A. The locking wheel on the shopping cart caused Ms. Lubken to be thrown to the concrete floor 11:39:27

and become injured, yes.
Q. And what -- how do you support that opinion besides what you mentioned about the testimony of Ms. Lubken?
A. Well, that's what we have. We have a video. We have her testimony. We have the accident report as entered into the Sedgwick claim system. 11:39:39
That what we have, Counselor, unless everybody's lying.
Q. Any other methodologies that you used to reach Opinion 1? 11:39:57
A. Not me.
Q. And any other testing that you used to reach Opinion 1?
A. Other than my 48 years of experience in the business, my frequent and almost weekly interaction with grocery store equipment, specifically shopping carts and other pieces, that's what I base my opinion on, Counselor, that and the discovery that I've been furnished to date. 11:40:07 11:40:30
I don't -- I don't -- I'm sorry, but I don't know how to make it any clearer.
Q. Did you explore any other possibilities of what might have caused the plaintiff, Jean Lubken, to fall? 11:40:42

A. No.
I don't have the shopping cart to disprove that it locked up. I have a terrible accident investigation. So I don't -- I don't have the tools that somebody would need to start, you know, pointing the other way. 11:40:57
Q. But you admit that the after response to the incident or the after investigation could not have caused Ms. Lubken to fall, that wouldn't make sense; right? 11:41:12
A. You mean them commingling the cart? That wouldn't have caused Ms. Lubken to fall.
The wheels locking up as she described and as testified to by Fred Meyer personnel and the snippet of the video, those lead me to that conclusion that that's what happened. 11:41:29
Q. So you're primarily basing this opinion on Ms. Lubken's testimony; correct?
A. She's part of the discovery, her statement of what happened. She's the one that had the injuries. 11:41:45
Q. Is that a "yes"?
A. That is a yes. That's my opinion.
Q. Okay.
And do you have testimony from anybody else 11:41:50

Q. Okay.
So that's a "no" because there's no technical evidence; correct?
A. Once I get the rest of the discovery, then, you know, an additional site inspection to prove that out may be required by Mr. Kohles. I don't know. 12:38:56
Q. Okay.
And in line with that, would you agree that you have no data currently to show that outdoor storage causes anti-theft wheel mechanisms to lock? 12:39:07
A. I don't think there's any doubt in my mind that carts stuck outside behind the building being weathered in the Northwest part of the United States would have an effect on the anti-locking mechanism. 12:39:29
Do I have the technical evidence? No, I don't.
Q. Okay.
And do you have the data to support that -- any data to support that? 12:39:43
A. Well, my data is my whole report.
The evidence to establish and fine-tune the relationship between anti-locking and weather, I don't have that, and I don't have the data.
Q. Okay. 12:39:58

the testimony of two Fred Meyer employees, that's my opinion.

Q. So with that said, is this your final conclusion, or is it possible your conclusion could change? 12:52:52

A. Oh, sure, it could change. You bet. You bet. That's why I really need that other stuff. Looking forward to getting it.

Q. Okay.

And then wouldn't you agree that it is the jury's duty to decide if a claim is with merit? 12:53:03

A. They are the ultimate fact finders and deciders. 100 percent agree.

Q. Okay. Give me just a second before I set us out to a break. And please understand, I may have a few follow-up questions. 12:53:28

A. Counselor, it's okay. No problem.

Q. Okay.

In the "Final Conclusion" where you said that the actions and inactions of the defendants -- right? You said their "failures, actions, and inactions fell well below industry accepted standards," which industry accepted standards are you referring to if I wanted to review those? 12:53:53

A. Opinions 1 through 5. I mean, I lay them 12:54:11

Q. Okay.
So you're not even sure if that was an anti-locking wheel case?
A. Correct.
Q. All right. 01:17:44
And you mentioned -- so were any of the cases where you have been retained in the last five years involving an anti-lock wheel?
A. Not sure. Don't -- I'm not sure about the Winco case. It was a different issue with a cart 01:18:03 and not relative -- it was missing wheels which caused the lady to get injured. I don't know if it was anti-locking or not.
Q. But to your recollection is this the first anti-lock wheel case that you have been retained as 01:18:19 an expert to opine on?
A. Yes.
Q. Have you ever had a case where someone came to you to inquire if you could provide expert testimony and you turned down the case because you 01:18:42 felt you wouldn't be able to provide opinions which might be favorable to the individual who contacted you?
A. No.
I've had to turn down cases because of 01:18:53

STENOGRAPHIC REPORTER'S CERTIFICATE

I, Kathleen Mary O'Neill, Certified Shorthand Reporter No. 5023, RPR, CLR, duly empowered to administer oaths, do hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing Zoom videoconference deposition;

Prior to being examined, the deponent was by me first remotely duly sworn;

Said deposition is a true, correct, and complete transcript of said proceedings taken to the best of my ability;

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void;

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, it was requested that the deponent shall have 30 days to review the transcript; therefore, any changes made by the deponent or whether or not the deponent signed the transcript cannot at this time be set forth.

Dated: June 24, 2026

KATHLEEN MARY O'NEILL
CSR 5023, RPR

I, Kathleen M. O'Neill, Certified Shorthand Reporter, CSR No. 5023, hereby certify:

The foregoing is a true and correct copy of the original transcript of the proceedings taken by me as thereon stated.

Dated: June 29, 2026

Kathleen M. O'Neill, CSR No. 5023