# EXHIBIT "D"

UNITED STATES DISTRICT COURT
DISTRICT OF WASHINGTON
WESTERN DIVISION

JEAN LUBKEN and WILLIAM LUBKEN, Husband and wife and their marital community,

Plaintiff,

vs.

FRED MEYER STORES, INC., an Ohio corporation doing business in the State of Washington; THE KROGER CO., an Ohio Corporation doing business in the State of Washington; GATEKEEPER SYSTEMS, INC., a California corporation doing Business in the State of Washington,

Defendants.

NO. 3:24-CV-05811-SKV

**EXPERT REPORT OF JOSEPH GRAY WELSH**

1. My name is Joseph Gray Welsh.

2. I offer this report and expert opinions as to the matters contained herein based upon my experience, specialized knowledge in the area of retail operations, safety, and review of the documents provided.

3. I am a 'Business, Retail Operations, and Retail Safety Expert' based in the State of Nevada, primarily working, consulting, and advising retail stores and related businesses of varying formats and related entities, food, non-food related entities, apparel, hardware, lawn, crafts, variety, and garden centers including exterior retail operations across the United States and abroad. I have a four-year bachelor's degree in accounting and extensive professional education, training, as well as a career of 48-years in the best practices and policies of various retail stores, food and non-food operations, fuel centers, department stores and large, big-box retail. Additionally, I am an expert in operational science, operations of various retail and wholesale stores, markets, big-box, food and non-food formats, and others where safety, loss prevention, and standard of care issues are dynamic forces to a successful operation and shopper, associate, and vendor safety. I have evaluated, consulted, owned, operated, reviewed, and/or built more than 900 stores over my career.

4. My education, training, and experience include designing and building retail blueprints, merchandising plans, equipment procurement and operation, designed best practices and protocols, receiving and backroom techniques, merchandising, risk assessment, loss prevention and shopper safety, associate safety, vendor safety, training in varying environments, facilities, types of stores, and best practices. A true and accurate, and complete copy of my Curriculum Vitae listing some of my education, training, experience, and qualifications is attached hereto and incorporated herein as **EXHIBIT "A".**

5. I am employed by Joseph Welsh Consulting, LLC as a Retail Operations and Safety Expert, among other duties. I have been engaged to offer my opinions in the form of this report, based on the material provided to me. Aside from my fee to review the materials, write this report, provide testimony either by deposition, trial, or both, based on the materials, applicable standards and my education and 48 years of experience, I have no financial interest in the outcome of this matter. The materials provided to me for review are listed in the attached **EXHIBIT "B".**

6. As a Retail Operations Expert, I am called upon to analyze, interpret, consult, review, troubleshoot, advise, amend, report, or build safe operations-which includes stocking practices, receiving practices, equipment operations and maintenance, front-end customer processing, packaging, merchandising, loss prevention, shopper and associate safety guidelines, and other duties as well as bring awareness of potential harm of bad practices to those who employ me. As an Expert, I have been called and hired in multiple litigation matters, in the last many years. A summary of those cases is listed in **EXHIBIT "C".** I have been compensated in the matters in **EXHIBIT "C"** a list of my current rates and fees are attached as **EXHIBIT "D"**. The current rate sheet is applicable in this case.

7. In my field, experience, and employment, I have been charged with the responsibility to protect health, safety, and welfare of the general public, and trained in the art, technology, and science of retail layouts, operational procedures, equipment operation and maintenance, merchandising plans, order processing (stocking) and best practices on the store front-end(s), back room, sales floors, and the best practices of general retailing. My extensive 'in the field' experience and retailing acumen qualify me to examine and opine to the facts in this case, any best or bad practices in this case, and address the standard of care that maintains safe shopping experiences, associate safety, and third-party vendor safety. That same extensive experience and industry acumen affords me the competence to rebut other expert's opinions and conclusions, if necessary.

