RIMKUS

16932 Woodinville-Redmond Road NE, Suite A 105
Woodinville, WA 98072
(206) 623-0630

# Report of Findings - Mechanical

Gatekeeper Systems, Inc./Lubken Biomechanical Evaluation/Mechanical Evaluation
Claim Number: EUB2303
Style: Jean Lubken/William Lubken v Fred Meyers Stores, Inc./The Kroger Co./Gatekeeper Systems, Inc.

Rimkus Matter No: 100336805

Prepared For:
The Aguilera Law Group
23046 Avenida De La Carlota, Suite 300
Laguna Hills, CA 92653

Attention:
Mr. Scott LaSalle

Thomas J Kulaga

Digitally signed by: Thomas J Kulaga
DN: CN = Thomas J Kulaga C = US O = Unaffiliated
Date: 2026.05.18 10:29:12 -07'00'

Registered Professional Engineer (Mechanical)
CERTIFICATE NO.
52968
THOMAS JOHN KULAGA
Date Signed
ARIZONA U.S.A.

EXPIRES:12-31-26

Thomas J. Kulaga, P.E.
Engineering Number 52968
Principal Consultant

May 18, 2026

# TABLE OF CONTENTS


I. Introduction 1

II. Conclusions 2

III. Discussion 3

- Background
- Video Surveillance
- Observations
- Gatekeeper System
- Analysis
- Welsh Report
- Kohles Report

IV. Basis of Report 22

V. Attachments 23

A. Photographs

B. Curriculum Vitae

# Section I
# INTRODUCTION

On December 23, 2023, Ms. Jean Lubken was pushing a grocery cart while shopping when an anti-theft wheel on the cart reportedly locked and braked the cart to an unexpected stop, causing her to fall. The reported incident occurred at a Fred Meyer's store located at 4505 South 19th Street in Tacoma, Washington. The anti-theft wheel was manufactured by Gatekeeper Systems (Gatekeeper).

Rimkus was retained to evaluate the anti-theft wheel and system.

This report was prepared for the exclusive use of The Aguilera Law Group and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Mr. Paul G. Phillips, Principal Consultant.

## Section II
## CONCLUSIONS

1. The cause of the subject incident could not be determined based on the available evidence.

2. The subject incident could not have been caused by a lockup of the anti-theft wheel(s) on the cart.

3. Opinions offered by the Welsh Report regarding the operation or malfunction of the wheel were unsupported and incorrect:

    a. The Welsh Report incorrectly classified the malfunction of the wheel as a fact, rather than an unproven hypothesis in need of rigorous analysis based on the available evidence. No such analysis was provided.

    b. The Welsh Report mischaracterized incident reports as having been similar to the subject incident and applicable to the analysis.

    c. The Welsh Report improperly concluded that the subject cart experienced a wheel malfunction, providing no analysis or basis for the conclusion.

4. The Kohles Report failed to properly identify that Ms. Lubken was using a small cart at the time of the incident.

5. Opinions offered by the Kohles Report regarding the operation or malfunction of the wheel were unsupported and incorrect:

    a. The Kohles Report provided no engineering analysis of the anti-lock wheel, its internal configuration, or the means by which it was controlled. It offered no theory of failure that explained how the wheel could engage the brake without having received a lock command.

    b. Of the hypothetical defects listed in the Kohles Report, none of them would lead to an inadvertent locking of the wheel.

    c. The testing described in the Kohles Report never produced the inadvertent wheel lock event, which is the specific defect being alleged by the plaintiff.

# Section III
# DISCUSSION

**Background**

Rimkus reviewed the deposition testimony of Ms. Lubken. According to her testimony, she went to the store for the sole purpose of purchasing a hand mixer. She testified that she initially selected a shopping cart at the entrance to the store but abandoned it because it would not move. She selected a different cart and continued her shopping trip by making her way to the part of the store that offered hand mixers for sale.

She testified about the subject event, saying:

> *"Q. And at some point I understand from your interrogatory responses that the cart stopped; correct?*
>
> *A. Abruptly.*
>
> *Q. What happened when the cart stopped abruptly?*
>
> *A. When the cart stopped, I continued my motion forward, and it pushed me back because it just – just because it had stopped. So at that point my right foot heel interacted with the cart, and it caused me then to fall to the right side to the floor onto my right side into the side aisle.*
>
> *Q. Okay. So when the cart stopped, was it your impression that it had stopped at one of the wheels in the front or the back or it was all together the whole thing?*
>
> *A. I'm not a person who's designed to know about shopping carts, but I know that that cart stopped on the spot, and I was jolted."*

Ms. Lubken testified that there was no one else present during the incident:

> *"Q. Did you see someone else come up and contact the cart or was it just you and the cart?*
>
> *A. It was the cart and myself. At that point there was no one else."*

Ms. Lubken testified that she lay on the floor for “A good two minutes” before another customer saw her and lifted the cart off her before summoning store staff to the scene.

