08.05.2026
Chen
3
Buell Realtime Reporting

RIMKUS
16932 Woodinville-Redmond Road NE, Suite A 105
Woodinville, WA 98072
(206) 623-0630

# Report of Findings

Lubken Incident Investigation and Biomechanical Analysis
Cause Number: 3:24-CV-05811-JCC
Style: Jean Lubken/William Lubken vs. Fred Meyers Stores Inc./Gatekeeper Systems Inc.

Rimkus Matter No: 100336805

Prepared For:
The Aguilera Law Group
23046 Avenida De La Carlota, Suite 300
Laguna Hills, CA 92653

Attention:
Scott LaSalle, Esq.

Christopher T Chen
2026.05.18 19:15:58 -04'00'

Christopher T. Chen, Ph.D.
Principal Consultant

# TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Conclusions | 2 |
| III. | Discussion | 3 |
| | • Incident Report and Statements | |
| | • Surveillance Videos | |
| | • Incident Site Inspection | |
| | • Medical Records of Ms. Jean A. Lubken | |
| | • Report from Kohles Bioengineering Corp | |
| | • Biomechanical Analysis | |
| IV. | Basis of Report | 14 |
| V. | Attachments | 16 |
| | A. Photographs | |
| | B. Figures and Tables | |
| | C. Curriculum Vitae | |

# Section I
# INTRODUCTION

On December 23, 2023, an incident occurred in the Fred Meyer store (the “Fred Meyer”) located at 4505 South 19th Street in Tacoma, Washington. Ms. Jean A. Lubken, a guest of the Fred Meyer, was shopping for a hand mixer. Reportedly, Ms. Lubken lost her footing and fell onto her right side when her shopping cart stopped suddenly at Aisle 86. The (small) shopping cart (the Cart) was equipped with the anti-theft wheel (s), manufactured by Gate-keeper Systems (the Gatekeeper). Ms. Lubken reported that she sustained injuries from the subject incident.

Rimkus was retained to reconstruct the dynamics of this incident and to determine the motions/mechanisms that Ms. Lubken would have sustained in the subject incident in relation to the reported injuries, as well as to respond to the findings from a report issued by Kohles Bioengineering Corp.

Rimkus was also retained to inspect the incident site and to evaluate the involvement of anti-theft wheels and system in this incident, which would be addressed by Mr. Thomas J. Kulaga, P.E., of Rimkus in a separate report.

This report was prepared for the exclusive use of the Aguilera Law Group and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Ming Xiao, Ph.D., Practice Leader.

# Section II
# CONCLUSIONS

1. Subcapital femoral neck fracture cannot be ruled out for a female with Ms. Lubken's height and weight to fall on her hip in the subject incident.

2. According to the testimony from the store manager and employees of the Fred Meyer store, no instance of wheel lockup has been reported in the store's aisles, where the claim of locking wheels by Ms. Lubken in the subject incident has not been verified.

3. Based on the recorded video of guest shoppers on the date of the subject incident and an exemplar shopper during the staged tests, all their feet and heels were located in the area between the two rear wheels and behind the stopped carts in the lockup events. There was no visible evidence that any shopper stepped on the rear wheel of the stopped cart, as reported by Ms. Lubken.

4. The base of support (or stride width) in adults during normal walking was approximately 2 to 5 inches, less than the gap/width between the Cart's rear wheels (21 inches). With the hands on the handle of the Cart, the right heel of the shopper was at least 6 inches away from the right-rear wheel during the lockup event. An entanglement of the right heel with the right (outer) portion of Cart's right-rear wheel would not be expected.

5. The lockup dynamic of the exemplar Cart tested in the Kohles Report showed that the shopping cart equipped with anti-theft wheels would stop slowly in the subject Aisle with skid marks up to 52 inches. Their findings indicated that Ms. Lubken's claim of "abruptly stop" was not consistent with the lockup dynamic of the shopping cart in the subject incident. With the moderate decelerations, the distance of stride length would reduce, but a trip by the rear wheels, as claimed by Ms. Lubken in the subject incident, would not be expected.

# Section III
# DISCUSSION

**Incident Report and Statements**

Incident Report and the Subject Cart.

The incident occurred at Fred Meyer Store #390, which was located at 4505 South 19th Street in Tacoma, Washington, and owned by Kroger Co (**Figure 1**). According to the Kroger incident report number 4A2312Q4C20001, the subject incident occurred in Aisle number 86 by the mixers at approximately 1:55 p.m. on Saturday, December 23, 2023. The report stated that Ms. Angela Padilla was the manager on duty at the time of the incident. The report indicated that Ms. Lubken was the only known witness to the subject incident.

The report stated that Ms. Patty Pickett (with the nickname "Patty P.") was the staff member to contact Ms. Lubken initially, with the description of the subject accident as follows: "*Customer stopped me as I was passing Aisle # 86 and told me that she injured herself because her cart locked up and fell on her. I called another assoc. to get mgr. assist. I did not witness this incident, but the customer indicated that another customer witnessed the incident. Mgr. came & assisted w/ customer*."

The report also provided the description provided by Ms. Lubken as follows: *"I was pushing the cart, wheel locked. I took a step and fell when the cast did not move. I fell onto my right hip. The cart fell on top of me. A shopper saw me, asked if I wanted her to lift up the cart. She did and went to inform an employee after she saw that I could stand. I needed support to hold onto a non-moving structure."*

Statements of Ms. Angela Padilla

In the deposition, dated July 23, 2025, Ms. Padilla testified that Ms. Lubken was sitting on the floor when she arrived at Aisle 86 for the housewares. She stated that she did not witness the incident and that the subject Cart was upright when she arrived, and she did not notice any debris or hazards on the floor. Ms. Padilla testified that Ms. Lubken declined medical help when asked. She stated that Mr. Kenneth Smittling helped Ms. Lubken gather information for an incident report and brought Ms. Lubken a computer chair

to assist her in exiting the store. Ms. Padilla testified that Kroger's claims administrator (Sedgwick) was notified on the same day to open a claim with a reported lockage of the cart's wheel, a fall, and injuries to the hip, neck, and hand. Ms. Padilla stated that the carts, equipped with anti-theft locking wheels manufactured by the Gatekeeper system, would be locked if a customer exited the store without proceeding to the register for checkout. The anti-theft wheels could be unlocked by using a handheld "key" device. Ms. Padilla repeatedly stated she was not aware of anyone who had inspected the cart after the subject incident to verify whether the anti-theft locking wheel in the subject cart was defective. But she had not seen any carts locked inside the store or in the aisles.

