# Christopher T. Chen, PhD, PE

# Lubken v. Fred Meyer Stores, Inc., et al.

# August 5, 2026

BUELL
REALTIME REPORTING

1325 Fourth Avenue, Suite 1840 Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066 Tacoma 253.235.0111 Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community,

Plaintiffs,

v. ) No. 3:24-cv-05811-JCC

FRED MEYER STORES, INC., an Ohio corporation doing business in the State of Washington; THE KROGER CO., and Ohio corporation doing business in the State of Washington; GATEKEEPER SYSTEMS, INC., a California corporation doing business in the State of Washington,

Defendants.

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF
CHRISTOPHER T. CHEN, PhD, PE

Las Vegas, Nevada

(All participants appeared via videoconference.)

DATE TAKEN: AUGUST 5, 2026
REPORTED BY: CINDY M. KOCH, RPR, CRR, CCR #2357



A P P E A R A N C E S

FOR PLAINTIFFS:
ANDREW S. ULMER
Pfau Cochran Vertetis Amala
909 A Street
Suite 700
Tacoma, WA 98402-4413
253.777.0799
aulmer@pcvalaw.com
JOSEPH M. LOMBINO
Lombino Martino, P.S.
9315 Gravelly Lake Drive SW
Suite 201
Tacoma, WA 98499-1502
253.830.2700
joey.lombino@lombinomartino.com

FOR DEFENDANTS FRED MEYER STORES, INC., AND THE KROGER COMPANY:
SARAH K.Z. CAMPBELL
Scheer.Law PLLC
701 Fifth Avenue
Suite 3860
Seattle, WA 98104
360.901.1017
SarahC@scheer.law

FOR DEFENDANT GATEKEEPER SYSTEMS, INC.:
R. SCOTT LASALLE
The Aguilera Group
23046 Avenida De La Carlota
Suite 300
Laguna Hills, CA 92653
714.384.6600
slasalle@aguileragroup.com

* * * * *



DEPOSITION OF CHRISTOPHER T. CHEN, PhD, PE

EXAMINATION INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Ulmer | 4 |
| Ms. Campbell | 93 |


EXHIBIT INDEX


| EXHIBITS FOR IDENTIFICATION | | PAGE INTRODUCED |
|---|---|---|
| Exhibit 1 | Curriculum vitae | 5 |
| Exhibit 2 | Testimony list | 6 |
| Exhibit 3 | Report of Findings by Dr. Chen | 7 |
| Exhibit 4 | Invoice dated 4/24/2026 | 8 |
| Exhibit 5 | Invoice dated 6/24/2026 | 8 |




LAS VEGAS, NEVADA; AUGUST 5, 2026
10:02 a.m.
-o0o-
(Exhibit Nos. 1-5 marked.)

CHRISTOPHER T. CHEN, PhD, PE, witness herein, having been first duly sworn on oath, was examined and testified as follows:

E X A M I N A T I O N

BY MR. ULMER:
**Q. Good morning. Can you please provide us with your full name.**
A. My full name is Christopher Tung Chen.
**Q. And what's your professional address?**
A. My professional -- my current address of office -- this office is 6221 Dean Martin Drive of the Las Vegas.
**Q. And you are employed by Rimkus?**
A. That's correct.
**Q. Where is that company based out of?**
A. It's based in Houston.
**Q. How long have you worked for Rimkus?**
A. About eight years.
**Q. And what is your current job title with Rimkus?**
A. My current title is principal consultant of -- in -- for Rimkus.

**Q. Do you have any other occupations in addition to being a consultant for Rimkus?**
A. Not currently.
**Q. And so right now your sole occupation is doing consulting work for Rimkus?**
A. That's correct.
**Q. Okay. And you've offered testimony a number of times at deposition and at trial; is that correct?**
A. That's correct.
**Q. I'm going to share my screen so we can take a look at a number of different documents. Give me a second here. All right. Can you see my screen?**
A. Yes.
**Q. Perfect.**
**So I have a number of tabs open here. We're looking at what I'll mark as Exhibit 1 to the deposition. This is a five-page document. And, sir, this is your curriculum vitae, as I understand it. Is that correct?**
A. That's correct.
**Q. And Rimkus responded to the subpoena my office propounded, producing this copy of your CV. Do you happen to know if you've had any updates recently to your CV?**
A. Probably this is current.



**Q. Okay. The document I'm showing here is reflective of your professional experience as a biomechanical engineer; is that right?**
A. That's correct.
**Q. Okay. I'm going to jump to the next tab. We'll circle back to the prior exhibits.**
**Exhibit 2, as I understand it, is your testimony list that's created by Rimkus. Is that -- is that right?**
A. Yes.
**Q. Okay. And then the testimony list here is for yourself. You're identified as a Rimkus consultant, and it's for the time frame of September of 2018 to December of 2025; is that right?**
A. That's about right.
**Q. Since December of last year, have you testified in other cases?**
A. None that I remember. I mean, they have several, and probably more than five to ten was scheduled, but it was canceled in the last minute.
**Q. Okay. Sir, do you happen to know what your current consulting caseload is, meaning the number of cases you're retained as a consultant at the moment with Rimkus?**
A. You mean total, or you mean the current active?



I mean, that's --
**Q. Yeah, currently active right now.**
A. Probably about 50.
**Q. Are the -- is the majority of those cases litigation-related work?**
A. Yes.
**Q. Okay. The earliest date provided here for your testimony list is September of 2018.**
**Do you happen to know how long you've been offering testimony as an expert witness?**
A. That was --
**Q. Is that earlier than 2018?**
A. That was the first one.
**Q. Okay. And so Exhibit 2, which is five pages long, contains all of the situations where you've testified at deposition or at trial?**
A. That's -- I believe that's right.
**Q. Okay. And then I turn over to Exhibit 3, which I understand to be the report that you generated from this case. It is 41 pages long, and it's signed by you on May 18th of 2026; is that correct?**
A. That's correct.
**Q. All right. And is it accurate that this report contains a summary of all the conclu- -- all the opinions and findings that you are making in this case?**



A. That's correct.
**Q. Have you created any additional reports or, you know, writings that offer supplemental opinions that you're offering or anticipated to offer?**
A. No.
**Q. I turned over to Exhibit 4. Do you see that Exhibit 4 is an invoice from Rimkus to Gatekeeper Systems, dated April 24 of 2026?**
A. Right.
**Q. Okay. And Pages 2 through 3 give an itemization of the work that Rimkus put on this case, including the hours that you've personally put in; correct?**
A. That's correct.
**Q. I turned over to Exhibit 5. It's the same type of invoice, but this invoice is dated June 24 of 2026; is that right?**
A. That's correct.
**Q. The June 24 invoice has the last work being performed in May of 2026, on the 18th, by yourself. Do you know how much additional work you personally have put into this particular case since May of 2026?**
A. It's very recent because the reason for this deposition, we reviewed the report and also related report produced by the plaintiff counsel. And that's

something -- the major thing we do every now and then, we just review the document in preparation for the deposition.

**Q. Okay. Plaintiffs have retained Sean Kohles. That's someone that you recognize?**

A. Yes.

**Q. And how do you know him?**

A. We are -- I think that's probably in 1990, we was -- I was studying my PhD for the biomechanics. He was in the same lab with the same advisor, PhD advisor, with myself.

**Q. Okay. You know, in terms of his qualifications and his background, and you having witnessed him as a peer and colleague in the same field, any -- do you have any criticisms about him in terms of, you know, his background, experience, or qualifications?**

A. I think he's a well-qualified scientist.

**Q. Okay. And in terms of personal temperament, you know, as a colleague, you know, knowing each other, any -- I guess, do you have any observations that would be negative from personally having been a colleague together?**

A. Not re- -- I mean -- I mean, we been in multiple project, with a sizeable lab. I think our conversation is more academic at the time.



And for the personal, besides that time, we also met each other in the national meeting after we graduated. I moved to New York, Cornell University and Medical Center later on, and he was in Boston, I believe, near to Boston before he moved to Oregon.

But we each see each other sometime -- very briefly. Sometime it is just gathering update, some of the -- I think his research, everything I think is quite reasonable.

**Q. Okay. Thank you.**

**And I just mean to ask, because I just want to know if there's some sort of personal backstory out there. And I take it, you know, you have a pretty normal professional relationship with each other from your past. Is that fair to say?**

A. Yes.

**Q. Okay. So I turn back to your CV. I understand you have some education in biomechanics, and you're also a licensed professional engineer. Is that right?**

A. Yeah, that's correct.

**Q. How many states?**

A. I lost count because it's so many state. My first one, which is -- we call the primary, is in Wisconsin. At the time I was in the -- PhD student. I also do some engineering work, so I established as



engineer. That's my first one, is nineteen ninety -- I think '95.

And after that, I also have in this state. We are resident right now in Nevada, California. Probably we also additional work with the Midwest -- oh, sorry, in the -- in the West, so including Colorado, Arizona. And I think probably I also applied for Washington because of this case, but it's a long process. I haven't seen approval yet.

**Q. I saw in your CV, on Page 2, you have experience with device operation and failure. In your CV, it says that -- it says here, "Design and operations and failure of medical devices, industrial devices, furniture, gates, and car seatbacks."**

A. Uh-huh.

**Q. And so you've analyzed a variety of different types of products through the consulting work that you've done through Rimkus?**

A. Some of them is consulting work with Rimkus. Some of them, I do the test when I was in the research environment.

**Q. Okay. I guess I'm wondering, do you have any experience analyzing either shopping carts or, in this case, some sort of wheel design?**

A. I have no expertise in the wheel design, but I



have been working with Tom Kulaga in a separate case with a similar design in different state.

**Q. I understand that Rimkus has both yourself and Tom on this particular case. Could you help me understand the -- you know, the scope of where you're working from on this case and where Tom is, and help me understand the assignments, how they're distinct between you two.**

A. My portion was to determine the dynamic of the incident, including the cart, and also how the fall was -- occurred, and also potential mechanism of the -- which is Ms. Lubken was sustained in this accident, which means the fracture of the femur head in this case.

We tried to see what is the -- what is come -- and also respond to some of the finding from the report of the -- Kohles. Because he have to do some kind of mechanical testing on this one for the cart. So I just reviewed those to see if anything can help to understand how the incident was occurred.

(Court reporter clarification.)

BY MR. ULMER:

**Q. And, Dr. Chen, you're doing good. Cindy might just chime in because sometimes it's hard to hear through Zoom.**

A. Yes.

**Q. So are you offering an engineering opinion about the mechanics of how the anti- -- I'll call it the antitheft product, how that works?**
A. I do not offer the mechanism, but I look into the mechanism report by Mr. Kulaga.
**Q. That's Thomas Kulaga?**
A. Yes, Thomas Kulaga.
**Q. Okay.**
A. The name also on the first page of my report. K-u-l-a-g-a.
**Q. Thank you.**
**And did you attend the inspection at the Fred Meyer store?**
A. I did not.
**Q. And --**
A. Because I have a time conflict.
**Q. Okay. And have you inspected an exemplar product, which would be a shopping cart that had the antitheft product installed on it?**
A. That is a separate project, but not this particular one.
**Q. Okay. And you mentioned that you and Mr. Kulaga have another case?**
A. Yes.
**Q. Is it with the same antitheft product?**



A. Yes.
**Q. Where is that case based in?**
A. That is in New Mexico.
**Q. Is that active or has that resolved?**
A. My understanding is, it resolved.
**Q. What were the years that you worked on that case?**
A. I've been working on the -- I believe last year.
**Q. And were you deposed in that case?**
A. No.
**Q. Okay. Had you produced -- or strike that.**
**Have you authored a report in that case?**
A. I offered the preliminary conclusion, but not really a full report before we kind of -- I think the case was settled.
**Q. Understood. And what is the nature of the allegation with respect -- let me -- let me actually lay a little more foundation.**
**The case that you worked with Tom Kulaga involved the identical antitheft product that is involved here in this case?**
A. I won't -- I won't -- I cannot say for sure is from the same company. I -- and this -- and he's more of the person for the equipment, so I will refer to him.



Because sometimes they have a different model. I don't want to -- I don't want to overstep his opinion, and I don't -- I think it's similar, but I don't know if that's exactly.
**Q. Understood.**
**It's a -- you worked with Mr. Kulaga on a case involving a Gatekeeper product that was installed on shopping carts, but what I understand you're saying is, you can't say for certain if it's the identical model --**
A. Yeah.
**Q. -- as the product at issue in this case?**
A. Right.
**Q. And in that case, similar to this case, you were looking at the in- -- the alleged injury dynamics?**
A. I am looking for the dynamics of the -- of the cart also in that case, and also report injury.
**Q. What was -- what's your understanding of the nature of the allegation of what had occurred in that case that you had worked with Mr. Kulaga out of New -- involving the case out of New Mexico?**
A. I'm not quite sure I can talk to that because I need to get the approval from the company because that's -- that is -- that's our policy. I don't know if I can talk too much detail in the case.
MR. LASALLE: Dr. Chen, I think you can give



generalities, as best you can, to answer Mr. Ulmer's questions. I mean, we're not going to name the specific person and --
THE WITNESS: Okay.
MR. LASALLE: -- you know, for privacy rights in terms of their HIPAA and their injury claims, but I think generalities is fine.
BY MR. ULMER:
**Q. Yeah, I just -- I'm trying to understand the nature of the alleged injury incident.**
A. I see.
**Q. Yeah.**
A. So is the hand injury. The person push forward the cart, which the cart was locked at the exit of the -- of the -- of the -- of the -- the store at the time.
So they -- I inspect -- investigated on the mechanism of the -- also dynamic in this case when they have a video to show the cart was locked at the time of when they exit the exit of the store.
**Q. And the -- in that situation, what were the alleged injuries? Were -- and I'm talking generalities. Was it a fall? Was it a hand injury? What was alleged, if you --**
A. Yeah.

**Q. -- recall?**
A. It was -- it was a hand injury, the upper extremity.
**Q. And you had indicated you were not deposed or testified at trial in that case?**
A. No.
**Q. Okay. In that case, had you tested or studied either the -- the subject cart with the antitheft product or an exemplar?**
A. I do -- that would relate to -- that is -- portion was Tom Kulaga's job. I did not touch that part. I didn't do a test, anything.
**Q. Okay. In this case, Mr. Kulaga -- well, let me -- let me not testify.**
**Was Mr. Kulaga present for the site inspection in this case?**
A. Yes. That's my understanding.
**Q. And you were not present for that inspection?**
A. Which one? You mean the cur- -- the subject accident?
**Q. In this case, did you -- were you in attendance at the Tacoma inspection --**
A. No.
**Q. -- Tacoma, Washington?**
**Okay. And had -- have -- for this case, have**



**you tested an exemplar cart?**
A. Not myself.
**Q. Okay. Is it your understanding that Mr. Kulaga did?**
A. That's my understanding, he did.
**Q. Okay. Am I -- am I pronouncing that correctly? Is it "Kulaga"?**
A. "Kulaga," yeah.
**Q. Okay. Thank you.**
**For this case, are you offering any opinions about the design of the Gatekeeper wheel?**
A. No.
**Q. Okay. As I understand it, you are not offering opinions about the mechanics of how the wheel operates, and your role in this case is to speak about the fall dynamics?**
A. I also will be -- offer opinion about the dynamic of the cart was stopped, that dynamic. That part, I do involve because that connect with the fall, the -- the force, and also motion of the -- of the incident. But not locking mechanism.
**Q. Okay. Meaning -- are you offering opinions about, you know, the way the wheel is designed and how it operates, or are you more so looking at, say, the rate of braking because that's germane to a fall**



**analysis?**
A. My portion of the opinion is more about the dynamic, how the cart was stopped.
**Q. Okay.**
A. And relate to this accident.
**Q. Are you offering any opinions about how the product performs in terms of, you know, whether it stops consistently, whether there's deviations in the manner in which it brakes when compared to other similar products?**
A. Can you rephrase it?
**Q. Sure.**
A. Sound like multiple component there.
**Q. Yeah, I'm always happy to rephrase, so let me know if you don't understand a question.**
**Does -- from what you've seen in the materials and in some of the information you acquired from Mr. Kulaga, does the Gatekeeper wheel have deviations in the rate that it brakes?**
A. Not quite sure -- I mean, they have a certain video beside the -- the surveillance video provide, they -- at the time -- at the date of the testing, and from the video, it appeared to be -- they have two different kind of cart.
One is -- they call a larger, and is a smaller,



a slight different design. And I think the two have slight different dynamic. But we seen each one of them, I think, being consistent.
**Q. Okay. Is it your -- so from your -- from what you've seen, does the wheel consistently lock at the same rate of speed?**
A. They have -- because we talk about multiple different location, and also different cart. So I need to break down your question to different -- different portions so I can answer your question more effectively.
So they are -- they are -- in the exit they also -- they do the test. And they have one staff person who is doing the test, push out the cart and stop at the -- near the entrance. Okay.
That is consistent with the surveillance video, with the people pushing from -- out of the exit. The cart stopped, I think, within that limit. In the front there, I think that -- my understanding, that the floor is a little bit different because it's carpet, not a smooth, concrete floor. So appear that stopping would be faster. Okay.
I don't -- I don't believe that being the force that have been report, how much force need to break it out from that. But the people do in the surveillance video, showing that some customer able to push the cart

Page 21

forward even after the activation of the wheel lock.
I hope that makes sense to you so far. So that's a -- because in -- in -- for the test --
**Q. So for the --**
A. Go ahead.
**Q. Sure. For Gatekeeper's antitheft wheel, when it's activated, it locks; right?**
A. Yes.
**Q. Do you have information about whether that -- whether that locking mechanism is consistently locking at the same rate of speed, or are you aware of any deviations in that -- in the speed in which it's locking?**
A. I will re- -- for the locking speed, I will refer to Mr. Kulaga.
**Q. Okay.**
A. I don't -- I won't comment because I didn't do any test. My part only from the observation of the -- of the video. So which means that is -- can be -- don't have any resolution to tell.
**Q. A couple of other questions about kind of your background. Aside from the New Mexico Gatekeeper case, had you worked on prior cases involving alleged injuries relating to shopping carts?**
A. They have several cases before, but that's

Page 22

different -- is not -- don't have antilock wheel. The answer is yes.
**Q. So different injury mechanisms that didn't involve a locking wheel?**
A. No. They -- in those case, they don't have antilocking wheel.
**Q. Sorry. That's what I was -- so you have prior experience in cases involving shopping carts, but that did not have a locking wheel mechanism?**
A. That's correct.
**Q. Okay. Have you worked on any type of case involving this -- a similar type of locking wheel?**
A. No.
**Q. Have you -- have you worked on a case involving radio frequency lock systems?**
A. No.
**Q. Okay. Do you have any opinions about the way the wheels are activated to lock, or is that something that Mr. Kulaga's speaking to?**
A. I have no opinion on -- on how -- how that -- how that operated. Is not in my expertise.
**Q. Understood.**
**And are you offering any opinions about the retail store's maintenance practices?**
A. No. I have no opinion on that.

Page 23

**Q. Okay. Let's go back to your testimony list here. There we go.**
**Can you see it?**
A. Yes.
**Q. There is a column, which is the fourth column from the right -- from the left -- sorry. Fourth column from the left, there's a column that identifies the party that has retained you.**
**And in going through every case you've been retained in, you've always been retained by the defense; is that right?**
A. In those testimony was from the defense, defendant.
**Q. Have you ever testified at deposition or trial in a case where you were retained by the injured party?**
A. No.
**Q. Okay. Do you know why you're only retained by the defense in cases where you've actually got to the point of testifying in?**
A. I will -- I -- I didn't --
MR. LASALLE: Object to the form.
Go ahead, Doctor.
A. I don't know the reason. I didn't ask them, and I only get the deposition when they ask. I have several -- many case with the plaintiff, but they

Page 24

weren't going to that -- that -- that -- that portion, that portion of the process.
BY MR. ULMER:
**Q. Have you -- in prior cases you've been retained in, have you offered opinions that related to the design of products?**
A. Yes.
**Q. And I imagine there are some cases where you're, like this case, more looking at injury dynamics?**
A. And those is -- are the design or testing. I have several cases relate to that, the design, but not -- not like this one, not -- not -- not the wheel.
**Q. Okay. Well, just -- just to clarify, do you know how many cases that you've been retained on as an expert consultant where you analyzed the design of a product, whether the -- you know, analyzing how the product worked and designed from an engineering or a mechanical engineering point of view?**
A. I will say -- huh -- probably around ten, give -- plus/minus. I couldn't -- I didn't -- I didn't have a count. But about ten of them, maybe five to ten, or ten to twenty. I don't remember the --
**Q. Is --**
A. -- I didn't have a count.
**Q. Is this case and the New Mexico case the only**

Page 25

**cases that you've worked on that involved antitheft wheels?**
A. Besides this, this is only two cases I have wheel.
**Q. And then you've been retained in other cases involving shopping carts. Do you know how many other cases you've been retained that involved an incident involving a shopping cart?**
A. Between ten to twenty.
**Q. Have there been any cases involving shopping carts that involved a customer tripping on the wheel of the shopping cart?**
A. I will say very close, but I don't remember exactly detail at this point, but not -- not -- I will say not exactly.
**Q. And is this the first case where you've analyzed whether someone had tripped on a shopping cart wheel?**
A. I will say of this -- this kind of situation.
**Q. Is --**
A. Which means sudden stop.
**Q. And you're a biomechanical engineer. Have you worked on prior tripping cases and analyzed falls, trips, and the mechanisms that caused someone to lose balance?**

Page 26

A. Yes.
**Q. How many different cases have you worked on in that regard?**
A. I work with trip and fall, slip and fall, misstep and fall, I think altogether, probably more than 50.
**Q. In those cases where you worked on -- have any of those cases been cases involving products, or are they cases involving someone falling, allegedly based on some sort of condition of the premises?**
A. I will probably say I don't remember because it's so many cases before. So I don't remember. But if they have any, maybe one or two maybe close to, but I don't remember exactly --
**Q. Okay.**
A. -- the detail.
**Q. In the cases that you've worked on where you've studied a trip and fall, and you're analyzing the fall dynamics, how do you go about to understand someone's gait or the manner in which they're walking prior to the fall?**
A. In typical, they have a video in the case I can calculate the speed and -- and the length of the -- which each -- each step, how far they walk before and after sometime.

