# Thomas Kulaga

# Lubken v. Fred Meyer Stores, Inc., et al.

# August 6, 2026

BUELL
REALTIME REPORTING

1325 Fourth Avenue, Suite 1840 Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066 Tacoma 253.235.0111 Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community, Plaintiffs, vs. FRED MEYER STORES, INC., an Ohio corporation doing business in the State of Washington; THE KROGER CO., an Ohio corporation doing business in the State of Washington; GATEKEEPER SYSTEMS, INC., a California corporation doing business In the State of Washington, Defendants.

No. 3:24-CV-05811-JCC

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

THOMAS KULAGA

Taken at Chandler, Arizona
(All participants appeared via videoconference.)

DATE TAKEN: AUGUST 6, 2026
REPORTED BY: LAURA L. OHMAN, RPR, CCR 3186



A P P E A R A N C E S
(ALL PRESENT APPEARING VIA VIDEOCONFERENCING)

FOR THE PLAINTIFFS:
NICHOLAS GILLAN
Pfau Cochran Vertetis Amala
909 "A" Street
Suite 700
Tacoma, WA 98402-5114
253.948.3199
Ngillan@pcvalaw.com
JOSEPH MICHAEL LOMBINO
LOMBINO MARTINO, P.S.
9315 Gravelly Drive SW
Suite 201
Lakewood, WA 98499-1502
253.830.2700
Joey.lombino@lombinomartino.com

FOR THE DEFENDANT GATEKEEPER SYSTEMS, INC.:
ROBERT SCOTT LASALLE
The Aguilera Law Group
23046 Avenue De La Carlta
Suite 300
Laguna Hills, CA 92653-1577
714.384.6600
Slasalle@aguileragroup.com

FOR THE DEFENDANT FRED MEYER STORES, INC.:
SARAH KAY ZALESKI CAMPBELL
Scheer Law
701 5th Avenue
Suite 3860
Seattle, WA 98104-7011
360.901.1017
Sarahc@sheer.law

* * * * *



VIDEOCONFERENCE DEPOSITION OF THOMAS KULAGA


EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| MR. GILLAN | 4 |
| MS. CAMPBELL | 33 |

EXHIBIT INDEX

| EXHIBITS FOR IDENTIFICATION | | PAGE NO. |
|---|---|---|
| 1 | Invoice dated 4/24/2026 | 8 |
| 2 | Invoice dated 6/24/2026 | 10 |
| 3 | Report of Findings- Mechanical dated 5/18/2026 | 14 |
| 4 | Colored photograph | 24 |




CHANDLER, ARIZONA; AUGUST 6, 2026
10:01 A.M.
-o0o-

THOMAS KULAGA, witness herein, having been first duly sworn under oath, was examined and testified as follows:

E X A M I N A T I O N

BY MR. GILLAN:
**Q. Good morning. Can you please state your name for the record.**
A. My name is Thomas J. Kulaga.
**Q. And what's a good address for you, Mr. Kulaga?**
A. I'm in Chandler, Arizona, right now.
**Q. Is that an office?**
A. A home office.
**Q. Home office.**
**And what's the address of that home office?**
A. Is my personal address necessary for the record?
MR. LASALLE: Just wherever you need the transcript sent, that's fine.
THE WITNESS: I'll be getting the transcript from you, so... (Pause.)

MR. LASALLE: Well, I think they'll send it to Rimkus, so just give theirs.
THE WITNESS: Oh, okay. The Rimkus address is 21002 North 19th Avenue, Suite 120, Phoenix, Arizona 85027.
BY MR. GILLAN:
**Q. And that's the address for Rimkus?**
A. Yes.
**Q. And have you ever been deposed before?**
A. Yes.
**Q. Do you know how many times?**
A. Approximately 25.
**Q. And have you ever testified in court before?**
A. Yes.
**Q. In trial?**
A. Yes.
**Q. How many times?**
A. Once.
**Q. When was that trial testimony?**
A. I'd have to check my testimony history. I can't recall. It's at least a few years ago.
**Q. How long have you been doing expert witness work?**
A. About 13 years.
**Q. And all of the times you have testified either in trial or in a deposition, was that in your capacity as a mechanical engineer?**



A. Yes.
**Q. And I have your CV. It looks like you graduated with your mechanical engineering degree in 1998; is that right?**
A. That's right.
**Q. And you're a registered professional engineer in Arizona and New Mexico; is that right?**
A. Yes.
**Q. Have you ever been registered in any other state?**
A. I got my engineering training certification from Illinois.
**Q. How long have you been a registered professional engineer?**
A. About 16 -- 15, 16 years, I think.
**Q. And it looks like you have been with Rimkus since 2013; is that right?**
A. Yes.
**Q. And what is your role with Rimkus?**
A. My title is principal consultant, and I exclusive do investigations and testimony. I don't manage anyone.
**Q. Is all your work legal related?**



A. No. A fair amount of it is insurance. Sometimes it evolves into legal, but typically not.
**Q. Have you ever -- do you have any prior experience with antilock -- or antitheft locking systems for shopping carts prior to this case?**
A. Yes.
**Q. And what was that experience?**
A. I had a case in New Mexico involving an injury related to a reported wheel lock event.
**Q. Were you retained by the plaintiff or the defendant in that case?**
A. Defendant.
**Q. Do you know roughly what year that case was?**
A. I think it ended -- I'm pretty sure it ended last year, so probably started in 2024, but I'd have to check my records to be sure.
**Q. Did you testify in that case either at a deposition or at trial?**
A. No. And if I'm incorrect about that, it would be in the testimony history, but I don't recall testifying.
**Q. Do you know what the resolution of that case was?**
A. I understood there was a settlement, but I have no detail.



**Q. Outside of that case in New Mexico, any other professional experience with antitheft locking systems on shopping carts?**
A. I was briefly retained on a case that I understood to involve an antitheft wheel, but it never materialized. I didn't do any billable work, so, truthfully, I can't say for sure that it did.
**Q. Prior to your retention in this case, any prior work related to Gatekeeper Systems?**
A. The New Mexico case involved Gatekeeper.
**Q. Okay. Any other prior experience with Gatekeeper?**
A. No.
**Q. Do you know roughly when you became involved in this case?**
A. I think last year. They should have produced our invoices. That would probably be the definitive reference. At least that's what I would refer to if I had to look it up.
**Q. Okay. And I have a couple of invoices. I had some questions on those, so I'll -- I'm going to share my screen with you, and I'll put this in the chat as well. This first one I'll mark as Exhibit 1. Let me make sure.**
**(Exhibit No. 1 marked.)**

Page 9

BY MR. GILLAN:
**Q. Mr. Kulaga, do you see an invoice on your screen?**
A. I do.
**Q. And this one is dated April 24th, 2026.**
**Do you see that?**
A. I see that.
**Q. And I want to scroll down here.**
**The first date on here is March 16th, 2026, and it -- it involves someone named Christopher Chen.**
**Can you identify that person for the record?**
A. That's my colleague, Dr. Chen, yes.
**Q. And what role does Dr. Chen has with Rimkus?**
A. I believe he's opining -- he's a biomechanical expert.
**Q. Okay. Okay. And then the first date on here related to you is March 19th, 2026, and it says, "Reading documents from client."**
**Do you know if you had -- if you conducted any work prior to March 19th, 2026?**
A. I would have guessed it was 2025, but it looks like not, that I would have to say this has got to be my first introduction to the file.
**Q. Okay. And it looks like the -- for this first invoice, you billed 25 and a half hours for a total of**

Page 10

**$8,415.**
**Does this look correct?**
A. That looks correct.
**Q. And your rate it appears is $330 per hour?**
A. Yes, for this instance.
**Q. So does that vary?**
A. Yes. We will have what we call our investigative rate and then the legal rate. Travel, doing inspection, that would be investigator.
**Q. And what is your legal rate?**
A. I believe it's $535 an hour.
**Q. And when does that legal rate apply?**
A. That's actually a pretty good question. I don't control when the given rate gets used. That's an administrative function here at Rimkus. What I understand is certainly depositions, reading depositions and participating in them, both, trial definitely are legal. Inspections are typically investigative, but where exactly to draw a bright line, I actually couldn't tell you.
**Q. Okay. I can take that one down, and I have another invoice here that I'll mark as Exhibit 2, and I'll share that.**
**(Exhibit No. 2 marked.)**
**///**

Page 11

BY MR. GILLAN:
**Q. Do you see another invoice on your screen?**
A. I do.
**Q. And this one -- I'll scroll.**
**Who is Paul Phillips?**
A. He did the technical review of my report.
**Q. And can you explain a little bit more about what that means?**
A. Inside Rimkus, one of our quality control steps is to have a peer review of every analysis, and so every opinion and then every written report will go through the same process, and it's simply an experienced testifying expert who reviews the report looking for anything from typos to logical errors, anything that just improves the quality of the report.
**Q. And what's Mr. Phillips' occupation?**
A. He's what we call a special consultant, so he doesn't work full-time at Rimkus anymore, but he is a professional engineer, mechanical engineer like me.
**Q. Okay. And this description just says technical review of report completed.**
**Do you know if Mr. Phillips was the one who reviewed your report?**
A. He is, yes.
**Q. Okay. And then there's also an Ming Xiao**