8. **EXPERT DISCLAIMER:**
I have reviewed the provided items regarding this matter from the parties, to date, and understand that there may be more materials to review, as the matter matures or progresses. I do not know the parties personally-I have never met or heard of any individual in this matter. **I reserve the right to alter, amend, adjust my findings and opinions as discovery continues and more information be given to me.**

9. **EXPERT-WITNESS ASSIGNMENT**:
My assignment is to opine on the documents and exhibits furnished, video, safety circumstances , equipment operation, and related facts to the accident of Jean Lubken inside the retail shopping area of Fred Meyer (store, owned by Kroger) located at 4505 S. 19th Street, Tacoma, Washington, 98405, United States, on or about December 23, 2023. I have been asked to review the items provided me-which include the items in **EXHIBIT "B"** of the accident location, pictures, video clips, facilities, shopping carts, and other items in accordance with the standards in the retail industry. Further, I am charged to review, evaluate and report on those deposed, if deposed yet, in this matter. It is my understanding that discovery is ongoing-and I may receive more documents and items as the case matures.

10. **EXPERT-WITNESS REVIEW, RESEARCH, AND INVESTIGATION**:
As aforementioned and documented in **EXHIBIT "B",** I understand that as the discovery process continues, and the case moves forward, there may be additional items for consideration and review. I reserve my right to amend this report or further affirm my findings and opinions as additional information becomes available or otherwise known to me.

11. **EXPERT METHODOLOGY:**
As a **retail operations expert**, with 48 years' experience, I also rely on the materials furnished me, to determine the pathway to the facts-which may form my expert opinion(s). Additionally, I may refer to industry guidelines that supplement my opinions and help me determine true and accurate conclusions.

In this matter, I also reviewed and considered the below:
**ASTM F1637-**Standard Practice for Safe Walking Surface
**ASTM E1188-11**-Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator
**ASTM E620-18-**Reporting Opinions of Scientific or Technical Experts (E-620-18)
**ISO 31000**-Risk Management-Guidelines
**ASSP-TR-31010-2020**-Technical Report: Risk Management- Techniques for Safety Practitioner.
**ASTM F-2372-15-**Standard Consumer Safety Performance for Shopping Carts
**ASTM F-2372-04-**Standard Consumer Safety Performance for Shopping Carts
**OSHA-1910.22-**Walking-Working Surfaces (General Requirements) (a) (1), (a) (2), (a) (3), (b), (c), (d) (1), (d) (2)
**OSHA 'General Duty Clause' Section 5a1 of the OSHA Act**
**National Safety Council, Data Sheet 495**

In short, these are only guidelines and standards that most industry retailers abide by and NOT NECESSARILY POLICY of the defendants or any related party. The above methodologies are not a sole source of Industry Best Practices. This is one view of industry standards and investigative techniques that may or may not be adopted by any retailer, expert, or industry practitioner.

12. **FACTUAL BACKGROUND OF CASE**

According to the complaint and discovery to date, Jean Lubken was a legal invitee at the Fred Meyer Store (owned by Kroger Corp.) and the premises located at 4505 S. 19TH Street, Tacoma, Washington, 98405, United States on December 23, 2023.

Plaintiff Lubken entered the Fred Meyer store to do some shopping, specifically to purchase a mixer. She had been there many times. While shopping on aisle 86, Plaintiff Lubkens' shopping cart, suddenly and without warning, experienced a wheel malfunction (abrupt locking) which caused Lubken to be 'thrown' to the concrete floor. She was seriously injured.

The shopping cart had an 'anti-theft' wheel locking mechanism furnished by Defendant Gatekeeper, which malfunctioned, and was unmaintained by Defendant Fred Meyer (Kroger). This malfunction had happened many times, all Defendants was clearly aware that a dangerous and hazardous existed with the shopping carts.

After some minutes, a customer noticed Lubken on the floor and called for assistance from the store personnel. A manager, Angela Padilla, arrived on the scene-and was eventually assisted by employee Kenneth (Ken) Smittling. They assisted Lubken-placed her on a 'mobile' chair from the furniture department, wheeled her from the scene of her accident to the front and began filling out an accident form. Lubken called her grandson and husband-who eventually arrived on scene-to transport her briefly home-and then immediately to the hospital. Prior to leaving the premises, Padilla had Lubken answer some questions for the accident report.