Ms. Lubken testified that she did not evaluate the cart after the incident, and that she didn’t see anything on the ground:

> *“Q. At any point during that time did you ever check your shopping cart to see what it was that caused it to stop?*
>
> *A. I was not interested in the shopping cart at that time, no. I was looking to not further have any more harm.*
>
> *Q. So you never checked the shopping cart to see if there was anything wrong with it?*
>
> *A. That was not my emphasis at that time. It was my safety.*
>
> *Q. All right. And did you check the ground to see if there was anything that the shopping cart might have hit, like, anything on the ground or any kind of gravel or sand or anything at all?*
>
> *A. There was nothing that I saw that would indicate that to be the case.”*

Ms. Lubken testified that she could not confirm that the anti-theft wheel on the cart had activated its braking mechanism:

> *“Q. Do you know why the cart stopped?*
>
> *A. The system locked.*
>
> *Q. And you checked that?*
>
> *A. I was not in a position to be looking at whether that was the case. I was falling.*
>
> *Q. So how do you know that the system locked?*
>
> *A. It was unable to move, and I was propelled to the ground.”*

Rimkus reviewed the deposition testimony of Ms. Angela Padilla. Ms. Padilla was a store employee who was working the day of the incident and interacted with Ms. Lubken

afterwards. Her testimony confirmed that she did not witness the incident and was only called to the scene after it occurred.

Ms. Padilla's testimony confirmed that the subject cart was small, but she could not confirm any details about the wheels of that cart:

*"Q. Okay. Do you remember if it was the normal-size cart or the smaller one?*

*A. Small.*

*…*

*Q. Okay. The cart that Jean had used had the antitheft wheel?*

*A. I -- I don't recall if I looked at the wheels. … It's not that heavy, but I don't remember if the wheels – I assume they're locked up. The wheels will also get stuff caught in them and then it makes them slow down."*

Ms. Padilla testified that she did not recall inspecting or evaluating the subject cart, but confirmed that it had to be moved out of the aisle:

*"Q. Do you remember taking a look at the cart that Jean had used? And to clarify, when I say take a look, did you kind of push it around or kind of --*

*A. I did not.*

*Q. Okay. What do you remember about what happened with the cart?*

*A. I don't recall. I know it had to have been taken out of the aisle, pushed out of the aisle. I don't recall exactly anything specifically about that at this point."*

Rimkus reviewed the deposition testimony of Mr. Chad Peterson, store manager for Fred Meyer. Mr. Peterson was not present during the incident and did not interact with Ms. Lubken on that date, but was able to confirm some aspects of the cart anti-theft system at the subject store:

*"Q. And is it your understanding that those wheel locks are on all of the carts, or just some of the carts?*

*A. The goal is for them to be on all the carts. I do know that some carts do not have them."*

**Video Surveillance**

Rimkus reviewed video surveillance footage taken from the subject store on the date of the incident. The video depicted multiple locations around the store. One video covered the store entrance that Ms. Lubken entered prior to the incident.




**Figure 1** – Surveillance video from store entrance.

The video depicted Ms. Lubken attempting to move a small cart near the entrance, then leaving the frame without a cart (**Figure 1**). This was consistent with her testimony that she was unable to move the first cart she chose. The video did not depict her selecting or moving the cart that was later involved with the incident. None of the provided videos depicted Ms. Lubken interacting with any other cart.

Another video depicted Aisle 86, where the incident occurred. That camera was not pointing at Aisle 86 at the moment of the incident, but later panned over and recorded the area. It depicted Ms. Lubken and various store staff who responded to the incident. Of note in the Aisle 86 video was the presence of a small cart (**Figure 2**).




**Figure 2** – Surveillance video from Aisle 86.

The small cart was presumably the subject cart. It remained at the scene throughout the video; no other store patrons moved or attempted to use it, and store staff moved it multiple times to clear it from the immediate area near Ms. Lubken. As a result of the staff moving the cart, it was possible to assess its mobility and resistance to movement. **Figures 3 and 4** are sequential frame grabs from the video. **Figure 3** represents a 16-second segment, and **Figure 4** represents a 19-second segment. In both segments, the cart is moved by a store employee with relative ease. It is seen pivoting on both the left and right rear wheels at different times. Most notably, the cart is moved by a store employee using only one fully stretched arm in **Figure 4**, which is indicative of the relative effort required to move the cart.




**Figure 3** – Surveillance video from Aisle 86 – 16 seconds elapsed.




**Figure 4** – Surveillance video from Aisle 86 – 19 seconds elapsed.

At no point did the surveillance video depict anyone using any device to unlock any of the wheels on the cart. The video also did not depict the wheels of the subject cart at any time.

**Observations**

Rimkus participated in a joint inspection of the store and exemplar carts on March 30, 2026. The subject cart was not available for inspection. Based on the testimony

described above, the cart was not preserved and was instead returned to circulation at the store, and could not be identified from the full cart inventory.

An exemplar "small' cart is depicted in **Photograph 1**. It was roughly the same width and height as a typical 'normal' shopping cart, but was substantially shorter and was equipped with a shallower basket. It was constructed of welded metal wire and framing, with two swiveling caster wheels on the front and two fixed wheels on the back. The rear left and front right wheels were anti-theft wheels manufactured by Gatekeeper (**Photographs 2 and 3**).

An exemplar 'normal' cart is depicted in **Photograph 4**. It was constructed in the same manner and from the same materials as the small cart. The front left and rear right wheels were anti-theft wheels manufactured by Gatekeeper (**Photograph 5**). Note that the installation position of the anti-theft wheels was reversed from the small cart.

Rimkus inspected Aisle 86, where the subject incident occurred. **Photograph 6** is taken from the same end of the aisle as the surveillance video discussed above, although from a lower altitude and shallower angle. The condition of the floor in Aisle 86 was generally smooth, with the only notable deviation being an approximate 1/4-inch vertical step that followed a seam in the concrete floor (**Photograph 7**).