<u>Statements of Mr. Kenneth Smittling</u>

In the deposition, dated November 10, 2025, Mr. Smittling stated that he had very limited memory of the subject incident. He testified that he may have assisted generally, but he did not witness the fall. Mr. Smittling also stated that two locking wheels were installed on the shopping carts, typically one in the front and one in the opposite rear, making the carts difficult to move once locked at the store exit equipped with perimeter sensors. He testified that he did not recall whether anyone inspected the subject cart and did not know what happened to it after the incident. Mr. Smittling stated that he could neither confirm nor refute Ms. Lubken's account that the subject cart was abruptly locked in Aisle # 86. But Mr. Smittling testified that he had neither seen nor known that any cart was locked in the store aisles.

<u>Statements of Mr. Chad Peterson</u>

In the deposition dated November 7, 2025, Mr. Peterson stated that he was the store manager and had been working at the current Fred Meyer since 2021 or 2022, when the anti-theft wheels had already been installed in the shopping carts. He testified that he had no direct involvement in the design, installation, or maintenance of the anti-theft carts and had minimal firsthand knowledge of the subject incident. Mr. Peterson stated that, according to his understanding, the anti-theft wheels would lock at the store exit if the carts did not pass through the register for checkout in the presence of a cashier. He testified that damaged carts would be sent to the "cart graveyard" behind the store and that the repair process would begin when there were approximately 30 carts. Mr.

Peterson also testified that he was not aware of any instance of malfunctioning locks in the aisles and did not know of any systemic issue with anti-theft wheels.

Statements of Ms. Jean A. Lubken

In the "Defendant Gatekeeper Systems, Inc.'s Interrogatories to Plaintiff Jean Lubken with Answers Thereto" dated January 14, 2025 (Response to Interrogatory No. 6), Ms. Lubken provided her recollections of the subject fall:

> "I was at the Fred Meyer Store on 19th and Stevens, Tacoma, WA to buy a hand mixer. I selected a shopping cart and proceeded toward the appropriate aisle to select a hand mixer. As I was walking down the center of the aisle, the wheel on the right side of the cart abruptly stopped. My body continued forward and, as I took a step forward, the cart wheel tripped me, resulting in my falling into a side aisle on the right. I was holding onto the handle of the cart. The cart fell on top of me. I fell on my right side with my hip striking the floor before the rest of my body."

In the deposition taken on July 8, 2025, Ms. Lubken stated that she went to Fred Meyer only to buy a hand mixer. She testified that she put her purse on the top basket of the shopping cart and wrapped her hand through the purse strap onto the subject cart. Ms. Lubken stated that she was wearing black boots with wooden heels. She testified that the shopping cart abruptly stopped when she was pushing the subject cart in Aisle 86 with her hands. Ms. Lubken stated that as the cart stopped, her motion continued forward, where her right foot heel interacted with the cart, and it caused her to fall to the right side to the floor onto the right side into the side aisle. She testified that she fell when her right shoe took a step forward to the right side of the right back wheel.

Ms. Lubken admitted that she did not know the mechanisms for locking and did not inspect the subject cart, but she repeatedly stated that the locking wheels account for the subject Cart "halted" suddenly. Ms. Lubken testified that Mr. Lubken, her husband, returned to the store the next day and was told that the subject cart had been returned to circulation. Ms. Lubken stated that she received a surgical procedure to repair a right hip fracture on December 24, 2023. Ms. Lubken testified that she had preexisting knee problems (osteoarthritis) and had one fall in 2021 due to knee instability. Ms. Lubken received a joint replacement for her right knee in March 2023, as well as a neck fusion in 2022. She had the following statements about the subject incident:

"I only had the intent of buying a hand mixer. *[Q: And how long were you in the store before you got to the aisle where you fell?]* I'm thinking five to ten minutes. As I entered the store, there were carts there. I did not take the first cart because it wouldn't move. I went on and selected a cart. I ended up seeing friends, and we chatted for a few minutes. I asked where I might be going in the store to find a hand mixer, and then made my way to the aisle and proceeded down the aisle in the direction of where the hand mixers are kept… I was wearing black boots that had wooden heels… I had my purse I was carrying with me, and I had set the purse itself in the upper basket and wrapped my hand through the purse handle onto the grocery cart as we had been warned that there was a lot of theft happening pre-Christmas and women not to leave their handbags unattended and closely watched by you. So at the time that happened the only thing… in the upper basket was my purse." (Page 50 Line 7 through page 51 Line 14)

"*[Q: You were still looking for the hand mixer aisle?]* Yes… *[Q: And at some point I understand from your interrogatory responses that the cart stopped; correct?]* Abruptly… When the cart stopped, I continued my motion forward, and it pushed me back because it just because it had stopped. So at that point my right foot heel interacted with the cart, and it caused me then to fall to the right side to the floor onto my right side into the side aisle. *[Q: So when the cart stopped, was it your impression that it had stopped at one of the wheels in the front or the back or it was all together the whole thing?]* I'm not a person who's designed to know about shopping carts, but I know that that cart stopped on the spot, and I was jolted…. Well, I still had my hands on the cart, so that part was attached. The part I was saying to you about my right shoe is that in taking that step forward, it was to the right side of the right back wheel, and then I became involved in the fall. (Page 53 Line 1 through page 54 Line 3)

"I'm holding on to the cart. I'm walking in a normal pace. The cart blocks. My body motion continued, and then when it stopped, my body motion reversed. Still holding on to the cart, my right foot proceeded forward, and on the right-hand side of the right back wheel is where the contact with the cart was made, and that is at that point I fell to the right-hand side onto the side aisle. (Page 54 Line 13 through Line 20)

In summary, Ms. Lubken was the only known witness to the subject fall. She testified that her right heel contacted the cart when the shopping cart stopped abruptly and that she fell to the right as her right foot moved forward and contacted the right-hand side of the right back wheel. Ms. Lubken repeatedly stated that the locking wheels caused the subject Cart to "halt" suddenly, although she admitted she did not know the mechanisms for locking and did not inspect the subject cart.

Ms. Padilla, Mr. Smittling, and Mr. Peterson all testified that the anti-theft wheels would lock only at the exit. They also testified that they were not aware of any instances of malfunctioning wheel locks in the store's aisles, where the locking wheels reported by Ms. Lubken in the subject incident have not been verified.

**Surveillance Videos**

Three surveillance videos, recorded for the store entrance/exit and Aisle 86, from the subject store on the date of the incident, were reviewed. These videos showed at least 5 lockup events occurring at the store entrance/exit. The videos also showed that Ms. Lubken walked normally with a typical stride width and a typical stride length.

<u>Lockup Events at Store Entrance/Exit</u>

The footage from the store entrance/exit showed at least 5 lockup events, when these exemplar shoppers pushed the shopping cart out of the store. Three of the lockup events were described as follows:

At 1:05:21 p.m., an unknown female shopper pushed a small cart out of the store entrance/exit as shown in **Figure 2.** The feet of this shopper were located within the area between the two rear wheels behind the stopped small cart. There was no visible evidence that the female shopper was stepping on the rear wheel of the small cart.