Page 27

**Q. Okay. We'll get to the report in a minute, but I've turned over to Exhibits 4 and 5, which are the invoices.**
**First we'll look at Exhibit 4, which is the April 24, 2026, invoice. This invoice totaled -- from Rimkus, totaled $15,234.51; is that right?**
A. That sounds right.
**Q. Okay. And then the June 24, 2026, invoice totaled $19,208; correct?**
A. That's correct.
**Q. Okay. And the invoice itemized the time that you've spent on a case and provides a calculation of the total hours, as well as the total cost for your service; is that right?**
A. That's correct.
**Q. And in the April invoice, from March 16, 2026, to April 20, 2026, you had worked on this case for a total of 15.8 hours, amounting to a total charge to Gatekeeper of $5,214; is that right?**
A. That's about right.
**Q. And in this invoice, it indicates that you were the individual that had first made contact with counsel for Gatekeeper in March of 2026; correct?**
A. That's correct.
**Q. Okay. In -- have you worked with Mr. LaSalle before this case?**

Page 28

A. No.
**Q. But you had worked with Gatekeeper before on the New Mexico case?**
A. That's correct.
**Q. Do you recall who had ret- -- who the person was that had retained Rimkus initially on behalf of Gatekeeper?**
A. I don't -- can you rephrase that question? I'm not quite sure --
MR. LASALLE: Andy, do you mean the --
MR. ULMER: Let me clarify.
MR. LASALLE: Do you mean the New Mexico case?
BY MR. ULMER:
**Q. Let me clarify. Sir, were you the first point of contact with someone representing Gatekeeper for whatever the first in time litigation was that Gatekeeper was in?**
A. Well, that's -- my understanding at the time -- maybe Scott can correct me because we have a conversation. I think my understanding was that they talked to -- they went to -- they went to Rimkus, and I think -- and at that time our staff -- one of my colleagues just retired. His name is Gary Yamaguchi.

Page 29

And he referred this case to me from Mr. Scott LaSalle.
THE WITNESS: That's right?
BY MR. ULMER:
**Q. Okay.**
MR. LASALLE: Well, Andy, are you talking about the New Mexico case or this case?
MR. ULMER: Well, so what I'm getting at, I just wanted to understand the first point of contact that he's had with Gatekeeper in some form or fashion.
MR. LASALLE: Okay. So that -- Dr. Chen, I think he's talking about the New Mexico case because that was before --
THE WITNESS: Oh, I see.
MR. LASALLE: -- I ever spoke to you.
BY MR. ULMER:
**Q. Yeah. And I can help clarify, Dr. Chen.**
A. Okay. For the New Mex- --
**Q. Yeah. So tell me about how you -- did you -- were you contacted in the New Mexico case, or was it someone within Rimkus that was first contacted by Gatekeeper?**
A. Well, that's a -- that's a while ago because my understanding was that I was contact by the counsel from New Mexico about injury for the shopping cart. And I was first looking to the video, understanding what is

Page 30

happen to the cart and the -- and the stop mechanism, and -- and before Tom also got involved.
I think they maybe also talked to Tom at some point. But I was not completely clear, and I didn't know they contact Tom Kulaga first or at the same time. That part, I do not -- I do -- I not know.
**Q. And --**
A. But --
**Q. Okay. Have you ever --**
A. But they contact -- but they contact our New Mexico office first and they refer to us.
**Q. Okay. Have you -- do you know if you've ever -- if you've ever spoken to any employees or owners of Gatekeeper directly, or have -- has your contact just been through their counsel?**
A. I do have a conference call with a Gatekeeper person before Tom was joined at the time, later on. So which means I do have a contact with them. I speak to their people to understand how all the setting and how the activation of the antilock system.
**Q. Do you remember the name of the employee or employees that you've spoken to about the product?**
A. I do not remember.
**Q. And do you -- was that back in, what, last year, when you were working on the New Mexico case?**

Page 31

A. That's correct.
**Q. Okay. And the conversation you had with someone who worked for Gatekeeper pertained to how the product activated?**
A. Yes. That's what I try to un- -- basically wanted to understand, how the lock/unlock mechanism work and how much forces was generated by the locking cart. And my understanding was, they -- they have -- the -- it depends on how much wheel and also depends on the surface.
That, in -- in this case -- they also tell me that -- that the purpose they have carpet on that because it would generate more forces to stop the cart.
**Q. Got it.**
**All right. Let's turn to the second invoice, invoice dated June 24, 2026. This invoice billed Gatekeeper for a total of $19,208; is that right?**
A. That sounds right.
**Q. And actually, the invoice went to Travelers; right?**
A. I believe so.
**Q. Okay. And if we look at the bottom, the total time you've billed to the case from April 24, 2026, to May 18, 2026, was for 28.9 hours, for a total of $9,537; correct?**

Page 32

A. That's correct.
**Q. In addition to Mr. Kulaga, there is a number of other colleagues here that have put some work into the case as well. Which of these individuals assisted you in your biomechanical analysis?**
A. Primary is Ming Xiao, X-i-a-o. You see that?
**Q. Yeah.**
A. That --
**Q. Go ahead.**
A. And he was the -- we call the reviewer, we call technical review, to review my opinions and analysis.
**Q. Okay. And did -- did he provide you with any data that you were relying on, or was he just reviewing your report or -- or your opinions that you had at that point?**
A. They just reviewed my analysis, may -- if -- to see if any -- any -- anything is -- from scientific point of view is reasonable for -- and -- or any -- any -- anything he have the -- and also have opinion -- any opinion on my report. So they -- this is living document, so we did -- they -- he did review that both probably at the time.
**Q. Okay. And his position at Rimkus is as a practice leader?**
A. Yes.

**Q. Is he also a biomechanical engineer?**
A. He is.
**Q. Okay. And so he reviewed your work. And then do you recall having a conversation with him about his thoughts?**
A. I believe he agree with all my analysis.
**Q. Okay. And did he offer any suggested changes or modifications or additions to your -- your analysis?**
A. I do not remember. Is very subtle. Maybe it's like wording or something, but it's not -- and the calculation and everything, he agreed with.
**Q. Okay. Then we get to your report, which you completed in May of 2026?**
A. That's correct.
**Q. And Page 2 gives a summary of the five -- I'll call it primary opinions you're offering. Is that right?**
A. That's my conclusion, yes.
**Q. Okay. And we'll just go through each one. First opinion was that the subcapital femoral neck fracture cannot be ruled out for a female with Ms. Lubken's height and weight to fall on her hip in the subject incident.**
**By that -- could you -- could you explain? By not ruling out meaning you're not disputing that the**



**fracture she sustained was caused by the fall?**
A. That's correct. And we were analyze, in this particular case with his -- her weight and height, some people may not fracture, some may have a fracture, but in this particular case, she had the fracture.
So I think, from the biomechanics point of view, we cannot rule out from the thing we look after with medical record, which is consistent.
**Q. And there are cases where you are retained as a consultant, you're evaluating the allegation, someone's alleging an injury. And I'd imagine there are cases where you're looking at the mechanisms of the fall, and you're arriving at the opinion that the alleged injury could not have been caused by the fall at issue or the fall as described?**
A. If we -- that's correct. If they have evidence to support they are -- they are -- for example, they are -- sometimes they're like, for example, and also in the shopping, they allege they fell to the ground, but the video shows they are not. So I will say, this inconsistent.
**Q. Got it.**
**And the point --**
A. But not this --
**Q. Sorry. Go ahead.**



A. Yeah. For that purpose.
**Q. Okay. And so the point of that first opinion was, there's no reason to not conclude that she had sustained a fracture from her fall?**
A. I mean, she -- if she fall from her height in the -- the fe- -- femoral -- femoral neck fracture is possible.
**Q. And the material she fell on was concrete?**
A. To the floor, yes.
**Q. Okay.**
A. Also that matter.
**Q. The second opinion you're rendering in this case was, according to the testimony from the store manager and employees of Fred Meyer, there's -- no instance of wheel lockup has been reported in the store's aisles, where the claim of locking wheels by Ms. Lubken in the subject incident has not been verified?**
A. Yes.
**Q. So just to unpack that, the second opinion you are offering in this case, and correct me if I am misstating it, is that you're noting that the testimony from the employees was, they were unaware of the Gatekeeper wheel locking up within the store away from the store exits?**



A. They -- they -- they move away from the cart, but they have no indication the wheel was locked or has been unlocked after the accident of the subject cart, as claimed by Ms. Lubken. We don't know.
**Q. So just to unpack it, the second conclusion was you noting the information that's been presented to you, which was, you're noting that the testimony of the employees that gave deposition -- or that gave testimony at deposition, that they were unaware of a wheel locking in the store?**
A. Right. That's correct.
**Q. Just to unpack that opinion or comment, you do not know -- well, strike that.**
**This comment is based just on the employees that gave testimony in the case; correct?**
A. That's correct. And also the report of the incident.
**Q. The incident report that was filled out on the day Ms. Lubken fell?**
A. Right.
**Q. Okay.**
A. And also -- that also have the same -- have the same information.
**Q. The -- right. There's no survey from all employees' observations from this store, what they had**

Page 37

**seen. This is a comment based on the couple employees that had been deposed; is that right?**
A. That's correct.
**Q. Have you seen the incident reports that Fred Meyer had generated? Not involving Ms. Lubken's fall.**
A. I -- can you say it again? Can you --
**Q. Sure. Yeah.**
**Have you seen incident reports relating to other comp- -- alleged complaints for the Gatekeeper wheel in Fred Meyer stores?**
A. You mean other accident relate to the lock -- wheel locked?
**Q. So let me rephrase.**
A. Okay.
**Q. Have you seen other reports generated by Fred Meyer concerning other customers, other than Ms. Lubken, alleging some sort of injury complaint relating to the Gatekeeper wheel?**
A. I believe that I see that very quickly, but I didn't go into very much detail.
**Q. Okay. And there's over 400 pages of reports. Have you -- did you review those?**
A. I believe that I reviewed quickly. I don't remember I have -- go into very much detail for the injury mechanism. But -- but all of them is, I think at

Page 38

the time, I just look quickly because it's so many pages.
And another thing, it's not -- I believe it is not in the -- in the -- that -- that -- or in the accident area, not in this -- not inside the store area, so is a little bit different.
**Q. When you're analyzing the dynamics of the way someone is injured by a product, would it be helpful to look at how -- reports of how others have alleged to have been injured by that same product?**
A. That potentially, yes. And if they're relevant.
**Q. Right. And say you have over 50 reports of customers alleging injuries from a product, would you want to review that to learn more about how customers have been injured allegedly by the same product?**
A. Huh. Like I said it before, I think that the location is different, and -- but I look very quick -- I look quickly. But I don't remem- -- I don't remember that -- the point is, they are different location. The forces will be different.
**Q. How do you know that the forces are different, though?**
A. Because they are in the -- in the -- in the exit area, there's a carpet. And the friction between

Page 39

the carpet and the rubber is different than the -- than the concrete floor. That's well documented.
**Q. Is it your testimony that all the incident reports involved injuries on carpet?**
A. My understanding was that -- I didn't comment on that, but my understanding, those happened -- those accident happened in the exit area, not inside the store.
**Q. Okay. Are you aware of one of the reports being within the store?**
A. I do not know.
**Q. Okay. You don't recall reviewing one of the incident reports of a customer being allegedly injured because the wheel had locked within the store?**
A. I do not remember other -- others' incident.
**Q. Okay. And so you don't recall reviewing it or considering that for purposes of the opinions in this case?**
A. I do not remember that case, the detail of -- you mention. If you could bring my attention, I will look into that.
**Q. But for purpose of -- for purposes of the opinions you're offering, that report doesn't come to mind in terms of something you considered?**
A. For my opinion I just offered that for this

Page 40

purpose is just from No. 2, is that this -- the accident, it did not re- -- did not --
THE COURT REPORTER: I didn't understand those last few words.
A. That -- that more -- my point is that, in this case, in my opinion or conclusion was in the No. 2, it's not related to other cases.
BY MR. ULMER:
**Q. Well, if there's a report of someone being injured allegedly by a cart locking within the store, that would be related; right?**
A. I will need --
MR. LASALLE: Object to form.
A. -- to look into that.
BY MR. ULMER:
**Q. And I'm just trying to understand where your opinions are at in the present day, sitting here at deposition.**
**You have not considered or studied a prior report of an allegation of a cart locking within the store, other than Ms. Lubken's?**
A. First, it's not my scope to look into that particular accident. And the -- and the -- I need to -- you mentioned it. I didn't -- I do not remember I seen that because, again, as you mentioned, is 400 pages.

Page 41

So if they have that, I can review that, but my point was, is that my scope was to focus on this subject accident.

**Q. Okay. Well -- well, part of your opinions, as I understand it, was, she could not have tripped by a cart locking, or -- or is that not your opinion?**

A. Not exactly. That's not what I said. And -- but based on the circumstances and totality of how she pushed the cart, and she said that the cart was pushed forward at the time of the accident, and that she was -- her right heel was caught on the right side of the rear wheel of the shopping cart, which is unexpected.

Because when you push --

**Q. Well, let me maybe go in order. So let me --**

A. Maybe -- maybe -- maybe Sean will have because they have all of the thing, maybe you -- we want to clarify how we get into that position.

**Q. So let me -- let me maybe -- just to keep this organized. So for your second opinion here, is this -- is this more an opinion or a comment on the records that you've been presented with?**

A. That is the -- the video I will be presented with. So from all this case, and I see -- I repeat that, based upon the record video or videos of the gait of the shopper on the date of the subject incident, and

Page 42

exemplar shopper, which is test on the inspection date of the staged test, their feet and the heel were located in the area which is between the two rear wheels and behind the shopping cart when the lockup event occurred, which mean lot -- most of them is located in the exit area of the shopped.

**Q. I think it --**

A. And it's no visible evidence --

**Q. Dr. Chen, I'm sorry. I think the Zoom's maybe cutting a little --**

THE COURT REPORTER: Yeah, he froze for a little bit, but I'm not sure that anything got left out.

MR. ULMER: Okay.

THE COURT REPORTER: I think it might have just stuttered and kept going.

THE WITNESS: Okay. I apologize for that.

MR. ULMER: No, it's Zoom. It's okay.

MR. LASALLE: It's the Zoom world.

A. But my conc- -- is Conclusion No. 3, in the -- which means there's no visible evidence any shopper would step on the right rear of the stopped cart as reported by Lubken.

BY MR. ULMER:

**Q. Okay. So I'm just -- so for No. 2 here, you're saying there's no instance of wheel lockup reported in**

Page 43

**the store's aisles, and --**

A. That's No. 3. Sorry. I talk about No. 3.

**Q. Okay. So for No. 2, the statement from your report, that there's no instance of wheel lockup reported in the stores, you indicated you'd briefly looked through the over 400 pages of incident reports. You don't recall the report of a customer having a wheel lock within the store?**

A. Right. I did not -- I do not see that. And also the primary, based upon the testimony of the store, and look quickly, I say, yes, probably right. I do not remember any cases.

**Q. The third conclusion you've made is, based on the recorded video of guest shoppers on the date of the subject incident and an exemplar shopper during the staged testing, all their feet and heels were located in the area between the wheels behind the cart.**

A. Between the rear wheels.

**Q. Let me break that down a little bit. The recorded video of guest shoppers on the date of the subject incident, how many times did you see a cart lock as a shopper was pushing the cart, from the surveillance video produced in the case?**

A. I believe that's more than -- I think at least four -- more than four or five, at least. They have --

Page 44

again, there's a slight different in cart. They have a large cart and a small cart. And both of them, I didn't see anybody's feet is within that range.

**Q. How many small carts did you see lock up as a customer was pushing?**

A. That's a good question. Let me -- let me take out quickly. I seen large cart maybe three, small cart maybe two or three. I don't remember. I mean, at least five of them.

**Q. At least five total, both large and small?**

A. Yes. For the -- for the large cart, I see -- for the small cart, I see two, at least. For the large cart, I see at least three.

**Q. Okay. Do you think that's a -- that's a large enough sample to say Ms. Lubken could not have tripped on a wheel?**

A. That's not where I talk about the trip on the wheel. I talk about the feet within the rear of the wheel, which is a dynamic. If the cart push forward slowly -- I mean, it is cart -- like walking speed, and the per- -- you are face -- you are following the cart, the -- from a biomechanic point of view, your cart would be within that range.

**Q. Do you know the rate of speed Ms. Lubken was walking when the wheel locked or --**

A. I do not.
MR. LASALLE: Object to form.
BY MR. ULMER:
**Q. Let me -- let me rephrase.**
**Do you know how fast Ms. Lubken was walking prior to her tripping?**
A. Based upon her own testimony, is normal speed.
**Q. What is that in terms of the actual speed?**
A. Typical walking speed is about three mile per hour, two -- in -- in normal walking. In shopping, probably a little bit less because you push the cart. So I would say pushing, two mile per hour to three mile per hour, I would say typical.
**Q. And you have no video of how fast she was going; right?**
A. I have no idea. We had no video document that.
**Q. Okay. And there's no video documenting the fall; right?**
A. No. But they do have documentation of the -- she walking to the entrance, first pushing -- one cart was locked at the time. And she take out the purse -- in the purse, which is small cart, on the upper basket. And find out that was locked, and then remove it.
And after that, she walked normal speed based on the -- at speed about two or three mile per hour.



That's based on her typical walking speed, as you're referring to.
**Q. But you have no idea if that's the speed she actually was walking when she was in the aisle where she tripped?**
A. I have no way to -- there's no video to say she -- at the time, but there's no -- no evidence to disprove she was walking in that spill -- speed as well.
**Q. Well, you're -- you're disproving an assumption of the speed. What is the evidence of her exact rate of speed when she fell?**
A. That, according to Ms. Lubken, and she says she walking a typical speed, and based upon her walking speed into the store, based on her own words. And she didn't say she stopped. She didn't say she racing, like running. So I assuming that's her typical walking speed, about two or three mile per hour.
**Q. Okay. Well, was she ever asked how -- "Could you estimate how fast you were going?"**
A. Can you say that again?
**Q. She was never asked to estimate how fast she was going?**
A. I just asked me from her walking speed to the store, which we have that -- know the landmark and distance. So about two or three mile per hour.



**Q. The guest shoppers that you saw pushing a cart that locked, were they male or female? How many males? How many females?**
A. Let me -- let me see. Let me call it -- okay. And four female, one male.
**Q. Do you know Ms. Lubken's height?**
A. I believe it's five feet and -- let me see. Make sure I -- and let me see. And the five foot -- five foot -- five feet and five inches.
**Q. Okay. So do you know the height of the five customers that you saw on the surveillance footage?**
A. I didn't do the estimation, but it is about the same height based on the video, similar height. It's not especially short or especially tall.
**Q. Well, how do you -- how -- do you know how high her hips go to a shopping cart versus the hip height of any of the other customers in the video, the five shoppers that pushed a cart?**
A. It -- I didn't calculate it, but she was entering about the same location with the other accident occurred. So from the video, they are about -- mostly about the same height.
Some of them will be -- I mean, maybe they'll be shorter, some of them will be higher, but it's not like it's like six foot tall, not like five feet tall.