Page 12

**listed.**
A. At a guess, I would say that's who did the review for Dr. Chen.
**Q. Okay.**
A. But that is only a guess.
**Q. Understood.**
**Are you familiar with Courtney Drake?**
A. Courtney works in our central processor -- or CPC, central processor or central publishing, and all our reports go through the CPC to make sure they follow the Rimkus style guide.
**Q. How about Joshua Miller?**
A. The description makes reference to the biomechanical report, so I would say he was involved with Dr. Chen's work, not mine.
**Q. Okay. And it looks like for this invoice, you spent roughly 24.3 hours for a total of $8,019.**
**Does that look to be correct?**
A. That looks correct.
**Q. And so if we total these two invoices, the total is roughly $16,400 -- $400 -- $500 -- $400.**
**Does that sound like the approximate amount of money you've billed in this case?**
A. The total, this one is 19-2. The other one was I think --

Page 13

**Q. I was -- sorry. I was referring to you specifically.**
A. Oh. Me specifically, yeah, it looks like approximately $16,000.
**Q. Okay. Since June, have you issued any additional invoices?**
A. I don't believe so. If you -- if there were invoices, they would have been produced along side these. I don't really handle a lot of the invoicing.
**Q. And switching gears a little bit, what did you do to prepare for today's deposition?**
A. I reread my file materials.
**Q. Did you do anything else other than review your file?**
A. I had a call with my client this morning.
**Q. And when you say client, are you talking about an attorney?**
A. Scott.
**Q. Okay. Have you ever -- have you ever been retained on a case in Washington before?**
A. Yes. I definitely have. I'm trying to remember. I don't want to confuse the Oregon and Washington cases. I know I've had cases in Washington.
**Q. Okay. Do you know if you've testified in any Washington cases, whether in deposition or in trial?**

Page 14

A. That's why I was trying to remember. I had a vehicle related -- vehicle malfunction, no injuries or anything. It was just the cost of the repairs was the question, and it was -- I testified at an arbitration, and I can't remember if it was Oregon or Washington. It was one of the two. But that, again, would be in my testimony history.
**Q. Okay. And you've mentioned Dr. Chen a couple of times.**
**Are you planning to, yourself, offer any opinions related to biomechanics?**
A. No, not at all.
**Q. Okay. And what were you asked to do in this case?**
A. Specifically to evaluate the Gatekeeper wheel and system.
**Q. And I'm going to bring up your report now and ask you some questions about it. I'll mark this as Exhibit 3.**
**(Exhibit No. 3 marked.)**
BY MR. GILLAN:
**Q. And I'll share.**
**And, Mr. Kulaga, do you see a document on your screen?**
A. I do.

Page 15

**Q. And does this appear to be your report in this case?**
A. That is the title page of my report, yes.
**Q. Okay. And I want to scroll down to the end or near the end. This is page 22. This section is titled "Basis of Report."**
**Is this a complete list of everything you reviewed in your evaluation of this case?**
A. I would say -- I would call it a complete list if the materials I used as a basis -- I may have reviewed some other things, but, for instance, if there's anything like insurance policy related, things like that, but I don't know what existed here, I can't remember, but I wouldn't count those as my basis. These are things that I relied on to reach my conclusions.
**Q. Okay. And since the date on this report, which is -- it looks like May 18th, 2026, have you reviewed any additional materials since that date?**
A. Probably yes. I'm -- I think I have seen since then the Welsh and Kohles depositions.
**Q. Okay. Did your review of those depositions change any of your opinions in this case?**
A. No.
**Q. In your -- this is page 2 of your report, which is titled "Conclusions."**

Page 16

**Your first conclusion is that the cause of the subject incident could not be determined based on the available evidence; is that correct?**
A. Yes.
**Q. And the -- I want to go down to page 6.**
**It looks like you reviewed some video surveillance, and that was listed on your -- a list of materials you reviewed as well; is that right?**
A. Yes, I did.
**Q. And this -- the stills that are provided in Figure 1, this is from the front of the store near the entrance; is that right?**
A. Yes.
**Q. And you have a -- on the right side, you have a box. It says, "Locked cart," and it's pointing at a small shopping cart near the front of the store?**
A. That's correct.
**Q. And what -- did you conclude that this cart was locked?**
A. I did.
**Q. And what was that based on?**
A. In the video, if you were to play it, you can see Ms. Lubken, walk up to the cart, attempt to move it, and walk away, and that coupled with her testimony that she did have that experience when she entered the store.



BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

From that, I concluded that for whatever reason, the cart wheels were locked in place.
**Q. Do you have an opinion as to what caused those cart wheels to lock?**
A. I didn't inspect that subject cart. I would -- based on the video, again, where you can see someone else attempting to move it, and given its location near the entry and exit, it more than likely received a wheel lock command from the lock loop that's installed at that location and caused the antitheft wheels to lock.
**Q. And there's some discussion of the lock loops later in your report, but can you explain what a lock loop is?**
A. Sure. It's an embedded antenna. It's embedded into the ground, and the purpose of it is to admit a wheel lock signal that passing wheels will receive this signal. If they have a permission granted from another device, they will ignore the lock command. If they do not have a permission, then they will lock up when they receive a lock command.
**Q. And do you know exactly where these lock loops are located inside or outside this Fred Meyer store?**
A. Dimensionally, I'm not certain. You can tell where they're at on the drawings that Gateway produced, and I have those in my file. I reference the Bates



number in my report. I have those Bates numbers, if you want them.
**Q. Yeah, I think I -- I think I have those later in your report.**
**Do you know if the lock loops are located -- the lock loops near this entrance that we're seeing in Figure 1 are located inside or in the vestibule or outside the store?**
A. They're typically located just inside the inner doors rather than the foyer. They don't have to be. They're always inside the store itself is -- is my experience. I -- I could look at the drawings if you'd like and give you a more precise answer.
**Q. Okay. And page 7 has another still from surveillance video. Here there's a red arrow that is pointing towards Ms. Lubken and then a red arrow pointed toward a -- what's been identified as a small card.**
**You state in the first sentence of this page, "The small cart was presumably the subject cart."**
**Can you explain the basis of presuming that the small cart was the subject cart?**
A. Sure. When Ms. Lubken entered the store, she attempted to use the small cart at the entrance. She abandoned it when it looked up, but she -- I would say she revealed her preference for a small cart at that



point. Her purpose of being in a store was to purchase a single item, a hand mixer, and a small cart would be more than sufficient to carry a shopping order that small. Ms. Padilla testified that she moved a small cart out of the aisle when she was at the scene of the incident, and we can see the small cart in the video confirming that that was the cart that Ms. Padilla moved.
**Q. Did you review any video showing Ms. Lubken pushing this cart that we're seeing in Figure 2?**
A. No. To my knowledge, there was no video of that prior to the event.
**Q. Did you review any testimony either from Ms. Lubken or from any of the other witnesses stating that this small cart in Figure 2 was the cart that was being used by Ms. Lubken and involved in the subject incident?**
A. The testimony of Ms. Padilla that I already mentioned, and I believe Ms. Lubken couldn't remember.
**Q. But did Ms. Padilla testify that this cart was being pushed by Ms. Lubken?**
A. She testified she moved it away from where Ms. Lubken was, and there are no other carts visible in the video, implying this is the only possible cart that could have been involved.
**Q. In the surveillance video from Aisle 86, can you**



**see the entire aisle?**
A. I'm sorry. Did you break up, or is this me?
**Q. Oh, I can repeat.**
MR. LASALLE: Yeah, maybe just repeat the question, Nick. It sounds like Tom didn't hear it.
BY MR. GILLAN:
**Q. In this surveillance video -- can you hear me?**
A. Yeah, I got a message popping up that my internet is unstable. I might be able to improve that if I can shut off video, but I don't want to do that without your approval.
MR. LASALLE: No, we need the reporter to be able to see you, Tom, so just keep going.
THE WITNESS: Understood.
BY MR. GILLAN:
**Q. Yeah, if we continue to have problems, we can troubleshoot.**
**But can you hear me now?**
A. I can.
**Q. Okay. So the -- my last question was, in the surveillance video from Aisle 86, can you see the entire aisle?**
A. The entire Aisle 86?
**Q. Yes.**
A. No. What I recall, the left half of it is

Page 21

obscure because we're looking at it on an angle.
**Q. Moving to page 8, and I want to go to the end of page 8 and beginning of page 9, page 8 indicates, "Rimkus participated in a joint inspection of the store and exemplar carts on March 30th, 2026. The subject cart was not available for inspection. Based on the testimony you described above, the cart was not preserved and was instead returned to circulation at the store and could be identified from the full cart inventory."**
**Was -- would you have liked to have inspected the subject cart during your inspection on March 30th, 2026?**
A. The word "like" implies I have a preference. I'll inspect what's available. More data is always better, though. I'll say that.
**Q. So would it have been helpful to formulating your opinions to have been able to inspect the subject cart?**
A. It might have been, depending on what we learned.
**Q. And I guess what -- what would have been helpful or not helpful about being able to inspect a subject cart?**
A. Well, what's -- probably look at my report. It