Lubken, according to the discovery and depositions furnished thus far, was admitted through the emergency room to the hospital with many injuries, requiring prompt surgery the very next day (December 24, 2023). Lubken spent the Christmas holidays in the hospital, then transitioned to a rehab facility in early January-for extended treatment. Her treatment for the injuries continues.

The Lubken's retained counsel and filed a lawsuit.

13. **<u>Video Deposition of Jean Lubken taken on July 8, 2025</u>**

<u>Things notable from her deposition</u>

- She is the plaintiff in this matter
- Had shopped in the store many times
- Claims her shopping trip to Fred Meyer was to buy a mixer
- She chose her shopping cart-after the first one she selected 'would not move'
- Shopping cart wheel locked up/malfunctioned which 'threw her to the floor'
- She landed on her right-side
- Claims the shopping cart landed on her
- Has lived in Tacoma for 48-years, raised family there
- Semi-retired educator, works part time
- Drove herself to the store on the day of the incident
- Customer assisted her in removing the shopping cart from on top of her
- Acknowledges a female employee came to assist (Padilla?)
- Acknowledges a male employee ('Kenny') came to assist and make a report
- States that her grandson took pictures later, that the store folks did not
- Felt like she was in shock
- States that the 'female' employee spoke of a 'defective wheel'
- Asked for a copy of the accident report, and could not get one
- Was eventually placed on a chair that rolled and was pushed to the front area
- Was assisted into her husband's car. Husband drove her to house and then hospital
- Says she stopped by house briefly and then went to hospital immediately to address injuries
- Spent multiple days in hospital during Christmas holiday and then went to a boarding rehab facility
- Has had surgeries since the accident
- States she has suffered because of the accident at Fred Meyer

**14. <u>Video Deposition of William Lubken taken on July 8, 02025</u>**

<u>Things notable from his deposition</u>

- Husband of Jean Lubken
- Did not witness accident, was called later post-accident
- Drove wife to house and then to hospital
- Went to store following day to obtain copy of accident report, was NOT given a copy
- Asked for a copy of the accident video, was NOT given a copy
- Asked store personnel (he thinks lady manager) to preserve the accident footage/video
- Eventually saw the video
- Asked for the shopping cart to be saved, was told it wasn't set aside
- Took over many duties during his wife's recovery

**15. <u>Video Deposition of Angela Padilla taken on July 23, 2025</u>**

<u>Things notable from her deposition</u>

- Eight-year employee at Fred Meyer
- Was 'Home Assistant Manager' on the day of the incident, 2nd in command
- Usually supervised 10-15 in her department, more if manager in charge
- Was an employee when 'locking wheels' were installed, tested, etc.
- States carts will 'lock-up' unless pushed through area at check stands
- States that store has 'little handheld' units that can unlock 'locked up' wheels
- Admits no photographs were taken in accident aftermath
- States that the store may have had 180-200 employees working on Dec 23, 2023
- Identifies Kenneth Smittling as her associate who assisted Lubken during accident
- States that Sedgwick 'sometimes they'll ask us questions basically **on our opinion on what happened or what we thought'** during the claims process
- States, that once accident report is complete, and they call Sedgwick for an incident number, then the accident report if faxed and then **filed on site.**
- Admits assisting Lubken during accident and then was assisted by Kenneth
- States that smaller carts have two locking wheels attached
- States that Ken retrieved a chair for Lubken, and then once on the chair-Ken pushed Lubken to the front end…for her pickup or exit
- Acknowledges that the 'faulty cart' was not set aside or isolated
- Doesn't recall what happened to the cart
- Says her department (home department) takes carts to the 'cart graveyard' located outside in the back of the store-when deemed not working
- States that CCK Department (Cashiers, Parcels, Front-End Personnel) usually handles shopping carts
- **Re-states that no one preserved the faulty cart**
- Acknowledges that Lubken told her the cart **jolted and made her fall over**
- **States that incident reports/accident investigations are part of management responsibility—**
- States that she doesn't know much about the maintenance on the carts and wheels