Comparing the position of Ms. Lubken in the surveillance video to the configuration of the aisle during the inspection indicated that she had fallen directly in front of the "Mixer" portion of the aisle (**Photograph 8**).

At the center of the Mixer shelf section were hand mixers (**Photograph 9**). Recall from the testimony that Ms. Lubken was at the store with the specific purpose of purchasing a hand mixer. Also notable was the presence of boxes protruding from the end of the shelf and out into the aisle walkway.

**Gatekeeper System**

Rimkus is aware of and understands the operational configuration of the Gatekeeper anti-theft system based on previous experience. The purpose of the system is to reduce losses to theft. Shopping carts are equipped with special wheels that will engage a brake ("lock up") if it is pushed out of an exit or beyond the perimeter of a parking lot if it has not received "permission" from a source inside the store. For instance, if a shopper fills a cart

with goods and heads out of an exit without stopping at a register to pay for the items, the wheels will lock at the exit. If a shopper does pass through a register, a special permission-granting device will allow the cart to exit the store without the wheels locking.

The system consists of multiple parts, including:

- Anti-theft locking wheels that are installed on shopping carts
- Permission-granting transmitters installed at registers and other locations
- A “lock loop” installed at exits and/or around the parking lot perimeter

The system operates on a “permission” paradigm and communicates via radio-frequency signals on multiple frequency bands. Using the radio-frequency network, the wheels are granted permission to ignore lock commands when various conditions are satisfied. Without an active grant of permission, the wheel will lock whenever it receives a lock command. The wheel includes a radio-frequency receiver that can receive signals from other devices that will either grant the wheel controller permission to ignore locking signals for a limited time or issue a lock command that turns on an electric motor that tightens a band brake, stopping the wheel from rotating freely. The motor and internal circuitry are powered by a battery in the wheel. The wheel will not lock autonomously and requires the lock command to engage the brake. Similarly, the wheel will not unlock itself and instead requires a device to issue an unlock command before a locked brake will release.

Signals sent to the wheel were generated by multiple different devices shown on the system drawings produced by Gatekeeper (Bates GATE 000070-000082):

- A “lock loop”, which consists of a radio frequency antenna embedded in the floor or ground at the store entrance/exits. Any wheel passing over the loop would receive a command to engage the band brake. These were the only fixed devices that could trigger a wheel locking event.
- A “permission loop” just outside the store entrance/exits. This is similar to the lock loop but sends a signal that grants a 2-minute permission for a wheel to ignore commands from a lock loop, thereby preventing brake activation. This device permits carts to enter the store and temporarily ignore the lock loop while doing so.

- A Short-Range Transmitter (SRT). This was a signal emitter installed at check-out lanes and other locations. Any wheel passing within range and meeting the programmed criteria would receive a permission signal that would grant a time-limited permission to ignore lock commands.

- A Long-Range Transmitter (LRT). These are similar to the SRTs, but with a greater range.

- A handheld device that can manually issue either lock or unlock commands as desired when triggered by a human operator.

The system is configured with a set of rules that restrict any grant of permission until the rules are satisfied. For instance, at the self-checkout stations, permission would not be granted until the wheel stayed within range of the signal for at least 20 seconds of "dwell time" and experienced fewer than 250 rotations during that time. It is important to note that the handheld device is the only source of an unlock command. A locked wheel that receives a permission command will not unlock.

In default conditions, the Gatekeeper wheel will only lock whenever it receives a lock command, either by passing over a lock loop or when commanded by a handheld device. Interaction with any of the permission-granting emitters will permit a wheel to ignore a lock loop for a limited time. In practice, the system would allow shoppers to push shopping carts across the lock loop installed at the store exit without issue, so long as they either passed through a staffed checkout lane or spent sufficient time at a self-checkout lane. The net effect and intent of the system is to impede attempts to push a cart full of unpurchased items, i.e., a cart that had not been through the checkout process, out of the store.

**Analysis**

The cause of the subject incident could not be determined based on the available evidence. The subject cart was not available for inspection, and therefore, it was impossible to determine:

- Whether the cart was equipped with anti-theft wheels.

- The number of anti-theft wheels installed on the cart (if any).

- The position of the anti-theft wheel(s) (if any) on the cart.
- The condition of the anti-theft wheel(s) on the cart.
- The condition of the normal wheels on the cart.
- The presence of debris or obstacles on the floor at the time of the incident.
- The presence of debris fouling the cart wheels.

Lack of this knowledge prevented the determination of a cause. Per the testimony of Mr. Peterson, not all carts in the store were equipped with anti-theft wheels. Ms. Lubken did not evaluate the wheels at the time of the incident. None of the available testimony identified any specific defect or condition that would have resulted in an abrupt stop of the cart. The unavailability of the subject cart for inspection prevented any after-the-fact investigation from identifying a cause.

Multiple potential causes fit the available evidence. For instance, an obstacle or debris (such as a small rock) may have been present that caused the cart to stop, but was knocked away from the area as a result of Ms. Lubken's fall and not detected by any party. Of particular note was the location of the incident: Directly in front of the mixer shelves. Ms. Lubken testified that she was in the store to buy a hand mixer. It was reasonable to presume that her attention was focused on the hand mixers on the shelf instead of looking in the direction of her travel, and as a result, she failed to detect an obstacle. Note also, the protrusion of the boxes on the mixer shelves depicted in **Photograph 9**. It was possible that the cart struck a protruding box, causing it to stop abruptly.