At 1:40:57 p.m., an unknown guest shopper pushed a large cart out of the store entrance/exit as shown in **Figure 3.** The feet of this shopper were located within the area between the two rear wheels behind the large cart. The video showed that the shopper was slowing down before stopping.

At 2:54:06 p.m., an unknown senior shopper pushed a large cart out of the store entrance/exit as shown in **Figure 4.** The feet of this senior shopper were located within

the area between the two rear wheels behind the stopped cart. There was no visible evidence that the senior shopper stepped on the rear wheel of the large cart.

Based on the recorded video of guest shoppers on the date of the subject incident, the feet of all the shoppers were located within the area between the rear wheels behind the stopped carts. There was no evidence that any shopper stepped on the rear wheels of the stopped cart, as reported by Ms. Lubken.

Gait Pattern of Ms. Lubken

The footage from the store entrance/exit also showed that Ms. Lubken entered the store at approximately 1:47:20 p.m. She walked with a typical stride width and length similar to other shoppers without any evidence of zigzag or wide-based gait patterns (**Figure 5**). After entering the store, Ms. Lubken selected a small cart, whose wheels were locked and had been left near the entrance earlier by another shopper. She put her purse on the top basket of the small cart and attempted to move it (**Photograph 1**). Ms. Lubken was unable to move the small cart she chose first, as stated in her testimony. She then left the entrance area and walked with a typical stride width and length, as shown in **Figure 6**. Together, Ms. Lubken walked normally with a typical stride width and a typical stride length.

Incident at Aisle 86

Footage taken at Aisle 86 showed that a small shopping cart was next to Ms. Lubken and used store staff members, where an item was placed in the upper basket of the small cart (**Photograph 2**). This footage shows that the subject cart was a small shopping cart with an upper basket, the same style as Ms. Lubken's first attempt to use near the entrance (**Photograph 1**).

**Incident Site Inspection**

Mr. Kulaga of Rimkus participated in a joint inspection of the store, incident site, and exemplar carts on March 30, 2026. The details of the inspection related to the activation and locking mechanisms of anti-theft wheels were described in Mr. Kulaga's Report of Findings.

As aforementioned, surveillance video showed a small shopping cart that was next to Ms. Lubken and used store staff members at the time of the subject incident. An exemplar "small" cart was inspected by Mr. Kulaga, as shown in **Photographs 3 and 4**. The exemplar small shopping cart was approximately 40 inches tall, 23 inches wide, and had a distance between the rear wheels of approximately 21 inches.

Rimkus inspected Aisle 86, where the subject incident occurred. The condition of the floor in Aisle 86 was generally smooth. The position of Ms. Lubken in the surveillance video (**Photograph 2**), in relation to the configuration of the aisle during the inspection, indicated that Ms. Lubken would have fallen in Aisle 86, which was for the hand mixers, as shown in **Photograph 5**. There were some boxes with a depth greater than the shelves' depth and extending into the walking area, as indicated by a red arrow (**Photograph 5**).

**Medical Records of Ms. Jean A. Lubken**

Medical records for Ms. Lubken were reviewed to determine the injuries diagnosed in her medical records, the nature of the injuries, and the potential contribution of pre-existing conditions to tissue tolerances. This follows the methodology for a biomechanical assessment outlined in peer-reviewed and widely accepted literature (e.g., Nahum and Gomez 1994). A biomechanical engineering assessment would not typically include a physical examination because the diagnoses of the medical providers are considered at face value. Instead, biomechanics seeks to determine whether the appropriate mechanisms to result in the diagnosed injuries were present in the subject incidental event.

According to the records reviewed, Ms. Lubken was 54 years old. She stood 5 feet 5 inches tall and weighed approximately 142 pounds at the time of the incident. Ms. Lubken had a medical history of bilateral knee osteoarthritis, senile osteopenia, iron deficiency anemia, hypertension, hyperlipidemia, chronic lower back pain, and a history of falling. She received a neck surgery in 2009, a total joint replacement for her right knee in March 2022, and was scheduled for left knee replacement on January 9, 2024.

On December 23, 2023, a few hours after the subject incident, Ms. Lubken visited St. Joseph Medical Center for her hip pain. Radiographs of her right hip were taken and read by Daniel N. Heller, M.D., who indicated closed minimally displaced right subcapital neck

fracture. Ms. Lubken was interviewed by Luciana F de Oliveira, M.D. and diagnosed with closed right acute subcapital femoral neck fracture.

On December 23, 2023, Ms. Lubken was transferred to Franciscan Medical Clinic. Computed tomography (CT) scans of her lower extremity were performed at Franciscan Medical Clinic and interpreted by Nicholas Z Conley, M.D., who indicated acute subcapital right femoral neck fracture with minimal anterior displacement, impaction, and apex anterior angulation, along with a small right hip joint effusion. She was interviewed by Stephen F. Ou, D.O., and diagnosed with right Pauwels type 3 nondisplaced subcapital femur fracture. On December 24, 2023, Ms. Lubken received Open Reduction and Internal Fixation (ORIF) for right hip fracture using cephalomedullary nail, performed by Dr. Ou. Ms. Lubken was discharged on December 28, 2023.

**Report from Kohles Bioengineering Corp**

A report from Kohles Bioengineering Corp authored by Sean S. Kohles, Ph.D., EIT, FBMES, FAIMBE, was issued on April 28, 2026 (Kohles report). In the Kohles report, staged lockup tests were performed to determine the dynamics of the large and small shopping carts in response to the lockups of the anti-theft wheels during the joint inspection on March 30, 2026.

In the lockup tests at the exit, the feet of an exemplar shopper were located behind the shopping cart and within two rear wheels, similar to other guest shoppers in the lockup events recorded in the videos (**Photograph 7**). The lockup test also showed that the shopping carts with locked wheels were slowing down in the carpet area at the exit.

<u>Lockup Dynamics of the Shopping Cart</u>

In the Kohles report, 12 total rolling lockup tests were conducted on small and large carts in the incident site (Aisle 86) with a polished concrete floor. The exemplar carts were pushed forward at speeds of 2.5 to 3.5 mph. The findings showed 47 to 52 inches of frictional skidding (braking) marks from the small lockup carts, and 34 to 51 inches for large lockup carts (**Photograph 8**). The forces required to push the lockup carts from a static position into dynamic sliding were approximately 8 and 15 pounds for the small and large lockup carts, respectively. The surface interactions between the plastic wheel

material and the polished concrete floor had a resulting coefficient of friction of 0.2 to 0.3, which was lower than that of between plastic wheels and a carpet (0.4 to 0.6)

The test results shown in the Kohles report indicated that a lockup cart did not stop abruptly in the aisle with a polished concrete floor. Instead, a lockup cart would induce frictional skidding (braking) marks on the aisle and travel up to 52 inches after the initiation of the locked wheel signal. These findings showed that Ms. Lubken's claim of "abruptly stopped cart resulted from the locked anti-theft wheels in the subject incident" was not consistent with the dynamics of a lockup cart. These findings also showed that the subject Cart would induce resisting forces to slow down the motion of the shoppers. In the subject incident, Ms. Lubken would have had enough time to respond to a slowing cart, the misstep on the rear wheels, and an entanglement with the rear wheel would not have resulted.