It's probably between -- within that five -- five and a half range.
**Q. What's the range of the variance for the customers that you're basing that opinion on?**
A. Basing on the video, and you walk -- you look at the -- the people with the height at the en- -- entrance, you can get an estimation about this. It's not very accurate, for sure, but it's -- it's not six foot tall.
**Q. Okay. The exemplar shopper during staged tests, who was that?**
A. I -- I believe that it was a -- Dr. Kohles. I know -- I don't know what -- his name. He's a male.
**Q. And what's his height?**
A. He a little bit -- seemed to be a little bit taller. I don't know exactly height.
**Q. Okay. And do you know how high his hip goes from the ground?**
A. I didn't calculate that.
**Q. Okay. You say there's no visible evidence that any shopper stepped on the rear wheel of the stopped cart. So that's an observation based on the five shoppers you saw in the surveillance video?**
A. Yes.
**Q. And then the exemplar shopper was the filmed --**

**was Dr. Kohles being filmed pushing the cart?**
A. They have one video. The person was push the cart out of the exit. But they have a multiple, probably more than, I think, four or five, they pushing different cart on the -- on the concrete floor.
**Q. Were the exemplar shoppers trying to fall or -- they were aware that it was going to lock; correct?**
A. I do not believe they are aware of the lock besides the step from the -- Dr. Kohles' group.
**Q. Sorry. The exemplar shoppers that you're pointing to in this third conclusion, right, those would --**
A. Yes.
**Q. -- be people aware of the locking; right?**
A. They do not -- they do not aware locking before the locked. Okay.
**Q. I'm sorry. What was that?**
A. They are not aware in the locking in -- before that occurred. And after the lock, they are -- their foot was with -- they tried to push it and they just couldn't, but their foot was waiting between two rear wheels.
**Q. But that was for the expert's testing?**
A. Sorry? Can you say it again?
**Q. You're basing this opinion that you -- she**



**didn't trip on the wheel based on Plaintiff's expert pushing the cart?**
A. No. What I say, this is the -- all of the foot was within -- between the rear wheels. Okay. There's no evidence any of the person was step on the wheel or close to the wheel at the time of the acc- -- of the said event, a locking wheel.
**Q. And the sample size is how many situations that you studied?**
A. In this case, at least -- about six.
**Q. That includes the surveillance?**
A. That including surveillance.
**Q. Okay. So from six sample studies, including five video surveillance of random shoppers, that's where you're drawing this opinion from?**
A. That is -- that's say the video observation, that this conclusion talking about.
**Q. In the incident reports that were produced, did you take note of how many customers fell after the wheel locked?**
A. I did not count them.
**Q. Okay. Are you aware of how many customers had the cart fall as well when they fell?**
A. I do not -- I do not -- I do not count them.
**Q. Why did you not consider that?**



MR. LASALLE: Object to form.
Go ahead, Doctor.
A. Yes, I did -- I just -- because is -- I did not count them. I didn't -- I didn't know they have -- relate to this case.
BY MR. ULMER:
**Q. When you say there's no physical -- there's no visible evidence that any shopper stepped on the wheel as reported by Ms. Lubken, is that a comment on the fact that there's no surveillance of Ms. Lubken falling?**
A. No. This is --
**Q. Let me even clarify. There's no video footage of Ms. Lubken falling; right?**
A. Yeah.
**Q. All we have, in terms of footage, was her entrance into the store, and then time passes, and then she's on camera filling out paperwork?**
MR. LASALLE: Object to form.
A. And -- and what is the question?
BY MR. ULMER:
**Q. Sure. Let -- I'll let you describe. What could you see of Ms. Lubken from the surveillance footage on the day of the incident?**
A. You are not talking about the Conclusion No. 3; right? You're talking about other video observation?



**Q. Yeah. Just what do you recall seeing in the surveillance footage of Ms. Lubken?**
A. I believe she entered the -- I have the -- let me go to that. The surveillance video, the first one is, they have -- like I mentioned before, they got at least five lock event, I -- observation in the record video.
And for Ms. Lubken, and she was entering the -- first she was entering the store at about 1:47, and she moving to the right of him -- of her. On the video, it's on the left.
There was one small cart was locked that she put her purse on the top basket, and then she tried to move it and she couldn't. And then she decide to take out her purse and put on -- and walk away into the store at the time.
And after that, from a different view, in Aisle 86, we can see that she was -- she was there at the time because, at the time of the accident, the video didn't focus on the Aisle 86. But they moved to 86 at the time the incident already occurred.
So at the time, he -- Ms. Lubken was -- was talking to the staff, I believe there probably seemed -- there seemed to be a small shopping cart next to her.
And another thing is, the -- the staff seemed

to put something in the upper basket, and they have some item in the upper basket. I think probably some -- likely maybe that's her purse, that's what she described, that she put something -- her purse in the upper basket.

And the footage also showed me that the -- at the time the -- the staff put some kind of -- some kind of -- I think it's a hand -- hand mixer into the cart. It's a small -- I couldn't recognize, but it's a small package into her cart.

And after that, the small cart was moved away without any view of that being locked or unlocked at the time. And -- and after that, and the -- and the last thing was, she was moving -- exit the -- I would say the check -- check out and exit the store after that.

That's all from the video.

**Q. Okay. So she entered the store at 1:47 p.m.; right?**

A. That's right.

**Q. The incident was approximated to have happened at 1:55 p.m.; right?**

A. That's about right.

**Q. The video doesn't show Ms. Lubken until 2:04 p.m.**

A. I don't know the -- the timing of the accident.



MR. LASALLE: Dr. Chen --

A. A little bit more than 2:00.

MR. LASALLE: Dr. Chen, you froze --

THE WITNESS: Yes.

MR. LASALLE: So maybe start that response again.

THE WITNESS: Okay. Sorry.

A. I do not know the time of the accident because there is no video to show, but she was on the video about a little bit more than 2:00 at the time.

BY MR. ULMER:

**Q. Okay. So the -- by the time you see the camera pan to the location where Ms. Lubken's at, it's about ten minutes after the alleged incident?**

A. That part, I do not know.

**Q. She testified the shop -- the shopping cart fell.**

A. Can you say it again?

**Q. She testified the shopping cart fell when she fell.**

A. Yes.

**Q. Do you have any idea who picked it up?**

A. No.

**Q. Do you have any idea whether, if it was locked, if a cus- -- if an employee had deactivated it with the**



**remote?**

A. I have no idea.

**Q. Do you have any idea where the cart went after she fell?**

A. I do not.

**Q. The cart that you see -- once the security surveillance camera pans over to her, that you see the employees pushing, there's -- there's no one -- there's no one that ties that cart to the cart that she was pushing in the moment that she fell?**

MR. LASALLE: Object to form.

MS. CAMPBELL: I'm going to -- I'm sorry. I want to join on that. It took me a second to unmute, but, yeah, join the objection.

A. I have -- I have no way to tell. I can't say yes or -- I cannot -- I cannot say because I do not know.

BY MR. ULMER:

**Q. There's no -- in fact, the managers that have given testimony say they don't have any idea if anyone inspected the cart that Ms. Lubken was using when she fell; right?**

A. I -- I have no idea where the -- where the cart went.

**Q. The cart that you're pointing out in the**



**security footage after the surveillance camera pans over to her, you have no idea if that was her cart or another shopping cart that one of the other employees brought to assist her to complete her transaction that day; right?**

A. I have -- I -- I couldn't say.

**Q. Okay. And the store and its employees didn't set aside the cart that Ms. Lubken was using -- was using when she fell; correct?**

A. Can you repeat that question?

**Q. Sure. The store, the Fred Meyer store, and its employees, they did not preserve the cart that was involved in her fall; correct?**

A. That's my understanding, yes.

**Q. Had they preserved that evidence, how would that have -- how would you have used that evidence for your own opinions? What would you have -- what would you have done to utilize that?**

MR. LASALLE: Object to form.

Go ahead, Doctor.

MS. CAMPBELL: I'm joining on that objection.

A. I -- if that cart exists, I will inspect that cart. But they have lot of thing I don't know -- for example, like a -- is -- is -- I don't recall kind of cart. That's the first thing. Right?

And -- but -- and if any damage to the wheel, for example. But I don't know. I don't know how I gonna use it until -- if that present -- preserved. But --
BY MR. ULMER:
**Q. But you would have liked to have evaluated it if they had preserved it?**
A. Yes. Yes, of course.
**Q. Do you know if the cart had turned or shifted before Ms. Lubken had tripped?**
A. According to her, she was moving forward. She -- she's not turning, for example. She was going straight at that time.
**Q. But the cart, was the -- did the -- do you know if the cart remained in the same position as when she was pushing it, or if it had shifted at the -- at the point when she's tripping?**
A. She didn't indicate the cart was turning.
MR. ULMER: Okay. I'm going to go back to share screen here.
MS. CAMPBELL: Andy, before we get started on the next set, can we take a break? It's been about an hour and a half.
MR. ULMER: That's fine. So let's go off the record.



(Recess from 11:30 a.m. to 11:37 a.m.)
E X A M I N A T I O N (Continuing)
BY MR. ULMER:
**Q. All right. Sir, we're back on record. I put up Exhibit 3 again, which is your report.**
**Do you see it?**
A. Yes.
**Q. Okay. So Conclusion 4 says, "The base of support (or stride width) in adults during normal walking was approximately 2 to 5 inches, less than the gap or width between the cart's rear wheels (21 inches). With the hands on the handle of the cart, the right heel of the shopper was at least 6 inches away from the right rear wheel during the lockup event. An entanglement of the right heel with the right (outer) portion of the cart's right rear wheel would not be expected."**
A. Uh-huh.
**Q. And so this conclusion's based on the -- you mentioned the -- the five shoppers and the exemplar video of Dr. Kohles?**
A. The Conclusion No. 4 is based upon first is walking gap -- gait, gait of Ms. Lubken because, when she walk into the store, she was a -- I think -- I would say normal stride width is not particular.
Like some people walk very different, like turn



to the right or turn to the left, with the right -- she -- it was not. She had normal walking gap -- gait, like typical people.
And for the typical people, the -- what called stride base, which is about -- the base of your right heel and the left heel is about two to five inches. If we add up all the width of your foot together, that give-and-take is about -- that -- the width. And that right side of the foot was about six inches away from the right heel -- the right wheel, if the person walking typically, if that make sense.
**Q. How did she fall then?**
A. That's -- part's -- she said she fall onto her right and then bring the cart down with her. That's my understanding.
**Q. How did she fall?**
MR. LASALLE: Well, object to form. Calls for speculation.
Go ahead.
BY MR. ULMER:
**Q. Sir, do you know -- we're -- she fell. That's a fact in the case. How did she fall?**
A. She fall to --
MR. LASALLE: Same objection.
A. She fall to the right.



BY MR. ULMER:
**Q. Why?**
MR. LASALLE: Same objection.
MS. CAMPBELL: Join.
A. I mean, that's the question. And we tried to say how she -- I mean, I tried to do is tried to get an understanding how she said. That's what she said. She said the reason she fell was because of her right heel get onto -- entangled with the cart's right rear wheel.
BY MR. ULMER:
**Q. Your opinion is --**
A. That's what she said.
**Q. Your opinion is, the fall dynamics, as you understand it, don't support that story?**
A. Yes.
**Q. Then -- then give me the narrative of how she fell then.**
MR. LASALLE: Object to form.
MS. CAMPBELL: Join.
MR. LASALLE: Calls for speculation.
Go ahead, Doctor.
A. They have several possibility. I mean, she indicate the cart -- I -- she cart was stopped suddenly, very sudden. That's in No. 5. I tried to say the cart dynamic is not suddenly stop. It take a -- it take a

Page 61

while to stop.
From the test of the -- on the -- on the staged test on the date, they moved for at least fif- -- at least some distance, like 55 -- up to 55 inches. So even the cart was locked, then when you push on it, you still can push it.
So when -- when -- when she said she was -- was fall in -- by the wheel lock, I think that probably didn't make much sense. That's the only thing I tried to say from the dynamic of the -- of the cart. It doesn't sound like a -- like a sudden stop.
So they have other factor. We may get into that later. But I -- I -- this is speculation. You just -- this is not my conclusion. But I just base upon what she said, and she fell and wheel locked. Did that make sense? It didn't consistent with dynamic of cart. That's my conclusion.
BY MR. ULMER:
**Q. So you're saying my client's perjuring herself by not -- by not telling a truthful story on how she fell. So help me understand how she fell then.**
MR. LASALLE: All right. Doctor, don't answer that.
Object to form. Argumentative. He's not saying she perjured herself. He said what he said. Do

Page 62

you have a question that doesn't have a preamble such as that, Andy?
MR. ULMER: Yeah --
BY MR. ULMER:
**Q. You're --**
MS. CAMPBELL: I'm joining in the objection.
BY MR. ULMER:
**Q. Sir, you're a biomechanical engineer who's worked on many trip-and-fall cases. We know she fell. How'd she fall?**
MR. LASALLE: Object to form.
Go ahead, Doctor.
A. And I didn't say she lied. She -- she -- she indicates the cart was stopped suddenly. The dynamic of the -- of the -- of test showing the cart was not stopped suddenly. It take time.
So it was not consistent, was -- because she thinks -- her recollection is saying it must be on the wheel. Maybe for the first experience, when entering to the store, the cart can locked. But the point is that it's not how the cart dynamic work for this particular -- for the example of the -- this kind of design case.
So my point is that it's not how they -- how they -- how they occur for the -- how the cart was --

Page 63

was dynamic. It's not inconsistent with her description of the fall. I believe that why she fall, the cart was suddenly stopped, and for some reason she fell to the right.
My -- and that understanding was, her hand was with the -- with the purse or some kind of the handb- -- a -- a -- a bag -- I mean, handbag. I don't know exactly.
But she was -- I mean, her hand was on the -- on -- on the -- on the purse. So when she fell, the purse will bring the cart down with her. That part, I think that's probably consistent with my understanding of the fall.
The question is how she -- why she fell to the right. It could suddenly stop. I don't know exactly. But could be -- I think I show in the vide- -- the photo that some kind -- the small intrusion of the -- of the box can block the cart very easily, for example.
(Court reporter clarification.)
A. The box showing my Photo No. 6 at the time of inspection. Some kind of box, it's a little bit longer than the aisle. They can coming out, and when that occur, when the cart -- didn't pay too much attention -- the cart pushed against the box, and the cart was stopped suddenly.

Page 64

That would be one scenario. But I do not know.
BY MR. ULMER:
**Q. Yeah. And there's no evidence that there was a protruding box; right?**
A. Right. I -- but when you -- when you ask me to speculate, I tell you what possibility cart can suddenly stop.
**Q. We know she fell --**
A. And this is one of the case.
**Q. We know she fell to the right; correct?**
A. That's correct.
**Q. If she was dead center behind that shopping cart that suddenly stopped, she would have just bumped into the shopping cart at center at mass; right?**
A. That depends on -- depends on how the -- I mean, because when we will get into area we call the hypothetical area, which mean they have a lot of possibility of how the -- how -- how that occurred.
For example, this -- if there is something blocked in the partially and the cart may rotate or some -- I mean, she may lost -- she may lost balance, shift briefly, and then -- and -- and fall to the right, and that bring down the cart with her. I don't know.
There have been so many possibility how the cart can stop without wheel lock.

Page 65

**Q. When she was pushing the cart right before she tripped, do you have any idea if she was more toward the -- holding the cart more toward the right of the handles or toward the center of the handles, or is that just unknown?**
A. My understanding was that she was -- her hand was on the handle. I think that's -- that's my understanding. And her right hand was with the strip of the -- the -- like a -- like a strap of the -- of the bag, handbag on her right -- tied into her right hand. So I -- I am -- my assumption is not going to be too far from that bag.
**Q. Right. I'm just wondering, do you -- do you know if she's to the right of the handles? As she's pushing her cart, a customer can push the cart dead center, they could push it from the very right, say if they're looking at the merchandise toward the right.**
A. Uh-huh.
**Q. Do we know where she is in terms of --**
A. I --
**Q. -- the cart?**
A. I -- I have -- I do not know, but I -- if she was going to move to the right, and no matter how -- how that occur, and she prob- -- most likely she will be -- push the cart forward at the time, especially from the

Page 66

dynamic, we see the cart didn't stop right away.
**Q. Right. I mean, a customer can push a cart forward -- I don't even need to be behind the cart. I could be pushing a cart forward with my left hand, completely to the right of the cart. I mean, we know she's pushing it forward, but we don't know where she is behind the cart; right?**
A. My understanding, she was looking forward and -- and -- I mean, she was moving forward. But that -- that's my -- my point, the -- if you -- going even left or right, I mean, that's still within the range behind the handle. Otherwise, the cart would not go straight.
If you -- if you push the cart, usually you have both hand on it. If you -- even if you take off one hand, it's probably about the same location. If you move your hand around and -- and you certain side, and the cart wouldn't go very straight, like what she described.
**Q. At the -- at this moment, you're not able to explain how she fell to the right?**
A. I do not -- I don't -- I don't -- I don't want to -- because they have a -- the cart can suddenly stop for many, many reasons, and -- and I don't want to speculate.

Page 67

**Q. Okay.**
A. Because I would look to be some object on the ground could block the cart go. I mean, but I don't -- we don't have any prove or disprove that, right.
**Q. You have not --**
A. So we don't want -- I don't -- I don't speculate that. But that -- I -- I -- I -- I respect her testimony -- I respect her testimony, the cart was suddenly stopped.
**Q. Okay. The -- we don't have -- or strike that.**
**Did you review any footage or photo stills that help you understand what her gait pattern is?**
A. Can you repeat that question?
**Q. Yeah. Let me resume screen here. I jumped down in Exhibit 3 to Page 8, where you're describing her gait pattern. I'm just wondering what your -- what the source of information is that helps you understand her gait pattern.**
A. You mean her actual -- when she moved? That's in the Video No. 6, I believe.
**Q. Okay. Oh, these are Photo 6's.**
A. Yeah, Video No. 6.
**Q. Which page is --**
A. Page -- going up a little bit. Going up. Before the table.

Page 68

**Q. Here we go.**
A. There you go.
**Q. The surveillance footage has a couple stills of her looking around as she's entering?**
A. Yes.
**Q. Okay.**
A. And they're showing that -- the typical stride and also in each heel strike.
**Q. Okay. And you're -- you're able to surmise what her gait is from these six photo stills?**
A. I -- I -- there is no distance for that, so I think from there, we can estimate how her stride. It's not going to be very accurate, but it's going to be some estimation. But is -- from her stride length and also from walking pattern with the others -- customer or guest shopper, I think she is typical.
**Q. Right. But do we know the measurements of her typical stride in terms of, you know, inches, or however you want to measure that, for each stroke of her leg movements? Do we have any idea what even the range of her typical stride looks like?**
A. From this, I can -- and this -- I can -- I can see -- they -- they can be -- the typical stride can be determined in -- in certain -- certain -- I mean, of -- in -- from this -- this video, yes.

**Q. What is the range in terms of some sort of measurement for her stride?**
A. I -- based upon her -- the size of her foot, the length of her foot, which is typical for this height, the length of the shoes is about nine inches. So you can look at the shoes based upon that, and you can estimate how much the stride width is. That's what we think about typical range, about two to five.
**Q. You have her shoe size?**
A. I do not have a shoe size, but typical shoe size for the female about this is about nine inches, give and take. Even ten inches is still about two to five.
**Q. Okay.**
A. That would be even smaller.
**Q. Wouldn't you need to -- I'm going back to the Conclusions section. Wouldn't you need to know where she is in relation to the cart to know whether her right heel could have connected with the wheel?**
A. The -- the -- the -- the thing is not -- it's contact with the right wheel. It's contact with the outer portion of the right wheel. That comes into issue. When you have a heel strike, the maximum you can do, no matter the location you are, you're going to hit the left side of the wheel, not the right side of the



wheel.
Typical, people hit the right side of the wheel is when the cart probably rotate at least 30 degree to the right. And in that case, you can hit the right side of the wheel -- of the rear wheel with your -- with your heel. Otherwise, very, very difficult to do that.
And she says she -- the cart wasn't moving forward at the time of the accident. It's not turn 60 -- oh, 45 degree or 30 degree to the right, and with her foot to hitting the right side -- outside the heel -- of the wheel is not expect, almost -- I won't say -- almost closely impossible.
**Q. But you don't know where she is behind the cart?**
A. The point is that, no matter how you walk, is very difficult to hit the right side of the wheel. And this not just hit. It's entangle. That's what she said.
**Q. You're saying no one can --**
**(Simultaneous speakers.)**
A. How can you entangle with --
**Q. -- with her right foot?**
**(Court reporter admonishment.)**
BY MR. ULMER:
**Q. Sir, can you touch a wheel with your right**



**foot?**
MR. LASALLE: Object to form.
Go ahead, Doctor.
A. My -- my conclusion was that the typical way you push the cart forward, and the wheel's on your right, typical is about six inches. If even you -- the heel can touch the inside of the wheel. Is very difficult to touch the outside of the wheel and entangle with it.
That's why I say that, when you -- no matter how you look at it wrong, if you push the cart forward, in the -- in -- in the -- and your foot -- right foot is inside, which is on the left side of the right wheel -- right rear wheel. Right?
So you want to entangle with that, typically the cart would rotate about 30 degree or even more degree for your cart -- for your right heel to entangle with that outside of the heel -- of the wheel the day of the accident.
The reason was she was fall or stop is because her right heel entangle with the outside or outer portion of the rear wheel well, which I don't expect that.
MR. ULMER: I think there was some freezing. Cindy, I don't know if you got all that.



THE WITNESS: Maybe I can turn off my video, it maybe help.
(Discussion off the record.)
BY MR. ULMER:
**Q. So how wide is the small shopping carts?**
A. My understanding was -- I think it's 21 inches. Let me see. The total width is 23. The inside of the small shopping cart is 21. So give and take, the width of the -- the wheel is about one inch.
**Q. Do you see your report on the screen?**
A. Yes.
**Q. I'm looking at Page -- Photograph No. 1. It's the 20th page in Exhibit 3.**
**Do you see it? It's a photo still?**
A. Yeah.
**Q. I mean, do you see the customer right here pushing the small cart?**
A. Yes.
**Q. I mean, don't you see his right foot, like, going over the right wheel? I mean, just as an example, here's --**
A. Where?
**Q. -- a customer to the right of that right wheel?**
A. Where? You mean the -- the -- the person with --

**Q. The person who looks like they're pushing a boxed wine in the small shopping cart.**
A. It's difficult to say, but I think that's -- his right foot was within -- is on the inside the cart.
**Q. The --**
A. Because the angular, so it's difficult to say from this angle.
**Q. I mean, from this photo, it looks like his right foot is right on -- right aligned with that right wheel; right?**
MR. LASALLE: Object to form.
A. I don't -- I don't think I would say that because the optical -- I couldn't say that's outside the wheel or on the -- on the wheel because it was blocked by the stuff on the top of the cart.
BY MR. ULMER:
**Q. In this photograph, we see Ms. Lubken and an arrow pointing to her; right?**
A. And also in the same photo, you can see very clear the female on the right side, her foot is just on inside the cart.
**Q. Right. Because she's pushing center at mass. She's not toward the right of the cart.**
MR. LASALLE: Doctor, just -- the question about Ms. Lubken, let's focus on that one.