Page 22

specifically -- starting on page 11, continuing to page 12 in the analysis section, there's a list of things that could not be determined, and, for instance, the first one on the list is whether the cart was equipped with antitheft wheels. That would have been great knowledge to have in this instance. The number of wheels, where they were positioned, that sort of thing we could learn if we had that cart and if it hadn't been, you know, altered. You know, if somebody -- say someone broke a wheel and repaired it in the intervening time, that sort of thing. It comes back to the confidence level that -- of how it was preserved. You know, if it went back into circulation, any number of things can change, so even if we looked at it, it might not be a perfect world, but potentially we could answer some of these -- or address some of these issues.
**Q. But sitting here today, without having been able to inspect the subject cart, you cannot say whether or not the cart was equipped with antitheft wheels at all?**
A. That's correct. That's what I say in my report on this page.
**Q. And you also can't say for certain what the condition of the cart was; is that right?**
A. That's correct.
**Q. You also -- I'll go back to page 9. And I want**

Page 23

**to go to the paragraph before "Gatekeeper System." It states, "At the center of the mixer shelf section were hand mixers. Recall from the testimony that Ms. Lubken was at the store with the specific purpose of purchasing a hand mixer. Also notable was the presence of boxes protruding from the end of the shelf and out into the aisle walkway."**
**What was the reason you included this in your report?**
A. Describing the location and the, I guess, net effect of what I say in this paragraph is it establishes that this was Ms. Lubken's intended destination. She was looking for a hand mixer. She was -- the event occurred at the hand mixer shelf, and Photograph 9 is a picture of that shelf. It's the face of the shelf that you can't see from the camera images, from the security camera images. It's looking at it from standing in the aisle, but in that picture, you can see that's where the hand mixers are and that there's a box protruding from the end of the shelf.
**Q. And is there any -- is there any importance to the fact that there was a box protruding from the shelf in that photo?**
A. It presents a possibility that this is -- this is a configure that is not impossible, that it occurred

Page 24

when I was standing there. I can't sit here and tell you that it was in that condition on the date of loss, but it's something that could happen.
**Q. And I'm going to stop sharing this for a moment, and I'm going to share what I believe was mentioned in your report as Photograph 9.**
A. I lost you again.
**Q. Oh, sorry. Can you hear me?**
A. Yes.
**Q. Okay. I'm going to bring up Photograph 9 from your report and share. This will be Exhibit 4.**
**(Exhibit No. 4 marked.)**
BY MR. GILLAN:
**Q. Mr. Kulaga, is this -- is this what you refer to in your report as Photograph 9?**
A. Yes.
**Q. Okay. And this box kind of in the center of the photo, that's the protruding box that you mentioned?**
A. That's correct.
**Q. And this photo was taken March 30th, 2026, during the inspection?**
A. Yes, during the joint inspection.
**Q. Did you review any surveillance video from the date of the incident December 3rd -- 23rd, 2023, that showed any protruding boxes in the subject aisle?**

Page 25

A. No, I didn't.
**Q. And there's some similar discussion in your report about possible debris in the aisle.**
**Did you see -- in your review of the surveillance footage, were you able to see any potential debris that was an obstacle for Ms. Lubken?**
A. The resolution of the video wasn't sufficient, so I would say I cannot use the video to confirm the presence nor could not rule out the presence of any debris.
**Q. Did you review any testimony from Ms. Lubken or any of the other witnesses that mentioned debris in Aisle 86?**
A. The store employees made no mention one way or another of debris. When asked, I believe Ms. Lubken testified that she was more focused on her personal safety than anything else and did not examine the floor.
**Q. I'm going to go back to your report, so this is Exhibit 3 again, and this is page 14. This is during your discussion of -- discussion of the Welsh report, and you state that, "The Welsh report mischaracterized incident reports as having been similar to the subject incident and applicable to the analysis."**
**From the Welsh report, during discovery, I was furnished with dozens and dozens, nearly 60 incident**

Page 26

**reports all related to wheel locking incidents and at Fred Meyer and Kroger stores, and you state that this is a mischaracterization?**
**Did you review incident reports in this case?**
A. I did.
**Q. Do you know how many incident reports you reviewed?**
A. The set Mr. Welsh describes sounds like the same set I reviewed. I can't promise you it's exactly 60, but in that range, yes.
**Q. And you go on to state, "This key difference meant that the majority of the incident reports should have been discarded, as they were not applicable to the subject incident."**
**Sorry. I went to the wrong place.**
**"The Welsh report failed to note that in those cases where the incident location was provided, the vast majority of the incidents occurred as patrons were pushing carts out of the store exits, precisely where the lock loops are installed, and precisely where the lock commands can be issued to Gatekeeper wheels."**
**My question is, did you see any incident reports or review any incident reports that involved wheel locking within the store?**
A. I don't recall any that said in the store other

Page 27

than just inside the entry way could arguably be considered inside the store. When I say inside the store, I'm talking, you know, the aisles, the main body of the store, not the entryways.
**Q. So is it your testimony then that none -- none of the incident reports that you were provided involved wheel locking inside an aisle?**
A. I don't recall any incident reports of that nature.
**Q. I'll go to page 19.**
**Here you're discussing hypothetical defects that are listed in the Kohles report, and you conclude none of them would have led to an inadvertent locking of the wheel.**
**So first, a weak or discharged battery will not be able to drive the motor that engages the break. This will result in a failure to lock, not an inadvertent lock event.**
**So is it your testimony that a weak or discharged battery cannot result in a -- in an inadvertent lock?**
A. That's correct.
**Q. And can you explain the basis for that opinion?**
A. Sure. The mechanism by which this wheel locks, it's what's called a band brake. A band brake is

Page 28

nothing more complex than a strap that wraps around a cylinder. It is a concept that is probably on the order of a hundred to 150 years old. Simple to build. Simple to install. Suffers from some limitations on reliability, but generally, a good way of bringing things to a stop still used to this day. And what you do is simply wrap the slap around the cylinder. The cylinder is rotating with the wheel, and when you want it to stop, you tighten the strap. The strap grabs the cylinder, creates more friction, it's a brake and eventually brings the cylinder to a stop or at the very least will provide a braking force to the wheel or whatever is spinning. The subject wheel uses a band brake inside and it's driven by a small motor. That motor turns a screw that tightens the band. You can hear this when you actuate the -- if you stand there when the handheld locking device next to a wheel, listening closely, quiet area, you push a button, you can hear the motor spin, so that spinning of the motor is required to lock the brakes. The spinning of the motor, in turn, can only be done if you have sufficient electrical current to make the motor spin. If the battery is discharged, you can't drive the motor, therefore, you can't lock the wheel.
**Q. Thank you.**

Page 29

**Your next opinion or your next bullet point here has to do with wireless signals.**
**Is both the -- the lock -- the locking command and the permission command, are those both done through a wireless signal?**
A. They are, yes.
**Q. So is it not -- is it not possible that the wireless signal for the locking command was able to be transmitted but the permission command was not?**
A. It wouldn't have needed a permission command where she was at. There are no devices issuing lock commands out in the main body of the store. The permission commands are typically granted, you know, at the registers, at self checkout, at some of the smaller kiosks. I would have to go to the drawing to cite all of them, but, you know, some grocery stores will have a customer service. Customer service, you'll have a permission granting device there. All of those areas can grant permission because at all those areas, you're expected to be exiting the store at some reasonable amount of time. The middle of the store requires no permission because there's nothing there telling the wheel to lock. Only at the exits and sometimes at the perimeter of the parking lot do you have a device or an emitter that is telling a wheel -- sending a lock

Page 30

command, telling a wheel to lock, so whether or not she had a permission command is a nonissue.
The lock command is transmitted wirelessly, and the description of wireless signal is inconsistent. There's only one way to interpret that statement, that consistent would be continually the same strength at the same frequency. Inconsistent would be you lose strength because you have a maximum strength that you're normally operating at, so an inconsistent signal will be too weak, will not -- they will not be received by the wheel and the wheel will not lock. And we experienced this. When Dr. Kohles was doing his testing, there were occasions where either the handheld device would not induce a lock event when it was commanded, and then one instance where it didn't lock as the cart was rolled out the exit, so, you know, that's what an inconsistent signal will get you, is that you don't get it to lock up randomly. You have to receive a strong enough signal that it could be perceived by -- received by and interpreted by the wheel. And short of that, nothing will happen. A weak signal will not lock it, or, you know, a garbled signal will not lock it. It's got to be a clean, let's call it loud enough signal, strong enough that it can be received and interpreted correctly.
**Q. So it sounds like -- and please correct me if**