**16. <u>Video Deposition of Kenneth (Ken) Smittling taken on November 10, 2025</u>**

<u>Things notable from his deposition</u>

- Twelve-year employee at Fred Meyer
- Current title is 'Relief Assistant Manager', works all over the store
- Same role in Home Department on date of accident December 23, 2023
- **Not aware of any policy that asks employees to inspect shopping carts**
- States that carts that has 'things wrong with it' are taken out of circulation
- Was never trained on cart inspections or maintenance

- Was there when **SmartWheels** were introduced
- Says that they are simply called 'locking wheels', unsure of any technical name
- **Says "Yeah. Yeah, they lock up sometimes."**
- **Has experienced carts locking up while he is pushing them**
- **"…it is fairly difficult to move them when they are locked"**
- States that sometimes they (store personnel) cannot get the locks to unlock
- Recalls assisting Lubken on date of accident
- Affirms that Lubken stated that the wheels locked
- Identifies Alex Sidoff as the leader in Asset Protection, and still works at Fred Meyer
- States that he doesn't remember what happened to the cart used by Lubken
- **States that 'we are to take photograph evidence if we're able to'**
- **States that he has received no training about cart injuries...**

**17. <u>STORE INSPECTION COMPLETED ON MARCH 30, 2026</u>**

I was originally notified that a store inspection in this lawsuit had been scheduled for December 9th/10th at the location in Tacoma. I made travel arrangements-and was notified at the last minute, that Fred Meyer (Kroger) had cancelled the inspection with no reason.

The store inspection was rescheduled multiple times, I made multiple plans and then adjustments to my schedule (which affected many other people), upon receiving the 'new' proposed dates. I was finally notified by Plaintiff's counsel that the **court had now ordered** that the inspection would take place in March , which it did.

As above, the store inspection **did take place** on March 30, 2026.

In my many decades in the retail grocery business, **this was one of the worst store inspections I have attended as an expert witness, a store person, a consultant, or basically in any capacity. The conduct of the defense counsel, store personnel, and cooperation was simply outrageous.**

- Defense counsel for Fred Meyer (Kroger) showed up at 8:30am, when the inspection was to begin at 8:00am. The defense counsel said that this "wasn't even her case—" and offered no apology. The store personnel would not let us begin, until counsel arrived' and all introductions were made.

Eventually, the inspection did begin. In my case, and in my scope, I was able to gather most all of the data that I needed….with that said, and being an older guy that has been around…**there was an obvious attempt to 'not answer basic questions', and every basic request was met by a 20-minute phone call (or alleged phone call) and then unlimited pacing around the store by defense counsel for Fred Meyer (Kroger).**

- **Fred Meyer (Kroger) personnel at the store-who were shadowing us during the inspection, told me on a few occasions, they either needed to go on break, find someone who could open a door, answer a question, escort us to the back of the store…etc. Each event took multiple minutes-which, in my opinion was a strategy to eat up the time of the 4-hr inspection window.**

Part of my scope was to review the camera room-available camera locations-and all items related to the video footage. The store inspection was scheduled from 8:00am-Noon. At about 11:00am, I began asking for access or someone to accompany me to the 'camera room'. I personally did not think I would need an hour, in fact-based on many store inspections done- I only thought I would need a maximum of two hours for the entire exercise. Nonetheless, over the next hour…**ever possible excuse was given to keep me from the camera room. They include:**

- **We need permission from LP (Loss Prevention) to enter the room**
- **We do not know who is working LP today**
- **The regular LP person is off on Mondays**
- **The person with the key just went on break**
- **The person came off break-but has the wrong key**
- **We need to make 'some calls'**
- **Our hands are tied**
- **Is this really (camera room inspection) necessary?**
- **Let me make another couple of calls**
- **We're going to see what we can do...**
- **And on….**

Per the court order and time allocated (8:00am-Noon) I concluded my inspection…I personally never got into the camera room.