The subject incident could not have been caused by a lockup of the anti-theft wheel(s) on the cart. As discussed above, the design and function of the wheels require the reception of a lock command before the anti-theft wheel will engage its brake. The brake mechanism is a motor-driven band brake, which requires the application of electrical power to the motor for a period of time long enough to tighten the brake (generally 1 to 2 seconds). The wheel brakes cannot simply fall into a closed state; they must be driven over time into that state. As such, the design failure mode will be to fail to brake when commanded, not to brake without being commanded. Also note that none of the evidence confirmed that the subject cart was even equipped with anti-theft wheels.

Further, consider the video of Aisle 86 discussed above. In that video, store employees can be seen moving the cart around without difficulty, indicating that the wheels are not locked. The cart was easily moved by one hand. The video does not depict any store employee using a handheld device to unlock a wheel on the subject cart. Neither Ms. Lubken nor any of the store employees testified that a handheld device was needed to unlock a cart wheel.

Compare this to the video of Ms. Lubken trying to move a locked cart at the store entrance. She fails to move the cart, even with two hands. Other wheel lock events experienced by other customers are visible in the same video. In all cases, the carts with locked wheels are visibly very resistant to motion, even to the point of tilting instead of sliding forward. This substantial disparity in resistance to motion and the lack of evidence that a handheld device was needed to unlock a wheel confirm that the subject cart wheels did not lock in Aisle 86.

**Welsh Report**

Rimkus reviewed an undated expert report signed by Joseph Gray Welsh of Joseph Welsh Consulting (Welsh Report). The report addressed the subject incident from the perspective of store operations rather than the engineering of the anti-theft wheel, but did touch on technical and factual issues, offering statements and opinions that were at odds with the evidence. Opinions offered by the Welsh Report regarding the operation or malfunction of the wheel were unsupported and incorrect. For instance, in a section titled "Factual Background of Case," the report stated:

> *"While shopping on aisle 86, Plaintiff Lubkens' shopping cart, suddenly and without warning, experienced a wheel malfunction (abrupt locking) …*
>
> *The shopping cart had an 'anti-theft' wheel locking mechanism furnished by Defendant Gatekeeper, which malfunctioned, and was unmaintained by Defendant Fred Meyer (Kroger). This malfunction had happened many times…"*

The malfunction of the wheel was not confirmed, and per the opinions offered by Rimkus could not have occurred at all. It was improper to consider the malfunction to be a "fact", and at best is a conclusion in need of a basis. The Welsh Report did not provide such a basis, nor did it provide an engineering analysis of the wheel or the subject incident. As such, the Welsh Report incorrectly classified the malfunction of the wheel as a fact, rather

than an unproven hypothesis in need of rigorous analysis based on the available evidence. No such evidence or analysis was provided.

The Welsh Report mischaracterized incident reports as having been similar to the subject incident and applicable to the analysis. From the Welsh Report:

> *"During discovery, I was furnished dozens and dozens (nearly 60) incident reports all related to 'Wheel Locking' incidents and at Fred Meyer (Kroger) stores."*

The Welsh Report failed to note that, in those cases where the incident location was provided, the vast majority of the incidents occurred as patrons were pushing carts out of the store exits, precisely where the lock loops are installed, and precisely where lock commands can be issued to Gatekeeper wheels. This is markedly and critically different from the subject incident, which occurred well away from and out of range of any source of lock commands. This key difference meant that the majority of the incident reports should have been discarded as they were not applicable to the subject incident. This conclusion is supported by the testimony of the Fred Meyer employees who did not recall locking events occurring in the aisles of the store, and instead typically occurred at the entrance/exits.

Further, the Walsh Report failed to consider the possibility that some or all of the lock events described in the incident reports may have indeed been evidence of proper operation instead of a malfunction. A cart that has not received a permission signal is expected and intended to lock when passing over the lock loop at an exit. It was entirely possible that the lock event was intentional and proper in some or all of the exit lockup incidents, and impossible to assess that potential based on the descriptions provided in the incident reports.

The Welsh Report improperly concluded that the subject cart experienced a wheel malfunction, providing no analysis or basis for the conclusion. It was instead an assertion not grounded in the evidence. From the Welsh Report:

> *"Lubken, while pushing a shopping cart, experience[d] the wheels on the cart locking abruptly, which 'jerked her', and she fell and was injured by no fault of her own. Based on the testimony from all parties and available video, this is undisputed.*

> *The shopping cart wheels, which are meant to lock up once the building is exited improperly, malfunctioned on the sales floor (aisle 86) and injured Lubken."*

The Welsh Report described no inspection of the subject cart or its wheels, obviously because the cart had not been preserved, and could not be inspected. The report offered no technical analysis of the Gatekeeper system, its design, likely failure modes (and related causes), or configuration. No basis for these opinions other than the testimony of non-technical, non-experts was provided, and no contextual analysis of that testimony was performed. As such, these opinions were unsupported and were instead simple assertions.

**Kohles Report**

Rimkus reviewed a report produced by Sean S. Kohles of Kohles Bioengineering dated April 28, 2026 (Kohles Report). That report discussed the subject incident from a biomechanical perspective, although it dealt extensively with technical subjects outside that discipline.