**Biomechanical Analysis**

<u>Fall and Subcapital Fracture</u>

The records indicated an overall body height of 5 feet 5 inches for Ms. Lubken. The body height for an adult female was approximately 65 percentiles for age 30 to 69 years old, according to the report from the United States National Center for Health Statistics (**Table 1**). For the female at 65 percentile, the buttock height was approximately 35.6 inches (**Table 2**). For the female at 65 percentile, the functional grip reach was approximately 30.1 inches (**Table 3**).

Considering that Ms. Lubken fell from her hip/buttock height (35.6 inches) in a free-fall, the velocity at the time of contact with the ground would be approximately 9.4 mph. With a contact time of 0.05 to 0.1 seconds, the contact force would be approximately 610 to 1,220 pounds. Considering that Ms. Lubken was diagnosed with senile osteopenia before the subject's fall, where bone strength and properties were weaker than those of a normal healthy bone. Taken together, the contact forces resulting from a fall on the right hip in a female of Ms. Lubken's height and weight indicated subcapital femoral neck fracture cannot be ruled out in the subject incident.

Misstep and Entanglement with the Rear Wheel

Ms. Lubken testified that her right shoe took a step forward to the right side of the right rear wheel of the subject cart, where her right foot was entangled with the right wheel. As shown in the recorded videos of all lockup events, the shoppers' feet were in the area between the two rear wheels and behind the stopped carts. There was no visible evidence that any shopper stepped on the rear wheel of the stopped cart, as reported by Ms. Lubken.

The typical stride base for adults was 2 to 5 inches wide, which was much less than the distance between the rear wheels (21 inches). Ms. Lubken testified that her hands were on the cart at the time of the subject accident handle, her torso would be located near the center of the shopping cart, where her feet/heel would be at least 6 inches away from the rear wheel, during normal walking. According to the recorded video before the subject incident, Ms. Lubken walked with a typical gait pattern, with a regular stride base and stride length, similar to a typical shopper with no visible zig-zag patterns or wide-stride gait. Furthermore, the rear wheel, along with the cart, would need to rotate clockwise at least 30 degrees for her right foot or heel to make contact with the right side of the rear wheel, which would not be expected, especially with her hand on the cart. Together, the entangle of her right foot heel and the right wheel would not be expected. Similarly, the misstep on the rear wheels of a stopped cart during a typical gait with hands on the Cart's handle would not be expected.

Circumstances of Abruptly Stopped Cart

As aforementioned, the description of an abruptly stopped cart as described by Ms. Lubken was not consistent with the dynamics of a lockup cart as shown in the Kohles report. Other scenarios could account for an abruptly stopped cart: the blockage of shopping by a protruded box as shown in **Photograph 6**.

Summary of Biomechanical Analysis

In summary, the right heel of the shopper was at least 6 inches away from the right-rear wheel during the lockup event. An entanglement of the right heel with the right (outer) portion of Cart's right-rear wheel would not be expected. Although the subcapital femoral neck fracture cannot be ruled out for a female with Ms. Lubken's height and weight to fall

on her hip in the subject incident, the subject fall was not induced by a locked anti-theft wheel. The description of an abruptly stopped cart as described by Ms. Lubken was not consistent with the dynamics of a lockup cart as shown in the Kohles report.

Methodology

The opinions expressed in this report are offered to a reasonable degree of probability within the accident reconstruction, biomechanics, and scientific fields. The methods used and studies cited in this report are relevant to the biomechanics of human motion and injury mechanisms resulting from accidental events. Biomechanics is the application of principles and methods of engineering mechanics to the study and solution of problems arising in biology and medicine. The science of injury biomechanics is fundamentally different from that of medicine in that it does not offer diagnoses, treatment, or prognoses, but instead addresses the relationships between events and tissue damage by studying the physics of accidental events, the properties of tissues, and the application of loads to tissues during such events. In this particular case, the application of biomechanics principles explains Ms. Lubken's motions. These methods have been tested and have yielded consistent results in the articles cited in the **Basis of Report** and others. The methods used and results expressed in these reports can be verified experimentally.

# Section IV
# BASIS OF REPORT

The following materials were reviewed and tasks were performed during the course of our work:

1. Kroger incident report number 4A2312Q4C20001 was reviewed.

2. Three security camera recordings taken at the subject store on December 23, 2023, were reviewed.

3. Inspections of the site and exemplar carts were performed by Thomas J. Kulaga, P.E., of Rimkus on March 30, 2026.

4. A report authored by Thomas J. Kulaga, P.E., dated May 18, 2026, was reviewed.

5. Transcript of deposition of Ms. Jean Lubken taken July 8, 2025, was reviewed.

6. Transcript of deposition of Ms. Angela Padilla taken July 23, 2025, was reviewed.

7. Transcript of deposition of Mr. Chad Peterson taken November 7, 2025, was reviewed.

8. Google Maps/Earth Pro and Street View imagery around the site of the incident were reviewed.

9. Transcript of deposition of Mr. Kenneth Smittling taken November 10, 2025.

10. Report produced by Sean S. Kohles of Kohles Bioengineering dated April 28, 2026, was reviewed.

11. Medical records for Ms. Jean A. Lubken were reviewed.

12. Various legal documents were reviewed, including the following:

    - Complaint
    - Plaintiff's Response to Defendant Gatekeeper's Interrogatories
    - Plaintiff's Response to Defendant Fred Meyer's Interrogatories
    - Defendant Gatekeeper's Response to Plaintiff's Interrogatories

- Defendant Fred Meyer's Response to Plaintiff's Interrogatories
- Lombino's Spoilation Letter
- Motion for Summary Judgement dated April 9, 2026.
- Plaintiff's Response to Motion for Summary Judgement dated February 10, 2026.

13. Various materials were referenced as follows:


a. Nahum, A.M. and Gomez, M.A., Injury Reconstruction: The Biomechanical Analysis of Accidental Injury, SAE paper, 1994.

b. Whiting, W.C., Zernicke, R.F., Biomechanics of Musculoskeletal Injury, Human Kinetics, 1998.

c. Schmitt, K.U., Niederer, P., and Walz, F., Trauma Biomechanics: Introduction to Accidental Injury, Springer-Verlag, 2004.

d. Gordon, et al. Anthropometric Survey of U.S. Army Personnel: Summary Statistics, Interim Report for 1988. March 1989.

e. Anderson DE, Madigan ML. Healthy older adults have insufficient hip range of motion and plantar flexor strength to walk like healthy young adults. J Biomech. 2014 Mar 21;47(5):1104-9).