BY MR. ULMER:
**Q. But do you see Ms. Lubken and -- I mean, it looks like her shoulders are broader than the size of the cart; right?**
MR. LASALLE: Object to form.
A. I mean, I'm not quite sure what's your question. Can you repeat your question?
BY MR. ULMER:
**Q. It's a -- it's a pretty narrow cart; correct?**
A. The -- the size of the cart is probably about, I would say, give and take, is about 22, 23 inches.
**Q. I mean, in this photo, we see Ms. Lubken kind of hunched over a cart that's locked, as we -- as we --**
A. That's correct.
**Q. -- later confirm in the footage; right?**
A. That's correct.
**Q. I mean, looking at this, the width of her body is almost identical, if not larger, than the width of the shopping cart.**
MR. LASALLE: Object to form.
A. The size of the -- of the shoulder, it probably about the size -- about the same size of the width. But the hand is going to be -- and the foot, when they walk, you're going to be in the -- in the center of your body. That's how people walk.



If people didn't walk from -- like very awkward, on the right side -- aligned with the right of your shoulder, the left side of your shoulder, is walking the center of your body. That's right about two to five inches away.
BY MR. ULMER:
**Q. If the wheel locked, you wouldn't expect someone to potentially trip or lean in one direction or the other?**
A. That is not about this report. I said, when locked, the person will stop behind the -- the cart.
**Q. Your testimony is that the sudden stopping caused the fall?**
A. That's not my conclusion. This is testimony of Ms. Lubken.
**Q. Okay. And I asked a couple times, and I -- do you -- I mean, you don't know why she fell, as I understand it. You cannot offer an opinion explaining why she fell?**
MR. LASALLE: Object to form.
Go ahead, Doctor.
MS. CAMPBELL: Join.
A. When you asking -- this is really hypothetical question. You say, is any theory the possible she fell. Which mean that is going to be pretty much against her



words, and -- how that occur.
THE COURT REPORTER: I think we did lose some words there.
A. My point was that they have poss- -- many -- they have possibility for the cart was suddenly stopped at the time, and including the box protrusion of the aisle. A small object on the aisle blocked the cart moving forward. But is not a case of a locking wheel. That's what I tried to say there. The dynamic doesn't consistent with what she said.
BY MR. ULMER:
**Q. So we have direct evidence coming from the sworn testimony of Ms. Lubken that it locked, and that her heel connected with the wheel, and that she fell.**
**I'm asking if you can put forth some alternative scenario and explain to me -- you don't believe the first scenario. How did she fall?**
MR. LASALLE: Object to form.
Go ahead, Doctor.
MS. CAMPBELL: I am joining in the objection.
A. Because I -- I -- I will -- I'll -- I honor her words. She -- they have suddenly stopped, which is possible. And her hand was entangled with -- not her foot, but her hand was entangled with a small purse,

which is on that.

Even she move right, lost balance a little bit, that cart gonna go with her. And that -- that is -- that's what she said. I think that's a possibility. She fall from other mechanism.

But wheel locked, we have no evidence. That's why my second conclusion, there's no evidence to verify that. Right? And we do not know the cart wheel was locked for this particular subject cart. But we do know the dynamic of the cart doesn't stop suddenly as she described.

So what I tried to say is that her recollection of the accident is inconsistent with the wheel was locked in this case.

BY MR. ULMER:

**Q. Sir, have you ever --**

A. Which is the physical evidence.

**Q. Okay.**

A. Which is physical evidence we're going through.

**Q. What does "suddenly" mean to you?**

A. The suddenly locked, which mean the wheel of the cart move less than, say, three inches. In this case, from the tests, we know the cart will keep moving about fif- -- up to 52 inches, which mean they do not -- they will -- or in that case they would allow for the



extra step for the person to put on her foot -- the right foot on the ground. Less than three means their foot have no way to have entangled with the cart wheels. That's what my definition -- or my understanding.

**Q. Did you evaluate --**

A. But in case -- in this case, particularly, they have so much space, her foot will be on the ground. It will not entangle in anything at all, especially her hand still on the -- you say one hand's on the -- on the handle.

Even that, the cart still can push forward easily before completely lock. Even the cart was completely locked, they still can push the cart, which is a -- which is like similar people pushing a garbage can, which you can push along with you on this kind of surface. But not on the carpet.

That's the purpose of the carpet in the exit. That's why I talked to the people in the Gatekeeper. They purpose say that, why the cart be -- have to be there because they have increased friction. Otherwise, people gonna push the cart around even they have been locked.

**Q. Yeah, if it locks on concrete, it will slip, and it might rotate or swivel or roll; right?**

A. As you can see in the video, which is the



staged test, they did -- they did -- they still going straight. Not rotate 30 degree. Not more than -- not more than 10 degree, as I can see for the staged test. We think, I would say, eight inches.

**Q. How did the cart suddenly stop?**

MR. LASALLE: Object to form.

Go ahead, Doctor.

MS. CAMPBELL: Join.

A. I'd say, hypothetically, I do not know. I -- they -- they paused, I'd say -- this is the third time. There's other possibilities the cart would suddenly stop.

For them -- for the box protrusion, and they suddenly -- you hit the box and the cart will stop, which is less than two inches, like one inches. And if you have something on the ground for the wheel, you might -- you might lock the wheel, but in that case, they may push a little before -- more distance. I don't know. But this is all hypothetical. It's not my conclusion. It's not relevant to my conclusion.

My conclusion only is that if -- from the dynamic of this cart working is inconsistent with the statement of Ms. Lubken, which mean even the cart was locked, I give totally what -- in the situation, the cart will keep moving forward. Her foot will be step on



the ground without any entanglement.

I hope that makes sense in -- from the -- I see so many -- the video showing that they -- sometimes -- the small cart even have a -- have a longer distance to push. The bigger cart -- the bigger cart heavier. The stop distance is a little bit slower, a little bit less.

BY MR. ULMER:

**Q. Okay. And did you evaluate, in the 60-plus incident reports that Fred Meyer's produced, how many of those involved someone having the cart lock on carpet versus some other type of subsurface material? Or do you just not know?**

A. I do not remember the -- anything on the sub- -- on the concrete. I do not remember anything.

**Q. I think I said "subsurface" --**

A. Anything -- you may point to me, I can repeat --

**Q. But for the 60-plus --**

**(Simultaneous speakers.)**

**Q. Sir, hold on. So for the 60-plus incident reports of customers alleging they were injured by this product, you don't know what material was underneath the carts at the point when the product activated; right?**

A. I did not comment on the activation. I only concerning about the dynamic of cart. In this case --

Page 81

for this particular case, I didn't see the dynamics of the cart is matching this subject accident described by Mr. [sic] Lubken.
And each incident, like we -- we spend a lot of time on this incident. Incident -- every incident can be lot of reasons, and which we did not -- it's out of my scope, and I do not know -- if you give me the situation that is conflict with what I said, I would willing to look into that to see what is that incident. But it's not this incident. It's not situation.
**Q. So your opinion in this case is, you do not find that she could have fallen because the cart locked and her heel connected with the wheel, but sitting here today, you can't explain to me how the cart stopped or how she fell?**
A. I think there's multiple question in -- you just describe. I try to see if I can answer each one of them.
First, I didn't say that she -- the accident -- I only -- saying didn't occur. I didn't say she didn't fall. I only say she described the cart was sudden fall is inconsistent with the dynamic of the cart when they locked. Okay? That's inconsistent with her description of the fall.
**Q. That the cart -- that the carts can't suddenly**

Page 82

**stop? You don't think cart -- that these carts can suddenly stop?**
MR. LASALLE: Object to form.
A. That's a --
MR. LASALLE: Go ahead.
A. You talk about instantaneous locked, and I base upon the report from Dr. Kohles. Right? And he described it take about up to 52 inches for the cart to finally stop.
And you look at the video, in this case, even without the pushing, sometimes just let go, without anybody on the handle, which is much -- I would say worst case scenario. If somebody push on it, it might take it even longer.
So I do not know how -- how -- how -- how -- how -- I -- I agree with that, and then look in the video, I agree with that. That's probably about right. The striking distance, the point from the activation to actually stop, it takes some time.
Even they test without -- without -- after stop, you still can pull the small cart with 80 pound of force. And have to remember -- we call this high school physics -- the status force is higher than dynamics of friction, which mean if you talk about dynam- -- when the cart was moving, the starting force is less than

Page 83

80 pounds. So which means, for the small cart, you can push it very easily with the dynamic without 10 pound of force or 80 pound of force.
BY MR. ULMER:
**Q. And why is --**
A. Just like they pushing the garbage can on this particular floor.
**Q. Okay. Well, I mean, do you have any idea then why there's 60-plus customers claiming to have been injured by this product?**
MR. LASALLE: Object to form.
MS. CAMPBELL: Join.
A. Each one -- like we said, this one, every -- every single one have a slight different situation, what kind of injury. I do not have the -- my scope is not going investigating those 60 injury, how that occur, the dynamic. That's not my scope. If I -- if I agree to in scope, I can investigate what's going on, but this is not my scope.
BY MR. ULMER:
**Q. Okay. So I'm just trying to understand what you will then testify at trial. At trial you will say the cart stopping could not have caused her to fall?**
A. No, I --
**Q. That's your opinion. Do I have that --**

Page 84

A. That's not my opinion. That's not my opinion. I talk a couple time. That's not my opinion.
**Q. Okay. So the cart stopping can cause her to fall?**
A. Suddenly -- suddenly stop can lost balance. That's possible.
**Q. Okay.**
A. I cannot rule out the possibility.
**Q. Okay. You know, and there's been no -- no witnesses, no employees, no one has said that there was a box protrusion that caused the cart to stop. Right?**
A. The point is that -- the point is that you asked me to speculate the possibility for the stop -- sudden stop. Right? But there's no evidence to say there's no protrusion either.
**Q. Sir, I can say a dog was running through the store and caused the cart to fall, or she tripped on a dog, but I can't just say that because I need evidence to explain this fall.**
**What's the evidence to explain this fall?**
MR. LASALLE: Object to form. Calls for speculation.
Go ahead, Doctor.
A. You asked me to -- first I -- I said my opinion's based upon the dynamic of the cart and how

Page 85

they -- how they move. It is inconsistent with the sudden stop as described by Ms. Lubken.
The second, when she said she was entangled with the right foot with the cart, which she is -- I do not expect that. Because usually you -- the cart have to rotate to certain degree before your heel can really hit the outside of the wheel -- of the right wheel and then -- and entangle with that.
I don't know how you got -- you think about, you say, how can it happen? And it had to be rotate at least -- at least 30, maybe even easier, like 45 degree. When you have that, you foot get into that entanglement.
BY MR. ULMER:
**Q. But you --**
A. But in this case is not what she said about how she -- cart was moved before the accident. So I think that doesn't make any sense either.
**Q. Have you studied any photos of her holding the cart at different positions along the handles to see where her feet are at, depending on where she's holding the cart?**
A. She had try to push the stopped cart in -- near entrance at the time. And I think is typical.
**Q. That wasn't my question. My --**
A. I want to say she --

Page 86

**Q. My question was, do you have any data, any photographs, any videos showing her holding the cart at different positions in the handles, that you can then divine where her feet would be positioned, depending on where she's holding the cart?**
MR. LASALLE: Object to form.
A. I -- I -- my point was that no matter where she push the cart, the cart have to rotate at least about 30 degree before her foot will be entangled with the heel -- her heel will entangle with the wheel, and which doesn't make much sense, which is not expected.
BY MR. ULMER:
**Q. Well, I'm going back to Page 20 of your report. Image quality's not the greatest, but let's just take this customer as an example. I mean, the wheel's just protruding right there. Anyone can step on it; right?**
MR. LASALLE: What?
BY MR. ULMER:
**Q. Do you see this wheel, this little black part? That's the wheel; right?**
A. Yes --
MR. LASALLE: Object --
A. -- this is the left wheel.
BY MR. ULMER:
**Q. And you're saying no customer can step on this?**

Page 87

MR. LASALLE: Object to form.
Go ahead.
A. I -- my point was that you -- it's easier to look at her right foot. It's inside the wheel when she walk -- and you also see her left foot was not inside the wheel -- two wheels, not outside, not in contact with the outside the wheel.
My point is -- was that the -- your -- your heel try to contact without -- in this case -- we call it inside and outside. In this one, the left side, the outside the wheel is very difficult to contact. And -- and also to entangle with it.
BY MR. ULMER:
**Q. The shopping cart that Ms. Lubken was pushing had Gateway wheels that locked on which wheels? The cart has four wheels, two -- the right and left on the front, right and left on the back.**
**Which wheels on her cart can lock?**
MR. LASALLE: Objection. Calls for speculation, lack of foundation. Object to form.
A. In -- in -- I don't know. First, I do not know, is it big or small? Do we know that?
MR. LASALLE: Well, Doctor, just answer the question. You don't have to ask any questions.
A. Because the -- the bigger cart and small cart,

Page 88

the locking wheel is on different location. The large carts, the lock -- the lock -- for locked wheel on -- typically on the left side -- it's on the right side. For the small cart, the locked wheel typical on the left side.
BY MR. ULMER:
**Q. Of the front or back?**
A. So when you ask me which is the -- sorry? I talk about the left rear wheels. If you look at the -- carefully about the rear wheel of each individual cart, or even the -- the -- the -- the -- the archive, which mean they put the -- put away, the large carts typical on the back of the -- of the cart, the rear wheel, the -- the locking wheel is on the left side. The small cart, the locking -- sorry. The large cart, the locking wheel is on the right side, and the small cart, the locking wheel's on the left side, which is black.
**Q. Just on the -- on the front or -- just on the back?**
A. The -- for the small -- for the small cart -- I don't know if it -- and on the small cart, the locking wheel is typical is on the left side. I talk about maybe what -- that's easier. Just talk about one particular cart. The small cart, the typical with the locking wheel is in the front will be on the right, in

Page 89

the back on the left side.
**Q. So the -- let's talk about the small carts then. Do you know if the small carts have two locking wheels, or just one?**
A. Typically, they have two locking wheel. In the front will be on the right. In the back it will be on the left. Typically. I don't -- I won't say completely.
**Q. And when they lock when moving over concrete, have you studied what direction they veer when activated?**
MR. LASALLE: Object to form.
Go ahead, Doctor.
A. From the video they typically going straight. And the activation, you see that, they still going little bit straight. Maybe -- they sometime going -- going straight and maybe a little bit to the left. But -- but typically they going straight.
BY MR. ULMER:
**Q. You read Sean Kohles' report where he's finding that they're veering in a direction; right?**
A. I also looked the video, the record video at the time of the accident -- of the inspection.
**Q. Well, what do you -- what's your opinion about what Dr. Kohles found in terms of the cart's veering**

Page 90

**when activated?**
A. I think her test -- his test was with a lot of the -- if I do test, I would do differently. Because when they do the test, the cart wheel is no hand on the -- no hand on the handles and let the cart moving around. It's not typical people have the situation when the cart stop in that case. That both hand was on the cart in most of the case I see.
**Q. Did you run your own --**
A. In that case --
**Q. Did you run your own test to find different conclusions --**
A. I would say, based upon the test with let go of the cart, the cart may pull a little bit to the right. Initially straight. In the end, turn maybe a little bit to the left.
But the point is that there's no hand on it. With a hand -- a hand on it, the cart, the turning point is very limited. They usually align with your hand. That's what -- how the shopping cart work, is aligned with your handle.
You can move along with your handle. With both hands on the cart, the cart would pretty much align with your body for -- body and your hand, or pretty -- I would say pretty much straight.

Page 91

**Q. Did you or Kulaga run a different test to reach different results?**
A. I based upon the surveillance video, the -- basically the cart move -- go straight, not moving left or right.
**Q. The customer surveillance video of the five --**
A. Yes.
**Q. -- customers?**
A. Uh-huh.
**Q. The image quality's pretty poor. You can actually tell whether there's veering from that?**
A. I would say that if you look at -- the veering is -- we talk about less than ten degree. Even in -- in the staged test, they all -- we think it will say about ten -- ten inches, maybe a foot. In that range, the cart turning less than ten degree.
**Q. And the customers are experiencing the lock over concrete or over this matted area?**
A. In -- when I talk about customer is on the exit -- which entrance area with the carpet on it. And also the staged test based upon one person with Dr. Kohles, and also they do the staged test on the -- like a concrete floor. And you can see that they all go straight even without a hand.
**Q. Okay. So --**

Page 92

A. For the first, I would say, one foot, 12 inches. The change of degree probably most likely less than ten.
**Q. Okay.**
A. I would say before, they need to probably turn at least 30 degree before the right side of the wheel exposure for -- and to -- for the entangle.
**Q. Well, so the surveillance footage that you are basing your opinions on regarding the five customers, that happens with a different surface area than --**
A. That's right.
**Q. -- what's inside of the store.**
A. That's correct.
**Q. So you'd have different --**
A. But when inside --
**Q. You'd have different -- you'd likely have different expected levels of veering, considering the different surface area?**
A. I think some of the case -- Ms. -- I would say -- the staff of Dr. Kohles also have both hand on it, but some of the cases, the person just let go of the cart. So they have both cases for this scenario.
MR. ULMER: Let's take a quick five-minute break.
(Recess from 12:29 p.m. to 12:41 p.m.)

MR. ULMER: I have no more questions for you. Thank you for being available.
MS. CAMPBELL: I do have a few questions.

E X A M I N A T I O N

BY MS. CAMPBELL:
**Q. Hi, Dr. Chen. My name is Sarah Campbell, and I represent the defendants, Fred Meyer Stores and Kroger Company, and I had some questions just regarding your report.**
A. Yes.
**Q. And we touched upon earlier what you had depicted in Picture 6 of your report.**
MS. CAMPBELL: And, Andy, do you have it up and you can just kind of share --
MR. ULMER: Yeah, one second.
MS. CAMPBELL: That's great. It's in Exhibit 3. I don't know the page number on that. I could look it up, but it's Picture -- or Photograph 6.
MR. ULMER: Is it Figure 6 -- let me just share and let me know if it's what you wanted.
MS. CAMPBELL: It's actually the photograph of the -- it shows a red arrow pointing at a box.
MR. LASALLE: Not Figure 6. Photo 6.
MS. CAMPBELL: Well, yes, that's correct.
MR. ULMER: Here we go.



BY MS. CAMPBELL:
**Q. Okay. And so, Dr. Chen, on this, I wanted to start by asking, did you take this photograph?**
A. No. Is the -- at the time of joint inspection, and Mr. Tom Kulaga take the picture.
**Q. Okay. And we established you did not attend the joint inspection; correct?**
A. That's correct.
**Q. And did you have -- well, let me strike that.**
**Was this photograph taken on the date of the incident?**
A. No.
**Q. Okay. And do you have a photograph of Aisle 86 on the date of the incident at the Fred Meyer store, showing a box protruding into the aisle?**
A. No.
**Q. And is it your conclusion that a box protruding into Aisle 86 is what caused Ms. Lubken's cart to stop abruptly?**
A. No. It's -- it's not my conclusion. It just show -- like I said, I have no idea how the cart was stopped. They have a -- we speculate a couple of the situation.
This just one of the -- even -- not a situation -- I would say most likely occurred, which



would be different than Ms. Lubken's here, which has nothing to do with the box at all, which is maybe she turned -- when -- she say entangle with that -- she entangle with the foot, which mean the cart turn 30 degree.
When the cart turning, they have a lot of friction, and they can just hit the -- hit the -- hit the cart -- hit the cabinet and stop suddenly without a protrusion of the box at all.
And in that situation, and that was consistent first certainly with the cart was certainly stopped. And secondly, and the cart was turned 30 degree because the turning of herself and hitting that.
And then she -- her hand was turning, hitting the right side of the wheel because the cart was turning when you handle it, in that probably in hitting the store.
But the point is that we have no evidence at all about the box is anything to do with this. It's just -- it's just something, protrusion when they -- the plaintiff attorney asked me to speculate, say that is one possibility. It was consistent, consider that the cart was going straight, and that is a possibility for the cart stop, but I have no idea.
**Q. And would you agree that there's many**



**possibilities of what --**
A. Exactly.
**Q. -- could have caused the cart to stop and Ms. Lubken to fall?**
A. Right. Exactly. Like I said, when the cart was turning, suddenly they hit something in this area and it suddenly stopped. Also possible suddenly stop. But it's all hypothetical. It's not relate to Mrs. --
**Q. So my question goes back to your report. If it is all speculative and not a conclusion, why did you include it in your report?**
A. I didn't include it in my report. It's not my conclusion.
**Q. Why did you include Photograph 6 and an arrow with the caption that -- showing that this box was protruding into the cart? Why did you include that with your report?**
A. That -- that is when I -- that's -- well, what is -- we think about what has happened to the accident. To be honest, I have no idea. Because that thing is not consistent with the statement of Ms. Lubken.
And this is one the poss- -- and this -- I didn't say this was -- occur. It just -- this is just even a small kind of coming off, and may -- people maybe can catch it. Doesn't mean the cart is -- is injury or

Page 97

risk hazard, but it's just sometimes it could happen. It --
**Q. Were you asked -- were you asked by somebody to include this in the report?**
A. No.
**Q. You -- so how did you determine to include this picture and this caption in your report? You -- is your testimony that you're just not sure why you included it in the report?**
A. I just showing that this is a -- this is a -- this is the aisle with the hand mixer. You see that hand mixer there? This is exactly location where the supposed accident occurred. I just showing the cursor. And they say, yeah, the box protrusion, but I had no -- I have no opinion about a box --
**Q. Okay. And just to --**
A. -- relating to the --
**Q. And just to wrap that up, this picture wasn't even taken on the date of the incident; is that accurate?**
A. That's correct. That's the --
**Q. So --**
A. -- taken on the joint inspection.
**Q. So --**
A. That is said in the title.