Page 31

**I'm wrong -- that an antitheft wheel can lock from being pushed over one of the lock loops, which you've testified are at -- at the parameter -- or just inside the store at the entrances and exits or manually using a handheld device; is that right?**
A. That's right. Yes.
**Q. Are there any other ways that an antilock -- antitheft lock can be engaged?**
A. No. Those are the main by which you engage the motor, engage the band brake, cause the wheel to lock. You have to send the lock command, and the two ways to send it are a lock loop or the handheld device.
**Q. It sounds like based on her position within the store, it's your opinion that the lock could not have been engaged by a lock loop; is that right?**
A. No. She was far out of range of the lock loops.
**Q. Can you rule out that the lock was engaged by a handheld device?**
A. Ms. Lubken's testimony is that there was no one else in the aisle. The handheld device has to be held, per my testing, within two or three feet of a given wheel for that signal to be successfully received. If there was no one in the aisle, then there was no one within two or three feet of the wheel, and even if a handheld device was, say in the next aisle, that would

Page 32

not be strong enough to trigger a lock event.
**Q. And this is based on your testing of the handheld device during the inspection?**
A. During this inspection and my inspection involved in the Mexico matter. It's the same device. It works the same way.
**Q. Did you -- did you have any equipment to test the signal -- or the strength of the signal on the handheld device?**
A. No.
**Q. Do you know if the handheld device that you used or was used during the inspection was the same device that was being used in the store on the date of the incident?**
MR. LASALLE: Object to form.
THE WITNESS: I was not there. I can't say that it was. I know that the store had multiple devices. They all worked the same way. They're all produced by Gatekeeper, so I wouldn't expect that to be particularly important, which specific device was used during our testing versus whatever was available on the -- in the store on that date. I -- I just do know that they have more than one. I don't know how many.
BY MR. GILLAN:
**Q. Do you intend to offer an opinion as to how Ms.**

**Lubken's fall was caused or what --**
A. No. My -- my opinion is specifically limited to the wheel itself and the Gatekeeper system.
MR. GILLAN: Okay. Mr. Kulaga, I think that's all the questions I have for you today. Thank you for your time.
MR. LASALLE: So, Sarah, do you have any questions?
MS. CAMPBELL: I do. Can we take, like, a five-minute break and we'll come back and finish up?
(A break was taken from 10:59 a.m. to 11:10 a.m.)
E X A M I N A T I O N
BY MS. CAMPBELL:
**Q. Okay. Good morning, Mr. Kulaga. My name is Sarah Campbell, and I am the attorney representing the Fred Meyer stores and the Kroger company in this matter. I just have a few follow-up questions for you. And I wanted to refer back to the report and the attached Photograph No. 9 that we wrote -- briefly spoke about, so let me see if I can get that up for you. This is not my best forte here, so give me just a second.**
MS. CAMPBELL: Let's see. Laura, is that something that you can share for us?
THE COURT REPORTER: I can. I just need one



minute or two here to get it pulled up.
(Discussion off the record.)
BY MS. CAMPBELL:
**Q. So I just want to confirm a few things. My understanding is that you did attend the joint inspection this past March; is that correct?**
A. That's correct.
**Q. And my understanding also is that you took the photograph during the joint inspection; is that correct?**
A. Yes.
**Q. And that you don't have any photograph of any protruding boxes from the date of the loss; is that correct?**
A. Yes. That's correct.
**Q. Did you happen to take any measurements with regard a the protruding box to see, for example, how much it protruded from the shelf on the date that you were there taking this photograph?**
A. You know, I'd have to go back through my photographs. I -- I don't think I had that dimension. I may -- I can estimate it. It looks like about four inches, but that's about as accurate as I could be, I'd say.
**Q. So -- so you're not sure if you did any further testing or measurements?**



A. I definitely didn't do any testing. There's a chance I took a measurement, but it really wasn't germane to my opinions, so not something I focused on.
**Q. Because your opinion overall is that we don't know what caused the incident; is that correct?**
A. That's correct. I referenced this photo as a possibility, and I mentioned it that way in my report. I don't want there to be confusion. I'm not saying that that is my opinion that this occurred. It's simply on the list of possibilities.
**Q. And so it's completely speculative at this point; correct?**
A. I wouldn't even call it speculation. It's more along the lines of if you were to hypothesize potential causes, you could include it on the list because of this shelf configuration, but those are purely hypothetical. I think I'm more comfortable with that word.
**Q. And we already confirmed that there's no evidence, either physical evidence or testimony, to point to this as being the cause of the incident; correct?**
A. That's correct.
**Q. And when you say you didn't do any testing, so that would mean you didn't take a cart and push it into a box and see what would happen in this case; right?**



A. Absolutely not. I didn't want to damage and then have to purchase a mixer.
**Q. Understood. I wouldn't want to either.**
**And so you weren't there on the date of the actual incident, correct, in the store?**
A. Of course not, no.
**Q. Were you asked by anyone in particular to include alternative causes, potential causes of the incident?**
A. I wasn't explicitly asked. When -- whenever I have an opinion that we could not make a determination, I typically follow that up with potential causes that fit what evidence we have in an effort to underscore how or why we can't make a determination. You know, for instance, if I present a hypothetical, I can then explain, we can't make a determination. And in this case, this is a good example. I don't have that picture of that box, if that box was even there on the day of. I know that the shelf can end up configured that way because we see it in the picture, but I don't know that's what it looked like, so I couldn't use this to make a determination. It's merely on the list of available evidence for consideration when considering things other than a wheel lock that could have caused a cart to stop.

**Q. Do you intend to offer this as an opinion if this were to go to trial that the potential is there that a protruding box in the aisle could cause the subject incident?**
A. I wouldn't necessarily call it an opinion. This is more of an analysis of a possibility. If it was an opinion, it would be include in the list of conclusions in that section of my report. It's not. It's merely discussed in the analysis section as things to consider when trying to estimate a cause because we can't determine an actual cause. That -- again, that's the opinion, is I cannot determine a cause.
**Q. Sure. So let me rephrase my question.**
**Do you intend to offer as a suggestion that this is a possible alternative cause to a jury if we were to go to trial?**
A. If asked, I would give some more answers to what I'm saying now, that this is not my opinion. If not asked, it's not in my report as an opinion, and I wouldn't characterize it that way to a jury.
MS. CAMPBELL: Okay. I -- I have no further questions, unless anybody else does, and then I reserve to ask. Thank you.
MR. LASALLE: No questions here.
Nick, anything else?



MR. GILLAN: No, I don't have anything further. Thank you.
(Reading and signing was requested pursuant to FRCP Rule 30(e).)
(Deposition concluded at 11:18 a.m.)



CERTIFICATE

STATE OF WASHINGTON
COUNTY OF KING

I, Laura L. Ohman, a Certified Shorthand Reporter in and for the State of Washington, do hereby certify that the foregoing transcript of the videoconference deposition of THOMAS KULAGA, having been duly sworn on August 6, 2026, is true and accurate to the best of my knowledge, skill, and ability.
IN WITNESS WHEREOF, I have hereunto set my hand and seal this 19th day of August, 2026.

LAURA L. OHMAN, RPR, CCR 3186

My commission expires:
MARCH 2027

**A**

**a.m** 4:2 33:12,12 38:5
**abandoned** 18:24
**ability** 39:10
**able** 20:9,13 21:18 21:23 22:17 25:5 27:16 29:8
**Absolutely** 36:1
**accurate** 34:22 39:10
**actual** 36:5 37:11
**actuate** 28:16
**additional** 13:6 15:18
**address** 4:15,20,21 5:3,7 22:16
**administrative** 10:15
**admit** 17:15
**ago** 5:21
**Aguilera** 2:14
**aisle** 19:5,25 20:1 20:21,22,23 23:7 23:18 24:25 25:3 25:13 27:7 31:20 31:23,25 37:3
**aisles** 27:3
**altered** 22:9
**alternative** 36:8 37:15
**Amala** 2:4
**amount** 7:1 12:22 29:21
**analysis** 11:10 22:2 25:23 37:6,9
**angle** 21:1
**answer** 18:13 22:15
**answers** 37:17
**antenna** 17:14
**antilock** 7:4 31:7
**antitheft** 7:4 8:2,5 17:10 22:5,19 31:1,8
**anybody** 37:22
**anymore** 11:18
**appear** 15:1
**appeared** 1:20
**APPEARING** 2:2
**appears** 10:4
**applicable** 25:23 26:13
**apply** 10:12
**approval** 20:11
**approximate** 12:22
**approximately** 5:12 13:4
**April** 9:5
**arbitration** 14:4
**area** 28:18
**areas** 29:18,19
**arguably** 27:1
**Arizona** 1:19 4:1 4:16 5:4 6:9
**arrow** 18:15,16
**asked** 14:13 25:15 36:7,10 37:17,19
**attached** 33:19
**attempt** 16:23
**attempted** 18:23
**attempting** 17:7
**attend** 34:5
**attorney** 13:17 33:16
**August** 1:24 4:1 39:9,12
**available** 16:3 21:6 21:15 32:21 36:23
**Avenue** 2:14,20 5:4