**18. PRIOR INCIDENTS WHERE LOCKING WHEELS HAD MALFUNCTIONED**

The wheel malfunction that happened on December 23, 2023, and injured Plaintiff Lubken, was not an isolated incident. **During discovery, I was furnished dozens and dozens (nearly 60) incident reports all related to 'Wheel Locking' incidents and at Fred Meyer(Kroger) stores.** I have attached these incident reports as **EXHIBIT "E" to the Welsh Report.** From a Loss Prevention purview, immediate action would be needed. This would include collaboration between provider Gatekeeper, Fred Meyer Leadership, and staff…and possibly local health officials due to the volume and safety concerns of the public. In both Fred Meyer managers depositions, Padilla and Smittling, they made no mention of **any action taken to date. Both affirm they know little and have had no training on the handling of locking wheel problems, preventive maintenance, or company protocols and procedures. In my opinion, this is outrageous and negligent.**

19. **<u>EXPERT WITNESS SUMMARY AND OPINIONS:</u>**

**OPINION 1: DEFENDANTS, THROUGH THEIR PRACTICES, BAD HABITS, ACTIONS, AND NON-ACTIONS CREATED A HAZARDOUS AND DANGEROUS CONDITION FOR THE SHOPPERS AND STAFF OF THE PREMISES.THEIR NEGLIGENCE AND PRODUCT MALFUNCTION CAUSED PLAINTIFF TO BE THROWN FROM HER STANDING POSITION ONTO THE CONCRETE FLOOR AND BECOME INJURED.**

**DEFENDANTS OWED A DUTY TO PATRONS, EMPLOYEES, AND THE GENERAL PUBLIC TO PROVIDE A HAZARD AND DANGER FREE ENVIRONMENT.**

**DEFENDANTS ACTIONS AND INACTIONS FELL BELOW THE REASONABLY ACCEPTED STANDARDS FOR THE INDUSTRY.**

- Lubken, while pushing a shopping cart, experience the wheels on the cart locking abruptly, which 'jerked her', and she fell and was injured by no fault of her own. Based on the testimony from all parties and available video, this is undisputed.
- The shopping cart wheels, which are meant to lock up once the building is exited improperly, malfunctioned on the sales floor (aisle 86) and injured Lubken.
- To date, no formal training has been furnished in discovery that the employees of Fred Meyer (Kroger) receive training on inspecting the wheel locking carts.
- Fred Meyer (Kroger) offers customer **no alternative** of shopping carts, other than the locking wheels.
- Shoppers, like Lubken, should have reasonable expectations that the dangerous and hazardous equipment used at Fred Meyer (Kroger) will work properly, not malfunction, and not injure them.
- Gatekeeper, the manufacturer and supplier of the wheels, is responsible for the programming (Geofence) of when, where, and why the wheels 'lock-up'. They are instructed on these details by Fred Meyer (Kroger).
- Fred Meyer (Kroger) violated their own internal practices which may have led to the wheel malfunction of failed communication.
- Because staff may have to handle, push, or retrieve carts…that, in this case have wheels that may malfunction, this violates **<u>OSHA 'General Duty Clause' Section 5a1</u>** **<u>of the OSHA Act</u>. Employees cannot knowingly be placed in a Dangerous and Hazardous situation.**

**OPINION 2: DEFENDANTS FAILED TO WARN PLAINTIFF THAT A HAZARDOUS AND DANGEROUS CONDITION EXISTED WITH THE SHOPPING CARTS. DEFENDANTS HAD PRIOR KNOWLEDGE OF THIS DANGEROUS AND HAZARDOUS CONDITION AND FAILED TO ACT. DEFENDANTS FAILURE TO PROVIDE A REASONABLY SAFE CONDITION FUTHER RISKED THE HEALTH AND SAFETY OF SHOPPERS, EMPLOYEES, AND POTENTIAL 3RD PARTY VENDORS.**

- Limited to **no notice or warning existed** that could have alerted Plaintiff Lubken to avoid malfunctioning carts.
- Fred Meyer (Kroger) gave shoppers and legal invitees **no alternative** of shopping carts, other than those with locking wheels.
- Fred Meyer (Kroger) was well aware of **multiple injuries and multiple malfunctions** due to the locking wheels, thus kept 'business as usual' which created and fostered a **hazardous and dangerous shopping environment**. See **Exhibit E to Welsh Report**
- Fred Meyer (Kroger) does place a small plastic sign on the inside of the cart, that alerts shoppers about potential stoppages. It reads… "Shopping Carts may stop unexpectedly at exit doors and carts will stop if taken beyond the perimeter of the parking lot." **This sign is small, placed on the inside of the cart (out of shopper normal view), and says nothing about potential stops or malfunctions. See Exhibit F to Welsh Report.**