The Kohles Report failed to properly identify that Ms. Lubken was using a small cart at the time of the incident. From the report:

> *"She eventually identified and utilized a mobile cart within the store, but it is not known whether it was a small or large cart product."*

This was at odds with both testimony and the available evidence. Ms. Padilla specifically testified that Ms. Lubken was using a small cart and described having to move it out of Aisle 86 after the incident. The video surveillance footage showed Ms. Lubken selecting (but then abandoning) a small cart at the store entrance, revealing her preference. She testified that she was only in the store to buy a hand mixer and would have had no need for a normal cart. The video surveillance of Aisle 86 showed a small cart being moved around the area outside the aisle by store employees. That collection of evidence made it reasonable to conclude that Ms. Lubken was using a small cart.

The Kohles Report incorrectly concluded that the aisle was clear of debris or obstruction based only on Ms. Lubken's testimony, failing to recognize that her testimony was unclear and that she did not pay particular attention to the cart wheels after the incident.

From the report:

> *"She recalled that no debris or external influence affected the cart's wheels."*

That statement was a misrepresentation of the testimony. As noted above, Ms. Lubken's testimony on the topic was:

> *"Q. At any point during that time did you ever check your shopping cart to see what it was that caused it to stop?*
>
> *A. I was not interested in the shopping cart at that time, no. I was looking to not further have any more harm.*
>
> *Q. So you never checked the shopping cart to see if there was anything wrong with it?*
>
> *A. That was not my emphasis at that time. It was my safety.*
>
> *Q. All right. And did you check the ground to see if there was anything that the shopping cart might have hit, like, anything on the ground or any kind of gravel or sand or anything at all?*
>
> *A. There was nothing that I saw that would indicate that to be the case."*

She testified that she didn't see anything. She did not testify that nothing was there. There is a distinct difference between those two positions. Further, she testified that her "emphasis" was on her personal safety, not on examining either the floor or the cart wheels. The Kohles Report was unjustified in interpreting Ms. Kohles' testimony to be that the floor was clear of debris or obstacles.

Importantly, the Kohles Report does not describe any inspection of the subject cart or its wheels and could not have provided such a description because the cart was not available for inspection. It was impossible to confirm the condition or presence of anti-theft wheels on the cart, and therefore, opinions offered by the Kohles Report regarding the operation or malfunction of the wheel were unsupported and incorrect.

Consider the investigation and resultant findings summarized by The Kohles Report as follows:

*“At issue is an overall question specifically related to injury biomechanics:*

- *What flaws in the inspection, repair, and maintenance of the grocery cart theft-prevention system influenced its functional failure?*
- *What specific design, manufacturing, and functional flaws were present in the grocery cart theft-prevention system making it highly susceptible to predictive failure?*
- *Was the prevalence of failure commonly known and could simple design, manufacturing, and maintenance alterations have improved product safety by either eliminating, guarding from, or warning of the hazard?*
- *Were Ms. Lubken’s diagnosed and surgically treated injuries directly caused by the product failure?”*

The scope of work described by the Kohles Report as “specifically related to injury biomechanics” more realistically should have been categorized as related to electromechanical devices for the most part. Of the four bullet points listed in the report, three involved a purely electromechanical device (the anti-theft wheel) and involved no biological elements. Granted, the potential effects of a defect in an electromechanical device include injury, at which point biomechanical expertise may be of value. But the initial stage of the investigation, determining whether an electromechanical device was defective, falls into a different category of expertise.

This distinction becomes important when the next part of the Kohles Report is considered:

*“My mechanical engineering, biomedical engineering, biomechanics, and clinical science conclusions are the following, as provided within a reasonable degree of biomechanical engineering and scientific certainty:*

1. *Inspection, repair, and maintenance flaws associated with the grocery cart theft-prevention system included:*
    a. *Degradation associated with environmental exposures,*

   b. *Inconsistent wheel battery charge,*

   c. *Worn and damaged wheels including rolling surfaces,*

   d. *Worn and damaged wheel brake mechanisms,*

   e. *Spurious wireless signals throughout the store,*

   f. *No evidence of wheel functional status inspection,*

   g. *Inconsistent basic wheel performance including rolling and swiveling freedom;*

2. *Design, manufacturing, and functional flaws within the grocery cart theft-protection system included:*

   a. *Inconsistent wireless signal responsiveness,*

   b. *Delayed master to slave wheel interactions,*

   c. *Inconsistent placement of lockable wheels,*

   d. *Inconsistent permission time periods for cart use,*

   e. *Differing normal and brake wheel material properties including wear resistance,*

   f. *Lack of weatherproofing of brake wheel hubs;*

3. *The overall inconsistent nature of the grocery cart theft-prevention system created a consumer product that has been shown to cause injuries within any population of users;*

4. *Proper maintenance of an improved alternative design could have mitigated the hazardous nature of the at-issue product;"*

All of these conclusions were related to the wheels alone. There was no biological aspect to any of them. And most importantly, the Kohles Report provided no engineering analysis of the anti-lock wheel, its internal configuration, or the means by which it was controlled. It offered no theory of failure that explained how the wheel could engage the brake without having received a lock command.

Further, of the hypothetical defects listed in the Kohles Report, none of them would lead to an inadvertent locking of the wheel. Dealing with each of the hypothesized defects in turn:

- A weak or discharged battery will not be able to drive the motor that engages the brake. This will result in a failure to lock, not an inadvertent lock event.

- If the wireless signal is inconsistent, the wheel would occasionally not receive a valid lock command, preventing a valid lock event. It would not lock inadvertently.