# Section V
# ATTACHMENTS

A. Photographs

B. Figures and Tables

C. Curriculum Vitae

## Section V
## ATTACHMENT A

# Photographs

Photographs taken during our inspection and reviewed in this report, including photographs and videos that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Still image from the surveillance video at 1:47:34 p.m. showed that Ms. Lubken put her purse on the top basket of the small cart and attempted to move it, but could not, as indicated by a white arrow.



**Photograph 2**
Still image taken at Aisle 86 showed that a small cart was used next to Ms. Lubken and store staff members (2:06:52 p.m.), where an item was placed in the upper basket of the small cart, as indicated by a green arrow.



**Photograph 3**
A left front view of an exemplar small shopping cart, designed the same as the subject cart used by Ms. Lubken and staff members at the time of the subject incident, as shown in **Photograph 2.**




**Photograph 4**
A left top view of an exemplar small shopping cart with measurements: The width of the exemplar small shopping cart was approximately 23 inches, where the distance between the rear wheels was approximately 21 inches.



**Photograph 5**
A lateral view of the shelves for the hand mixers, taken at the time of joint inspection. The section was for mixers, including hand mixers. The number 86 was shown as compared to **Photograph 2**.



**Photograph 6**
A lateral view of the shelves for the hand mixers, taken at the time of joint inspection. There were some boxes bigger than the depth of the shelves and extended into the aisle walking area, as indicated by a red arrow.



**Photograph 7**

The staged tests performed by Kohles Bioengineering Corp, at the time of joint inspection on March 30, 2026. The exemplar shopper's feet were behind the shopping cart and within the area between the two rear wheels, similar to other guest shoppers, after the shopping cart was locked and stopped



**Photograph 8**

The staged tests were performed by Kohles Bioengineering Corp during the joint inspection on March 30, 2026. The exemplar Cart took about 4 feet to stop after lockup was initiated.



## Section V

## ATTACHMENT B

# Figures and Table

**Figure 1**
Google Maps aerial 3D view of the Fred Meyer. The yellow arrow indicates the entrance/exit of the store.



**Figure 2**
Still images from the surveillance video showed an unknown senior shopper pushing a large cart out of the store entrance at approximately 1:47:34 p.m. The feet of this shopper were located within the area between the two rear wheels behind the stopped carts; there was no visible evidence that the person's foot stepped on the rear wheel of the large cart.



**Figure 3**
Still images from the surveillance video showed an unknown shopper pushing a large cart out of the store entrance at approximately 1:40:57 p.m. The feet of this shopper were located within the area between the two rear wheels behind the stopped carts; there was no visible evidence that the person's foot misstepped on the rear wheel of the large cart.



**Figure 4**
Still images from the surveillance video showed an unknown senior shopper pushing a large cart out of the store entrance at approximately 2:54:05 p.m. The feet of this shopper were located within the area between the two rear wheels behind the stopped carts; there was no visible evidence that the person's foot misstepped on the rear wheel of the large cart.



**Figure 5**
Still images from the surveillance video showed that Ms. Lubken entered the store at approximately 1:47:34 p.m., then walked to the left with a typical stride width and length similar to those of other shoppers.



**Figure 6**
Still images from the surveillance video showed that Ms. Lubken left the entrance area and walked with a typical stride width and length (1:47:41 to 44 p.m.)



**Table 1**
Cumulative distribution of population by height and gender from Center for Disease Control and Prevention.

[Data are based on National Health and Nutrition Examination Survey (NHANES), a sample of the civilian noninstitutional population. For this survey, the respondent participates in an interview and a physical examination. For persons 20 years old and over. Height was measured without shoes. Based on sample and subject to sampling variability; see source]

| Height | Males | | | | | | Females | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 20–29 years | 30–39 years | 40–49 years | 50–59 years | 60–69 years | 70–79 years | 20–29 years | 30–39 years | 40–49 years | 50–59 years | 60–69 years | 70–79 years |
| Percent under— | | | | | | | | | | | | |
| 4'10" | – | – | – | (B) | – | – | – | [1] 1.7 | – | [1] 1.0 | – | [1] 3.3 |
| 4'11" | – | – | – | (B) | (B) | – | [1] 2.6 | 3.1 | [1] 1.6 | 2.1 | [1] 3.6 | 8.7 |
| 5' | (B) | – | – | (B) | (B) | – | 5.7 | 6.0 | 5.0 | 8.0 | 9.0 | 16.0 |
| 5'1" | (B) | (B) | (B) | (B) | [1] 0.4 | (B) | 12.3 | 11.6 | 10.8 | 16.7 | 14.7 | 26.0 |
| 5'2" | (B) | (B) | (B) | (B) | (B) | (B) | 20.8 | 19.7 | 19.8 | 23.3 | 23.4 | 36.9 |
| 5'3" | (B) | [1] 3.1 | [1] 1.9 | (B) | [1] 2.3 | (B) | 30.4 | 31.3 | 30.8 | 36.3 | 38.4 | 51.9 |
| 5'4" | 3.7 | [1] 4.4 | 3.8 | [1] 4.3 | 4.4 | 5.8 | 43.5 | 46.6 | 46.0 | 50.7 | 52.8 | 69.9 |
| 5'5" | 7.2 | 6.7 | 5.6 | 7.6 | 7.8 | 12.8 | 54.1 | 61.2 | 58.0 | 68.4 | 66.6 | 82.8 |
| 5'6" | 11.6 | 13.1 | 9.8 | 12.2 | 14.7 | 23.0 | 72.4 | 74.0 | 72.2 | 79.7 | 83.3 | 89.3 |
| 5'7" | 20.6 | 19.6 | 19.4 | 18.6 | 23.7 | 35.1 | 82.3 | 84.9 | 83.0 | 88.4 | 93.3 | 95.4 |
| 5'8" | 33.1 | 32.2 | 30.3 | 30.3 | 37.7 | 47.7 | 90.3 | 91.8 | 91.2 | 95.2 | 97.0 | 98.4 |
| 5'9" | 42.2 | 45.4 | 40.4 | 41.2 | 50.2 | 60.3 | 94.1 | 96.1 | 94.7 | 97.3 | 97.8 | 99.6 |
| 5'10" | 58.6 | 58.1 | 54.4 | 54.3 | 65.2 | 75.2 | 97.6 | 98.9 | 97.8 | 98.9 | 99.6 | 99.6 |
| 5'11" | 70.7 | 69.4 | 69.6 | 70.0 | 75.0 | 85.8 | 99.6 | 98.9 | 99.4 | 100.0 | 99.8 | 100.0 |
| 6' | 79.9 | 78.5 | 79.1 | 81.2 | 84.3 | 91.0 | 100.0 | 99.4 | 99.5 | 100.0 | 99.9 | 100.0 |
| 6'1" | 89.0 | 89.0 | 87.4 | 91.6 | 93.6 | 94.9 | 100.0 | 99.9 | 99.5 | 100.0 | 99.9 | 100.0 |
| 6'2" | 94.1 | 94.0 | 92.5 | 93.7 | 97.8 | 98.6 | 100.0 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 |
| 6'3" | 98.3 | 95.8 | 97.7 | 96.6 | 99.9 | 100.0 | 100.0 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 |
| 6'4" | 100.0 | 97.6 | 99.0 | 99.5 | 100.0 | 100.0 | 100.0 | 100.0 | 99.5 | 100.0 | 100.0 | 100.0 |
| 6'5" | 100.0 | 99.4 | 99.4 | 99.6 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 6'6" | 100.0 | 99.5 | 99.9 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

– Represents zero. B Base figure too small to meet statistical standards of reliability of a derived figure. [1] Figure does not meet standard for reliability or precision.