Page 98

**Q. And being a little bit speculative, myself, but wanting to clarify, it's possible that box wasn't even there on Aisle 86 on the date of the incident; correct?**
A. I think most likely it's not because you read the shelf life for the -- for the box, they won't allow -- last that long.
**Q. Okay. A couple other questions just to wrap it up here. Did you do -- did you take any measurements as to how far that box was protruding off of the shelf and into the aisle?**
A. No, no.
**Q. Did you review any measurements of how far the box was protruding out into the aisle?**
A. This is just a picture taken at the time of the inspection, and to show -- initially just to show the -- the mixer area, with the hand mixer. And we have no intention to speculate this is relate to the accident, so is no measurement was taken.
**Q. Okay. And in the same -- along the same lines then, there was no testing as to the relationship of distance between -- measurement or testing, I should say, to be more clear, between the cart that -- and this particular mixer that's on the shelf; right? There's no testing or measurements; correct?**
A. That's correct. If -- we -- if we concerning

Page 99

about that, we probably would do the test with the cart to see if they're able to stop the cart. That's the first thing.
And we never -- we never -- we never con- -- we never conceded that will be -- this is not my scope, to -- to speculate all the possibility of how the cart was stopped at all.
**Q. And when --**
A. But we didn't show -- no, we didn't -- we didn't speculate that, but we just consist- -- we just try to see if the -- the -- the cart -- we call it dynamics, and also the gait pattern of Ms. Lubken is consistent with his description that the -- the wheel locks is contribute to the fall of the accident. And we decide -- our conclusion is not contribute to that. We do not believe that.
**Q. And you mentioned that Mr. Kulaga, from -- also from Rimkus, did attend that joint inspection; correct?**
A. He joint -- he attend the joint inspection at the time.
**Q. And he wrote a report that you reviewed; is that correct?**
A. That's correct.
**Q. Did -- besides reviewing his report, was there any collaboration between you and Mr. Kulaga in**

Page 100

**rendering your opinions in this matter?**
A. I think we discuss about -- about the -- about the -- the -- the photo, we -- because we shared the video. So they say, where is location of the accident? So we had spent quite a bit of time talking about the -- the accident and the photo after 2/4 I think, 2 -- and we also showing that the cart was stopped.
Say, do you -- do you have -- see -- because so many video. So we initially say which one they really show the cart was stopped and how they be moving around by people.
And we actually see the people in the accident, they try to move the cart after the -- in the carpet area, which require much higher forces. They say, well, the cart can be moved. We agree. Even in the area.
It's difficult to move, but you can -- you can push the cart around with that. And then that's why I mentioned that I talked to the people with the Gatekeeper. They say that's intentional, have carpet.
In this particular floor, they don't have carpet. The force can be much less to push around, which means that -- we have that discussion about the -- the friction and how the -- the -- also more or less about how the wheel lock system work.
**Q. Okay. And besides the things that you just**

**mentioned and the fact that you read his report, any other collaboration in rendering your opinions in this matter?**
A. Not with this matter, yeah. No.
**Q. Okay. And --**
A. And I hope my -- and you see my opinions is completely independent with his opinion. His opinions most about the locking system. My opinions about the dynamic of the -- the wheel and the gait and also injury.
**Q. Okay. Are you aware of any evidence, including testimony, that Ms. Lubken's cart collided with a box that was extending into Aisle 86 on the date of the incident?**
A. No.
MS. CAMPBELL: Okay. Just looking through my notes briefly.
One last thing. If we could scroll over to Page 5. Andy, are you able to do that? Sorry. Can you scroll the Exhibit 3 to Page 5? Oh, that's not quite it. Sorry. It's looking at the testimony --
MR. ULMER: Page No. 5. Is this it?
MS. CAMPBELL: Page No. 5, yes.
MR. ULMER: Yes.
////



BY MS. CAMPBELL:
**Q. So in looking at Ms. Lubken's testimony, which is under "Statements of Ms. Jean A. Lubken" on Page 5, and it's indented, it looks -- so I'm going to go ahead and just read it briefly.**
**It says, "I was at the Fred Meyer Store on 19th and Stevens, Tacoma, Washington to by a hand mixer. I selected a shopping cart and proceeded toward the appropriate aisle to select a hand mixer. As I was walking down the center of the aisle, the wheel on the right side of the cart abruptly stopped."**
**So I'm going to stop there. So isn't it true that, looking at her testimony, she said she was walking in -- down the center of the aisle?**
A. Uh-huh. Right.
**Q. Okay. And so if we believe that she was walking down the center of the aisle, would she have been able to hit a box that was protruding slightly off of the shelf?**
A. In that case, probably not.
MS. CAMPBELL: Okay. I have --
A. Unless --
BY MS. CAMPBELL:
**Q. Oh, go ahead.**
A. Unless she -- she was turning. That's not --



**Q. And we don't have any evidence that she --**
A. We don't have evidence that she was turning. She's insisted that she was moving forward.
MS. CAMPBELL: Okay. Correct.
Okay. I don't have any further questions.
MR. ULMER: All right. That raises nothing from me.
MR. LASALLE: No questions. Thank you very much.
(Deposition concluded at 12:55 p.m.)
(Reading and signing was requested pursuant to FRCP Rule 30(e).)
-o0o-



C E R T I F I C A T E

STATE OF WASHINGTON
COUNTY OF PIERCE

I, Cindy M. Koch, a Certified Court Reporter in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of Christopher T. Chen, PhD, PE, having been duly sworn, on August 5, 2026, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 8th day of August, 2026.

CINDY M. KOCH, CCR, RPR, CRR #2357

My commission expires:
JUNE 9, 2027

**A**

**a.m** 4:2 58:1,1
**ability** 104:11
**able** 20:25 66:20 68:9 99:2 101:19 102:18
**abruptly** 94:19 102:11
**academic** 9:25
**acc-** 50:6
**accident** 12:12 17:20 19:5 36:3 37:11 38:5 39:7 40:2,23 41:3,10 47:20 52:19 53:25 54:8 70:8 71:19 77:13 81:2,19 85:16 89:23 96:19 97:13 98:17 99:14 100:4,6,12
**accurate** 7:23 48:8 68:13 97:20 104:10
**acquired** 19:17
**activated** 21:7 22:18 31:4 80:23 89:11 90:1
**activation** 21:1 30:20 80:24 82:18 89:15
**active** 6:25 7:2 14:4
**actual** 45:8 67:19
**add** 59:7
**addition** 5:1 32:2
**additional** 8:2,21 11:5
**additions** 33:8
**address** 4:13,14
**admonishment** 70:23
**adults** 58:9
**advisor** 9:10,10
**ago** 29:22
**agree** 33:6 82:16,17 83:17 95:25 100:15
**agreed** 33:11
**Aguilera** 2:19
**ahead** 21:5 23:22 32:9 34:25 51:2 56:19 59:19 60:21 62:12 71:3 75:21 76:19 79:7 82:5 84:23 87:2 89:13 102:4,24
**aisle** 46:4 52:18,20 63:22 76:7,7 94:13,15,18 97:11 98:3,10,13 101:13 102:9,10,14,17
**aisles** 35:16 43:1
**align** 90:19,23
**aligned** 73:9 75:2 90:20
**allegation** 14:18 15:18 34:10 40:20
**allege** 34:19
**alleged** 15:14 16:10 16:22,23 21:23 34:13 37:9 38:9 54:14
**allegedly** 26:9 38:16 39:13 40:10
**alleging** 34:11 37:17 38:14 80:21
**allow** 77:25 98:6
**alternative** 76:16
**altogether** 26:5
**Amala** 2:3
**amounting** 27:18
**analysis** 19:1 32:5 32:11,16 33:6,8
**analyze** 34:2
**analyzed** 11:16 24:15 25:17,23
**analyzing** 11:23 24:16 26:18 38:7
**ANDREW** 2:3
**Andy** 28:11 29:5 57:21 62:2 93:13 101:19
**angle** 73:7
**angular** 73:6
**answer** 16:1 20:10 22:2 61:23 81:17 87:23
**anti-** 13:2
**anticipated** 8:4
**antilock** 22:1 30:20
**antilocking** 22:6
**antitheft** 13:3,19 13:25 14:21 17:8 21:6 25:1
**anybody** 82:12
**anybody's** 44:3
**apologize** 42:16
**appear** 20:20
**appeared** 1:21 19:23
**applied** 11:7
**appropriate** 102:9
**approval** 11:9 15:22
**approximated** 53:20
**approximately** 58:10
**April** 8:8 27:5,16 27:17 31:23
**archive** 88:11
**area** 38:5,5,25 39:7 42:3,6 43:17 64:16,17 91:18,20 92:10,18 96:6 98:16 100:14,15
**Argumentative** 61:24
**Arizona** 11:6
**arriving** 34:13
**arrow** 73:18 93:22 96:14
**aside** 21:22 56:7
**asked** 46:18,21,23 75:16 84:13,24 95:21 97:3,3
**asking** 75:23 76:15 94:3
**assignments** 12:7
**assist** 56:4
**assisted** 32:4
**assuming** 46:16
**assumption** 46:9 65:11
**attend** 13:12 94:6 99:18,19
**attendance** 17:21
**attention** 39:20 63:23
**attorney** 95:21
**August** 1:24 4:1 104:10,13
**aulmer@pcvala...** 2:6
**authored** 14:13
**available** 93:2
**Avenida** 2:19
**Avenue** 2:14
**aware** 21:11 39:9 49:7,8,14,15,18 50:22 101:11
**awkward** 75:2

**B**

**back** 6:6 10:17 23:1 30:24 57:19 58:4 69:16 86:13 87:17 88:7,13,19 89:1,6 96:9
**background** 9:13 9:16 21:22
**backstory** 10:12
**bag** 63:7 65:10,12
**balance** 25:25 64:21 77:2 84:5
**base** 58:8 59:5,5 61:14 82:6
**based** 4:19,20 14:2 26:9 36:14 37:1 41:8,24 43:10,13 45:7,24 46:1,13 46:14 47:13 48:22 50:1 58:18,21 69:3,6 84:25 90:13 91:3,21
**basically** 31:5 91:4
**basing** 48:4,5 49:25 92:9
**basket** 45:22 52:13 53:1,2,5
**behalf** 28:7
**believe** 7:17 10:5 14:8 20:22 31:21 33:6 37:19,23 38:3 43:24 47:7 48:12 49:8 52:3 52:23 63:2 67:20 76:17 99:16 102:16
**best** 16:1 104:10
**big** 87:22
**bigger** 80:5,5 87:25
**billed** 31:16,23
**biomechanic** 44:22
**biomechanical** 6:3 25:22 32:5 33:1 62:8
**biomechanics** 9:9 10:18 34:6
**bit** 20:19 38:6 42:12 43:19 45:11 48:15,15 54:2,10 63:21 67:24 77:2 80:6,6 89:16,17 90:14,15 98:1 100:5
**black** 86:19 88:17
**block** 63:18 67:3
**blocked** 64:20 73:14 76:7
**body** 74:17,24 75:4 90:24,24
**Boston** 10:4,5
**bottom** 31:22
**box** 63:18,20,21,24 64:4 76:6 79:13

79:14 84:11 93:22 94:15,17 95:2,9 95:19 96:15 97:14 97:15 98:2,5,9,13 101:12 102:18
**boxed** 73:2
**brakes** 19:9,19
**braking** 18:25
**break** 20:9,23 43:19 57:22 92:24
**briefly** 10:7 43:5 64:22 101:17 102:5
**bring** 39:20 59:14 63:11 64:23
**broader** 74:3
**brought** 56:3
**bumped** 64:13
**business** 1:9,10,12

**C**

**C** 2:1 104:1,1
**CA** 2:20
**cabinet** 95:8
**calculate** 26:23 47:19 48:19
**calculation** 27:12 33:11
**California** 1:12 11:4
**call** 10:23 13:2 19:25 30:16 32:10 32:10 33:16 47:4 64:16 82:22 87:9 99:11
**called** 59:4
**Calls** 59:17 60:20 84:21 87:19
**camera** 51:17 54:12 55:7 56:1
**Campbell** 2:13 3:5 55:12 56:20 57:21 60:4,19 62:6 75:22 76:20 79:8 83:12 93:3,5,6,13 93:16,21,24 94:1 101:16,23 102:1 102:21,23 103:4
**canceled** 6:20
**caption** 96:15 97:7
**car** 11:14
**carefully** 88:10
**Carlota** 2:19
**carpet** 20:19 31:12 38:25 39:1,4 78:16,17 80:10 91:20 100:13,19 100:21
**cart** 12:10,17 13:18 15:16 16:14,14,19 17:8 18:1,18 19:3 19:24 20:8,13,17 20:25 25:8,12,17 29:24 30:1 31:7 31:13 36:1,3 40:10,20 41:6,9,9 41:12 42:4,21 43:17,21,22 44:1 44:2,2,7,7,11,12 44:13,19,20,21,22 45:11,20,22 47:1 47:16,18 48:22 49:1,3,5 50:2,23 52:12,24 53:8,10 53:11 54:16,19 55:3,6,9,9,21,23 55:25 56:2,3,7,11 56:22,23,25 57:9 57:14,15,18 58:12 59:14 60:23,23,24 61:5,10,16 62:14 62:15,20,21,25 63:2,11,18,23,24 63:24 64:6,13,14 64:20,23,25 65:1 65:3,15,15,21,25 66:1,2,3,4,5,7,12 66:14,18,23 67:3 67:8 69:18 70:3,7 70:14 71:5,11,16 71:17 72:8,17 73:2,4,15,21,23 74:4,9,10,13,19 75:11 76:5,7 77:3 77:8,9,10,22,23 78:3,11,12,13,19 78:21 79:5,11,14 79:22,23,25 80:4 80:5,5,10,25 81:2 81:12,14,21,22,25 82:1,8,21,25 83:1 83:23 84:3,11,17 84:25 85:4,5,16 85:19,21,22 86:2 86:5,8,8 87:14,16 87:18,25,25 88:4 88:10,13,15,15,16 88:20,21,24,24 90:4,5,7,8,14,14 90:18,20,23,23 91:4,16 92:22 94:18,21 95:4,6,8 95:11,12,15,23,24 96:3,5,16,25 98:22 99:1,2,6,11 100:7,10,13,15,17 101:12 102:8,11
**cart's** 58:11,16 60:9 89:25
**carts** 11:23 15:8 21:24 22:8 25:6 25:11 44:4 72:5 80:23 81:25 82:1 88:2,12 89:2,3
**case** 7:20,25 8:11 8:22 11:8,24 12:1 12:4,6,13 13:23 14:2,7,10,13,16 14:20,22 15:6,11 15:13,13,16,19,20 15:24 16:18 17:5 17:7,13,16,21,25 18:10,15 21:22 22:5,11,14 23:9 23:15,25 24:9,25 24:25 25:16 26:22 27:12,17 28:1,4 28:14 29:1,6,6,11 29:19 30:25 31:11 31:23 32:4 34:3,5 35:13,21 36:15 39:18,19 40:6 41:23 43:23 50:10 51:5 59:22 62:23 64:9 70:4 76:8 77:14,23,25 78:6 78:6 79:17 80:25 81:1,11 82:10,13 85:15 87:9 90:7,8 90:10 92:19 102:20
**caseload** 6:22
**cases** 6:17,23 7:4 21:23,25 22:8 23:18 24:4,8,11 24:14 25:1,3,5,7 25:10,23 26:2,7,8 26:8,9,12,17 34:9 34:11 40:7 43:12 62:9 92:21,22
**catch** 96:25
**caught** 41:11
**cause** 84:3
**caused** 25:24 34:1 34:14 75:13 83:23 84:11,17 94:18 96:3
**CCR** 1:25 104:17
**center** 10:4 64:12 64:14 65:4,16 73:22 74:24 75:4 102:10,14,17
**certain** 15:9 19:20 66:17 68:24,24 85:6
**certainly** 95:11,11
**Certified** 104:6
**certify** 104:7
**change** 92:2
**changes** 33:7
**charge** 27:18
**check** 53:15,15
**Chen** 1:17 3:1,11 4:5,12 12:22 15:25 29:10,16 42:9 54:1,3 93:6 94:2 104:9
**chime** 12:23
**Christopher** 1:17 3:1 4:5,12 104:9
**Cindy** 1:25 12:22 71:25 104:6,17
**circle** 6:6
**circumstances** 41:8
**claim** 35:16
**claimed** 36:4
**claiming** 83:9
**claims** 16:6
**clarification** 12:20 63:19
**clarify** 24:13 28:12 28:16 29:16 41:17 51:12 98:2
**clear** 30:4 73:20 98:22
**client's** 61:19
**close** 25:13 26:13 50:6
**closely** 70:12
**Cochran** 2:3
**collaboration** 99:25 101:2
**colleague** 9:14,19 9:21
**colleagues** 28:25 32:3
**collided** 101:12
**Colorado** 11:6
**column** 23:5,5,6,7
**come** 12:14 39:23
**comes** 69:22
**coming** 63:22 76:12 96:24
**comment** 21:17 36:12,14 37:1

39:5 41:20 51:9 80:24
**commission** 104:19
**community** 1:5
**comp-** 37:9
**company** 2:12 4:19 14:24 15:22 93:8
**compared** 19:9
**complaint** 37:17
**complaints** 37:9
**complete** 56:4
**completed** 33:13
**completely** 30:4 66:5 78:12,13 89:8 101:7
**component** 19:13
**con-** 99:4
**conc-** 42:19
**conceded** 99:5
**concerning** 37:16 80:25 98:25
**conclu-** 7:24
**conclude** 35:3
**concluded** 103:10
**conclusion** 14:14 33:18 36:5 40:6 42:19 43:13 49:11 50:17 51:24 58:8 58:21 61:14,17 71:4 75:14 77:7 79:20,20,21 94:17 94:20 96:10,13 99:15
**conclusion's** 58:18
**conclusions** 69:17 90:12
**concrete** 20:20 35:8 39:2 49:5 78:23 80:14 89:9 91:18 91:23
**condition** 26:10
**conference** 30:16
**confirm** 74:15
**conflict** 13:16 81:8
**connect** 18:19
**connected** 69:19 76:14 81:13
**consider** 50:25 95:22
**considered** 39:24 40:19
**considering** 39:17 92:17
**consist-** 99:10
**consistent** 20:3,15 34:8 61:16 62:17 63:12 76:10 95:10 95:22 96:21 99:13
**consistently** 19:8 20:5 21:10
**consultant** 4:24 5:2 6:12,23 24:15 34:10
**consulting** 5:5 6:22 11:17,19
**contact** 27:22 28:17 29:8,23 30:5,10 30:10,14,18 69:21 69:21 87:6,9,11
**contacted** 29:19,20
**contains** 7:15,24
**Continuing** 58:2
**contribute** 99:14 99:15
**conversation** 9:25 28:22 31:2 33:4
**copy** 5:22
**Cornell** 10:3
**corporation** 1:9,10 1:12
**correct** 4:18 5:6,8,9 5:19,20 6:4 7:21 7:22 8:1,13,14,18 10:20 22:10 27:9 27:10,15,23,24 28:5,21 31:1,25 32:1 33:14 34:2 34:16 35:21 36:11 36:15,16 37:3 49:7 56:8,12 64:10,11 74:9,14 74:16 92:13 93:24 94:7,8 97:21 98:3 98:24,25 99:18,22 99:23 103:4
**correctly** 18:6
**cost** 27:13
**counsel** 8:25 27:22 29:23 30:15
**count** 10:22 24:21 24:24 50:21,24 51:4
**COUNTY** 104:4
**couple** 21:21 37:1 68:3 75:16 84:2 94:22 98:7
**course** 57:8
**Court** 1:1 12:20 40:3 42:11,14 63:19 70:23 76:2 104:6
**created** 6:8 8:2
**criticisms** 9:15
**CRR** 1:25 104:17
**cur-** 17:19
**current** 4:14,23,24 5:25 6:22,25
**currently** 5:3 7:2
**curriculum** 3:9 5:18
**cursor** 97:13
**cus-** 54:25
**customer** 20:25 25:11 39:13 43:7 44:5 65:15 66:2 68:15 72:16,23 86:15,25 91:6,19
**customers** 37:16 38:14,15 47:11,17 48:4 50:19,22 80:21 83:9 91:8 91:17 92:9
**cutting** 42:10
**CV** 5:22,24 10:17 11:10,12

**D**

**damage** 57:1
**data** 32:13 86:1
**date** 1:24 7:7 19:22 41:25 42:1 43:14 43:20 61:3 94:10 94:14 97:19 98:3 101:13
**dated** 3:12,13 8:8 8:16 31:16
**day** 36:19 40:17 51:23 56:4 71:18 104:13
**De** 2:19
**deactivated** 54:25
**dead** 64:12 65:15
**Dean** 4:15
**December** 6:13,16
**decide** 52:14 99:15
**defendant** 2:17 23:13
**defendants** 1:14 2:11 93:7
**defense** 23:10,12 23:18
**definition** 78:4
**degree** 70:3,9,9 71:16,17 79:2,3 85:6,11 86:9 91:13,16 92:2,6 95:5,12
**depending** 85:20 86:4
**depends** 31:9,9 64:15,15
**depicted** 93:12
**deposed** 14:10 17:4 37:2
**deposition** 1:16 3:1 5:8,17 7:16 8:24 9:3 23:14,24 36:8 36:9 40:18 103:10 104:8
**describe** 51:21 81:17
**described** 34:15 53:4 66:19 77:11 81:2,21 82:8 85:2
**describing** 67:15
**description** 63:1 81:23 99:13
**design** 11:12,24,25 12:2 18:11 20:1 24:5,10,11,15 62:23
**designed** 18:23 24:17
**detail** 15:24 25:14 26:16 37:20,24 39:19
**determine** 12:9 97:6
**determined** 68:24
**deviations** 19:8,18 21:12
**device** 11:11
**devices** 11:13,13
**different** 5:11 11:16 12:2 15:1 19:24 20:1,2,8,8,9 20:9,19 22:1,3 26:2 38:6,18,20 38:21,22 39:1 44:1 49:5 52:17 58:25 83:14 85:19 86:3 88:1 90:11 91:1,2 92:10,14 92:16,17,18 95:1
**differently** 90:3
**difficult** 70:6,16 71:8 73:3,6 87:11 100:16
**direct** 76:12
**direction** 75:8 89:10,21
**directly** 30:14
**discuss** 100:2
**discussion** 72:3 100:22
**disprove** 46:8 67:4