**B**

**back** 22:11,13,25 25:18 33:10,19 34:19
**band** 27:25,25 28:13,15 31:10
**based** 16:2,21 17:6 21:6 31:13 32:2
**basis** 15:6,10,14 18:20 27:23
**Bates** 17:25 18:1
**battery** 27:15,20 28:23
**beginning** 21:3
**believe** 9:14 10:11 13:7 19:18 24:5 25:15
**best** 33:22 39:10
**better** 21:16
**billable** 8:6
**billed** 9:25 12:23
**biomechanical** 9:14 12:14
**biomechanics** 14:11
**bit** 11:7 13:10
**body** 27:3 29:12
**box** 16:15 23:19,22 24:17,18 34:16 35:25 36:18,18 37:3
**boxes** 23:5 24:25 34:12
**brake** 27:25,25 28:10,14 31:10
**brakes** 28:20
**braking** 28:12
**break** 20:2 27:16 33:10,11
**briefly** 8:4 33:20
**bright** 10:19
**bring** 14:17 24:10
**bringing** 28:5
**brings** 28:11
**broke** 22:10
**build** 28:3
**bullet** 29:1
**business** 1:9,11,12
**button** 28:18

**C**

**C** 2:1 39:1,1
**CA** 2:15
**California** 1:12
**call** 10:7 11:17 13:15 15:9 30:23 35:13 37:5
**called** 27:25
**camera** 23:16,17
**Campbell** 2:19 3:5 33:9,14,16,23 34:3 37:21
**capacity** 6:1
**card** 18:17
**Carlta** 2:14
**carry** 19:3
**cart** 16:15,16,18,23 17:2,4,5 18:19,19 18:21,21,23,25 19:2,5,6,7,10,15 19:15,19,23 21:6 21:7,9,12,19,24 22:4,8,18,19,23 30:15 35:24 36:25
**carts** 7:5 8:3 19:22 21:5 26:19
**case** 7:5,8,11,13,17 7:22 8:1,4,8,10,15 12:23 13:20 14:14 15:2,8,22 26:4 35:25 36:17
**cases** 13:23,23,25 26:17
**cause** 16:1 31:10 35:20 37:3,10,11 37:12,15
**caused** 17:3,10 33:1 35:5 36:24
**causes** 35:15 36:8,8 36:12
**CCR** 1:25 39:16
**center** 23:2 24:17
**central** 12:8,9,9
**certain** 17:23 22:22
**certainly** 10:16
**certification** 6:13
**Certified** 39:6
**certify** 39:7
**chance** 35:2
**Chandler** 1:19 4:1 4:16
**change** 15:22 22:14
**characterize** 37:20
**chat** 8:22
**check** 5:20 7:16
**checkout** 29:14
**Chen** 9:10,12,13 12:3 14:8
**Chen's** 12:15
**Christopher** 9:10
**circulation** 21:8 22:13
**cite** 29:15
**clean** 30:23
**client** 9:18 13:15,16
**closely** 28:18
**Cochran** 2:4
**colleague** 9:12
**Colored** 3:11
**come** 33:10
**comes** 22:11
**comfortable** 35:17
**command** 17:9,18 17:20 29:3,4,8,9 29:10 30:1,2,3 31:11
**commanded** 30:14
**commands** 26:21 29:12,13
**commission** 39:18
**community** 1:5
**company** 33:17
**complete** 15:7,9
**completed** 11:21
**completely** 35:11
**complex** 28:1
**concept** 28:2
**conclude** 16:18 27:12
**concluded** 17:1 38:5
**conclusion** 16:1
**conclusions** 15:15 15:25 37:7
**condition** 22:23

24:2
**conducted** 9:19
**confidence** 22:12
**configuration** 35:16
**configure** 23:25
**configured** 36:19
**confirm** 25:8 34:4
**confirmed** 35:18
**confirming** 19:7
**confuse** 13:22
**confusion** 35:8
**consider** 37:9
**consideration** 36:23
**considered** 27:2
**considering** 36:23
**consistent** 30:6
**consultant** 6:22 11:17
**continually** 30:6
**continue** 20:16
**continuing** 22:1
**control** 10:14 11:9
**corporation** 1:9,10 1:12
**correct** 10:2,3 12:18,19 16:3,17 22:20,24 24:19 27:22 30:25 34:6 34:7,9,13,14 35:5 35:6,12,21,22 36:5
**correctly** 30:24
**cost** 14:3
**count** 15:14
**COUNTY** 39:4
**couple** 8:20 14:8
**coupled** 16:24
**course** 36:6
**court** 1:1 5:13 33:25
**Courtney** 12:7,8
**CPC** 12:9,10
**creates** 28:10
**current** 28:22
**customer** 29:17,17
**CV** 6:4
**cylinder** 28:2,7,8 28:10,11

**D**

**damage** 36:1
**data** 21:15
**date** 1:24 9:9,16 15:16,18 24:2,24 32:13,22 34:12,17 36:4
**dated** 3:8,9,10 9:5
**day** 28:6 36:18 39:12
**De** 2:14
**debris** 25:3,6,10,12 25:15
**December** 24:24
**defects** 27:11
**defendant** 2:12,18 7:11,12
**Defendants** 1:14
**definitely** 10:17 13:21 35:1
**definitive** 8:17
**degree** 6:5
**depending** 21:20
**deposed** 5:9
**deposition** 1:15 3:1 6:1 7:18 13:11,25 38:5 39:8
**depositions** 10:16 10:16 15:20,21
**described** 21:7
**describes** 26:8
**Describing** 23:10
**description** 11:20 12:13 30:4
**destination** 23:12
**detail** 7:25
**determination** 36:11,14,16,22
**determine** 37:11,12
**determined** 16:2 22:3
**device** 17:18 28:17 29:18,24 30:13 31:5,12,18,20,25 32:3,5,9,11,12,20
**devices** 29:11 32:18
**difference** 26:11
**dimension** 34:20
**Dimensionally** 17:23
**discarded** 26:13
**discharged** 27:15 27:20 28:23
**discovery** 25:24
**discussed** 37:9
**discussing** 27:11
**discussion** 17:11 25:2,20,20 34:2
**DISTRICT** 1:1,2
**document** 14:23
**documents** 9:18
**doing** 1:9,10,12 5:22 10:9 30:12
**doors** 18:10
**dozens** 25:25,25
**Dr** 9:12,13 12:3,15 14:8 30:12
**Drake** 12:7
**draw** 10:19
**drawing** 29:15
**drawings** 17:24 18:12
**drive** 2:9 27:16 28:23
**driven** 28:14
**duly** 4:6 39:9

**E**

**E** 2:1,1 4:10 33:13 39:1,1
**effect** 23:11
**effort** 36:13
**either** 5:25 7:17 19:13 30:13 35:19
36:3
**electrical** 28:22
**embedded** 17:14,14
**emitter** 29:25
**employees** 25:14
**ended** 7:14,14
**engage** 31:9,10
**engaged** 31:8,15,17
**engages** 27:16
**engineer** 6:2,8,16 11:19,19
**engineering** 6:5,13
**entered** 16:25 18:22
**entire** 20:1,21,23
**entrance** 16:12 18:6,23
**entrances** 31:4
**entry** 17:8 27:1
**entryways** 27:4
**equipment** 32:7
**equipped** 22:4,19
**errors** 11:14
**establishes** 23:11
**estimate** 34:21 37:10
**evaluate** 14:15
**evaluation** 15:8
**event** 7:9 19:12 23:13 27:18 30:14 32:1
**eventually** 28:11
**evidence** 16:3 35:19,19 36:13,23
**evolves** 7:2
**exactly** 10:19 17:21 26:9
**EXAMINATION** 1:15 3:2,3
**examine** 25:17
**examined** 4:7
**example** 34:16 36:17
**exclusive** 6:23
**exemplar** 21:5
**Exhibit** 3:6 8:23,25 10:22,24 14:19,20 24:11,12 25:19
**EXHIBITS** 3:7
**existed** 15:13
**exit** 17:8 30:16
**exiting** 29:20
**exits** 26:19 29:23 31:4
**expect** 32:19
**expected** 29:20
**experience** 7:4,7 8:2,11 16:25 18:12
**experienced** 11:12 30:11
**expert** 5:22 9:15 11:13
**expires** 39:18
**explain** 11:7 17:12 18:20 27:23 36:16
**explicitly** 36:10

**F**

**F** 39:1
**face** 23:15
**fact** 23:22
**failed** 26:16
**failure** 27:17
**fair** 7:1
**fall** 33:1
**familiar** 12:7
**far** 31:16
**feet** 31:21,24
**Figure** 16:11 18:7 19:10,15
**file** 9:23 13:12,14 17:25
**Findings-** 3:10
**fine** 4:23
**finish** 33:10
**first** 4:6 8:23 9:9,16 9:23,24 16:1 18:18 22:4 27:15
**fit** 36:13