  **On the inspection date of March 30, 2026…I sampled 50 shopping carts, and found the sign affixed on 11 of 50 carts that I sampled…or 22% of the carts. Again, this signage only pertains to the exits and store premises perimeter. IT IS NOT A WARNING SUFFICIENT FOR SHOPPERS SAFETY. (Exhibit F to Welsh report).**

**OPINION 3: DEFENDANTS LACK ANY SAFETY INSPECTIONS PROCEDURES OR NORMAL OPERATING KNOWLEDGE TO MANAGEMENT STAFF ON THE SHOPPING CARTS. LACK OF ANY REASONABLE PROCEDURES AND TRAININGS CONSTITUTES AN ENVIRONMENT OF NON-COMPLIANCE TO REASONABLE RETAIL INDUSTRY STANDARDS AND ENDANGERS PATRONS, EMPLOYEES, AND THE GENERAL PUBLIC.**

- Based on the sworn deposition testimony of Managers Padilla (Deposition of Angela Padilla) and Smittling (Deposition of Kenneth Smittling) Fred Meyer (Kroger) has no formal training for store safety, store walks, visual inspections, and accident prevention, as it relates to the shopping carts. The 'CCK' department handles the shopping carts-and other departments have very little to do with them. A retail operation the size of Fred Meyer (Kroger), relies on many managers-all of which come into contact with shopping carts. Since these are 'wheel locking' carts and have malfunctioned on many occasions, it is reasonable that all leadership be trained on the basics, and what to do when one malfunctions.
- Gatekeeper, the manufacturer and supplier of the wheels have many available safety resources available-which could have provided the Fred Meyer (Kroger) information to incorporate into a policy book, basic safety guidelines for inspections, and brought them within REASONABLE INDUSTRY STANDARD, which they failed to meet. A REASONABLE SAFETY PLAN and PREVENTIVE MAINTENANCE PLAN may have saved Lubken from her trip-fall-injury.
- These shopping carts are used throughout Fred Meyer (Kroger), which is a large 'Super Center' operation-and confining the 'intimate knowledge of the cart' to only the 'CCK' department **is not a best practice.**
- Defendants have multiple locations and need their safety policies, training, and operation to mature, with trainings, policies, and safety measures to keep shoppers safe, and to avoid **the Hazardous and Dangerous condition that existed on the date (December 23, 2023) in which Lubken was jerked off her feet, fell, and was injured.**

**OPINION 4: DEFENDANTS FAILED MISERABLY TO COLLECT THE FACTS FULLY, CONDUCT A QUALITY, TRUE, AND ACCURATE INVESTIGATION. THIS FAILURE IS DAMAGING TO ALL PARTIES, VIOLATES INDUSTRY STANDARDS, AND BEST PRACTICE PROTOCOLS THAT SHOPPERS, LEGAL INVITEES, PATRONS, VENDORS, AND EMPLOYEE/ASSOCIATES RELY ON, IN CASE OF ACCIDENTS-INJURIES-OR DEATHS.**

- When there is an 'incident' or 'accident' and in this case, malfunctioning equipment that led to a fall-and injury, best practices require that a true and accurate investigation must commence.
- The time of the fall-and injury is the BEST TIME to secure all the facts of the 'accident'. Memorializing the facts and data-while they are 'fresh in mind' is needed.
- Defendants effort was weak-and they were woefully disorganized to properly investigate an accident, fall, and injury.