- If there were a delay in braking events between master and slave wheels, the lock event would become more gradual and less abrupt, with the delay causing braking power to be applied over a longer period of time. This does not produce an inadvertent lock event.

- The placement of the wheels is entirely unrelated to the transmission and reception of the lock command or the actuation of the brake and has no bearing on the subject incident.

- Permission time periods have no bearing on the subject incident, as Plaintiff had not passed a register and the wheel had no opportunity to receive a permission command.

- Differences in wheel material properties have no bearing on the subject incident, as the material condition would only affect coefficients of friction, not the actuation of the brake.

- Lack of wheel weatherproofing has no bearing on the subject incident, as no evidence exists to indicate that weather intrusion into the subject wheel had any effect.

None of these alleged defects will result in an inadvertent actuation of the wheel brake, and no theory of inadvertent brake actuation rooted in the available facts has been presented. It should also be noted that many of them are entirely without support from the physical evidence. For instance, the subject cart was never inspected by any expert after the incident, and it was impossible to confirm battery strength, presence of environmental damage, weather intrusion, or even whether an anti-theft wheel was

installed at all. As regarded the wireless signals, the Kohles Report offered this testing option:

> *"Many electronic technologies exist to assess the strength and reach of wireless signals. My laboratory utilizes a radio frequency electromagnetic strength meter (Model 480846, Extech Instruments) to assess this issue. This and similar devices could confirm wheel battery strength, test communicating signals between wheels (master to slave), assess doorway location signal strengths as well as wheel triggering efficiency, and identify spurious triggering signals throughout the store. These signal checks could be done as a component of routine maintenance."*

But the Kohles Report described no such testing being performed, nor any results of signal measurements. Remarkably, the diagnostic recommended to Fred Meyer to ensure proper operation of the Gateway system by the Kohles Report itself was never, in fact, described as having been performed in the Kohles Report to prove that any spurious signals were present. Their failure to use their own recommended technique would indicate a failure to fully investigate the incident using standards and methods that they themselves described and recommended. Regardless, no evidence exists that "spurious" wireless signals were present, or that the anti-theft wheel could be induced to lock inadvertently if those signals did exist.

The potential for spurious wireless signals in the modern world is virtually guaranteed. Cellular signals alone are present in all but the most remote areas. Network "Wi-Fi" signals are similarly present in many buildings. Such signals do not, in the main, present a risk to the function of unrelated wireless devices. At most, a strong undesired signal can overpower or "jam" a desired signal, much like a room full of people shouting will drown out a person whispering. Such situations are rare because federal regulations restrict the transmitting power of wireless devices to tolerable levels, reducing the risk of signal interference. In the subject instance, even if such a strong signal was present, it would drown out a legitimate lock command and prevent the anti-theft wheel from receiving the command and activating the brake. It would not induce an inadvertent lock event.

The testing described in the Kohles Report and witnessed by Rimkus consisted of measuring the braking performance of exemplar carts after a lock command was deliberately issued. Such testing presumes that a lock event did occur at the start of the

subject incident, though there was no evidence that justified that presumption. Most importantly, none of the testing described by the Kohles Report investigated the means by which a wheel could lock inadvertently. The failure to investigate or test for this specific scenario indicates an assumption that the wheel did lock, rather than an investigation of whether such a lock was possible. This was a critical flaw in the investigation described by the Kohles Report, as the investigation simply accepted Plaintiff's allegation as fact, rather than trying to independently determine the actual events that caused the subject incident.

The Kohles Report does not identify any testing in which the cart instantly stopped, nor did Rimkus observe any such testing while present at the site inspection on March 30, 2026. Critically, none of the testing described by the Kohles Report resulted in a wheel that locked without receiving a lock command. To be clear, the testing described in the Kohles Report never produced the inadvertent wheel lock event that is the specific defect being alleged by the plaintiff. Indeed, the Kohles Report required the use of the handheld remote key to initiate lock events for the testing that was performed in Aisle 86 (where the incident reportedly occurred). Other testing described in the Kohles Report that occurred at the store exit did not require the handheld key to initiate a lock event, as a lock loop was installed and issuing lock commands at that location.

# Section IV
# BASIS OF REPORT

1. On March 30, 2026, Thomas J. Kulaga participated in a joint exam of the subject store and exemplar shopping carts.

2. The following documents were reviewed:

   a) Transcript of deposition of Ms. Jean Lubken taken July 8, 2025.

   b) Transcript of deposition of Ms. Angela Padilla taken July 23, 2025.

   c) Transcript of deposition of Mr. Chad Peterson taken November 7, 2025.

   d) Transcript of deposition of Mr. Kenneth Smittling taken November 10, 2025.

   e) Bates-numbered documents GATE 000001-000003, 000065-000082, 000348-000470.

   f) A set of three security camera recordings taken at the subject store on the date of loss.

   g) Motion for Summary Judgement dated April 9, 2026.

   h) Plaintiff's Response to Motion for Summary Judgment dated February 10, 2026.

   i) Undated expert report with exhibits signed by Mr. Joseph Gray Welsh of Joseph Welsh Consulting.

   j) Report produced by Mr. Sean S. Kohles of Kohles Bioengineering dated April 28, 2026.

# Section V
## ATTACHMENTS

A. Photographs

B. Curriculum Vitae

## Section V
## ATTACHMENT A

# Photographs

Photographs taken during our inspection, including photographs that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Exemplar small cart.