Source: U.S. National Center for Health Statistics, unpublished data, <http://www.cdc.gov/nchs/nhanes.htm>.

**Table 2**
Cumulative distribution of the Buttock Height from Gordon et al., Anthropometric Survey of U.S. Personnel: Summary Statistics Interim Report. March 1989.

**Buttock Height**

| FEMALE N = 2208 | | | MALE N = 1774 | | |
|---|---|---|---|---|---|
| Centimeters | | Inches | Centimeters | | Inches |
| 83.83 | Mean | 33.01 | 88.74 | Mean | 34.94 |
| 4.52 | Std Dev | 1.78 | 4.71 | Std Dev | 1.85 |
| 102.20 | Maximum | 40.24 | 111.40 | Maximum | 43.86 |
| 65.30 | Minimum | 25.71 | 71.50 | Minimum | 28.15 |
| | Percentiles | | | Percentiles | |
| 73.89 | 1st | 29.09 | 78.43 | 1st | 30.88 |
| 75.02 | 2nd | 29.53 | 79.71 | 2nd | 31.38 |
| 75.73 | 3rd | 29.81 | 80.48 | 3rd | 31.68 |
| 76.69 | 5th | 30.19 | 81.48 | 5th | 32.08 |
| 78.18 | 10th | 30.78 | 82.98 | 10th | 32.67 |
| 79.20 | 15th | 31.18 | 83.99 | 15th | 33.07 |
| 80.01 | 20th | 31.50 | 84.79 | 20th | 33.38 |
| 80.72 | 25th | 31.78 | 85.49 | 25th | 33.66 |
| 81.36 | 30th | 32.03 | 86.13 | 30th | 33.91 |
| 81.96 | 35th | 32.27 | 86.74 | 35th | 34.15 |
| 82.54 | 40th | 32.50 | 87.32 | 40th | 34.38 |
| 83.10 | 45th | 32.72 | 87.89 | 45th | 34.60 |
| 83.66 | 50th | 32.94 | 88.47 | 50th | 34.83 |
| 84.23 | 55th | 33.16 | 89.06 | 55th | 35.06 |
| 84.81 | 60th | 33.39 | 89.66 | 60th | 35.30 |
| 85.42 | 65th | 33.63 | 90.30 | 65th | 35.55 |
| 86.07 | 70th | 33.88 | 90.99 | 70th | 35.82 |
| 86.77 | 75th | 34.16 | 91.75 | 75th | 36.12 |
| 87.57 | 80th | 34.48 | 92.61 | 80th | 36.46 |
| 88.51 | 85th | 34.85 | 93.62 | 85th | 36.86 |
| 89.71 | 90th | 35.32 | 94.93 | 90th | 37.37 |
| 91.50 | 95th | 36.02 | 96.89 | 95th | 38.14 |
| 92.67 | 97th | 36.48 | 98.15 | 97th | 38.64 |
| 93.53 | 98th | 36.82 | 99.06 | 98th | 39.00 |
| 94.86 | 99th | 37.35 | 100.46 | 99th | 39.55 |



**Table 3**
Cumulative distribution of the Functional Grip Reach from Gordon et al., Anthropometric Survey of U.S. Personnel: Summary Statistics Interim Report. March 1989.

**Functional Grip Reach**

| FEMALE N = 2208 | | | MALE N = 1774 | | |
|---|---|---|---|---|---|
| Centimeters | | Inches | Centimeters | | Inches |
| 68.61 | Mean | 27.01 | 75.07 | Mean | 29.55 |
| 3.39 | Std Dev | 1.33 | 3.68 | Std Dev | 1.45 |
| 83.20 | Maximum | 32.76 | 92.10 | Maximum | 36.26 |
| 57.50 | Minimum | 22.64 | 62.60 | Minimum | 24.65 |
| | Percentiles | | | Percentiles | |
| 61.51 | 1st | 24.22 | 67.26 | 1st | 26.48 |
| 62.12 | 2nd | 24.46 | 68.04 | 2nd | 26.79 |
| 62.55 | 3rd | 24.63 | 68.55 | 3rd | 26.99 |
| 63.19 | 5th | 24.88 | 69.28 | 5th | 27.28 |
| 64.26 | 10th | 25.30 | 70.45 | 10th | 27.74 |
| 65.03 | 15th | 25.60 | 71.27 | 15th | 28.06 |
| 65.66 | 20th | 25.85 | 71.93 | 20th | 28.32 |
| 66.22 | 25th | 26.07 | 72.52 | 25th | 28.55 |
| 66.72 | 30th | 26.27 | 73.05 | 30th | 28.76 |
| 67.19 | 35th | 26.45 | 73.54 | 35th | 28.95 |
| 67.64 | 40th | 26.63 | 74.02 | 40th | 29.14 |
| 68.08 | 45th | 26.80 | 74.49 | 45th | 29.33 |
| 68.51 | 50th | 26.97 | 74.95 | 50th | 29.51 |
| 68.95 | 55th | 27.15 | 75.42 | 55th | 29.69 |
| 69.40 | 60th | 27.32 | 75.90 | 60th | 29.88 |
| 69.86 | 65th | 27.50 | 76.40 | 65th | 30.08 |
| 70.34 | 70th | 27.69 | 76.92 | 70th | 30.29 |
| 70.87 | 75th | 27.90 | 77.50 | 75th | 30.51 |
| 71.46 | 80th | 28.14 | 78.15 | 80th | 30.77 |
| 72.15 | 85th | 28.41 | 78.91 | 85th | 31.07 |
| 73.03 | 90th | 28.75 | 79.87 | 90th | 31.45 |
| 74.36 | 95th | 29.27 | 81.31 | 95th | 32.01 |
| 75.24 | 97th | 29.62 | 82.25 | 97th | 32.38 |
| 75.90 | 98th | 29.88 | 82.94 | 98th | 32.65 |
| 76.97 | 99th | 30.30 | 84.03 | 99th | 33.08 |



## Section V

## ATTACHMENT C

# Curriculum Vitae




## Christopher T. Chen, Ph.D., P.E.
Principal Consultant

6221 Dean Martin Drive
Las Vegas, NV 89118

(702) 470-0232

cchen@rimkus.com


## Background

Dr. Christopher Chen received an M.S. and Ph.D. from the University of Wisconsin-Madison for studying musculoskeletal tissue mechanics/medical devices and gained postdoctoral training from Cornell University in the fields of joint mechanics, orthopedics, tissue engineering, and musculoskeletal biochemistry/histology. Dr. Chen is also a registered professional engineer in multiple states with significant expertise in design and computer simulation/modeling of mechanical systems.