**disproving** 46:9
**disputing** 33:25
**distance** 46:25 61:4 68:11 79:18 80:4 80:6 82:18 98:21
**distinct** 12:7
**DISTRICT** 1:1,2
**divine** 86:4
**Doctor** 23:22 51:2 56:19 60:21 61:22 62:12 71:3 73:24 75:21 76:19 79:7 84:23 87:23 89:13
**document** 5:17 6:1 9:2 32:21 45:16
**documentation** 45:19
**documented** 39:2
**documenting** 45:17
**documents** 5:11
**dog** 84:16,18
**doing** 1:9,10,12 5:4 12:22 20:13
**Dr** 3:11 12:22 15:25 29:10,16 42:9 48:12 49:1,9 54:1,3 58:20 82:7 89:25 91:22 92:20 93:6 94:2
**drawing** 50:15
**Drive** 2:8 4:15
**duly** 4:6 104:9
**dynam-** 82:24
**dynamic** 12:9 16:18 18:18,18 19:3 20:2 44:19 60:25 61:10,16 62:14,21 63:1 66:1 76:9 77:10 79:22 80:25 81:22 83:2,17 84:25 101:9
**dynamics** 15:14,15 18:16 24:9 26:19 38:7 60:13 81:1 82:23 99:12

**E**

**E** 2:1,1 4:8 58:2 93:4 104:1,1
**earlier** 7:12 93:11
**earliest** 7:7
**easier** 85:11 87:3 88:23
**easily** 63:18 78:12 83:2
**education** 10:18
**effectively** 20:10
**eight** 4:22 79:4
**either** 11:23 17:8 84:15 85:17
**employed** 4:17
**employee** 30:21 54:25
**employees** 30:13,22 35:14,23 36:8,14 37:1 55:8 56:3,6 56:11 84:10
**employees'** 36:25
**en-** 48:6
**engineer** 6:3 10:19 11:1 25:22 33:1 62:8
**engineering** 10:25 13:1 24:17,18
**entangle** 70:17,21 71:8,15,17,21 78:8 85:8 86:10 87:12 92:7 95:3,4
**entangled** 60:9 76:24,25 78:3 85:3 86:9
**entanglement** 58:14 80:1 85:12
**entered** 52:3 53:17
**entering** 47:20 52:8 52:9 62:19 68:4
**entrance** 20:14 45:20 48:7 51:16 85:23 91:20
**environment** 11:21
**equipment** 14:25
**especially** 47:14,14 65:25 78:8
**established** 10:25 94:6
**estimate** 46:19,21 68:12 69:7
**estimation** 47:12 48:7 68:14
**evaluate** 78:5 80:8
**evaluated** 57:6
**evaluating** 34:10
**event** 42:4 50:7 52:6 58:14
**evidence** 34:16 42:8,20 46:7,10 48:20 50:5 51:8 56:14,15 64:3 76:12 77:6,7,17 77:19 84:14,18,20 95:18 101:11 103:1,2
**exact** 46:10
**exactly** 15:4 25:14 25:15 26:14 41:7 48:16 63:8,15 96:2,5 97:12
**EXAMINATION** 1:16 3:2,3
**examined** 4:6
**example** 34:17,18 56:24 57:2,12 62:22 63:18 64:19 72:20 86:15
**exemplar** 13:17 17:9 18:1 42:1 43:15 48:10,25 49:6,10 58:19
**Exhibit** 3:7,9,10,11 3:12,13 4:4 5:16 6:7 7:14,18 8:6,7 8:15 27:4 58:5 67:15 72:13 93:17 101:20
**exhibits** 3:8 6:6 27:2
**exists** 56:22
**exit** 16:14,20,20 20:11,16 38:25 39:7 42:5 49:3 53:14,15 78:17 91:20
**exits** 35:25
**expect** 70:11 71:22 75:7 85:5
**expected** 58:16 86:11 92:17
**experience** 6:2 9:16 11:11,23 22:8 62:19
**experiencing** 91:17
**expert** 7:10 24:15 50:1
**expert's** 49:23
**expertise** 11:25 22:21
**expires** 104:19
**explain** 33:24 66:21 76:16 81:14 84:19 84:20
**explaining** 75:18
**exposure** 92:7
**extending** 101:13
**extra** 78:1
**extremity** 17:3

**F**

**F** 104:1
**face** 44:21
**fact** 51:9 55:19 59:22 101:1
**factor** 61:12
**failure** 11:11,13
**fair** 10:15
**fall** 12:10 16:23 18:15,19,25 26:4 26:4,5,18,18,21 33:22 34:1,12,14 34:15 35:4,5 37:5 45:18 49:6 50:23 56:12 59:12,13,16 59:22,23,25 60:13 61:8 62:10 63:2,2 63:13 64:22 71:20 75:13 76:17 77:5 81:21,21,24 83:23 84:4,17,19,20 96:4 99:14
**fallen** 81:12
**falling** 26:9 51:10 51:13
**falls** 25:23
**far** 21:2 26:24 65:11 98:9,12
**fashion** 29:9
**fast** 45:5,14 46:19 46:21
**faster** 20:21
**fe-** 35:6
**feet** 42:2 43:16 44:3 44:18 47:7,9,25 85:20 86:4
**fell** 34:19 35:8 36:19 46:11 50:19 50:23 54:17,19,20 55:4,10,22 56:8 59:21 60:8,17 61:15,21,21 62:9 63:3,10,14 64:8 64:10 66:21 75:17 75:19,24 76:14 81:15
**female** 33:21 47:2,5 69:11 73:20
**females** 47:3
**femoral** 33:20 35:6 35:6
**femur** 12:13
**field** 9:14
**fif-** 61:3 77:24
**Fifth** 2:14
**Figure** 93:19,23
**filled** 36:18
**filling** 51:17

**filmed** 48:25 49:1
**finally** 82:9
**find** 45:23 81:12 90:11
**finding** 12:15 89:20
**findings** 3:11 7:25
**fine** 16:7 57:24
**first** 4:6 7:13 10:23 11:1 13:9 25:16 27:4,22 28:16,18 29:8,20,25 30:5 30:11 33:20 35:2 40:22 45:20 52:4 52:9 56:25 58:21 62:19 76:17 81:19 84:24 87:21 92:1 95:11 99:3
**five** 6:19 7:14 24:21 33:15 43:25 44:9 44:10 47:7,8,9,9,9 47:10,17,25 48:1 48:1,22 49:4 50:14 52:6 58:19 59:6 69:8,13 75:5 91:6 92:9
**five-minute** 92:23
**five-page** 5:17
**floor** 20:18,20 35:9 39:2 49:5 83:7 91:23 100:20
**focus** 41:2 52:20 73:25
**following** 44:21
**follows** 4:7
**foot** 47:8,9,25 48:9 49:20,21 50:3 59:7,9 69:3,4 70:10,22 71:1,12 71:12 72:19 73:4 73:9,20 74:23 76:25 78:1,2,3,7 79:25 85:4,12 86:9 87:4,5 91:15 92:1 95:4
**footage** 47:11 51:12 51:15,23 52:2 53:6 56:1 67:11 68:3 74:15 92:8
**force** 18:20 20:22 20:23 82:22,23,25 83:3,3 100:21
**forces** 31:7,13 38:21,22 100:14
**foregoing** 104:8
**form** 23:21 29:9 40:13 45:2 51:1 51:18 55:11 56:18 59:17 60:18 61:24 62:11 71:2 73:11 74:5,20 75:20 76:18 79:6 82:3 83:11 84:21 86:6 87:1,20 89:12
**forth** 76:15
**forward** 16:13 21:1 41:10 44:19 57:11 65:25 66:3,4,6,8,9 70:8 71:5,11 76:8 78:11 79:25 103:3
**found** 89:25
**foundation** 14:19 87:20
**four** 43:25,25 47:5 49:4 87:16
**fourth** 23:5,6
**fracture** 12:13 33:21 34:1,4,4,5 35:4,6
**frame** 6:13
**FRCP** 103:12
**Fred** 1:8 2:11 13:12 35:14 37:4,10,15 56:10 80:9 93:7 94:14 102:6
**freezing** 71:24
**frequency** 22:15
**friction** 38:25 78:20 82:24 95:7 100:23
**front** 20:17 87:17 88:7,18,25 89:6
**froze** 42:11 54:3
**full** 4:11,12 14:15
**furniture** 11:14
**further** 103:5

**G**

**gait** 26:20 41:24 58:22,22 59:2 67:12,16,18 68:10 99:12 101:9
**gap** 58:11,22 59:2
**garbage** 78:14 83:6
**Gary** 28:25
**Gatekeeper** 1:11 2:17 8:7 15:7 18:11 19:18 21:22 27:19,23 28:3,8 28:17,19 29:9,21 30:14,16 31:3,17 35:24 37:9,18 78:18 100:19
**Gatekeeper's** 21:6
**gates** 11:14
**Gateway** 87:15
**gathering** 10:7
**generalities** 16:1,7 16:22
**generate** 31:13
**generated** 7:19 31:7 37:5,15
**germane** 18:25
**getting** 29:7
**give** 5:11 8:10 15:25 24:20 60:16 69:12 72:8 74:11 79:24 81:7
**give-and-take** 59:8
**given** 55:20
**gives** 33:15
**go** 21:5 23:1,2,22 26:19 32:9 33:19 34:25 37:20,24 41:14 47:16 51:2 52:4 56:19 57:19 57:24 59:19 60:21 62:12 66:13,18 67:3 68:1,2 71:3 75:21 76:19 77:3 79:7 82:5,11 84:23 87:2 89:13 90:13 91:4,23 92:21 93:25 102:4 102:24
**goes** 48:17 96:9
**going** 5:10 6:5 16:2 23:9 24:1 42:15 45:15 46:19,22 49:7 55:12 57:12 57:19 65:11,23 66:10 67:24,24 68:13,13 69:16,24 72:20 74:23,24 75:25 77:19 79:1 83:16,18 86:13 89:14,15,16,17,18 95:23 102:4,12
**gonna** 57:3 77:3 78:21
**good** 4:10 12:22 44:6
**graduated** 10:3
**Gravelly** 2:8
**great** 93:16
**greatest** 86:14
**ground** 34:19 48:18 67:3 78:2,7 79:16 80:1
**group** 2:19 49:9
**guess** 9:20 11:22
**guest** 43:14,20 47:1 68:16

**H**

**half** 48:2 57:23
**hand** 16:13,23 17:2 53:8,8 63:5,9 65:6 65:8,10 66:4,15 66:16,17 74:23 76:24,25 78:9 90:4,5,7,17,18,18 90:19,24 91:24 92:20 95:14 97:11 97:12 98:16 102:7 102:9 104:12
**hand's** 78:9
**handb-** 63:6
**handbag** 63:7 65:10
**handle** 58:12 65:7 66:12 78:10 82:12 90:21,22 95:16
**handles** 65:4,4,14 85:19 86:3 90:5
**hands** 58:12 90:23
**happen** 5:23 6:21 7:9 30:1 85:10 97:1
**happened** 39:6,7 53:20 96:19
**happens** 92:10
**happy** 19:14
**hard** 12:23
**hazard** 97:1
**head** 12:13
**hear** 12:23
**heavier** 80:5
**heel** 41:11 42:2 58:12,15 59:6,6 59:10 60:8 68:8 69:19,23 70:6,11 71:7,17,18,21 76:14 81:13 85:6 86:10,10 87:9
**heels** 43:16
**height** 33:22 34:3 35:5 47:6,10,13 47:13,16,22 48:6 48:14,16 69:5
**help** 12:4,6,18 29:16 61:21 67:12 72:2
**helpful** 38:8
**helps** 67:17
**hereunto** 104:12

**Hi** 93:6
**high** 47:15 48:17 82:22
**higher** 47:24 82:23 100:14
**Hills** 2:20
**hip** 33:22 47:16 48:17
**HIPAA** 16:6
**hips** 47:16
**hit** 69:24 70:2,4,16 70:17 79:14 85:7 95:7,7,7,8 96:6 102:18
**hitting** 70:10 95:13 95:14,16
**hold** 80:20
**holding** 65:3 85:18 85:20 86:2,5
**honest** 96:20
**honor** 76:22
**hope** 21:2 80:2 101:6
**hour** 45:10,12,13 45:25 46:17,25 57:23
**hours** 8:12 27:13 27:18 31:24
**Houston** 4:20
**How'd** 62:10
**huh** 24:19 38:17
**hunched** 74:13
**husband** 1:5
**hypothetical** 64:17 75:23 79:19 96:8
**hypothetically** 79:9

**I**

**idea** 45:16 46:3 54:22,24 55:2,3 55:20,23 56:2 65:2 68:20 83:8 94:21 95:24 96:20
**identical** 14:21 15:9 74:18
**IDENTIFICATI...** 3:8
**identified** 6:12
**identifies** 23:7
**image** 86:14 91:10
**imagine** 24:8 34:11
**impossible** 70:12
**in-** 15:14
**inch** 72:9
**inches** 47:9 58:10 58:11,13 59:6,9 61:4 68:18 69:5 69:11,12 71:6 72:6 74:11 75:5 77:22,24 79:4,15 79:15 82:8 91:15 92:2
**incident** 12:10,19 16:10 18:21 25:7 33:23 35:17 36:17 36:18 37:4,8 39:3 39:13,15 41:25 43:6,15,21 50:18 51:23 52:21 53:20 54:14 80:9,20 81:4,5,5,5,9,10 94:11,14 97:19 98:3 101:14
**include** 96:11,12,14 96:16 97:4,6
**included** 97:8
**includes** 50:11
**including** 8:12 11:6 12:10 50:12,13 76:6 101:11
**inconsistent** 34:21 63:1 77:13 79:22 81:22,23 85:1
**increased** 78:20
**indented** 102:4
**independent** 101:7
**INDEX** 3:2,7
**indicate** 57:18 60:23
**indicated** 17:4 43:5
**indicates** 27:21 62:14
**indication** 36:2
**individual** 27:22 88:10
**individuals** 32:4
**industrial** 11:13
**information** 19:17 21:9 36:6,23 67:17
**initially** 28:7 90:15 98:15 100:9
**injured** 23:15 38:8 38:10,16 39:13 40:10 80:21 83:10
**injuries** 16:22 21:23 38:14 39:4
**injury** 15:14,16 16:6,10,13,23 17:2 22:3 24:9 29:24 34:11,13 37:17,25 83:15,16 96:25 101:10
**inside** 38:5 39:7 71:7,13 72:7 73:4 73:21 87:4,5,10 92:12,15
**insisted** 103:3
**inspect** 16:17 56:22
**inspected** 13:17 55:21
**inspection** 13:12 17:15,18,22 42:1 63:21 89:23 94:4 94:7 97:23 98:15 99:18,19
**installed** 13:19 15:7
**instance** 35:15 42:25 43:4
**instantaneous** 82:6
**intention** 98:17
**intentional** 100:19
**INTRODUCED** 3:8
**intrusion** 63:17
**investigate** 83:18
**investigated** 16:17
**investigating** 83:16
**invoice** 3:12,13 8:7 8:16,16,19 27:5,5 27:8,11,16,21 31:15,16,16,19
**invoices** 27:3
**involve** 18:19 22:4
**involved** 14:21,22 25:1,7,11 30:2 39:4 56:12 80:10
**involving** 15:7,20 21:23 22:8,12,14 25:6,8,10 26:8,9 37:5
**issue** 15:11 34:14 69:23
**item** 53:2
**itemization** 8:11
**itemized** 27:11

**J**

**Jean** 1:4 102:3
**job** 4:23 17:11
**joey.lombino@lo...** 2:10
**join** 55:13,14 60:4 60:19 75:22 79:8 83:12
**joined** 30:17
**joining** 56:20 62:6 76:20
**joint** 94:4,7 97:23 99:18,19,19
**JOSEPH** 2:7
**jump** 6:5
**jumped** 67:14
**June** 8:16,19 27:8 31:16 104:20

**K**

**K-u-l-a-g-a** 13:10
**K.Z** 2:13
**keep** 41:18 77:23 79:25
**kept** 42:15
**kind** 12:16 14:15 19:24 21:21 25:19 53:7,7 56:24 62:22 63:6,17,21 74:12 78:15 83:15 93:14 96:24
**know** 5:23 6:21 7:9 8:3,21 9:7,12,15 9:19,19 10:12,13 12:5 15:3,23 16:5 18:23 19:7,15 23:17,23 24:14,16 25:6 30:5,6,12 36:4,13 38:22 39:11 44:24 45:5 46:24 47:6,10,15 48:13,13,16,17 51:4 53:25 54:8 54:15 55:17 56:23 57:2,2,9,14 59:21 62:9 63:7,15 64:1 64:8,10,23 65:14 65:19,22 66:5,6 68:17,18 69:17,18 70:13 71:25 75:17 77:8,9,23 79:9,19 80:12,22 81:7 82:15 84:9 85:9 87:21,22,22 88:21 89:3 93:17,20
**knowing** 9:19
**knowledge** 104:11
**Koch** 1:25 104:6,17
**Kohles** 9:4 12:16 48:12 49:1 58:20 82:7 89:25 91:22 92:20
**Kohles'** 49:9 89:20
**Kroger** 1:10 2:11 93:7
**Kulaga** 12:1 13:5,6 13:7,23 14:20 15:6,19 17:13,15

18:3,7,8 19:18 21:15 30:5 32:2 91:1 94:5 99:17 99:25
**Kulaga's** 17:11 22:19

**L**

**La** 2:19
**lab** 9:10,24
**lack** 87:20
**Laguna** 2:20
**Lake** 2:8
**landmark** 46:24
**large** 44:2,7,10,11 44:12,14 88:1,12 88:15
**larger** 19:25 74:18
**Las** 1:19 4:1,16
**LaSalle** 2:18 15:25 16:5 23:21 27:25 28:11,13 29:1,5 29:10,14 40:13 42:18 45:2 51:1 51:18 54:1,3,5 55:11 56:18 59:17 59:24 60:3,18,20 61:22 62:11 71:2 73:11,24 74:5,20 75:20 76:18 79:6 82:3,5 83:11 84:21 86:6,17,22 87:1,19,23 89:12 93:23 103:8
**lay** 14:18
**leader** 32:24
**lean** 75:8
**learn** 38:15
**left** 23:6,7 42:12 52:11 59:1,6 66:4 66:11 69:25 71:13 75:3 86:23 87:5 87:10,16,17 88:3 88:4,9,14,17,22 89:1,7,17 90:16 91:4
**leg** 68:19
**length** 26:23 68:14 69:4,5
**let's** 23:1 31:15 57:24 73:25 86:14 89:2 92:23
**levels** 92:17
**licensed** 10:19
**lied** 62:13
**life** 98:5
**liked** 57:6
**limit** 20:17
**limited** 90:19
**lines** 98:19
**list** 3:10 6:8,11 7:8 23:1
**litigation** 28:18
**litigation-related** 7:5
**little** 14:19 20:19 38:6 42:10,12 43:19 45:11 48:15 48:15 54:2,10 63:21 67:24 77:2 79:18 80:6,6 86:19 89:16,17 90:14,15 98:1
**living** 32:20
**located** 42:2,5 43:16
**location** 20:8 38:18 38:20 47:20 54:13 66:16 69:24 88:1 97:12 100:4
**lock** 20:5 21:1 22:15,18 37:11 43:8,21 44:4 49:7 49:8,19 52:6 61:8 64:25 78:12 79:17 80:10 87:18 88:2 88:2 89:9 91:17 100:24
**lock/unlock** 31:6
**locked** 16:14,19 36:2 37:12 39:14 44:25 45:21,23 47:2 49:16 50:20 52:12 53:12 54:24 61:5,15 62:20 74:13 75:7,11 76:13 77:6,9,14 77:21 78:13,22 79:24 81:12,23 82:6 87:15 88:2,4
**locking** 18:21 21:10 21:10,13,14 22:4 22:9,12 31:7 35:16,24 36:9 40:10,20 41:6 49:14,15,18 50:7 76:8 88:1,14,15 88:15,17,21,25 89:3,5 101:8
**locks** 21:7 78:23 99:14
**lockup** 35:15 42:4 42:25 43:4 58:14
**Lombino** 2:7,7
**long** 4:21 7:9,15,20 11:8 98:6
**longer** 63:21 80:4 82:14
**look** 5:11 13:4 27:4 31:22 34:7 38:1,9 38:18,19 39:21 40:14,22 43:11 48:5 67:2 69:6 71:11 81:9 82:10 82:16 87:4 88:9 91:12 93:18
**looked** 43:6 89:22
**looking** 5:16 15:14 15:15 18:24 24:9 29:25 34:12 65:17 66:8 68:4 72:12 74:17 101:16,21 102:2,13
**looks** 68:21 73:1,8 74:3 102:4
**lose** 25:24 76:2
**lost** 10:22 64:21,21 77:2 84:5
**lot** 42:5 56:23 64:17 81:4,6 90:2 95:6
**Lubken** 1:4,5 12:12 35:17 36:4,19 37:16 42:22 44:15 44:24 45:5 46:12 51:9,10,13,22 52:2,8,22 53:23 55:21 56:7 57:10 58:22 73:17,25 74:2,12 75:15 76:13 79:23 81:3 85:2 87:14 96:4 96:21 99:12 102:3
**Lubken's** 33:22 37:5 40:21 47:6 54:13 94:18 95:1 101:12 102:2