**five-minute** 33:10
**floor** 25:17
**focused** 25:16 35:3
**follow** 12:10 36:12
**follow-up** 33:18
**follows** 4:8
**footage** 25:5
**force** 28:12
**foregoing** 39:8
**form** 32:15
**formulating** 21:17
**forte** 33:22
**four** 34:21
**foyer** 18:10
**FRCP** 38:4
**Fred** 1:8 2:18 17:22 26:2 33:17
**frequency** 30:7
**friction** 28:10
**front** 16:11,16
**full** 21:9
**full-time** 11:18
**function** 10:15
**furnished** 25:25
**further** 34:24 37:21 38:2

**G**

**garbled** 30:22
**Gatekeeper** 1:11 2:12 8:9,10,12 14:15 23:1 26:21 32:19 33:3
**Gateway** 17:24
**gears** 13:10
**generally** 28:5
**germane** 35:3
**getting** 4:24
**GILLAN** 2:4 3:4 4:11 5:6 9:1 11:1 14:21 20:6,15 24:13 32:24 33:4 38:1
**give** 5:2 18:13 33:22 37:17
**given** 10:14 17:7 31:21
**go** 11:11 12:10 16:5 21:2 22:25 23:1 25:18 26:11 27:10 29:15 34:19 37:2 37:16
**going** 8:21 14:17 20:13 24:4,5,10 25:18
**good** 4:12,15 10:13 28:5 33:15 36:17
**grabs** 28:9
**graduated** 6:4
**grant** 29:19
**granted** 17:17 29:13
**granting** 29:18
**Gravelly** 2:9
**great** 22:5
**grocery** 29:16
**ground** 17:15
**Group** 2:14
**guess** 12:2,5 21:22 23:10
**guessed** 9:21
**guide** 12:11

**H**

**half** 9:25 20:25
**hand** 19:2 23:3,5 23:13,14,19 39:11
**handheld** 28:17 30:13 31:5,12,18 31:20,25 32:3,9 32:11
**handle** 13:9
**happen** 24:3 30:21 34:15 35:25
**hear** 20:5,7,18 24:8 28:16,19
**held** 31:20
**helpful** 21:17,22,23
**hereunto** 39:11
**Hills** 2:15
**history** 5:20 7:20 14:7
**home** 4:18,19,20
**hour** 10:4,11
**hours** 9:25 12:17
**hundred** 28:3
**husband** 1:5
**hypothesize** 35:14
**hypothetical** 27:11 35:16 36:15

**I**

**IDENTIFICATI...** 3:7
**identified** 18:17 21:9
**identify** 9:11
**ignore** 17:18
**Illinois** 6:14
**images** 23:16,17
**implies** 21:14
**implying** 19:23
**importance** 23:21
**important** 32:20
**impossible** 23:25
**improve** 20:9
**improves** 11:15
**inadvertent** 27:13 27:17,21
**inches** 34:22
**incident** 16:2 19:6 19:16 24:24 25:22 25:23,25 26:4,6 26:12,14,17,22,23 27:6,8 32:14 35:5 35:20 36:5,9 37:4
**incidents** 26:1,18
**include** 35:15 36:8 37:7
**included** 23:8
**inconsistent** 30:4,7 30:9,16
**incorrect** 7:19
**INDEX** 3:2,6
**indicates** 21:3
**induce** 30:14
**injuries** 14:2
**injury** 7:8
**inner** 18:9
**inside** 11:9 17:22 18:7,9,11 27:1,2,2 27:7 28:14 31:3
**inspect** 17:5 21:15 21:18,23 22:18
**inspected** 21:11
**inspection** 10:9 21:4,6,12 24:21 24:22 32:3,4,4,12 34:6,9
**Inspections** 10:18
**install** 28:4
**installed** 17:9 26:20
**instance** 10:5 15:11 22:3,6 30:15 36:15
**insurance** 7:1 15:12
**intend** 32:25 37:1 37:14
**intended** 23:12
**internet** 20:9
**interpret** 30:5
**interpreted** 30:20 30:24
**intervening** 22:10
**introduction** 9:23
**inventory** 21:10
**investigations** 6:23
**investigative** 10:8 10:18
**investigator** 10:9
**invoice** 3:8,9 9:2,25 10:22 11:2 12:16
**invoices** 8:17,20 12:20 13:6,8
**invoicing** 13:9
**involve** 8:5
**involved** 8:10,14 12:14 19:16,24 26:23 27:6 32:5
**involves** 9:10
**involving** 7:8
**issued** 13:5 26:21
**issues** 22:16
**issuing** 29:11
**item** 19:2

**J**

**J** 4:14
**JEAN** 1:4
**Joey.lombino@l...** 2:11
**joint** 21:4 24:22 34:5,9
**JOSEPH** 2:8
**Joshua** 12:12
**June** 13:5
**jury** 37:15,20

**K**

**KAY** 2:19
**keep** 20:13
**key** 26:11
**kind** 24:17
**KING** 39:4
**kiosks** 29:15
**know** 5:11 7:13,22 8:14 9:19 11:22 13:23,24 15:13 17:21 18:5 22:9,9 22:13 26:6 27:3 29:13,16 30:16,22 32:11,17,22,23 34:19 35:5 36:14 36:19,20
**knowledge** 19:11 22:6 39:10
**Kohles** 15:20 27:12 30:12
**Kroger** 1:10 26:2 33:17
**Kulaga** 1:17 3:1 4:5,14,15 9:2 14:23 24:14 33:4 33:15 39:9

**L**

**L** 1:25 39:6,16
**La** 2:14
**Laguna** 2:15
**Lakewood** 2:10
**LASALLE** 2:13 4:22 5:1 20:4,12 32:15 33:7 37:24
**Laura** 1:25 33:23 39:6,16
**Law** 2:14,19
**learn** 22:8
**learned** 21:21
**led** 27:13
**left** 20:25
**legal** 6:25 7:2 10:8 10:10,12,18
**let's** 30:23 33:23
**level** 22:12
**liked** 21:11
**limitations** 28:4
**limited** 33:2
**line** 10:19
**lines** 35:14
**list** 15:7,9 16:7 22:2 22:4 35:10,15 36:22 37:7
**listed** 12:1 16:7 27:12
**listening** 28:18
**little** 11:7 13:10
**located** 17:22 18:5 18:7,9
**location** 17:7,10 23:10 26:17
**lock** 7:9 17:4,9,9,10 17:11,12,16,18,19 17:20,21 18:5,6 26:20,21 27:17,18 27:21 28:20,24 29:3,11,23,25 30:1,3,11,14,15 30:17,21,22 31:1 31:2,8,10,11,12 31:14,15,16,17 32:1 36:24
**locked** 16:15,19 17:2
**locking** 7:4 8:2 26:1,24 27:7,13 28:17 29:3,8
**locks** 27:24
**logical** 11:14
**LOMBINO** 2:8,8
**long** 5:22 6:15
**look** 8:19 10:2 12:18 18:12 21:25
**looked** 18:24 22:14 36:21
**looking** 11:13 21:1 23:13,17
**looks** 6:4,18 9:21 9:24 10:3 12:16 12:19 13:3 15:17 16:6 34:21
**loop** 17:9,13 31:12 31:15
**loops** 17:11,21 18:5 18:6 26:20 31:2 31:16
**lose** 30:7
**loss** 24:2 34:12
**lost** 24:7
**lot** 13:9 29:24
**loud** 30:23
**Lubken** 1:4,5 16:23 18:16,22 19:9,14 19:16,18,20,22 23:3 25:6,11,15
**Lubken's** 23:12 31:19 33:1

**M**

**M** 4:10 33:13
**main** 27:3 29:12 31:9
**majority** 26:12,18
**malfunction** 14:2
**manage** 6:24
**manually** 31:4
**March** 9:9,17,20 21:5,12 24:20 34:6 39:19
**marital** 1:5
**mark** 8:23 10:22 14:18
**marked** 8:25 10:24 14:20 24:12
**MARTINO** 2:8
**materialized** 8:6
**materials** 13:12 15:10,18 16:8
**matter** 32:5 33:17
**maximum** 30:8
**mean** 35:24
**means** 11:8
**meant** 26:12
**measurement** 35:2
**measurements** 34:15,25
**mechanical** 3:10 6:2,5 11:19
**mechanism** 27:24
**mention** 25:14
**mentioned** 14:8 19:18 24:5,18 25:12 35:7
**merely** 36:22 37:8
**message** 20:8
**Mexico** 6:9 7:8 8:1 8:10 32:5
**Meyer** 1:8 2:18 17:22 26:2 33:17
**MICHAEL** 2:8
**middle** 29:21
**Miller** 12:12
**mine** 12:15
**Ming** 11:25
**minute** 34:1
**mischaracterizat...** 26:3
**mischaracterized** 25:21
**mixer** 19:2 23:2,5 23:13,14 36:2
**mixers** 23:3,19
**moment** 24:4
**money** 12:23
**morning** 4:12 13:15 33:15
**motor** 27:16 28:14 28:15,19,19,21,22 28:23 31:10
**move** 16:23 17:7
**moved** 19:4,8,21
**Moving** 21:2
**multiple** 32:17