1. A <u>customer incident report</u> (Claim-4A2312Q4CZ00001) was completed on the incident day. Upon completion, it was called in to Claims processor 'Sedgwick Claims Management Services' (Exhibit 1 to Padilla Deposition) for official entry into Fred Meyer (Kroger) claims system.
   - **Incident Report Discrepancy-Lubken says in her sworn deposition that she was wearing "*black boots that had wooden heels*" (page 51, lines 1-2 Lubken Deposition). On the Sedgwick Claim (page 5), Padilla reports that Lubken was wearing sneakers (tennis shoes).**

2. An <u>evidence report</u> (Claim 4A2312Q4CZ00001) was completed on the incident day. It has 3-pages. On page one, Alex Sidoff (Loss prevention manager) claims to have burned footage from nearby camera-and customer entrance and exit.
   - **In discovery, I was furnished only *very short snippets* of video footage. Best practices would have captured, sequestered, and supplied the entire shopping journey of Lubken. This would include her departing her vehicle in the parking lot-entering store-her shopping journey-the incident/injury-her being wheeled on a chair to the front-and her eventual exit from the premises. WHAT WAS FURNISHED IS WOEFULLY INADEQUATE FOR A COMPLETE INVESTIGATION.**
   - **The evidence report (none of the 3 pages) speaks to the shopping cart. The shopping cart that malfunctioned and injured Lubken WAS NOT SET ASIDE OR SEQUESTERED. Obviously, a Best Practice for the store and a quality investigation would have been to set the cart aside, label it with the malfunction issues, and sequester it. <u>Why risk another injury?</u>**

In fact, later, Fred Meyer was warned in a letter from original counsel, Lombino and Martino, dated January 22, 2024, to preserve all evidence in this matter. "The destruction, alteration, or loss of any of the evidence below amounts to *spoilation of evidence* under Washington law". (Exhibit I to Welsh report).

3. **Not one witness statement was taken. Many witnesses were available including staff. Staff is not exempt from witness statements (separate from incident reports) because they had input or assisted in writing reports on behalf of the store.**

4. **There is no evidence of any 'injury assistance training' and Lubken should have not been moved at all, placed on a wheeled chair from the furniture department, and pushed up front-when she was clearly injured. Padilla and Smittling should not have moved Lubken, and because of the significance of her injuries, professional EMS should have been called-so that the risk of further injuries were not made worse.**

5. No photos of the area, Lubken, the cart, or environment were taken-although encouraged by Fred Meyer. Smittling says in his deposition "I've always been trained, take photographic evidence and then get with store manager….". (Smittling Deposition, page 37, lines 3-5). **Again, no photos were taken.**

6. A customer statement was taken from Lubken. (Claim 4A2312Q4CZ00001) and was written by 'someone else'. **Lubken nor her designee (William Lubken) signed the statement as true and accurate.**

Injured parties need to sign off on their version of their incident and injury.

- **More information at the time of an accident is better.**

**OPINION 5; DEFENDANTS POOR HANDLING AND TREATMENT OF EQUIPMENT, SPECIFICALLY THE SHOPPING CARTS, CREATES AND EXACERBATES THE FAULTY OPERATION OF THE CARTS/LOCKING WHEELS AND LIKELY LED TO THE INJURY OF LUBKEN. WITH IMPORVED BEST PRACTICES, THIS NEGLIGENT ACT COULD HAVE BEEN AVOIDED.**

1. Fred Meyer (Kroger) put in locking wheel carts 10 years ago, or less. They put these carts in to keep from losing them to customers who push them off the premises.
2. Each grocer, such as Fred Meyer (Kroger) who puts these types of carts into operation has the ability to customize the Gatekeeper type of software, to control where the carts will be allowed to go. In practice we call this <u>*GEOFENCE.*</u>
3. According to the sworn deposition testimony of managers Padilla and Smittling, Fred Meyer 'geofences' or 'locks the wheels' when a cart does not go through the checkstand area or is attempted to be taken off the store premises (outside). Fred Meyer does not want to lose control of the shopping carts-and in some venues, it may be a city ordinance. **Carts are expensive.**
4. Fred Meyer (Kroger) has had many incidents, in which the SmartWheels (wheels on these carts) have malfunctioned and injured people. Obviously, due to Fred Meyer's (Kroger), poor care and neglect of the carts…Lubken was injured.
5. Fred Meyer abuses their carts and that contributed to the malfunction of the wheel, in my professional opinion.
6. Fred Meyer is a Super-Center, low price operation. These types of retail formats rely on a 'low price image'…and internally, that leads to **STRICT PAYROLL CONTROL**. In these type operations, you see limited carry-out service, and the majority of shoppers push their own carts out and place the groceries or non-food items in their vehicles. This practice allows Fred Meyer (Kroger) to minimize expenses in this area and **maximize profits.** Another example of this would be the emergence of 'self-checkout'. **Over time, more of the shopping experience (and work) has been shifting to the customer for the sake of profits.**
7. Fred Meyer (Kroger) relies on only a handful of clerks (referred to as *Parcels)* to retrieve the carts outside-occasionally-**not frequently-**throughout the day. The carts get **weathered, banged up, beaten down…and flat out neglected. <u>This can no doubt be damaging to the cart wheels.</u>**
8. The Fred Meyer store in question has **fifteen cart corrals** throughout the property parking lot. So-throughout the day, the parcels must retrieve hundreds of carts that shoppers place in the corrals. Many times, shoppers do not place the carts, they just leave them on the lot.
9. Per the testimony of Mangers Padilla and Smittling, the cart that malfunctioned and injured Lubken, was **NOT SEQUESTERED FOR INSPECTION OR REVIEW. This is negligent…placing a cart that just malfunctioned back into the assortment of available carts in NOT a best practice.**