**Photograph 2**
Exemplar small cart left rear wheel.



**Photograph 3**
Exemplar small cart right front wheel



**Photograph 4**
Exemplar normal cart.



**Photograph 5**
Exemplar normal cart wheels.



**Photograph 6**
Aisle 86.



**Photograph 7**
Concrete seam in Aisle 86.



**Photograph 8**
Signage in Aisle 86.



**Photograph 9**
Mixer shelves, hand mixers circled in red, protruding boxes indicated by arrows.



## Section V

## ATTACHMENT B

# Curriculum Vitae

RIMKUS


## Thomas J. Kulaga, P.E.

Principal Consultant

21002 North 19th Avenue, Suite 120
Phoenix, AZ 85027





(480) 489-9962

tjkulaga@rimkus.com


## Background

Mr. Thomas Kulaga holds a B.S. in Mechanical Engineering and is a Licensed Mechanical Engineer in Arizona and New Mexico.

Mr. Kulaga's experience includes over 20 years of performing a wide range of mechanical engineering design and analysis work, including fluid dynamics, thermal, structural, and optical design and analysis.

He is well-versed in many manufacturing technologies, including machining, casting, injection molding, stamping, extruding, and others. He has led teams of over 20 engineers to execute major design projects and develop new technologies from concept to production. His product design background has resulted in 10 patents in fields ranging from cell station combiner networks to LED lighting to bioreactors used in green energy production.

During his career, he has developed several innovative multi-physics analysis techniques to evaluate designs as small as a microchip to as large as a 100kW solar thermal collection system. His broad range of experience allows him to analyze a wide variety of failures and accidents, including mechanical, electro-mechanical, thermal, and fluid systems.

## Professional Engagements

- **Engineering Design/Development**
  - Commercial-Scale Outdoor Photobioreactor – Gilbert, AZ (2011- 2013), Managed design, build, and startup of Heliae Development's outdoor algae cultivator.
  - CIRCE Optical Analysis Software GUI – Albuquerque, NM (2010-2011), Developed a graphical user interface to simplify and streamline the use of Sandia National Laboratories CIRCE optical analysis software. Interface drastically reduced time-to-solution and simplified training.
  - Solar Dish Concentrator Model – Tempe, AZ (2006-2010), Developed multi-physics computer model including CFD, structural, and optical physics, producing a more efficient design and major cost reductions over conventional dish concentrator.
  - Solar Thermal Structures – Tempe, AZ (2006-2010), Managed R&D engineering programs to develop solar thermal structures, mirror alignment systems, energy capture systems, and engine durability programs, >$5M total revenue.

- Vibratory Pile Foundation – Tempe, AZ (2006-2010), Developed and executed test regimen to achieve code compliance for solar dish concentrator foundation.
- Products/Parts Design – Tempe, AZ (2006-2010), Routinely performed mechanical design and analysis of machined, cast, sheet metal, and injection molded parts for heavy truck/bus, defense, consumer products, alternative energy, and other industries.
- LED Bulb Design – Gilbert, AZ (2003-2005), Designed ground-breaking new LED light engine and LED bulb (patented). LED bulb design won "Best of What's New - 2004" award from Popular Science.
- Autotuning Combiner Design – Meriden, CT (1999-2003), Performed all thermal and mechanical design for smallest 860MHz autotuning combiner in the industry, including significant contribution to critical new IP allowing major reductions in size while improving performance and ease of tuning (US Pat. 6,812,808).
- TF-40 Isolator Bank Redesign – Meriden, CT (1999-2003), Engineered a new isolator bank that required less space than conventional system and cost 40% less with no degradation in performance.

## Forensic Engagements

- **System and Equipment**
  - Southwest (2013-2018), Evaluated range of systems, including domestic water heaters, domestic and commercial fire risers and sprinkler heads, chillers, cooling towers, fluid coolers, furnaces, air conditioning units, heat pumps, pumps, laundry washers, dishwashers, refrigerators, water filtration systems, and water softening systems.
  - Southwest (2013-2018), Performed failure analyses for pipes, tubing, fittings, plumbing connectors, valves, crimps, tanks, heating and cooling coils, toilet fill valves, dryers, and exhaust fans.
  - Southwest (2013-2018), Failure analysis of equipment involving software, electronics, and mechanisms, such as computer-controlled machine tools, factory automation equipment, and robots.

- **Information Technology**
  - Southwest (2013-2018), Failure analysis of servers and other IT equipment damaged by fire, water, and mechanical impact (shipping and handling).

- **Power/Energy**
  - Southwest (2013-2018), Failure analysis of utility-scale solar power plants damaged by weather events (high winds). Utilized finite element analysis and Computational Fluid Dynamics software tools to identify and explain failure mechanisms. Participated in failure analysis of conventional steam turbine failures related to weather events.

- **Fire**
  - Southwest (2013-2018), Evaluated electrical equipment and appliances to determine potential fire causes and origins.

- **Finite Element Analysis**
  - Modeled oscillating loads on steam strainer basket to confirm the cause of fatigue failure.
  - Modeled footstep loading on an acrylic plastic skylight that failed, resulting in a fall injury.
  - Modeled static loads and stress concentrations in a plastic water filter cartridge to predict creep and catastrophic failure.
  - Modeled static and dynamic forces on multiple utility-scale solar arrays exposed to high winds and aero-elastic flutter (galloping).