Dr. Chen's experience includes orthopedic biomechanics, traumatic (sub-traumatic) injuries, and musculoskeletal tissue regeneration such as orthopedic surgical repair of soft tissues (cartilage, ligament/tendon, meniscus, and spinal disc), bone fracture/healing, as well as soft tissue injuries. He has contributed to more than 100 scientific papers in the field of orthopedics, sports medicine, tissue mechanics, and bioengineering and continues to be involved with teaching biomechanics to graduate/medical students, residents, and orthopedic surgeons. His studies were supported by the National Institutes of Health (NIH), the Department of Defense (DoD), and numerous research foundations (ANRF, AOSSM, and OREF).

Dr. Chen's primary areas of consulting expertise include biomechanical/injury consistency, accident reconstruction, medical device product liability, and medical technology. He uses computer simulations and mathematical models to analyze vehicle dynamics and to perform biomechanical analysis on cases involving in low-speed accidents, sport injuries, and other accidental events.

## Education and Certifications

- **Mechanical Engineering, B.S.:** National Taiwan University
- **Mechanical Engineering, M.S.:** University of Wisconsin - Madison
- **Bioengineering (Mechanical Engineering/Mechanics), Ph.D.:** University of Wisconsin - Madison
- **Postdoctoral Training in Orthopedic Mechanics/Tissue Engineering:** Cornell University
- **Professional Engineer:** Arizona, California, Colorado, Nevada, New Mexico, Texas, Utah, and Wisconsin
- **Certified Bosch© CDR Tool Technician by IPTM**
- **Remote Pilot for Drone/UAS by FAA**
- **Certified Forensic Engineer by National Academy of Forensic Engineers (NAFE):** Senior member

## Professional Engagements

- **Orthopedics and Musculoskeletal Research**
  - University of Texas Southwestern Medical Center – Dallas, TX (2010-2017), Assessing integrity and functions properties in bone samples with osteoporosis and diabetics, cartilage degeneration/regeneration, spine/intervertebral disc impact injury, rotator cuff injury and repair using animal models, and lung regeneration and performing orthopedic surgeries for small animals for shoulder repairs, bone fracture healing/regeneration, and cartilage repair/degeneration.
  - Hospital for Special Surgery/Cornell Medical Center – New York, NY (2001-2010), Assessing biomechanical/biochemical properties of regenerated, repaired, and diseased cartilage; tissue engineering; cartilage/knee mechanics; shoulder (rotator cuff) injury; and shoulder joint mechanics, and performing orthopedic surgeries for small animals for cartilage repair/degeneration.
  - Hospital for Special Surgery/Cornell Medical Center – New York, NY (1999-2001 fellowship), Cartilage injury, cartilage tissue mechanics (biphasic/permeability), and knee mechanics.
  - Cornell University – Ithaca, NY (1996-1999), Cartilage impact injury, cartilage mechanics.
  - University of Wisconsin – Madison, WI (1992-1996), Studied interstitial fluid flows and tissue behavior in normal and diseased ligament and tendon; investigated ligament/tendon tissue mechanics (poroelasticity) and knee mechanics; and performed CFD simulations and FEA analysis.
  - University of Wisconsin – Madison, WI (1991-1994), Studied interbody cage design/test for spinal fusion.

- **Computation Analysis and Modeling**
  - Hospital for Special Surgery/Cornell Medical Center – New York, NY (2001-2009), Biphasic and poroelastic modeling for cartilage biomechanical properties.
  - University of Wisconsin – Madison, WI (1992-1996), Computation fluid modeling of interstitial fluid flow in ligament and tendon.

- **Medical Device and Design**
  - Hospital for Special Surgery / Cornell Medical Center - New York, NY (2003-2004), FT-IRIS device: designing the probe for determining biochemical properties of cartilage using FTIR.

## Forensic Engagements

- **Biomechanical Assessments**
  - Biomechanical assessment of injuries related to sports events, as well as slip/trip/fall.

- **Forensic Assessments for Motor Vehicle Accident**
  - Vehicle accident reconstruction and event data (Airbag Control Module) analysis.
  - Occupant motion analysis and biomechanical assessment of the consistency for injuries in head, shoulder, neck, lumbar spine, knee, and ankle.

- **Motion Studies**
  - Gait analysis and biomechanical analysis in slip, trip, misstep, and fall.
  - Complex sports injury in competitive sports events.

- **Device Operation and Failure**
  - Design and operations and failure of medical devices, industrial devices, furniture, gates, and car seatbacks.

## Professional Experience

- **Rimkus** **2018 – Present**
  - Principal Consultant

    Evaluates and analyzes biomechanical systems, including voluntary and involuntary human motions, for insurance carriers, law firms, and corporate clients. With computer and physical models, evaluates human injury impact from vehicular accidents, amusement park ride accidents, and cases involving falls or falling objects including occupant motion analysis to determine injury potential/causation (e.g., seatbelt use, the effects of airbag interaction, occupant positions). Uses both computer and physical models to reconstruct accidents and measure load and injury levels.

- **University of Texas Southwestern Medical Center** **2010 – 2017**
  - Assistant Professor - Orthopedic Surgery and Mineral Metabolism Center
  - Director of Orthopedic Research (Orthopedic Surgery)
  - Director of Core Facility for Bone Histomorphometry and Musculoskeletal Assessment

    Primary tasks and works from multiple aspects of orthopedics, musculoskeletal research, and bone quality assessment: 1) Integrated all aspects of research processes to address basic, applied, and clinical orthopedic topics; 2) Performed collaborative research with other intramural departments and outside academic and industrial institutions and implemented in the clinical setting; 3) Lectured medical students, orthopedic surgery residents, and biomedical engineering graduate students; 4) Incorporated orthopedic surgeons into the research process from identifying study topics, designing experiments, performing surgeries, testing, and data analyses to publication; 5) Taught courses of biomechanics and biomaterials.

- **Cornell Medical Center School/Hospital for Special Surgery** **1999 – 2010**
  - Assistant Scientist – Research Division/ Orthopedic Soft Tissue Research Program

    Performed collaborative research with other intramural departments and outside academic institutions related to musculoskeletal injury, tissue regeneration and repair; performed mechanical tests for soft tissues (cartilage, meniscus, and spinal disc); Performed simulations using biphasic and poroelastic theories. Provided lectures to medical students, orthopedic surgery residents, and physical therapy students; supervised/mentored engineering/medical students, residents for collaborative research; and trained and supervised undergraduate and graduate students.