**M**

**M** 1:25 2:7 4:8 58:2 93:4 104:6,17
**maintenance** 22:24
**major** 9:1
**majority** 7:4
**making** 7:25
**male** 47:2,5 48:13
**males** 47:2
**manager** 35:14
**managers** 55:19
**manner** 19:8 26:20
**March** 27:16,23
**marital** 1:5
**mark** 5:16
**marked** 4:4
**Martin** 4:15
**Martino** 2:7
**mass** 64:14 73:22
**matching** 81:2
**material** 35:8 80:11 80:22
**materials** 19:16
**matted** 91:18
**matter** 35:11 65:23 69:24 70:15 71:10 86:7 100:1 101:3 101:4
**maximum** 69:23
**mean** 6:18,25,25 7:1 9:23,23 10:11 16:2 17:19 19:20 28:11,13 35:5 37:11 42:5 44:8 44:20 47:23 60:5 60:6,22 63:7,9 64:16,17,21 66:2 66:5,9,11 67:3,19 68:24 72:16,19,20 72:24 73:8 74:2,6 74:12,17 75:17,25 77:20,21,24 79:23 82:24 83:8 86:15 88:12 95:4 96:25
**meaning** 6:22 18:22 33:25
**means** 12:13 21:19 25:21 30:18 42:20 78:2 83:1 100:22
**measure** 68:19
**measurement** 69:2 98:18,21
**measurements** 68:17 98:8,12,24
**mechanical** 12:17 24:18
**mechanics** 13:2 18:14
**mechanism** 12:11 13:4,5 16:18 18:21 21:10 22:9 30:1 31:6 37:25 77:5
**mechanisms** 22:3 25:24 34:12
**medical** 10:4 11:13 34:8

**meeting** 10:2
**mention** 39:20
**mentioned** 13:22 40:24,25 52:5 58:19 99:17 100:18 101:1
**merchandise** 65:17
**met** 10:2
**Mex-** 29:17
**Mexico** 14:3 15:20 21:22 24:25 28:4 28:13 29:6,11,19 29:24 30:11,25
**Meyer** 1:8 2:11 13:13 35:14 37:5 37:10,16 56:10 93:7 94:14 102:6
**Meyer's** 80:9
**Midwest** 11:5
**mile** 45:9,12,12,25 46:17,25
**mind** 39:24
**Ming** 32:6
**minute** 6:20 27:1
**minutes** 54:14
**misstating** 35:22
**misstep** 26:5
**mixer** 53:8 97:11 97:12 98:16,16,23 102:7,9
**model** 15:1,9
**modifications** 33:8
**moment** 6:23 55:10 66:20
**morning** 4:10
**motion** 18:20
**move** 36:1 52:14 65:23 66:17 77:2 77:22 85:1 90:22 91:4 100:13,16
**moved** 10:3,5 52:20 53:11 61:3 67:19 85:16 100:15
**movements** 68:20
**moving** 52:10 53:14 57:11 66:9 70:7 76:8 77:23 79:25 82:25 89:9 90:5 91:4 100:10 103:3
**multiple** 9:24 19:13 20:7 49:3 81:16

**N**

**N** 2:1 4:8,8 58:2,2 93:4,4
**name** 4:11,12 13:9 16:2 28:25 30:21 48:13 93:6
**narrative** 60:16
**narrow** 74:9
**national** 10:2
**nature** 14:17 15:18 16:10
**near** 10:5 20:14 85:22
**neck** 33:20 35:6
**need** 15:22 20:8,23 40:12,23 66:3 69:16,17 84:18 92:5
**negative** 9:21
**Nevada** 1:19 4:1 11:4
**never** 46:21 99:4,4 99:4,5
**New** 10:3 14:3 15:19,20 21:22 24:25 28:4,13 29:6,11,17,19,24 30:10,25
**nine** 69:5,11
**nineteen** 11:1
**ninety** 11:1
**normal** 10:14 45:7 45:10,24 58:9,24 59:2
**Nos** 4:4
**note** 50:19
**notes** 101:17
**noting** 35:22 36:6,7
**number** 5:7,11,15 6:22 32:2 93:17

**O**

**O** 4:8 58:2 93:4
**o0o-** 4:3 103:13
**oath** 4:6
**object** 23:21 40:13 45:2 51:1,18 55:11 56:18 59:17 60:18 61:24 62:11 67:2 71:2 73:11 74:5,20 75:20 76:7,18 79:6 82:3 83:11 84:21 86:6 86:22 87:1,20 89:12
**objection** 55:14 56:21 59:24 60:3 62:6 76:21 87:19
**observation** 21:18 48:22 50:16 51:25 52:6
**observations** 9:20 36:25
**occupation** 5:4
**occupations** 5:1
**occur** 62:25 63:23 65:24 76:1 81:20 83:16 96:23
**occurred** 12:11,19 15:18 42:4 47:21 49:19 52:21 64:18 94:25 97:13
**offer** 8:3,4 13:4 18:17 33:7 75:18
**offered** 5:7 14:14 24:5 39:25
**offering** 7:10 8:4 13:1 18:10,13,22 19:6 22:23 33:16 35:21 39:23
**office** 4:15,15 5:21 30:11
**oh** 11:5 29:13 67:21 70:9 101:20 102:24
**Ohio** 1:9,10
**okay** 5:7 6:1,5,11 6:21 7:7,14,18 8:10 9:4,12,18 10:10,17 11:22 13:8,17,22 14:12 16:4 17:7,13,25 18:3,6,9,13,22 19:4 20:4,14,21 21:16 22:11,17 23:1,17 24:13 26:15 27:1,8,11 27:25 29:4,10,17 30:9,12 31:2,22 32:12,23 33:3,7 33:12,19 35:2,10 36:21 37:14,21 39:9,12,16 41:4 42:13,16,17,24 43:3 44:14 45:17 46:18 47:4,10 48:10,17,20 49:16 50:4,13,22 53:17 54:7,12 56:6 57:19 58:8 67:1 67:10,21 68:6,9 69:14 75:16 77:18 80:8 81:23 83:8 83:21 84:3,7,9 91:25 92:4 94:2,6 94:13 97:16 98:7 98:19 100:25 101:5,11,16 102:16,21 103:4,5
**once** 55:6
**open** 5:15
**operated** 22:21
**operates** 18:14,24
**operation** 11:11
**operations** 11:12
**opinion** 13:1 15:2 18:17 19:2 22:20 22:25 32:19,20 33:20 34:13 35:2 35:12,20 36:12 39:25 40:6 41:6 41:19,20 48:4 49:25 50:15 60:11 60:13 75:18 81:11 83:25 84:1,1,2 89:24 97:15 101:7
**opinion's** 84:25
**opinions** 7:25 8:3 18:10,14,22 19:6 22:17,23 24:5 32:11,14 33:16 39:17,23 40:17 41:4 56:16 92:9 100:1 101:2,6,7,8
**optical** 73:13
**ORAL** 1:16
**order** 41:14
**Oregon** 10:5
**organized** 41:19
**others'** 39:15
**outer** 58:15 69:22 71:21
**outside** 70:10 71:8 71:18,21 73:13 85:7 87:6,7,10,11
**overstep** 15:2
**owners** 30:13

**P**

**P** 2:1,1
**p.m** 53:17,21,24 92:25,25 103:10
**P.S** 2:7
**package** 53:10
**page** 3:3,8 11:10 13:9 33:15 67:15 67:23,24 72:12,13 86:13 93:17 101:19,20,22,23 102:3
**pages** 7:14,20 8:10 37:21 38:2 40:25

43:6
**pan** 54:13
**pans** 55:7 56:1
**paperwork** 51:17
**part** 17:12 18:19 21:18 30:6 41:4 54:15 63:11 86:19
**part's** 59:13
**partially** 64:20
**participants** 1:21
**particular** 8:22 12:4 13:21 34:3,5 40:23 58:24 62:22 77:9 81:1 83:7 88:24 98:23 100:20
**particularly** 78:6
**party** 23:8,15
**passes** 51:16
**pattern** 67:12,16 67:18 68:15 99:12
**paused** 79:10
**pay** 63:23
**PE** 1:17 3:1 4:5 104:9
**peer** 9:14
**people** 20:16,24 30:19 34:4 48:6 49:14 58:25 59:3 59:4 70:2 74:25 75:1 78:14,18,21 90:6 96:24 100:11 100:12,18
**per-** 44:21
**Perfect** 5:14
**performed** 8:20
**performs** 19:7
**perjured** 61:25
**perjuring** 61:19
**person** 14:25 16:3 16:13 20:13 28:6 30:17 49:2 50:5 59:10 72:24 73:1 75:11 78:1 91:21 92:21
**personal** 9:18 10:1 10:12
**personally** 8:12,21 9:21
**pertained** 31:3
**Pfau** 2:3
**PhD** 1:17 3:1 4:5 9:9,10 10:24 104:9
**photo** 63:16,20 67:11,21 68:10 72:14 73:8,19 74:12 93:23 100:3 100:6
**photograph** 72:12 73:17 93:18,21 94:3,10,13 96:14
**photographs** 86:2
**photos** 85:18
**physical** 51:7 77:17 77:19
**physics** 82:23
**picked** 54:22
**picture** 93:12,18 94:5 97:7,18 98:14
**PIERCE** 104:4
**plaintiff** 8:25 23:25 95:21
**Plaintiff's** 50:1
**Plaintiffs** 1:6 2:2 9:4
**please** 4:10
**PLLC** 2:13
**plus/minus** 24:20
**point** 23:19 24:18 25:14 28:16 29:8 30:4 32:15,18 34:6,23 35:2 38:20 40:5 41:2 44:22 57:17 62:20 62:24 66:10 70:15 76:4 80:16,23 82:18 84:12,12 86:7 87:3,8 90:17 90:18 95:18
**pointing** 49:11 55:25 73:18 93:22
**policy** 15:23
**poor** 91:10
**portion** 12:9 17:11 19:2 24:1,2 58:15 69:22 71:22
**portions** 20:10
**position** 32:23 41:17 57:15
**positioned** 86:4
**positions** 85:19 86:3
**poss-** 76:4 96:22
**possibilities** 79:11 96:1
**possibility** 60:22 64:6,18,24 76:5 77:4 84:8,13 95:22,23 99:6
**possible** 35:7 75:24 76:24 84:6 96:7 98:2
**potential** 12:11
**potentially** 38:11 75:8
**pound** 82:21 83:2,3
**pounds** 83:1
**practice** 32:24
**practices** 22:24
**preamble** 62:1
**preliminary** 14:14
**premises** 26:10
**preparation** 9:2
**present** 17:15,18 40:17 57:3
**presented** 36:6 41:21,22
**preserve** 56:11
**preserved** 56:14 57:3,7
**pretty** 10:13 74:9 75:25 90:23,24,25 91:10
**primary** 10:23 32:6 33:16 43:10
**principal** 4:24
**prior** 6:6 21:23 22:7 24:4 25:23 26:20 40:19 45:6
**privacy** 16:5
**prob-** 65:24
**probably** 5:25 6:19 7:3 9:8 11:4,7 24:19 26:5,11 32:22 43:11 45:11 48:1 49:4 52:23 53:2 61:8 63:12 66:16 70:3 74:10 74:21 82:17 92:2 92:5 95:16 99:1 102:20
**proceeded** 102:8
**process** 11:8 24:2
**produced** 8:25 14:12 43:23 50:18 80:9
**producing** 5:22
**product** 13:3,18,19 13:25 14:21 15:7 15:11 17:9 19:7 24:16,17 30:22 31:4 38:8,10,14 38:16 80:22,23 83:10
**products** 11:17 19:10 24:6 26:8
**professional** 4:13 4:14 6:2 10:14,19
**project** 9:24 13:20
**pronouncing** 18:6
**propounded** 5:22
**protruding** 64:4 86:16 94:15,17 96:16 98:9,13 102:18
**protrusion** 76:6 79:13 84:11,15 95:9,20 97:14
**prove** 67:4
**provide** 4:10 19:21 32:12
**provided** 7:7
**provides** 27:12
**pull** 82:21 90:14
**purpose** 31:12 35:1 39:22 40:1 78:17 78:19
**purposes** 39:17,22
**purse** 45:21,22 52:13,15 53:3,4 63:6,10,11 76:25
**pursuant** 103:12
**push** 16:13 20:13 20:25 41:13 44:19 45:11 49:2,20 61:5,6 65:15,16 65:25 66:2,14 71:5,11 78:11,13 78:15,21 79:18 80:5 82:13 83:2 85:22 86:8 100:17 100:21
**pushed** 41:9,9 47:18 63:24
**pushing** 20:16 43:22 44:5 45:12 45:20 47:1 49:1,4 50:2 55:8,10 57:16 65:1,15 66:4,6 72:17 73:1 73:22 78:14 82:11 83:6 87:14
**put** 8:11,12,22 32:3 52:13,15 53:1,4,7 58:4 76:15 78:1 88:12,12

**Q**

**qualifications** 9:12 9:16
**quality's** 86:14 91:10
**question** 19:15 20:9

20:10 28:9 44:6 51:19 56:9 60:5 62:1 63:14 67:13 73:24 74:7,7 75:24 81:16 85:24 86:1 87:24 96:9
**questions** 16:2 21:21 87:24 93:1 93:3,8 98:7 103:5 103:8
**quick** 38:18 92:23
**quickly** 37:19,23 38:1,19 43:11 44:7
**quite** 10:9 15:21 19:20 28:10 74:6 100:5 101:20

**R**

**R** 2:1,18 104:1
**racing** 46:15
**radio** 22:15
**raises** 103:6
**random** 50:14
**range** 44:3,23 48:2 48:3 66:12 68:20 69:1,8 91:15
**rate** 18:25 19:19 20:6 21:11 44:24 46:10
**re-** 9:23 21:14 40:2
**reach** 91:1
**read** 89:20 98:4 101:1 102:5
**Reading** 103:11
**really** 14:15 75:23 85:6 100:9
**rear** 41:11 42:3,21 43:18 44:18 48:21 49:21 50:4 58:11 58:14,16 60:9 70:5 71:14,22 88:9,10,13
**reason** 8:23 23:23 35:3 60:8 63:3 71:20
**reasonable** 10:9 32:18
**reasons** 66:24 81:6
**recall** 17:1 28:6 33:4 39:12,16 43:7 52:1 56:24
**Recess** 58:1 92:25
**recognize** 9:5 53:9
**recollection** 62:18 77:12
**record** 34:8 41:24 52:6 57:25 58:4 72:3 89:22
**recorded** 43:14,20
**records** 41:20
**red** 93:22
**refer** 14:25 21:15 30:11
**referred** 29:1
**referring** 46:2
**reflective** 6:2
**regard** 26:3
**regarding** 92:9 93:8
**relate** 17:10 19:5 24:11 37:11 51:5 96:8 98:17
**related** 8:24 24:5 40:7,11
**relating** 21:24 37:8 37:17 97:17
**relation** 69:18
**relationship** 10:14 98:20
**relevant** 38:12 79:20
**relying** 32:13
**remained** 57:15
**remem-** 38:19
**remember** 6:18 24:22 25:13 26:11 26:12,14 30:21,23 33:9 37:24 38:19 39:15,19 40:24 43:12 44:8 80:13 80:14 82:22
**remote** 55:1
**remove** 45:23
**rendering** 35:12 100:1 101:2
**repeat** 41:23 56:9 67:13 74:7 80:17
**rephrase** 19:11,14 28:9 37:13 45:4
**report** 3:11 7:19,23 8:24,25 12:15 13:5,9 14:13,15 15:16 20:23 27:1 32:14,20 33:12 36:16,18 39:23 40:9,20 43:4,7 58:5 72:10 75:10 82:7 86:13 89:20 93:9,12 96:9,11 96:12,17 97:4,7,9 99:21,24 101:1
**reported** 1:25 35:15 42:22,25 43:5 51:9
**reporter** 12:20 40:3 42:11,14 63:19 70:23 76:2 104:6
**reports** 8:2 37:4,8 37:15,21 38:9,13 39:4,9,13 43:6 50:18 80:9,21
**represent** 93:7
**representing** 28:17
**requested** 103:11
**require** 100:14
**research** 10:8 11:20
**resident** 11:4
**resolution** 21:20
**resolved** 14:4,5
**respect** 14:18 67:7 67:8
**respond** 12:15
**responded** 5:21
**response** 54:5
**results** 91:2
**resume** 67:14
**ret-** 28:6
**retail** 22:24
**retained** 6:23 9:4 23:8,10,10,15,17 24:4,14 25:5,7 28:7 34:9
**retired** 28:25
**review** 9:2 32:11,11 32:21 37:22 38:15 41:1 67:11 98:12
**reviewed** 8:24 12:18 32:16 33:3 37:23 99:21
**reviewer** 32:10
**reviewing** 32:13 39:12,16 99:24
**right** 5:4,12 6:3,9 6:14,15 7:2,17,23 8:9,17 10:19 11:4 15:12 21:7 23:6 23:11 27:6,7,14 27:19,20 29:2 31:15,17,18,20 33:17 36:11,20,24 37:2 38:13 40:11 41:11,11 42:21 43:9,11 45:15,18 49:11,14 51:13,25 52:10 53:18,19,21 53:22 55:22 56:4 56:25 58:4,12,13 58:15,15,16 59:1 59:1,5,9,10,10,14 59:25 60:8,9 61:22 63:4,15 64:4,5,10,14,22 65:1,3,8,10,10,13 65:14,16,17,23 66:1,2,5,7,11,21 67:4 68:17 69:18 69:21,22,25 70:2 70:4,4,9,10,16,22 70:25 71:6,12,13 71:14,14,17,21 72:16,19,20,23,23 73:4,9,9,9,9,10,18 73:20,22,23 74:4 74:15 75:2,2,4 77:2,8 78:2,24 80:23 82:7,17 84:11,14 85:4,7 86:16,16,20 87:4 87:16,17 88:3,16 88:25 89:6,21 90:14 91:5 92:6 92:11 95:15 96:5 98:23 102:11,15 103:6
**rights** 16:6
**Rimkus** 4:17,21,23 4:25 5:2,5,21 6:8 6:12,24 8:7,11 11:18,19 12:3 27:6 28:7,23 29:20 32:23 99:18
**risk** 97:1
**role** 18:15
**roll** 78:24
**rotate** 64:20 70:3 71:16 78:24 79:2 85:6,10 86:8
**RPR** 1:25 104:17
**rubber** 39:1
**rule** 34:7 84:8 103:12
**ruled** 33:21
**ruling** 33:25
**run** 90:9,11 91:1
**running** 46:16 84:16