**N**

**N** 2:1 4:10,10 33:13 33:13
**name** 4:12,14 33:15
**named** 9:10
**nature** 27:9
**near** 15:5 16:11,16 17:7 18:6
**nearly** 25:25
**necessarily** 37:5
**necessary** 4:21
**need** 4:22 20:12 33:25
**needed** 29:10
**net** 23:10
**never** 8:5
**New** 6:9 7:8 8:1,10
**Ngillan@pcvala...** 2:7
**NICHOLAS** 2:4
**Nick** 20:5 37:25
**nonissue** 30:2
**normally** 30:8
**North** 5:4
**notable** 23:5
**note** 26:16
**number** 18:1 22:6 22:13
**numbers** 18:1

**O**

**O** 4:10 33:13
**o0o-** 4:3
**oath** 4:6
**Object** 32:15
**obscure** 21:1
**obstacle** 25:6
**occasions** 30:13
**occupation** 11:16
**occurred** 23:14,25 26:18 35:9
**offer** 14:10 32:25 37:1,14
**office** 4:17,18,19,20
**Oh** 5:3 13:3 20:3 24:8
**Ohio** 1:9,10
**Ohman** 1:25 39:6 39:16
**okay** 5:3 8:11,20 9:16,16,24 10:21 11:20,25 12:4,16 13:5,19,24 14:8 14:13 15:4,16,21 18:14 20:20 24:10 24:17 33:4,15 37:21
**old** 28:3
**Once** 5:18
**operating** 30:9
**opining** 9:14
**opinion** 11:11 17:3 27:23 29:1 31:14 32:25 33:2 35:4,9 36:11 37:1,5,7,12 37:18,19
**opinions** 14:11 15:22 21:18 35:3
**ORAL** 1:15
**order** 19:3 28:2
**Oregon** 13:22 14:5
**outside** 8:1 17:22 18:8
**overall** 35:4

**P**

**P** 2:1,1

**P.S** 2:8
**Padilla** 19:4,7,17 19:19
**page** 3:3,7 15:3,5 15:24 16:5 18:14 18:18 21:2,3,3,3 22:1,1,21,25 25:19 27:10
**paragraph** 23:1,11
**parameter** 31:3
**parking** 29:24
**participants** 1:20
**participated** 21:4
**participating** 10:17
**particular** 36:7
**particularly** 32:20
**passing** 17:16
**patrons** 26:18
**Paul** 11:5
**Pause** 4:25
**peer** 11:10
**perceived** 30:19
**perfect** 22:15
**perimeter** 29:24
**permission** 17:17 17:19 29:4,9,10 29:13,18,19,22 30:2
**person** 9:11
**personal** 4:21 25:16
**Pfau** 2:4
**Phillips** 11:5,22
**Phillips'** 11:16
**Phoenix** 5:4
**photo** 23:23 24:18 24:20 35:6
**photograph** 3:11 23:14 24:6,10,15 33:20 34:9,11,18
**photographs** 34:20
**physical** 35:19
**picture** 23:15,18 36:17,20
**place** 17:2 26:15
**plaintiff** 7:10
**Plaintiffs** 1:6 2:3
**planning** 14:10
**play** 16:22
**please** 4:12 30:25
**point** 19:1 29:1 35:12,20
**pointed** 18:16
**pointing** 16:15 18:16
**policy** 15:12
**popping** 20:8
**position** 31:13
**positioned** 22:7
**possibilities** 35:10
**possibility** 23:24 35:7 37:6
**possible** 19:23 25:3 29:7 37:15
**potential** 25:5 35:14 36:8,12 37:2
**potentially** 22:15
**precise** 18:13
**precisely** 26:19,20
**preference** 18:25 21:14
**prepare** 13:11
**presence** 23:5 25:9 25:9
**present** 2:2 36:15
**presents** 23:24
**preserved** 21:8 22:12
**presumably** 18:19
**presuming** 18:20
**pretty** 7:14 10:13
**principal** 6:22
**prior** 7:3,5 8:8,8,11 9:20 19:12
**probably** 7:15 8:17 15:19 21:25 28:2
**problems** 20:16
**process** 11:12
**processor** 12:8,9
**produced** 8:16 13:8 17:24 32:19
**professional** 6:8,15 8:2 11:19
**promise** 26:9
**protruded** 34:17
**protruding** 23:6,19 23:22 24:18,25 34:12,16 37:3
**provide** 28:12
**provided** 16:10 26:17 27:6
**publishing** 12:9
**pulled** 34:1
**purchase** 19:1 36:2
**purchasing** 23:4
**purely** 35:16
**purpose** 17:15 19:1 23:4
**pursuant** 38:4
**push** 28:18 35:24
**pushed** 19:20 31:2
**pushing** 19:10 26:19
**put** 8:22

**Q**

**quality** 11:9,15
**question** 10:13 14:4 20:5,20 26:22 37:13
**questions** 8:21 14:18 33:5,8,18 37:22,24
**quiet** 28:18

**R**

**R** 2:1 39:1
**randomly** 30:18
**range** 26:10 31:16
**rate** 10:4,8,8,10,12 10:14
**reach** 15:15
**reading** 9:18 10:16 38:3
**really** 13:9 35:2
**reason** 17:1 23:8
**reasonable** 29:20
**recall** 5:21 7:20 20:25 23:3 26:25 27:8
**receive** 17:16,20 30:18
**received** 17:8 30:10 30:19,24 31:22
**record** 4:13,21 9:11 34:2
**records** 7:16
**red** 18:15,16
**refer** 8:18 24:14 33:19
**reference** 8:18 12:13 17:25
**referenced** 35:6
**referring** 13:1
**regard** 34:16
**registered** 6:8,11 6:15
**registers** 29:14
**related** 6:25 7:9 8:9 9:17 14:2,11 15:12 26:1
**reliability** 28:5
**relied** 15:15
**remember** 13:22 14:1,5 15:14 19:18
**repaired** 22:10
**repairs** 14:3
**repeat** 20:3,4
**rephrase** 37:13
**report** 3:10 11:6,11 11:13,15,21,23 12:14 14:17 15:1 15:3,6,16,24 17:12 18:1,4 21:25 22:20 23:9 24:6,11,15 25:3 25:18,20,21,24 26:16 27:12 33:19 35:7 37:8,19
**reported** 1:25 7:9
**reporter** 20:12 33:25 39:6
**reports** 12:10 25:22 26:1,4,6,12,22,23 27:6,8
**representing** 33:16
**requested** 38:3
**required** 28:20
**requires** 29:21
**reread** 13:12
**reserve** 37:22
**resolution** 7:22 25:7
**result** 27:17,20
**retained** 7:10 8:4 13:20
**retention** 8:8
**returned** 21:8
**revealed** 18:25
**review** 11:6,10,21 12:3 13:13 15:21 19:9,13 24:23 25:4,11 26:4,23
**reviewed** 11:23 15:8,11,17 16:6,8 26:7,9
**reviews** 11:13
**right** 4:16 6:6,7,9 6:19 16:8,12,14 22:23 31:5,6,15 35:25
**Rimkus** 5:2,3,7 6:18,21 9:13 10:15 11:9,18 12:11 21:4
**ROBERT** 2:13
**role** 6:21 9:13
**rolled** 30:15
**rotating** 28:8
**roughly** 7:13 8:14 12:17,21
**RPR** 1:25 39:16
**rule** 25:9 31:17