- **A best practice would be to put the cart aside, label or tag it with specific detail as to what is 'not working', such as: wheels locking, handle broke, sign missing, etc. This makes it easy for a maintenance company to fix the problem as opposed to guessing and potentially and likely not diagnosing the carts problems adequately.**

10. Fred Meyer (Kroger) places carts outside in what is known as a **Graveyard.**
**Please see the pictures...**(Exhibit J to Welsh report). This is **not a best practice; in fact, it is negligent.**
11. The many dozens or hundreds of shopping carts, with differing problems, sit back there…**outside…in the weather…for months at a time…which cannot be good for the wheels….**until a third-party maintenance company comes to 'fix them'.
12. **HOW CAN THEY POSSIBLY KNOW WHAT TO FIX?**
13. During my inspection, as the photos depict, there were many dozens/hundreds of carts in the **graveyard**, waiting for repair. No personnel could tell me when the next maintenance person was going to fix the carts.
14. The carts were not labeled-with what the problems were or could be. This **is not a best practice.**
    - Due to this **BAD PRACTICE,** the maintenance person there to fix the carts, is fixing them in the blind.
    - **If a faulty cart wheel was the problem, yet unlabeled or identified, the maintenance person may fix the cart handle, car seat, or cart undercarriage…and the true problem…a faulty wheel may never be addressed.**

------------------------------------------------------------------------------------------------------------

Fred Meyer (Kroger) should have:

- Labeled or tagged all carts problems and sequestered them, or sent them back to the distribution center immediately for **professional maintenance**
- Eliminate the **Cart Graveyard** where the 'problem carts' will become further damaged by the Northwest weather and neglected. This can also create a sanitation problem and attract rodents to a store that sells **fresh foods.**
- With the volume of incidents and injuries, **Loss Prevention should immediately request corporate training for all managers on cart operations, notify Gatekeeper and any third-party maintenance companies to promptly inspect each store for software issues, Wi-Fi and/or communication and reception issues, and consider offering 'basic' non-wheel locking carts for shoppers that may not be able to handle abrupt malfunctions**

**FINAL CONCLUSION:**

DEFENDANTS FAILURES, ACTIONS, AND INACTIONS FELL WELL BELOW INDUSTRY ACCEPTED STANDARDS WHICH ULTIMATELY LED TO PLAINTIFF'S CART MALFUNCTIONING THEN FALL, AND INJURY. A CLAIM AGAINST DEFENDANTS IS WITH MERIT, in my expert opinion of 48-years, and inspection of over 900 stores.

**The information in this expert's report is true and correct to the best of my knowledge. All opinions expressed herein are within a reasonable degree of certainly of the standards of the Retail sales industry/ Risk Management profession. I reserve the right to alter or change my findings and opinions should new information become available.**

Joseph Gray Welsh
Joseph Welsh Consulting, LLC.
5573 Sumac Ridge Court
Las Vegas, Nevada 89149
915-471-6155
josephwelsh@joe-the-grocer.com
DUNS: 103712562
CAGE CODE: 8QTB5
SAM UEID: RHEBGMTYKXB4