- Modeled multiple impact scenarios on a steel bumper to calculate total energy imparted and change in vehicle speed ("delta-V") to permit injury evaluations.
- Modeled semi-truck fifth wheel, frame, and kingpin loading during overturning event to evaluate the performance of welds.
- Modeled impact of tornado-propelled debris to assess the design and performance of a biological containment vault door.
- Modeled bending and failure loading for a window shade bracket that failed, resulting in an injury.
- Modeled support structure load response for a cement silo that collapsed while being loaded.

- **Computational Fluid Dynamics**
  - Modeled wind flows over natural gas turbine building to permit assessment of debris (sand and dust) transport and entry into inlet structure.
  - Modeled dynamic, unsteady pipe and steam strainer flow characteristics to evaluate the cause of damage to power plant natural gas turbine blades.
  - Evaluated opposing expert model of airflows in refrigerated truck/storage room to assess carbon-monoxide buildup and transport.
  - Modeled transient and dynamic airflows over utility-scale solar arrays to detect aeroelastic flutter (galloping) frequencies and amplitudes that resulted in catastrophic failure of the arrays.

- **Vehicle Component Failure**
  - Southwest (2013-2018), Evaluated vehicle components such as sensors, controls, welded structures, and others to determine causes of vehicle accidents or vehicle-related injuries.

## Professional Experience

- **Rimkus** **2013 – Present**
  - Principal Consultant

    Responsible for industrial accident analysis and mechanical failure analysis. Provide expertise regarding the safety, design, and operation of material handling and processing equipment. Determine cause and origin analyses for system and equipment failures (e.g., cooling towers, fire risers, dishwashers) and products and components (e.g., pipes, fittings, valves).

- **Heliae Development, LLC** **2011 – 2013**
  - Director – Engineering Group

    Responsible for establishing the company's engineering unit from the ground up, including hiring staff, establishing processes, instituting document control systems, and selecting/deploying software systems. Standardized engineering project tracking system, which included custom database logging and reporting functions, was later adopted by other departments. Once formed, directed the cross-functional engineering team with over $2M budget, supporting R&D in the development of algae cultivation and processing systems. Executed several major projects, developing algae growth systems, processing equipment, and culture treatment technologies.

- **SolutionStream Engineering, LLC** **2009 – 2011**
  - Owner/Principal Engineer

    Provided mechanical engineering design and analysis services to customers in transportation, consumer product, and alternative energy industries.

- **ESG Engineering** **2005 – 2009**
  - Project Manager/Senior Engineer

  Performed Project Management duties for engineering services contracts with customers in alternative energy, transportation, aerospace, DoD, and consumer product industries. Performed structural, fluids, thermal, and optical analysis (classical and FEA) and component design work for engineering services customers. Routinely performed mechanical design and analysis of machined, cast, sheet metal, and injection molded parts. Developed and maintained expertise in a wide range of analysis and design software.

- **Enlux LED** **2003 – 2005**
  - Senior Mechanical Engineer

  Performed thermal applications engineering duties employing heat sinks, thermoelectric coolers, heat pipes, sheet metal and machined part design, and similar technologies. Performed all design activities in the development of an innovative LED light bulb, including thermal, mechanical, and electrical subsystems.

- **Radio Frequency Engineer** **1999 – 2003**
  - R&D Mechanical Engineer

  Supported Radio Frequency Engineers with thermal analysis and sheet metal and machined parts design and GD&T detail drawings for RF combiners, filters, and amplifiers.

- **Wells-CTI, Inc.** **1998 – 1999**
  - Manufacturing Engineer

  Supported Radio Frequency Engineers with thermal analysis and sheet metal and machined parts design and GD&T detail drawings for RF combiners, filters, and amplifiers.

- **U.S. Air Force** **1991 – 1995**
  - Tactical Air Command and Control Specialist

  Served alongside U.S. Army combat units, acting as liaison between Army and USAF close air support assets, planned missions with Army counterparts, and controlled close air support missions to support Army ground commander's objectives. Held Secret clearance; honorably discharged in 1995.

## Education and Certifications

- **Mechanical Engineering, B.S.:** Northern Illinois University (1998)
- **Registered Professional Engineer:** Arizona and New Mexico

## Continuing Education

- **Coursework:** Essentials of Project Management; Maximizing Team Effectiveness; PMP Exam Prep; Introduction to ANSYS CFX; ANSYS CFX Fluid-Structure Interaction; SolidWorks Essentials

## Patents

- Modular tubular bioreactor: **Pat. #US10876087**, December 29, 2020.
- Balanced mixotrophy method: **Pat. #US10240120**, March 26, 2019.
- Modular tubular bioreactor: **Pat. #US10053659**, August 21, 2018.
- Omega 7 rich compositions and methods of isolating omega 7 fatty acids: **Pat. #US9200236**, December 1, 2015.

- Mixotrophic, phototrophic, and heterotrophic combination methods and systems: Pat. **#US975875B2**, Sept. 12, 2017.
- Submersible High Illumination LED Light Source: **Pat. #US8100560B2**, Jan. 24, 2012.
- Methods and apparatus for an LED light engine: **Pat. #US7431477B2**, Oct. 7, 2008.
- Light bulb: **Pat. #USD528227S1**, Sept. 12, 2006.
- Methods and apparatus for an LED light: **Pat. #US6982518B2**, Jan. 3, 2006.
- Methods and apparatus for an LED light engine: **Pat. #US6942360B2**, Sept. 13, 2005.
- Aperture coupled output network for ceramic and waveguide combiner network: **Pat. #US6812808B2**, Nov. 2, 2004.