- **Cornell University** **1996 – 1999**
  - Postdoctoral Fellow/Design Engineer – Baker Institute for Animal Health

    Designed apparatus to test the structural failure and biological changes of articular cartilage injuries due to impact loading or cyclic sub-fracture impact loading, critical for the initiation of post-traumatic osteoarthritis. The paper (Chen et al., 1999) was presented in the meeting of American Society of Biomechanics and awarded for the best paper in Bone/Orthopedics (MSRC Biomechanics Award).

- **University of Wisconsin, Madison** **1991 – 1996**
  - Research Assistant – Mechanical Engineering Dept.

    Studied the effects of loading on interstitial fluid and solid interactions inside patellar tendon and spine/IVD using various computational tools/models such as finite element analysis (poro-viscoelastic model), Monte Carlo simulation, and Computational Fluid Dynamics (CFD models). Performed biomechanical testing for the behaviors and failure of ligament and tendon under various loading conditions such as cyclic fatigue load-to-fail. Performed biomechanical tests to determine lumbar vertebrae motion and segment stability with or without spinal cage(s) and/or external fixation.

## Continuing Education

- **Center for Public Safety at Northwestern University (NUCPS):**
    - Traffic Crash Reconstruction 2 (2018)
    - Crash Investigation 1 (2018);
    - Crash Investigation 2 (2019);
- **Engineering Dynamics Corporation:** EDC 2019 HVE Forum (2019)
- **IPTM:** Event Data Recorder Use in Traffic Crash Reconstruction (2022)
- **FAA:** Part 107 Small UAS Part 61 (2022, 2024)
- **Excel Tribometers** XL Tribometrist (2018)

## Professional Affiliations and Services

- **Memberships**
    - 1991 - American Society of Mechanical Engineers (ASME)
    - 2000 - Orthopaedic Research Society (ORS)
    - 2022 - Society of Automotive Engineers (SAE)
    - 2024 - National Academy of Forensic Engineers (NAFE)
    - 2024 - National Association of Professional Accident Reconstruction Specialists (NAPARS)

## Honors

- **ASME Ph.D. Paper Competition:** Finalist, Mechanical, Bioengineering Division
- **MSRC Biomechanics Award in Bone/Orthopedics:** American Society of Biomechanics
- **Herodicus Award:** Herodicus Society, American Orthopaedic Society for Sports Medicine
- **Fellow:** National Arthritis Research Foundation (2004)
- **Founder's Award:** Eastern Orthopaedic Society (2007)

## University Activities

- **Course Taught at Graduate and Undergraduate Levels**
    - Biomechanics in Human Disease
    - Biomaterials and Biocompatibility
    - An Introduction to Bioengineering
    - Introduction of Tissue Engineering and Drug Delivery
    - Human Physiology for Engineers

## Research Grant Reviewer

- 2007-2022 Reviewer, Orthopaedic Research Education Foundation
- 2003-2006 Reviewer, Cellular Biology Study Section - Arthritis Foundation
- 2009-2011 Ad hoc reviewer, Netherland ZonMw Foundation
- 2010-2011 Ad hoc reviewer, Skeletal Biology Structure & Regeneration Study Section NIH
- 2010-2013 Ad hoc reviewer, North Carolina Biotechnology Center
- 2011-2012 Ad hoc reviewer, Kentucky Science & Engineering Foundation
- 2011-2012 Ad hoc reviewer, Alberta Heritage Foundation of Research
- 2014-2015 Reviewer, Posttraumatic Osteoarthritis Study Section (PRMRP) - DoD-CDMRP

## Journal Editor

- **Journal of Clinical & Experimental Orthopaedics**

## Ad hoc Reviewer

- **Annuals of Biomedical Engineering** (2002-Present)
- **Clinical Orthopaedic and Related Research** (2005-Present)
- **Journal of Biomechanical Engineering** (2000-Present)
- **Journal of Biomechanics** (2001-Present)
- **Journal of Cellular Physiology** (2004-Present)
- **Journal of Orthopaedic Research** (2000-Present)
- **Journal of Biotechnology and Bioengineering** (2006-Present)
- **Osteoarthritis and Cartilage** (2005-Present)

## Publications (selection from 100+ scientific/engineering articles)

- **"A biomechanical analysis of biotenodesis screw versus bone tunnel methods to restore function of chronic ruptured Achilles tendon by flexor hallucis longus transfer."** Journal of Foot and Ankle Surgery 2017; 56(4):813-816.
- **"Type 2 Diabetes and Metformin Influence on Fracture Healing in an Experimental Rat Model."** Journal of Foot and Ankle Surgery, 2016; 55(5):955-60.
- **"Tissue Explant Models."** In the book of Post-Traumatic Arthritis: Pathogenesis, Diagnosis and Management, Ed. by Steve Olson and Farshid Guilak, of Springer Science, New York, 2015.
- **"Relationship Between Serum Uric Acid and Bone Mineral Density in the General Population and in Rats with Experimental Hyperuricemia."** Journal of Bone and Mineral Research. 2015; Jun;30(6):992-9.
- **"Full-thickness supraspinatus tears are associated with more synovial inflammation and tissue degeneration than partial-thickness tears."** Journal of Shoulder and Elbow Surgery 2011; 20:917-27.
- **"Are joint structure and function related to medial knee OA pain? A pilot study."** Clinical Orthopaedic and Related Research. 2011; Oct; 469(10):2866-73.
- **"Musculoskeletal effects of obesity."** Current Opinion in Pediatrics, 2009, Feb 21(1):65-70.
- **"Development of Experimental Model for Pressure Ulcers in Human Skin."** Wound Repair and Regeneration 2009; 17 (2), A24-A24.
- **"Biochemical and biomechanical properties of lesion and adjacent articular cartilage after chondral defect repair in an equine model."** American Journal of Sports Medicine, 2005; Nov 33(11):1647-53.
- **"Time, stress, and location dependent chondrocyte death and collagen damage in cyclically loaded articular cartilage."** Journal of Orthopaedic Research, 2003; 21:888-898.
- **"Matrix fixed charge density as determined by magnetic resonance microscopy of bioreactor-derived hyaline cartilage correlates with biochemical and biomechanical properties."** Arthritis & Rheumatism 2003; 48(4): 1047-56.
- **"Transient and cyclic responses of strain-generated potential in rabbit patellar tendon are frequency and pH dependent."** Journal of Biomechanical Engineering, 2000;122(5):465-70.
- **"A fiber matrix model for interstitial fluid flow and permeability in ligament and tendon."** Biorheology 1998; 35:103-118 (Cover highlighted article).