**S**

**S** 2:1,3
**sample** 44:15 50:8 50:13
**Sarah** 2:13 93:6
**SarahC@scheer....**

2:16
**saw** 11:10 47:1,11 48:23
**saying** 15:8 42:25 61:19,25 62:18 70:19 81:20 86:25
**says** 11:12,12 46:12 58:8 70:7 102:6
**scenario** 64:1 76:16 76:17 82:13 92:22
**scheduled** 6:20
**Scheer.Law** 2:13
**school** 82:22
**scientific** 32:17
**scientist** 9:17
**scope** 12:5 40:22 41:2 81:7 83:15 83:17,18,19 99:5
**Scott** 2:18 28:21 29:1
**screen** 5:10,12 57:20 67:14 72:10
**scroll** 101:18,20
**seal** 104:13
**Sean** 9:4 41:15 89:20
**seatbacks** 11:14
**Seattle** 2:15
**second** 5:12 31:15 35:12,20 36:5 41:19 55:13 77:7 85:3 93:15
**secondly** 95:12
**section** 69:17
**security** 55:6 56:1
**see** 5:12 8:6 10:6 12:14,18 16:11 23:3 29:13 32:6 32:17 37:19 41:23 43:9,21 44:3,4,11 44:12,13 47:4,7,8 51:22 52:18 54:12 55:6,7 58:6 66:1 68:23 72:7,10,14 72:16,19 73:17,19 74:2,12 78:25 79:3 80:2 81:1,9 81:17 85:19 86:19 87:5 89:15 90:8 91:23 97:11 99:2 99:11 100:8,12 101:6
**seeing** 52:1
**seen** 11:9 19:16 20:2,5 37:1,4,8,15 40:24 44:7
**select** 102:9
**selected** 102:8
**sense** 21:2 59:11 61:9,16 80:2 85:17 86:11
**separate** 12:1 13:20
**September** 6:13 7:8
**service** 27:13
**set** 56:7 57:22 104:12
**setting** 30:19
**settled** 14:16
**share** 5:10 57:20 93:14,20
**shared** 100:3
**shelf** 98:5,9,23 102:19
**shift** 64:22
**shifted** 57:9,16
**shoe** 69:9,10,10
**shoes** 69:5,6
**shop** 54:16
**shopped** 42:6
**shopper** 41:25 42:1 42:20 43:15,22 48:10,21,25 51:8 58:13 68:16
**shoppers** 43:14,20 47:1,18 48:23 49:6,10 50:14 58:19
**shopping** 11:23 13:18 15:8 21:24 22:8 25:6,8,10,12 25:17 29:24 34:19 41:12 42:4 45:10 47:16 52:24 54:16 54:19 56:3 64:12 64:14 72:5,8 73:2 74:19 87:14 90:20 102:8
**short** 47:14
**shorter** 47:24
**shoulder** 74:21 75:3,3
**shoulders** 74:3
**show** 16:19 53:23 54:9 63:16 94:21 98:15,15 99:9 100:10
**showed** 53:6
**showing** 6:1 20:25 62:15 63:20 68:7 80:3 86:2 94:15 96:15 97:10,13 100:7
**shows** 34:20 93:22
**sic** 81:3
**side** 41:11 59:9 66:17 69:25,25 70:2,4,10,16 71:13 73:20 75:2 75:3 87:10 88:3,3 88:5,14,16,17,22 89:1 92:6 95:15 102:11
**signed** 7:20
**signing** 103:11
**similar** 12:2 15:3 15:13 19:9 22:12 47:13 78:14
**Simultaneous** 70:20 80:19
**single** 83:14
**sir** 5:17 6:21 28:16 58:4 59:21 62:8 70:25 77:16 80:20 84:16
**site** 17:15
**sitting** 40:17 81:13
**situation** 16:21 25:19 79:24 81:8 81:10 83:14 90:6 94:23,25 95:10
**situations** 7:15 50:8
**six** 47:25 48:9 50:10,13 59:9 68:10 71:6
**size** 50:8 69:3,9,10 69:11 74:3,10,21 74:22,22
**sizeable** 9:24
**skill** 104:11
**slasalle@aguiler...** 2:21
**slight** 20:1,2 44:1 83:14
**slightly** 102:18
**slip** 26:4 78:23
**slower** 80:6
**slowly** 44:20
**small** 44:2,4,7,10 44:12 45:22 52:12 52:24 53:9,9,11 63:17 72:5,8,17 73:2 76:7,25 80:4 82:21 83:1 87:22 87:25 88:4,14,16 88:20,20,21,24 89:2,3 96:24
**smaller** 19:25 69:15
**smooth** 20:20
**sole** 5:4
**somebody** 82:13 97:3
**someone's** 26:19 34:10
**sorry** 11:5 22:7 23:6 34:25 42:9 43:2 49:10,17,24 54:7 55:12 88:8 88:15 101:19,21
**sort** 10:12 11:24 26:10 37:17 69:1
**sound** 19:13 61:11
**sounds** 27:7 31:18
**source** 67:17
**space** 78:7
**speak** 18:15 30:18
**speakers** 70:20 80:19
**speaking** 22:19
**specific** 16:2
**speculate** 64:6 66:25 67:7 84:13 94:22 95:21 98:17 99:6,10
**speculation** 59:18 60:20 61:13 84:22 87:20
**speculative** 96:10 98:1
**speed** 20:6 21:11 21:12,14 26:23 44:20,24 45:7,8,9 45:24,25 46:1,3,8 46:10,11,13,14,17 46:23
**spend** 81:4
**spent** 27:12 100:5
**spill** 46:8
**spoke** 29:14
**spoken** 30:13,22
**staff** 20:12 28:24 52:23,25 53:7 92:20
**staged** 42:2 43:16 48:10 61:2 79:1,3 91:14,21,22
**start** 54:5 94:3
**started** 57:21
**starting** 82:25
**state** 1:9,11,12 10:22 11:3 12:2 104:3,7
**statement** 43:3 79:23 96:21
**Statements** 102:3

**states** 1:1 10:21
**status** 82:23
**step** 26:24 42:21 49:9 50:5 78:1 79:25 86:16,25
**stepped** 48:21 51:8
**Stevens** 102:7
**stills** 67:11 68:3,10
**stop** 20:13 25:21 30:1 31:13 60:25 61:1,11 63:15 64:7,25 66:1,23 71:20 75:11 77:10 79:5,12,14 80:6 82:1,2,9,19,21 84:5,11,13,14 85:2 90:7 94:18 95:8,24 96:3,7 99:2 102:12
**stopped** 18:18 19:3 20:17 42:21 46:15 48:21 60:23 62:14 62:16 63:3,25 64:13 67:9 76:5 76:23 81:14 85:22 94:22 95:11 96:7 99:7 100:7,10 102:11
**stopping** 20:20 75:12 83:23 84:3
**stops** 19:7
**store** 13:13 16:15 16:20 35:13,24,25 36:10,25 38:5 39:8,10,14 40:10 40:21 43:8,10 46:14,24 51:16 52:9,15 53:15,17 56:6,10,10 58:23 62:20 84:17 92:12 94:14 95:17 102:6
**store's** 22:24 35:16 43:1
**stores** 1:8 2:11 37:10 43:5 93:7
**story** 60:14 61:20
**straight** 57:13 66:13,18 79:2 89:14,16,17,18 90:15,25 91:4,24 95:23
**strap** 65:9
**Street** 2:4
**stride** 58:9,24 59:5 68:7,12,14,18,21 68:23 69:2,7
**strike** 14:12 36:13 67:10 68:8 69:23 94:9
**striking** 82:18
**strip** 65:8
**stroke** 68:19
**student** 10:24
**studied** 17:7 26:18 40:19 50:9 85:18 89:10
**studies** 50:13
**studying** 9:9
**stuff** 73:15
**stuttered** 42:15
**sub-** 80:14
**subcapital** 33:20
**subject** 17:8,19 33:23 35:17 36:3 41:2,25 43:15,21 77:9 81:2
**subpoena** 5:21
**subsurface** 80:11 80:15
**subtle** 33:9
**sudden** 25:21 60:24 61:11 75:12 81:21 84:14 85:2
**suddenly** 60:23,25 62:14,16 63:3,15 63:25 64:6,13 66:23 67:9 76:5 76:23 77:10,20,21 79:5,11,14 81:25 82:2 84:5,5 95:8 96:6,7,7
**suggested** 33:7
**Suite** 2:4,8,14,20
**summary** 7:24 33:15
**supplemental** 8:3
**support** 34:17 58:9 60:14
**supposed** 97:13
**sure** 14:23 15:21 19:12,20 21:6 28:10 37:7 42:12 47:8 48:8 51:21 56:10 74:6 97:8
**surface** 31:10 78:16 92:10,18
**surmise** 68:9
**surveillance** 19:21 20:15,24 43:22 47:11 48:23 50:11 50:12,14 51:10,22 52:2,4 55:7 56:1 68:3 91:3,6 92:8
**survey** 36:24
**sustained** 12:12 34:1 35:4
**SW** 2:8
**swivel** 78:24
**sworn** 4:6 76:13 104:9
**system** 30:20 100:24 101:8
**systems** 1:11 2:17 8:8 22:15

**T**

**T** 1:17 3:1 4:5,8 58:2 93:4 104:1,1 104:9
**tab** 6:5
**table** 67:25
**tabs** 5:15
**Tacoma** 1:3 2:5,9 17:22,24 102:7
**take** 5:10 10:13 44:6 45:21 50:19 52:14 57:22 60:25 60:25 62:16 66:15 69:12 72:8 74:11 82:8,14 86:14 92:23 94:3,5 98:8
**taken** 1:24 94:10 97:19,23 98:14,18
**takes** 82:19
**talk** 15:21,24 20:7 43:2 44:17,18 82:6,24 84:2 88:9 88:22,23 89:2 91:13,19
**talked** 28:23 30:3 78:18 100:18
**talking** 16:22 29:5 29:11 50:17 51:24 51:25 52:23 100:5
**tall** 47:14,25,25 48:9
**taller** 48:16
**technical** 32:11
**tell** 21:20 29:18 31:11 55:15 64:6 91:11
**telling** 61:20
**temperament** 9:18
**ten** 6:19 24:19,21 24:21,22 25:9 54:14 69:12 91:13 91:15,15,16 92:3
**terms** 9:12,15,18 16:6 19:7 39:24 45:8 51:15 65:19 68:18 69:1 89:25
**test** 11:20 17:12 20:12,13 21:3,18 42:1,2 61:2,3 62:15 79:1,3 82:20 90:2,2,3,4 90:11,13 91:1,14 91:21,22 99:1
**tested** 17:7 18:1
**testified** 4:7 6:16 7:16 17:5 23:14 54:16,19
**testify** 17:14 83:22
**testifying** 23:19
**testimony** 3:10 5:7 6:8,11 7:8,10 23:1 23:12 35:13,22 36:7,8,15 39:3 43:10 45:7 55:20 67:8,8 75:12,14 76:13 97:8 101:12 101:21 102:2,13
**testing** 12:17 19:22 24:10 43:16 49:23 98:20,21,24
**tests** 48:11 77:23
**Thank** 10:10 13:11 18:9 93:2 103:8
**theory** 75:24
**thing** 9:1 34:7 38:3 41:16 52:25 53:14 56:23,25 61:9 69:20 96:20 99:3 101:18
**things** 100:25
**think** 9:8,17,24 10:8,8 11:2,7 14:15 15:3,25 16:7 20:1,3,17,18 26:5 28:22,24 29:11 30:3 34:6 37:25 38:17 42:7 42:9,14 43:24 44:14 49:4 53:2,8 58:23 61:8 63:12 63:16 65:7 68:12 68:16 69:8 71:24 72:6 73:3,12 76:2 77:4 79:4 80:15 81:16 82:1 85:9 85:16,23 90:2 91:14 92:19 96:19 98:4 100:2,6
**thinks** 62:18
**third** 43:13 49:11

79:10
**Thomas** 13:6,7
**thoughts** 33:5
**three** 44:7,8,13 45:9,12,25 46:17 46:25 77:22 78:2
**tied** 65:10
**ties** 55:9
**time** 6:13 9:25 10:1 10:24 13:16 16:16 16:19 19:22 27:11 28:18,20,24 30:5 30:17 31:23 32:22 38:1 41:10 45:21 46:7 50:6 51:16 52:16,19,19,21,22 53:7,13 54:8,10 54:12 57:13 62:16 63:20 65:25 70:8 76:6 79:10 81:5 82:19 84:2 85:23 89:23 94:4 98:14 99:20 100:5
**times** 5:8 43:21 75:16
**timing** 53:25
**title** 4:23,24 97:25
**today** 81:14
**Tom** 12:1,4,6 14:20 17:11 30:2,3,5,17 94:5
**top** 52:13 73:15
**total** 6:25 27:13,13 27:18,18 31:17,22 31:24 44:10 72:7
**totaled** 27:5,6,9
**totality** 41:8
**totally** 79:24
**touch** 17:11 70:25 71:7,8
**touched** 93:11
**transaction** 56:4
**transcript** 104:8
**Travelers** 31:19
**trial** 5:8 7:16 17:5 23:14 83:22,22
**tried** 12:14 49:20 52:13 60:5,6,6,24 61:9 76:9 77:12
**trip** 26:4,18 44:17 50:1 75:8
**trip-and-fall** 62:9
**tripped** 25:17 41:5 44:15 46:5 57:10 65:2 84:17
**tripping** 25:11,23 45:6 57:17
**trips** 25:24
**true** 102:12 104:10
**truthful** 61:20
**try** 31:5 81:17 85:22 87:9 99:11 100:13
**trying** 16:9 40:16 49:6 83:21
**Tung** 4:12
**turn** 7:18 10:17 31:15 58:25 59:1 70:8 72:1 90:15 92:5 95:4
**turned** 8:6,15 27:2 57:9 95:3,12
**turning** 57:12,18 90:18 91:16 95:6 95:13,14,15 96:6 102:25 103:2
**twenty** 24:22 25:9
**two** 12:8 19:23 20:1 25:3 26:13 42:3 44:8,12 45:10,12 45:25 46:17,25 49:21 59:6 69:8 69:12 75:4 79:15 87:6,16 89:3,5
**type** 8:15 22:11,12 80:11
**types** 11:17
**typical** 26:22 45:9 45:13 46:1,13,16 59:3,4 68:7,16,18 68:21,23 69:4,8 69:10 70:2 71:4,6 85:23 88:4,12,22 88:24 90:6
**typically** 59:11 71:15 88:3 89:5,7 89:14,18

**U**

**Uh-huh** 11:15 58:17 65:18 91:9 102:15
**Ulmer** 2:3 3:4 4:9 12:21 16:8 24:3 28:12,15 29:3,7 29:15 40:8,15 42:13,17,23 45:3 51:6,20 54:11 55:18 57:5,19,24 58:3 59:20 60:1 60:10 61:18 62:3 62:4,7 64:2 70:24 71:24 72:4 73:16 74:1,8 75:6 76:11 77:15 80:7 83:4 83:20 85:13 86:12 86:18,24 87:13 88:6 89:19 92:23 93:1,15,19,25 101:22,24 103:6
**Ulmer's** 16:1
**un-** 31:5
**unaware** 35:23 36:9
**underneath** 80:22
**understand** 5:18 6:7 7:19 10:17 12:3,5,7,18 15:8 16:9 18:13 19:15 26:19 29:8 30:19 31:6 40:3,16 41:5 60:14 61:21 67:12 67:17 75:18 83:21
**understanding** 14:5 15:17 17:17 18:3,5 20:18 28:20,22 29:23,25 31:8 39:5,6 56:13 59:15 60:7 63:5 63:12 65:6,8 66:8 72:6 78:4
**Understood** 14:17 15:5 22:22
**unexpected** 41:12
**UNITED** 1:1
**University** 10:3
**unknown** 65:5
**unlocked** 36:3 53:12
**unmute** 55:13
**unpack** 35:20 36:5 36:12
**update** 10:7
**updates** 5:23
**upper** 17:2 45:22 53:1,2,5
**use** 57:3
**usually** 66:14 85:5 90:19
**utilize** 56:17

**V**

**v** 1:7
**variance** 48:3
**variety** 11:16
**veer** 89:10
**veering** 89:21,25 91:11,12 92:17
**Vegas** 1:19 4:1,16
**verified** 35:18
**verify** 77:7
**versus** 47:16 80:11
**Vertetis** 2:3
**vide-** 63:16
**video** 16:19 19:21 19:21,23 20:15,25 21:19 26:22 29:25 34:20 41:22,24 43:14,20,23 45:14 45:16,17 46:6 47:13,17,21 48:5 48:23 49:2 50:14 50:16 51:12,25 52:4,7,10,19 53:16,23 54:9,9 58:20 67:20,22 68:25 72:1 78:25 80:3 82:10,17 89:14,22,22 91:3 91:6 100:4,9
**videoconference** 1:16,21
**videos** 41:24 86:2
**view** 24:18 32:18 34:7 44:22 52:17 53:12
**visible** 42:8,20 48:20 51:8
**vitae** 3:9 5:18

**W**

**WA** 2:5,9,15
**waiting** 49:21
**walk** 26:24 48:5 52:15 58:23,25 70:15 74:23,25 75:1 87:5
**walked** 45:24
**walking** 26:20 44:20,25 45:5,9 45:10,20 46:1,4,8 46:13,13,16,23 58:10,22 59:2,10 68:15 75:4 102:10 102:13,17
**want** 10:11 15:2,2 38:15 41:16 55:13 66:22,24 67:6 68:19 71:15 85:25
**wanted** 29:8 31:6 93:20 94:2
**wanting** 98:2
**Washington** 1:2,9 1:11,13 11:7 17:24 102:7 104:3

104:7
**wasn't** 70:7 85:24 97:18 98:2
**way** 18:23 22:17 38:7 46:6 55:15 71:4 78:3
**we'll** 6:6 27:1,4 33:19
**we're** 5:15 16:2 58:4 59:21 77:19
**weight** 33:22 34:3
**well-qualified** 9:17
**went** 28:23,23 31:19 55:3,24
**weren't** 24:1
**West** 11:6
**WESTERN** 1:2
**wheel** 11:24,25 18:11,14,23 19:18 20:5 21:1,6 22:1,4 22:6,9,12 24:12 25:4,11,18 31:9 35:15,24 36:2,9 37:10,12,18 39:14 41:12 42:25 43:4 43:7 44:16,18,19 44:25 48:21 50:1 50:5,6,7,19 51:8 57:1 58:14,16 59:10 60:9 61:8 61:15 62:19 64:25 69:19,21,22,25 70:1,2,5,5,11,16 70:25 71:7,8,13 71:14,18,22 72:9 72:20,23 73:10,14 73:14 75:7 76:8 76:14 77:6,8,13 77:21 79:16,17 81:13 85:7,7 86:10,19,20,23 87:4,6,7,11 88:1,2 88:4,10,13,14,16 88:22,25 89:5 90:4 92:6 95:15 99:13 100:24 101:9 102:10
**wheel's** 71:5 86:15 88:17
**wheels** 22:18 25:2 35:16 42:3 43:17 43:18 49:22 50:4 58:11 78:3 87:6 87:15,15,16,18 88:9 89:4
**WHEREOF** 104:12
**wide** 72:5
**width** 58:9,11,24 59:7,8 69:7 72:7,8 74:17,18,22
**wife** 1:5
**WILLIAM** 1:4
**willing** 81:9
**wine** 73:2
**Wisconsin** 10:24
**witness** 4:5 7:10 16:4 29:2,13 42:16 54:4,7 72:1 104:12
**witnessed** 9:13
**witnesses** 84:10
**wondering** 11:22 65:13 67:16
**wording** 33:10
**words** 40:4 46:14 76:1,3,23
**work** 5:5 7:5 8:11 8:19,21 10:25 11:5,17,19 26:4 31:6 32:3 33:3 62:21 90:20 100:24
**worked** 4:21 14:6 14:20 15:6,19 21:23 22:11,14 24:17 25:1,23 26:2,7,17 27:17 27:25 28:3 31:3 62:9
**working** 12:1,6 14:8 30:25 79:22
**works** 13:3
**world** 42:18
**worst** 82:13
**wouldn't** 66:18 69:16,17 75:7
**wrap** 97:18 98:7
**writings** 8:3
**wrong** 71:11
**wrote** 99:21

**X**

**X** 4:8 58:2 93:4
**X-i-a-o** 32:6
**Xiao** 32:6

**Y**

**Yamaguchi** 28:25
**yeah** 7:2 10:20 15:10 16:9,12,25 18:8 19:14 29:16 29:18 32:7 35:1 37:7 42:11 51:14 52:1 55:14 62:3 64:3 67:14,22 72:15 78:23 93:15 97:14 101:4
**year** 6:16 14:9 30:25
**years** 4:22 14:6
**York** 10:3

**Z**

**Zoom** 12:24 42:17 42:18
**Zoom's** 42:9

**0**

**1**

**1** 3:9 5:16 72:12
**1-5** 4:4
**1:47** 52:9 53:17
**1:55** 53:21
**10** 79:3 83:2
**10:02** 4:2
**11:30** 58:1
**11:37** 58:1
**12** 92:1
**12:29** 92:25
**12:41** 92:25
**12:55** 103:10
**15,234.51** 27:6
**15.8** 27:18
**16** 27:16
**18** 31:24
**18th** 7:21 8:20
**19,208** 27:9 31:17
**1990** 9:8
**19th** 102:6

**2**

**2** 3:10 6:7 7:14 8:10 11:10 33:15 40:1 40:6 42:24 43:3 58:10 100:6
**2/4** 100:6
**2:00** 54:2,10
**2:04** 53:24
**20** 27:17 86:13
**201** 2:8
**2018** 6:13 7:8,12
**2025** 6:14
**2026** 1:24 4:1 7:21 8:8,16,20,22 27:5 27:8,16,17,23 31:16,23,24 33:13 104:10,13
**2027** 104:20
**20th** 72:13
**21** 58:11 72:6,8
**22** 74:11
**23** 72:7 74:11
**23046** 2:19
**2357** 1:25 104:17
**24** 8:8,16,19 27:5,8 31:16,23
**253.777.0799** 2:5
**253.830.2700** 2:9
**28.9** 31:24

**3**

**3** 3:11 7:18 8:10 42:19 43:2,2 51:24 58:5 67:15 72:13 93:17 101:20
**3:24-cv-05811-J...** 1:7
**30** 70:3,9 71:16 79:2 85:11 86:9 92:6 95:5,12
**30(e)** 103:12
**300** 2:20
**360.901.1017** 2:15
**3860** 2:14

**4**

**4** 3:4,12 8:6,7 27:2 27:4 58:8,21
**4/24/2026** 3:12
**400** 37:21 40:25 43:6
**41** 7:20
**45** 70:9 85:11

**5**

**5** 1:24 3:9,13 4:1 8:15 27:2 58:10 60:24 101:19,20 101:22,23 102:3 104:10
**5,214** 27:19
**50** 7:3 26:6 38:13
**52** 77:24 82:8
**55** 61:4,4

**6**

**6** 3:10 58:13 63:20 67:20,22 93:12,18 93:19,23,23 96:14
**6's** 67:21
**6/24/2026** 3:13
**60** 70:9 83:16
**60-plus** 80:8,18,20 83:9

**6221** 4:15

**7**

**7** 3:11
**700** 2:4
**701** 2:14
**714.384.6600** 2:21

**8**

**8** 3:12,13 67:15
**80** 82:21 83:1,3
**86** 52:18,20,20 94:13,18 98:3 101:13
**8th** 104:13

**9**

**9** 104:20
**9,537** 31:24
**909** 2:4
**92653** 2:20
**93** 3:5
**9315** 2:8
**95** 11:2
**98104** 2:15
**98402-4413** 2:5
**98499-1502** 2:9