38:4

S

**S** 2:1
**safety** 25:17
**Sarah** 2:19 33:7,16
**Sarahc@sheer.law** 2:22
**saying** 35:8 37:18
**says** 9:17 11:20 16:15
**scene** 19:5
**Scheer** 2:19
**Scott** 2:13 13:18
**screen** 8:22 9:3 11:2 14:24
**screw** 28:15
**scroll** 9:8 11:4 15:4
**seal** 39:11
**Seattle** 2:21
**second** 33:22
**section** 15:5 22:2 23:2 37:8,9
**security** 23:16
**see** 9:2,6,7 11:2 14:23 16:23 17:6 19:6 20:1,13,21 23:16,18 25:4,5 26:22 33:21,23 34:16 35:25 36:20
**seeing** 18:6 19:10
**seen** 15:19
**self** 29:14
**send** 5:1 31:11,12
**sending** 29:25
**sent** 4:23
**sentence** 18:18
**service** 29:17,17
**set** 26:8,9 39:11
**settlement** 7:24
**share** 8:21 10:23 14:22 24:5,11 33:24
**sharing** 24:4
**shelf** 23:2,6,14,15 23:15,20,22 34:17 35:16 36:19
**shopping** 7:5 8:3 16:16 19:3
**short** 30:20
**Shorthand** 39:6
**showed** 24:25
**showing** 19:9
**shut** 20:10
**side** 13:8 16:14
**signal** 17:16,17 29:5,8 30:4,9,17 30:18,21,22,23 31:22 32:8,8
**signals** 29:2
**signing** 38:3
**similar** 25:2,22
**Simple** 28:3,3
**simply** 11:12 28:7 35:9
**single** 19:2
**sit** 24:1
**sitting** 22:17
**skill** 39:10
**slap** 28:7
**Slasalle@aguiler...** 2:16
**small** 16:16 18:17 18:19,21,23,25 19:2,4,4,6,15 28:14
**smaller** 29:14
**somebody** 22:9
**sorry** 13:1 20:2 24:8 26:15
**sort** 22:7,11
**sound** 12:22
**sounds** 20:5 26:8 30:25 31:13
**special** 11:17
**specific** 23:4 32:20
**specifically** 13:2,3 14:15 22:1 33:2
**speculation** 35:13
**speculative** 35:11
**spent** 12:17
**spin** 28:19,22
**spinning** 28:13,19 28:20
**spoke** 33:20
**stand** 28:16
**standing** 23:17 24:1
**started** 7:15
**starting** 22:1
**state** 1:9,11,13 4:12 6:12 18:18 25:21 26:2,11 39:3,7
**statement** 30:5
**states** 1:1 23:2
**stating** 19:14
**steps** 11:9
**stills** 16:10
**stop** 24:4 28:6,9,11 36:25
**store** 16:11,16,25 17:22 18:8,11,22 19:1 21:4,9 23:4 25:14 26:19,24,25 27:2,3,4 29:12,20 29:21 31:4,14 32:13,17,22 36:5
**stores** 1:8 2:18 26:2 29:16 33:17
**strap** 28:1,9,9
**Street** 2:5
**strength** 30:6,7,8 32:8
**strong** 30:18,23 32:1
**style** 12:11
**subject** 16:2 17:5 18:19,21 19:16 21:5,12,18,23 22:18 24:25 25:22 26:14 28:13 37:4
**successfully** 31:22
**Suffers** 28:4
**sufficient** 19:3 25:7 28:21
**suggestion** 37:14
**Suite** 2:5,9,15,20 5:4
**sure** 7:14,16 8:7,24 12:10 17:14 18:22 27:24 34:24 37:13
**surveillance** 16:7 18:15 19:25 20:7 20:21 24:23 25:5
**SW** 2:9
**switching** 13:10
**sworn** 4:6 39:9
**system** 14:16 23:1 33:3
**systems** 1:12 2:12 7:4 8:2,9

T

**T** 4:10 33:13 39:1,1
**Tacoma** 1:3 2:6
**take** 10:21 33:9 34:15 35:24
**taken** 1:19,24 24:20 33:11
**talking** 13:16 27:3
**technical** 11:6,20
**tell** 10:20 17:23 24:1
**telling** 29:22,25 30:1
**test** 32:7
**testified** 4:7 5:13 5:25 13:24 14:4 19:4,21 25:16 31:3
**testify** 7:17 19:19
**testifying** 7:21 11:13
**testimony** 5:19,20 6:23 7:20 14:7 16:24 19:13,17 21:7 23:3 25:11 27:5,19 31:19 35:19
**testing** 30:12 31:21 32:2,21 34:25 35:1,23
**Thank** 28:25 33:5 37:23 38:2
**theirs** 5:2
**thing** 22:7,11
**things** 15:11,12,15 22:2,14 28:6 34:4 36:24 37:9
**think** 5:1 6:17 7:14 8:16 12:25 15:19 18:3,3 33:4 34:20 35:17
**Thomas** 1:17 3:1 4:5,14 39:8
**three** 31:21,24
**tighten** 28:9
**tightens** 28:15
**time** 22:11 29:21 33:6
**times** 5:11,17,25 14:9
**title** 6:22 15:3
**titled** 15:5,25
**today** 22:17 33:5
**today's** 13:11
**Tom** 20:5,13
**total** 9:25 12:17,20 12:20,24
**training** 6:13
**transcript** 4:23,24 39:8
**transmitted** 29:9 30:3
**Travel** 10:8
**trial** 5:15,19 6:1 7:18 10:17 13:25 37:2,16
**trigger** 32:1
**troubleshoot** 20:17
**true** 39:9
**truthfully** 8:7
**trying** 13:21 14:1 37:10
**turn** 28:21

**turns** 28:15
**two** 12:20 14:6 31:11,21,24 34:1
**typically** 7:2 10:18 18:9 29:13 36:12
**typos** 11:14

**U**

**underscore** 36:13
**understand** 10:16
**understanding** 34:5,8
**understood** 7:24 8:5 12:6 20:14 36:3
**UNITED** 1:1
**unstable** 20:9
**use** 18:23 25:8 36:21
**uses** 28:13

**V**

**vary** 10:6
**vast** 26:17
**vehicle** 14:2,2
**versus** 32:21
**Vertetis** 2:4
**vestibule** 18:7
**video** 16:6,22 17:6 18:15 19:6,9,11 19:23,25 20:7,10 20:21 24:23 25:7 25:8
**videoconference** 1:15,20 3:1 39:8
**VIDEOCONFE...** 2:2
**visible** 19:22
**vs** 1:7

**W**

**WA** 2:6,10,21
**walk** 16:23,24
**walkway** 23:7
**want** 9:8 13:22 15:4 16:5 18:2 20:10 21:2 22:25 28:8 34:4 35:8 36:1,3
**wanted** 33:19
**Washington** 1:2,10 1:11,13 13:20,23 13:23,25 14:5 39:3,7
**wasn't** 25:7 35:2 36:10
**way** 25:14 27:1 28:5 30:5 32:6,18 35:7 36:19 37:20
**ways** 31:7,11
**we'll** 33:10
**we're** 18:6 19:10 21:1
**weak** 27:15,19 30:10,21
**Welsh** 15:20 25:20 25:21,24 26:8,16
**went** 22:13 26:15
**weren't** 36:4
**WESTERN** 1:2
**wheel** 7:9 8:5 14:15 17:8,16 22:10 26:1,23 27:7,14 27:24 28:8,12,13 28:17,24 29:23,25 30:1,10,11,20 31:1,10,22,24 33:3 36:24
**wheels** 17:2,4,10,16 22:5,7,19 26:21
**WHEREOF** 39:11
**wife** 1:5
**WILLIAM** 1:4
**wireless** 29:2,5,8 30:4
**wirelessly** 30:3
**witness** 4:5,24 5:3 5:22 20:14 32:16 39:11
**witnesses** 19:14
**word** 21:14 35:17 25:12
**work** 5:23 6:25 8:6 8:9 9:20 11:18 12:15
**worked** 32:18
**works** 12:8 32:6
**world** 22:15
**wouldn't** 15:14 29:10 32:19 35:13 36:3 37:5,20
**wrap** 28:7
**wraps** 28:1
**written** 11:11
**wrong** 26:15 31:1
**wrote** 33:20

**X**

**X** 4:10 33:13
**Xiao** 11:25

**Y**

**yeah** 13:3 18:3 20:4 20:8,16
**year** 7:13,15 8:16
**years** 5:21,24 6:17 28:3

**Z**

**ZALESKI** 2:19

**0**

**1**

**1** 3:8 8:23,25 16:11 18:7
**10** 3:9
**10:01** 4:2
**10:59** 33:12
**11** 22:1
**11:10** 33:12
**11:18** 38:5
**12** 22:2
**120** 5:4
**13** 5:24
**14** 3:10 25:19
**15** 6:17
**150** 28:3
**16** 6:17,17
**16,000** 13:4
**16,400** 12:21
**16th** 9:9
**18th** 15:17
**19** 27:10
**19-2** 12:24
**1998** 6:5
**19th** 5:4 9:17,20 39:12

**2**

**2** 3:9 10:22,24 15:24 19:10,15
**201** 2:9
**2013** 6:19
**2023** 24:24
**2024** 7:15
**2025** 9:21
**2026** 1:24 4:1 9:5,9 9:17,20 15:17 21:5,13 24:20 39:9,12
**2027** 39:19
**21002** 5:4
**22** 15:5
**23046** 2:14
**23rd** 24:24
**24** 3:11
**24.3** 12:17
**24th** 9:5
**25** 5:12 9:25
**253.830.2700** 2:10
**253.948.3199** 2:6

**3**

**3** 3:10 14:19,20 25:19
**3:24-CV-05811-J...** 1:6
**30(e)** 38:4
**300** 2:15
**30th** 21:5,12 24:20
**3186** 1:25 39:16
**33** 3:5
**330** 10:4
**360.901.1017** 2:21
**3860** 2:20
**3rd** 24:24

**4**

**4** 3:4,11 24:11,12
**4/24/2026** 3:8
**400** 12:21,21

**5**

**5/18/2026** 3:10
**500** 12:21
**535** 10:11
**5th** 2:20

**6**

**6** 1:24 4:1 16:5 39:9
**6/24/2026** 3:9
**60** 25:25 26:9

**7**

**7** 18:14
**700** 2:5
**701** 2:20
**714.384.6600** 2:16

**8**

**8** 3:8 21:2,3,3
**8,019** 12:17
**8,415** 10:1
**85027** 5:5
**86** 19:25 20:21,23 25:13

**9**

**9** 21:3 22:25 23:14 24:6,10,15 33:20
**909** 2:5
**92653-1577** 2:15
**9315** 2:9
**98104-7011** 2:21
**98402-5114** 2:6
**98499-1502** 2:10