# Angela Padilla

# Lubken v. Fred Meyer Stores, Inc.

# July 23, 2025

BUELL
REALTIME REPORTING

1325 Fourth Avenue, Suite 1840 Seattle, Washington 98101
6 South Second Street, Suite 718 Yakima, Washington 98901
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066 Tacoma 253.235.0111 Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: transcripts@buellrealtime.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community,

Plaintiffs,

vs.

FRED MEYER STORES, INC., an Ohio corporation doing business in the State of Washington; THE KROGER CO., an Ohio corporation doing business in the State of Washington; GATEKEEPER SYSTEMS, INC., a California corporation doing business In the State of Washington,

Defendants.

No. 3:24-CV-05811-JCC

VIDEOCONFERENCE VIDEOTAPED DEPOSITION
UPON ORAL EXAMINATION OF
ANGELA PADILLA

Taken at 909 "A" Street, Suite 700

Tacoma, Washington

DATE TAKEN: JULY 23, 2025
REPORTED BY: LAURA L. OHMAN, RPR, CCR 3186



APPEARANCES

FOR THE PLAINTIFFS:
ANDREW ULMER
PAIGE MAXA
Pfau Cochran Vertetis Amala, PLLC
909 "A" Street
Suite 700
Tacoma, WA 98402-4413
253.948.0232
Aulmer@pcvalaw.com

FOR THE DEFENDANT KROGER/FRED MEYER:
AHBRA FRANCO
Scheer.Law, PLLC
701 5th Avenue
Suite 3860
Seattle, WA 98104
206.666.3075
AhbraF@Scheer.law

FOR THE DEFENDANT GATEKEEPER SYSTEMS, INC.:
(Appearing via Zoom)
BRITTNEY ANNE RODRIGUEZ
The Aguilera Law Group
23046 Avenue De La Carlta
Suite 300
Laguna Hills, CA 92653-1577
714.384.6600
Brodriguez@aguileragroup.com

ALSO PRESENT: Melody Sorenson, Videographer

* * * * *



VIDEOTAPED DEPOSITION OF ANGELA PADILLA


EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| MR. ULMER | 5 |

EXHIBIT INDEX

| EXHIBITS FOR IDENTIFICATION | | PAGE NO. |
|---|---|---|
| 1 | Claim report to Sedgwick dated 12/23/2023 - CONFIDENTIAL | 39 |
| 2 | Subpoena to testify at a deposition in a civil action dated 6/23/2025 | 30 |
| 3 | Defendant Gatekeeper Systems, Inc.'s requests for production to Defendant Fred Meyer Stores, Inc., with responses thereto dated 12/24/2024 | 69 |
| 4 | Plaintiff's first set of interrogatories and requests for production to Defendant Fred Meyer Stores, Inc., dated 3/17/2025 | 74 |
| 5 | Video | 20 |




TACOMA, WASHINGTON; JULY 23, 2025
9:26 A.M.
-o0o-

THE VIDEOGRAPHER: We're now on the record. The time is now 9:27 a.m. on July 23rd, 2025. This is the video-recorded deposition of Angela Padilla -- Padilla, sorry, in the matter of versus Lubken versus Fred Meyer Stores, Inc., noted in the United States District Court, Western District of Washington, at Tacoma. The case number is 3:24-CV-05811-JCC.

My name is Melody Sorensen from Buell Realtime Reporting.

Will counsel please identify themselves for the record, after which, the court reporter will swear in the witness.

MR. ULMER: So this is Andrew Ulmer on behalf of the plaintiffs, and present with me spectating is Paige Maxa.

MS. FRANCO: Aubra Franco here on behalf of Kroger/Fred Meyer.

MS. RODRIGUEZ: Brittney Rodriguez here on behalf of Defendant Gatekeeper Systems, Inc.

///

///

ANGELA PADILLA, witness herein, having been first duly sworn under oath, was examined and testified as follows:

E X A M I N A T I O N

BY MR. ULMER:

**Q. All right. Let's start by getting your full name for the record.**

A. Angela Renee Padilla.

**Q. And what's your address?**

A. 813 East 62nd Street, Tacoma, 98408 -- or 404. Sorry.

**Q. That's fine.**

**Have you ever had your deposition taken before?**

A. Yes.

**Q. How many times?**

A. Once.

**Q. Okay. Do you remember the date that happened?**

A. 2013 -- '12 or '13.

**Q. Okay. So the rules probably are similar, but we have a court reporter here taking down everything we're saying.**

**To the best of your ability, let me get out my full question before you provide your answer. It assists the court reporter in taking down a clear**



**transcript. I'll try to do the same and not interrupt you; okay?**

A. Okay.

**Q. I don't think we'll be here very long, but to the extent you need a break, just let me know. I'm happy to oblige. I just ask for you to finish answering a pending question before we take a break.**

A. Okay.

**Q. All right. The deposition you had before, was that related in any way to Fred Meyer?**

A. No.

**Q. Okay. What was the nature of the case where you had your deposition taken?**

A. It was --

**Q. And so I don't need to know the details, just the type of case it was.**

A. Child exploitation. I think that's the best I can say.

**Q. Okay. And were you a party in that case or a witness?**

A. Parent.

**Q. Okay. You were a parent of a child involved in the case?**

A. Yes.

**Q. Understood.**



**Was it a criminal proceeding, or was it a civil case?**

A. It was military, so but it was criminal.

**Q. Okay. And so that was not a case for civil damages, was it?**

A. No.

**Q. Okay.**

A. No.

**Q. And so have you ever testified at trial or in a deposition relating to a civil case?**

A. No.

**Q. Okay. And I take -- I know the answer for this one. Have you ever had your deposition taken in the capacity of an employee at Fred Meyer?**

A. No.

**Q. Okay. How long have you worked at Fred Meyer?**

A. Eight years.

**Q. Eight years.**

**And so that would be what, 2017?**

A. Yes.

**Q. And what was your job title when you were first hired in 2017?**

A. I was a home clerk, worked in the field center.

**Q. And which store did you work at?**

A. 19th and Stevens.



**Q. That's in Tacoma?**

A. Yeah. Sorry.

**Q. And does Tacoma have one Fred Meyer?**

A. No.

**Q. So there's several Fred Meyer?**

A. Yeah, yes.

**Q. Okay.**

A. There's two if you don't count University Place.

**Q. And the Fred Meyer you started to work at in 2017, is that the same Fred Meyer that you worked at in December of 2023?**

A. Yes.

**Q. Okay. And so you started work as a home clerk.**

**Walk me through the other job titles you've had.**

A. I went from home clerk to floral lead, back to home as the fourth in charge and the third in charge and then the assistant, and now I'm at 72nd and Pacific as the home manager.

**Q. Do you remember the estimated date you became manager?**

A. May of 2024.

**Q. What was your official title in December of 2023?**

A. A home -- a home assistant manager.

**Q. And what are -- what are your general job duties**

Page 9

**and functions as the home assistant manager?**
A. Pretty much to run the home department. As we call it, you kind of run the show. The home manager is there in case -- does a lot more of the paperwork than anything else. The home assistant kind of is the one on the floor that gets everyone else to do what they need to do.
**Q. Okay. And so in the timeframe of December 2023, did you oversee a number of employees in your department?**
A. Yes.
**Q. And in that time period -- that's right on the precipice of Christmas Eve -- how many employees would you be supervising?**
A. Roughly maybe 10, 15, right around there.
**Q. And those would be employees working the floor of the store?**
A. Working the -- yeah, on the home department.
**Q. And help us -- help educate me on how many departments are in that Fred Meyer in Tacoma.**
A. Well, you have your fresh departments, which are bakery, deli, produce, meat department, floral. Center store, which is grocery, and then you have the apparel department, and then the home department, which includes garden center, electronics, and fuel, and then all the

Page 10

home goods.
**Q. And I don't know if the aisles have changed since December of 2023, but at least during that time period, are there certain aisles that fall within the home department?**
A. Yes.
**Q. Do you happen to know -- I don't know if you know by memory what aisles fall within the home department?**
A. No. Actually, they did a remodel back in -- before this. Home department, at that point before the remodel, did not have aisle numbers, and then after the remodel, they did, so not a lot of the home team could ever remember aisle numbers, yeah.
**Q. Okay. So during that time frame in December 23, 2023, you had a team working under you of about 10 to 15 employees?**
A. Uh-huh, yes.
**Q. And what are the types of things that your team that you're supervising would do?**
A. Each department, subdepartment, such as domestics, housewares, toys, sports, they all have leads. It's my job to -- it was my job, still is, but to make sure that they're doing any resets, putting out all their back stock, giving other people breaks,

Page 11

lunches, backing up cashiers, or there they have a self-checkout. Mainly getting freight out so people can buy it.
**Q. And so at the time when you were the kind of home department supervisor in December of 2023, who would be your direct report -- who would be the person you would directly report to or your boss?**
A. The home manager.
**Q. The home manager?**
A. Uh-huh.
**Q. And who was that in December 2023?**
A. Emily Cryder.
**Q. How do you spell the last name?**
A. C-r-y-d-e-r.
**Q. And what's her role in relation to the home department?**
A. She oversees it and does a lot more of the paperwork, so I would tell her basically what my plan was for the day. If she had any other input, like something needed to be done sooner or got something from the store leader, then she would, but basically kind of worked together a lot and then... (Pause.)
**Q. In the situations where Emily Cryder is either not on shift that day or if she's occupied with other duties, do you step in the role as the assistant manager**

Page 12

**for the home department?**
A. Yeah. I step in the manage -- yeah.
**Q. Okay. Do you recall back in December 23, 2023, at the time when the incident occurred, if Emily was on shift?**
A. I don't remember.
**Q. And on December 23, 2023, that was a day that you were on shift as the home assistant manager; correct?**
A. Yes.
**Q. Okay. The -- one of the issues in this case is the antitheft wheel that's either currently or at the time installed in some of the shopping carts.**
**Do you remember when that Fred Meyer store first started installing that on their carts?**
A. I do.
**Q. You do?**
A. I don't remember the date, but I do remember it. We all were waiting for it.
**Q. And the purpose of that antitheft device is to prevent individuals from taking the carts off property and steeling them; correct?**
A. No.
**Q. What are they for?**
A. So the ones that they installed are for if you

do not go through a check stand, it will lock up at the door preventing people from walking out with carts full of unpaid for merchandise.
**Q. And what was the time period that you recall Fred Meyer first installing those? And if you don't remember the specific date, if you remember the time of the year and what year.**
A. Oh, I -- I believe it was 2019. It was before COVID. I know that.
**Q. And to your memory, did Fred Meyer procure these wheels from different vendors, or was it always wheels provided by Gatekeeper?**
A. As far as I know, it was always Gatekeeper, but I didn't always see every box, and it wasn't until later in the years that I saw that that's who was providing it.
**Q. Okay. And you were employed at Fred Meyer when the wheels started being installed in the store's carts?**
A. I'm sorry. Repeat that.
**Q. You were employed by Fred Meyer --**
A. Yes.
**Q. -- at the time they started installing the wheels?**
A. Yes.
**Q. Okay. And was there -- were the wheels**



**installed on all carts, or were they installed on certain carts?**
A. All carts.
**Q. Okay. And is it installed on one wheel, two wheels, how -- how --**
A. Some --
**Q. -- how are they placed?**
A. Some carts, it's -- it's usually the -- one of the front ones, usually the front left one and the back right one. I think when they first started installing, it was only one, and now it's both.
**Q. When do you recall them installing the device on both a -- on more than one wheel?**
A. I don't recall that at all.
**Q. Was it after the December 23, 2023, incident?**
A. I -- I believe so because I believe that incident, it was one wheel. It was a smaller cart.
**Q. Okay. And what is your understanding for how they work? Like, they lock up.**
**What is the trigger from your understanding that causes them to lock up?**
A. If --
**Q. Is it a radio, or how does the technology work?**
A. It's -- if they just -- so when they come in the store, the longer they're in the store, it --



something -- I actually don't know, but unless they go through that check stand or even if they go through the customer service, there's something in there that triggers them to unlock. If they remain in the store after it is unlocked, like they go over to Starbucks, sit down for a half-hour or so, it will lock up again, so something triggers it to lock back up the more it's in the store.
**Q. And do you know if there's like a -- you know, a transmission box somewhere located in the store that communicates with the wheels to lock them up or how they work?**
A. I would assume so. I know that they did something like that because we can turn it off at the doors. During garden season, if you get too close to the -- to that -- the carts will lock up, so we can choose if we have the gates open to go ahead and turn it off so the carts don't lock up.
**Q. Okay. We're going to play a video. It will be marked as Exhibit 5.**
MR. ULMER: Brittney, do you want to -- for me to turn the laptop around to the television screen for me to play it, or do you want to watch the witness?
MS. RODRIGUEZ: I would like to watch the video.



MR. ULMER: All right.
MS. FRANCO: Here. You're doing too much. I got you.
Can you see?
MS. RODRIGUEZ: Yeah. Kind of.
MS. FRANCO: Okay.
MS. RODRIGUEZ: So far, but I can see it for the most part.
BY MR. ULMER:
**Q. All right. I have -- I have not yet played the video. I submit to you this is footage that we received in the case.**
**Looking at just a screen shot of just the very first frame, does it appear to you as an image taken from one of the security cameras inside the store facing one of the exits?**
A. Yeah. That's the grocery side entrance because you can see Starbucks on the left-hand side over there.
**Q. Okay. And there's two exits and entrances to this store; correct?**
A. Yes.
**Q. Okay. And what we're seeing here is depicting the interior of the store that you worked at on December 23, 2023; right?**
A. Yes.

Page 17

**Q. Okay. And the -- at that point in time in December of 2023, how many different security cameras were recording footage, if you -- if you remember.**
A. I couldn't tell you that.
**Q. Okay.**
A. I actually have -- that is an LP question, which is loss prevention. They're the ones that monitor the cameras.
**Q. I know that the -- at that point in time, the store on some of the aisles had the little screens that would show customers as they're walking through the aisle that they're on camera.**
**Do you know if there were certain screens that were not recording footage but merely as a -- you know, to pro- -- discourage theft seeing customers on screen but not recording footage?**
A. So those screens that they put in were for aisles such as -- that were high theft aisles. At the -- you can see right where that manikin is standing right there, that podium that's right next to it, in that podium is a screen that shows little pictures of every one of those aisles. If no one is standing there, no one sees it, and not a lot of times they're standing there. That does not go to what they're recording in the LP office.

Page 18

**Q. Okay. And so I understand sometimes as a way to discourage theft, you create the appearance to the customer that they're being recorded, and so at Fred Meyer in December of 2023, do you remember certain screens that showed customers on camera but footage was not being recorded?**
MS. FRANCO: Objection to form.
I just want to remind you she's here in her personal capacity. She's not --
MR. ULMER: Understood.
MS. FRANCO: Okay. I just --
BY MR. ULMER:
**Q. Your knowledge. I understand you don't --**
MS. FRANCO: Yeah.
BY MR. ULMER:
**Q. -- work in LP.**
MS. FRANCO: I just wanted to state for the record. Thank you.
THE WITNESS: As far as I know, those aren't recorded.
BY MR. ULMER:
**Q. I asked just because I got -- I received in this case three security tapes from three different security cameras as far as I understand them.**
**There were other cameras depicting customers**

Page 19

**that I did not receive footage for, and I'm wondering, to the extent you know, if footage was not reported from some of the cameras that were showing customers their face on camera.**
A. Yeah, I -- so the world of loss prevention is a secretive world because not only are they watching customers, they're also watching employees. So you don't know when they arrive. You don't know when they leave. You know, you don't know what they're watching.
**Q. Understood. My question was --**
A. Or what they're -- or what they're recording, I should say.
**Q. Okay. Who in December of 2023 was sort of running the loss prevention, if you remember?**
A. I think it was Alex at the time.
**Q. What was the last name for him?**
A. I know it, but I can't quite remember it, and it's really hard to pronounce. He's there now.
**Q. Okay.**
A. He's the one there.
**Q. Does Fred Meyer have its own internal loss prevention department, or do they contract with a third party security company?**
MS. FRANCO: Object to form.
BY MR. ULMER:

Page 20

**Q. To the extent you know.**
A. They have their own.
**Q. Okay. And to be clear, occasionally counsel will object. Unless you're instructed not to answer, you can go ahead and answer once the objection is made.**
**My question was just to the extent you know if, you know, a third party company like Allied Security was hired by Fred Meyer to track security footage or operate security.**
**Do you remember if there was some other company --**
A. No.
**Q. -- at that time in December of 2023?**
A. No.
**Q. Okay.**
A. They hire out, but they're not even allowed to see anything.
**Q. Okay.**
A. But it is only loss prevention that is Fred Meyer.
**Q. All right. So I'm going to play some footage. I have a note to myself on where to start.**
**All right. So we're going to look at Exhibit 5. I'm going to take us to timestamp 1:45 p.m.**
**(Exhibit No. 5 marked.)**

Page 21

MS. FRANCO: Did you say 1:45 p.m.?
MR. ULMER: Well, let me just drop somewhere, and then I'll note for the record where I'm starting the video. So I'm going to start the video at timestamp December 23, 2023, at 1:44 p.m. and 41 seconds. Top left of the video says "FOD exit." I'm going to hit play and then probably just ask you a couple of questions as we watch the video. I'm going to play a little bit, by the way, with this speed just so we can... (Pause.)
(Video playing.)
BY MR. ULMER:
**Q. All right. So as we're watching here, this is one of the entrances. So depicted in the video, I'm -- so that was around, let's see, 1:45 p.m. at 25 seconds. I'm going to reverse and then play forward a little bit back and forth during that timestamp, and what you see in the video is a customer frustratingly trying to push one of the carts; correct?**
A. Yes.
MS. FRANCO: Object to form.
BY MR. ULMER:
**Q. Is that -- is that a fair characterization of what we're seeing from one of the customers?**
MS. FRANCO: Object to form.

Page 22

THE WITNESS: Yes.
BY MR. ULMER:
**Q. And what's being displayed is the cart being locked; correct?**
MS. FRANCO: Object to form.
THE WITNESS: Yes.
BY MR. ULMER:
**Q. And it's at the entrance; right? One of the carts roughly at 1:45 p.m. at 15 seconds. Cart is at the entrance. It's locked at the antitheft -- at the antitheft wheel, and customer, as we see in the video, is trying to push it aside because it's completely locked; right?**
A. Yes.
**Q. Okay. Okay. And, you know, we're at timestamp 1:45 p.m. still. What we're seeing depicted on the video are a couple more customers trying to bypass the cart that's right in the middle of the entrance, try to push it to the side, and it's locked; right?**
A. Yes.
**Q. And what we're seeing displayed on camera and customers kind of manipulating the device is the antitheft wheel in operation. It's locking the cart, preventing it from moving; correct?**
A. Yes.

Page 23

MS. FRANCO: Object to form.
BY MR. ULMER:
**Q. And then we actually see a little bit before timestamp 1:46 p.m. at 49 seconds, customer has to physically lift it up to move it out the way; correct?**
A. I don't see that.
**Q. Yeah, let me reverse a little bit.**
**(Video playing.)**
THE WITNESS: Oh, okay.
BY MR. ULMER:
**Q. So at timestamp 1:46 p.m. at 33 seconds, give or take, we see a customer physically lift the cart to move it out of the way because it's in locked mode; correct?**
A. Yes.
**Q. Okay. And I'm showing you this because does this video at this time clip kind of display how the antitheft wheel works? It locks the cart in place physically making it impossible to move?**
MS. FRANCO: Object to form.
THE WITNESS: Yes.
BY MR. ULMER:
**Q. Okay. And so we see it lock at the entrance.**
**From your understanding, did Fred Meyer -- well, I shouldn't say this. Strike that.**
**To your understanding, in December of 2023, on**

Page 24

**the 23rd, were the wheels intended to lock at the entrances?**
MS. FRANCO: Object to form.
THE WITNESS: Yes.
BY MR. ULMER:
**Q. Okay. And do you have an understanding of what is communicating with the wheels to cause them to lock at that point?**
A. As I --
MS. FRANCO: Object to the form.
THE WITNESS: As I said, there is some sort of electronics that has it lock up.
BY MR. ULMER:
**Q. Okay. And to your understanding of how the device works, what unlocks it?**
A. We have a key.
**Q. Okay. And what is -- can you describe what that is?**
A. Well, there's two different kinds. There's one that's a little handheld one that parcels will take out to the parking lot. If the guard is at a door, then we have a bigger one that we just go along and unlock the carts.
**Q. And when you say key, is it like a little tiny remote device?**

Page 25

A. Yeah, first type is. The second type is on a big chain, and it's like this big, but same thing. It's a little electronic key that unlocks it.
**Q. I'm thinking in my head -- I don't know what it looks like, but is it like a little remote control?**
A. Yes.
**Q. And an employee would take it and physically, like, what, click a button toward the wheel, or how does it work?**
A. Yeah, you walk over to the wheels and you just push the button and you hear them unlock.
**Q. Okay. What's your understanding as to why some carts are passing through and exiting while some of the carts as we see here are locked?**
A. It didn't go through a check stand, and if you watch the beginning of the video, the guy who brought the cart in is the same guy who pushed it out. He's the one that took it to the door, locked it up and came back in and tried to push it and it was locked.
**Q. At the check stand, does an employee do something to the wheel to give it clearance to exit?**
A. No.
**Q. Well, how does one then leave the store with a cart?**
A. It's built into the bottom of the registers.

Page 26

There's something in the very bottom that allows the wheels to go -- they have -- the cart has to physically sit there for an amount certain like 10, 15 seconds and it will release it.
**Q. Okay. And so to your understanding, customer has to have the antitheft wheel, you know, in close proximity to the cashier for a certain amount of time in order to be able to leave the store without it locking?**
A. Yes.
**Q. Okay. And we see some of the wheels, at least one cart locking up at the entrance.**
**Do you know what it is that's causing them to lock in -- in this location here?**
A. The entrance.
**Q. I know. But what is installed in the entrance that's causing it to lock?**
MS. FRANCO: Objection; form.
THE WITNESS: I have no idea.
MS. RODRIGUEZ: Speculation.
MR. ULMER: Here. I'm going to flip the laptop over so you can see --
MS. FRANCO: Sorry. That was my job. I apologize.
MR. ULMER: Okay.
MS. FRANCO: I shirked my responsibility.

Page 27

MR. ULMER: Are we on video?
THE VIDEOGRAPHER: Yes.
BY MR. ULMER:
**Q. Okay. So this is -- it says on the top left, "FOD exit."**
**What does that stand for?**
A. Food.
**Q. Okay. And the other exit entrance, what do you call that at Fred Meyer?**
A. Home. Home.
**Q. Home. Okay.**
**And for that entrance and exit, does it have the same configuration where carts will lock up if they aren't sitting by the cash register for a certain amount of time?**
A. Yes.
MS. FRANCO: Object to form.
THE WITNESS: That -- that exit is a U-scan. There's -- so they -- so that unlocks it. It's not just the registers. It's the self-checkout also.
BY MR. ULMER:
**Q. And, you know, based on your understanding, what is the device that's located near the registers that allows this wheel to be in some sort of mode where it can exit without locking?**

Page 28

A. I have no idea.
**Q. Okay. And do you know what the technology is at both of the entrances, exits that communicates to the wheels that causes them to lock?**
MS. FRANCO: Object to the form.
THE WITNESS: No.
BY MR. ULMER:
**Q. And do you know the range for the devices at the entrance and exit that -- how far it communicates with the wheels?**
A. How far it is to the register or to the check stand -- or U-scan, or how close it is to the door? Which one are you asking?
**Q. Yeah, it's a good question. Let me ask this: The wheels that lock when they reach -- when they approach an entrance/exit, do you know the area where the wheels would lock, how -- how big that area is?**
A. So just in -- I don't know for sure, but just in my observation, it's roughly about a foot before the exit.
**Q. Okay. All right. You had mentioned sometimes a customer who's shopping at the Starbucks that we see in the left of the video, sometimes the carts would lock in that Starbucks?**
A. No.

**Q. Okay.**
A. I -- what I said was if they go through a check stand and it unlocks and then they go over to Starbucks and purchase food, drink, whatever and stay at that Starbucks for half an hour, then when they get close to the entrance, it would lock up because of the time frame.
**Q. To your knowledge, there's a certain amount of time a customer has to exit with the antitheft wheel without is locking after passing through the cash register?**
A. That's what I've observed. It's very rare. Most people don't hang around, but I have seen it happen a couple of times.
**Q. Do you know the duration of -- strike that.**
**Do you know how long someone has before the wheel will lock up once again after passing through a cash register?**
MS. FRANCO: Object to form.
THE WITNESS: No, I do not know the exact time.
BY MR. ULMER:
**Q. From your experience with, you know, working at the store, seeing these devices in action, have you seen them lock up in locations away from the exit?**



A. No.
**Q. Okay. And so your understanding is they're only locking at the entrances, slash, exits?**
A. As far as I know.
**Q. Okay. And do you have any history of them locking up elsewhere, say outside or inside the store?**
A. Only by the garden gate entrances. If they get too close to those gates, they will lock up.
**Q. Okay. All right. I'm going to have us actually look at Exhibit 2. Here is your copy.**
MS. FRANCO: Do you want me to --
MR. ULMER: Actually, yeah, hand that to the witness there.
MS. FRANCO: Yeah, no worries.
MR. ULMER: All right. So, Brittney, I passed out physical copies. We're locking at the subpoena, so... (Pause.)
MS. RODRIGUEZ: Okay.
MR. ULMER: Yeah.
(Exhibit No. 2 marked.)
BY MR. ULMER:
**Q. So I've handed you Exhibit 2, and I submit to you this is a subpoena duces tecum that my office served in this case, and I'm drawing your attention to the last page. The subpoena had an appending exhibit, Exhibit A,**



**that's for categories of records.**
**Have you seen this document before?**
A. This one?
**Q. Yeah.**
A. Yeah. I was served with it.
**Q. Okay. And it asks for categories of things, documents, footage, et cetera.**
**Do you know if you personally have any responsive documents or footage or photos that relate to the three topics listed in Exhibit A?**
A. I do not.
**Q. Okay. We received a number of documents and videos in this case produced by counsel for Fred Meyer.**
**Did you yourself play a role in obtaining things to produce in this case?**
A. The only thing that I did was at the time of the incident, I had the customer fill out the paperwork, and then I sent it into our insurance, Sedgwick. That is -- and then left the part for the video with the LP.
**Q. And you're -- correct me if I'm wrong, you're not exactly certain who the employee working LP was on that day? You think it's Alex?**
A. Alex is the manager for the LP. I don't believe there was anyone working that day. At least when I called, no one answered, but that doesn't always mean.



Again, they're quite secretive.
**Q. Do you know how many different employees work in LP?**
A. Three.
**Q. Okay. You named Alex. Who are the names -- what are the names of the others?**
A. I couldn't tell you.
**Q. Okay. And so we received the claim that was sent to Sedgwick. We received three videotapes.**
**From -- from your understanding, do you know if there's any recorded footage that showed Ms. Lubken's fall?**
A. No.
**Q. Okay.**
A. I do not know.
**Q. And just to be clear -- I asked you a question in the negative -- you don't know one way or another whether there was footage depicting the fall?**
A. I do not.
**Q. Okay. One of the things I asked for in the subpoena were photographs and -- and videos.**
**Did -- do you remember any employee or anyone photographing or videotaping the cart that Jean had used when she fell?**
A. No.

Page 33

**Q. Okay. And I can ask a different question.**
**The -- actually, let me kind of lay a little more groundwork.**
**You were working at Fred Meyer on December 23, 2023; right?**
A. Yes.
**Q. What was your shift that day, if you remember?**
A. 6 to 4.
**Q. And that is the day before Christmas Eve, and so --**
A. Oh.
**Q. -- that would be a -- I don't know if you remember, but would that be a rather busy day?**
A. Oh, yeah.
**Q. Okay. And how many employees, to your knowledge, would be working on a -- you know, a holiday or a day leading up to a holiday like Christmas?**
A. Do you know what day of the week that was? That makes a difference too.
**Q. I can look that up. Give me just a second. You have such great questions.**
**And so December 23, 2023, is a Saturday.**
A. Oh, yeah. Everyone would have been there, so there would have been -- well, it's not garden season, but yeah, somewhere about around 15. Like I said,

Page 34

anywhere... (Pause.)
**Q. Just to be clear, 15 employees for the home department or the store?**
A. Oh. For the home department.
**Q. For the home department.**
A. The store, there probably was a 180 to 200.
**Q. And how many employees would be working the floor on a Saturday on December 23, 2023?**
A. Pretty much everyone. Everyone in the store.
**Q. Okay. And they're doing various things like restocking, cleaning, organizing?**
A. December 23rd, you're helping customers. They're -- you're not restocking any of that. That's for freight that night. You're doing nothing but helping customers.
**Q. Okay. So employees on the floor December 23, 2023, would be doing customer service, you know, helping customers find items, that type of work?**
A. Yes.
**Q. Okay. And do you remember the -- you know, do you have a decent memory of that day when you interacted with Jean Lubken?**
A. Yes.
**Q. Okay. Where were -- why don't you just share from your perspective how you first learned about this**

Page 35

**fall that happened in the store and then what you remember seeing kind of from there after you received that notification?**
A. I got notified by walkie. Someone said, There's someone down. I don't recall the aisle number. I know it wasn't housewares. When I got to her, I got my third over Ken, had him go get her chair. I went and printed off the paperwork, handed it to him to start asking her questions, getting her address, that kind of stuff. Came back over. You know, at this -- I know we asked her how she was doing several times. That's pretty standard. Came back over, asked him if the paperwork was done, checked it over. Now, granted this was a time period of about 20 minutes. It wasn't a short. And then we got -- we got her -- her husband pulls the car around. Ken was helping her out. I was overlooking the paperwork, realized he forgot certain things, so I ran out and caught them as she was getting in her car.
**Q. You said that you were notified by walkie.**
**Is that -- do you mean walkie-talkie? Is that short for that?**
A. Yeah.
**Q. You guys call it the walkie?**
A. Yeah.

Page 36

**Q. Okay. Do you remember who that was that made the dispatch on walkie?**
A. I don't recall who it was. It was a female, but I don't recall who it was. I do know that her fall happened and there wasn't anyone that was around. She was already down.
**Q. The female who sent the notification on the walkie, do you remember if that was someone in the home department?**
A. Yes, it was.
**Q. Okay. And you just don't remember the name of that employee?**
A. If you keep asking me questions, it may come to me.
**Q. Okay.**
A. I -- the person who I thought it was is a -- doesn't work on a Saturday. That's why it has to be someone -- it will come to me.
**Q. I'm sure we can find those records.**
**So do you remember the names of the employees working in the home department that day besides Ken?**
A. Wow. Let's see. Patty would have been working. Phet. Emily would have been there because it was Saturday. Nick, Aaron. Adam was already out. What time of the day?

**Q. This is about 155, going onto 2?**
A. Okay, so at 2 o'clock, you would have the whole night crew coming in. Oh, I've been away from there for a year now, so it's -- I know Dan Mazzuca would have been there. Oh, yeah, there would have been like six new people coming in at that time.
**Q. And when you say at that time, at 2 o'clock, is that when the nightshift folks come in?**
A. The closers.
**Q. Okay. And you were there from 6 to 4, and so you were about two hours away from the end of your shift?**
A. Actually, because of the date, when you said that, it reminded me, we have a mandatory schedule that we work during the holidays. Some of those days, I work until 8 o'clock at night. Some of them they change us and I couldn't tell you exactly. My normal shift is 6 to 4.
**Q. What's Ken's last name?**
A. Smithling.
**Q. I take it you don't know how to spell it either?**
A. It has an "L" in it. It's like Smithing, but it has an "L" in it. So it's -- I've known him for quite a few years.
**Q. Phonetically you said Smith -- Smithling?**



A. Yeah, it's like -- yeah.
**Q. All right.**
A. It's like S-m-i-t-t-l-i-n-g. I believe that's how it is. I only have him as Ken in my phone.
**Q. Okay. And then you said Ken was the third over. What did you -- you mean he was three aisles over?**
A. No. He's the third in charge at the time. So as I was the assistant, that means I'm the second. He's the one right under me.
**Q. Okay. And so there's Emily Cryder, is the home manager. There's you as the assistant home manager, and then Ken.**
**Do you remember what his title was?**
A. It's third in charge.
**Q. Third in charge. Okay.**
**Like the assistant to the assistant?**
MS. FRANCO: Oh my god.
THE WITNESS: Yeah. It's -- it's -- yeah, it's actually --
BY MR. ULMER:
**Q. All right.**
A. So if I'm not there and Emily is not there, then he is the one that, as we say, run the show.
**Q. Okay. And so it wasn't Ken who made dispatch on**



**the walkie. It was a female voice. You just can't put a name to it?**
A. No. It was not Ken that notified.
**Q. All right.**
A. He heard it and came over also.
**Q. All right. The document with the sticker, could you just put that -- or, actually, I'll take it back.**
MR. ULMER: You can keep your copy.
MS. FRANCO: Okay. I was thinking, do you want me to keep her copies here for you just to help you out.
(Exhibit No. 1 marked.)
BY MR. ULMER:
**Q. I'm going to hand you Exhibit 1.**
**And is that the claim loss report?**
MS. FRANCO: Thank you. Yeah.
MR. ULMER: Brittney, I don't have a copy, once again, to hand you.
MS. RODRIGUEZ: Okay.
MR. ULMER: For your notes, Brittney, we're looking at the five-page claim report that Fred Meyer made on the day of the incident.
MS. RODRIGUEZ: Okay.
BY MR. ULMER:
**Q. Ms. Padilla, in looking at Exhibit 1, what are**



**we looking at?**
A. I'm sorry. What?
**Q. What's Exhibit 1?**
A. I don't know where you're at.
**Q. The document itself, how would you describe it?**
MS. FRANCO: It's Exhibit 2; right?
MR. ULMER: No. It has an Exhibit 1 sticker.
THE WITNESS: Oh. Yeah.
MR. ULMER: We took things out of order.
BY MR. ULMER:
**Q. So Exhibit 1 --**
MS. FRANCO: Sorry.
BY MR. ULMER:
**Q. -- how would you describe it?**
A. Well, it's basically, it looks like the stuff that Sedgwick got, the time I called them to get the claim number, how I reported the incident to them.
**Q. And so would this be a notice of a claim that you --**
A. Yes.
**Q. -- that you yourself wrote on December 23, 2023?**
**If you look at the front page, there's a --**
A. Yeah.
**Q. -- date?**

A. Yeah. This is the -- the -- the claim basically that I reported to them of what was recorded to me.
**Q. Got it.**
**And is there a -- I see that this was electronically -- you know, the data inputted here is electronic.**
**Is there a -- like, a blank template you have electronically to fill out?**
**I can ask a fresh question if you need me to.**
A. Yeah.
**Q. Yeah. Let me ask you this: Where do you get this document from --**
A. Well --
**Q. -- if you needed to fill out a claim?**
A. Well, I don't get this document. There's another one that I get online. We used to have them print it up, ready to go in envelopes. Now we have to go get them online because they're changing. Yeah, I just go into the Fred Meyer feed and we get these documents. It doesn't look anything like this.
**Q. And so Exhibit 1, the document you have in front of you, this is a document you filled out; right?**
A. This is not. This is, from what I just read, when I called Sedgwick, they asked me certain questions, I give them the answers, and this looks more like what



they fill out or what they... (Pause.)
**Q. And what do you remember filling out?**
A. Our -- our normal customer incident report, which is -- like I said, looks different than this.
**Q. Right. And how would you describe that? Is it like a little sheet with a template with questions that you handwrite answers into?**
A. It's about four pages acting -- asking the name, address, phone number, age. I don't think it asks descriptions. It will ask, like, did anybody witness this? What did the customer say that what happened to them? What do you see? Sometimes they'll ask us questions basically on our opinion on what happened or what we thought, and then once -- once I write down everything that just -- just of what I've been told and what the facts are, then I call them, they give me a case number, I fax it over, and they take it from there. If they have more questions, they call me.
**Q. Okay. This -- and the -- for what reasons would you fill that document out?**
A. If there's an incident with a customer, if there's slip and fall, that seems to be the biggest ones.
**Q. Okay. And so, you know, a potential personal injury claim, you know, happens in the store, and that's**



**the situation you would fill out this incident report?**
A. Yes.
**Q. Okay. The incident report that you filled out on December 23, 2023, were you the one that filled in the data, or did another employee help fill parts of it?**
A. Ken did. Ken helped fill parts of it.
**Q. Okay. And so this was a document that you and Ken were writing on?**
A. Yes.
**Q. Okay. I'm asking this because I don't have it.**
A. Yeah.
**Q. And so what do you remember happened with the document?**
A. I faxed it over, and then as far as I know, it gets filed.
**Q. Okay. And so when you fax it, do you have the fax -- does the document itself say, Please fax to this number for Sedgwick?**
A. No, actually, it's in our -- it's already in our printers that I just go straight to them and it faxes it to them.
**Q. Okay. And you fax it to Sedgwick because that's one of the carriers for Kroger?**
A. Yes.
**Q. Kroger is the parent company that acquired Fred**



**Meyer?**
A. Yes.
**Q. Okay. Do -- and -- okay. In December of 2023, Kroger owned Fred Meyer?**
A. Yes.
**Q. Is that -- is that your understanding?**
A. Yes.
**Q. Okay.**
A. They bought them in 2008.
**Q. All right. So we're going to take a look through this document.**
**You did not, yourself, create this document?**
A. Yes.
**Q. "Yes" meaning you did not create it; right?**
A. Yes.
**Q. Gotcha. Okay.**
**And so let's kind of go through then.**
**So on the front page, it says "Confidential." It says "Incident," and here's a number.**
**Is this the instant number that you recall Sedgwick providing you for this incident?**
A. As best as I know.
**Q. Okay. I doubt you committed a, you know, 15 or so digit number to memory, but --**
A. Yeah.

**Q. -- essentially, you would make a claim for personal injury, and then Sedgwick would provide you with a claim number?**
A. Yes.
**Q. Okay. It says call start date.**
**Do you remember calling Sedgwick?**
A. Yes.
**Q. Okay. Did you make a call to Sedgwick after Jean left the store or while she was there?**
A. After she left.
**Q. Okay. Do you remember the person you spoke to that day?**
A. I do not.
**Q. And do you remember if it was a male or female?**
A. I do not.
**Q. Okay. Did you call Sedgwick after you made a fax of the incident report or before?**
A. Before. That's -- I have to call them before to get the claim number. I can't fax it over until I have a claim number.
**Q. Okay. So you call Sedgwick, you get a claim number.**
**What other information do you remember relaying in the call?**
A. They asked for the basic information from the



form.
**Q. Okay. And the data -- for your understanding, the -- the date that they inputted in Exhibit 1 here came from information you provided to Sedgwick?**
A. Yes.
**Q. Okay. And so looking back, page 1, we have the call start date, same date as the incident; right?**
A. Yes.
**Q. Okay. The claimant, the person, the customer involved in the claim is Jean Lubken; right?**
A. Yes.
**Q. And you personally spoke with Jean on the day of the incident; correct?**
A. Yes.
**Q. Do you remember how long in total you spent talking to Jean?**
A. I would probably say -- there was three different times. I'd probably say five times -- five minutes each time, so 15 minutes.
**Q. Okay.**
A. And I could be wrong on that. It could have been longer.
**Q. What do you remember about what Jean told you during those three different times you spoke with her?**
A. So what -- what I don't quite recall, I know I



was told of what happened, but I don't recall if it was her that told me or if it was Ken. I believe I was told by the other -- by Ken that this is what she told -- said. I know that I was the one that reached her first. Ken reached her second. I sent him to go get a chair. I was speaking with her at that point more about, Can you get up, because she was sitting on the floor, and, you know, How are you? Where does it -- you know, Do I need to call an ambulance? Those are usually the first basic questions.
**Q. Someone sends a notice on the walkie.**
**Was the message an indication of what aisle this customer was in?**
A. Yes.
**Q. And then do you remember, upon hearing the walkie, you immediately going to the customer?**
A. Yes.
**Q. And then were -- do you know if you were the first employee that made contact with --**
A. I was.
**Q. -- Jean?**
A. I was the first one there.
**Q. Okay. And what do you remember seeing when you got to Jean? Was she on the floor? What -- what do you remember visually?**



A. I remember her sitting against the side of the aisle.
**Q. And do you remember what aisle that was in?**
A. I don't remember the number. I know it was a housewares aisle.
**Q. Do you remember if that was the aisle where there would be hand mixers?**
A. It could have been. It was the housewares aisle. Oh, yeah, I remember she came to buy one. I remember that. I remember specifically because I was, Do you want me to walk it up, yeah.
**Q. Okay. That aisle or somewhere around there had a screen that showed kind of customers on camera.**
**Do you -- do you remember that?**
A. I don't -- it is where we would have KitchenAids, but I don't recall that one. I know in housewares the vacuum aisle had one. I don't recall if there was one. I could tell you if I was still at that store, but... (Pause.)
**Q. Yeah, in December of 2023 in the home department, do you remember how many screens there was where customers can see themselves?**
A. I think there's only two, two to three, but --
**Q. Okay.**
A. -- I believe there's only a couple.

Page 49

**Q. And do you know if any of those cameras had the footage recorded?**
A. I do not.
**Q. Okay. And so you go and you meet Jean, and she's on the floor.**
**What do you remember about what she was first telling you?**
A. She said that her cart locked up. I do remember reading this, that she said it fell on her. Again, I asked her if she could get up. That was -- that's basically what she told me, that her cart locked up and she fell and the cart fell on her.
**Q. At the -- at the point where you contact -- where you met her, did -- was the cart nearby?**
A. It was.
**Q. Meaning, was she near the cart, or did she move away from it?**
A. I don't -- I remember the cart was standing there, but -- and she was sitting on the ground. Where the cart was specifically, it was somewhere off -- I don't remember exactly the location, but it was I would say more towards me as I walked up to the aisle to the left-hand side. She was sitting on the right-hand side.
**Q. When you were speaking with her and kind of understanding from her what had happened, did she point**

Page 50

**at the cart?**
A. I don't recall that.
**Q. In speaking with her, though, did you identify where -- which cart she had used?**
A. Yes.
**Q. Okay. Do you remember if it was the normal-size cart or the smaller one?**
A. Small.
**Q. Both the normal sized and smaller carts have the antitheft wheel on it; correct?**
A. Yes, they do.
**Q. All carts have the antitheft wheel?**
A. That's what we strive for.
**Q. Okay. The cart that Jean had used had the antitheft wheel?**
A. I -- I don't recall if I looked at the wheels. To be quite honest, it's a small cart. I got kind of a chuckle out of that it's a tiny cart that it fell. Not -- okay. That didn't come out correct at all. Boy. It's not a heavy cart, so that was like I got -- and it was standing up when I got there, and so I didn't know if it had been on her, and so I'm kind of that person that questions, was that cart really on her? It's not that heavy, but I don't remember if the wheels -- I assume they're locked up. The wheels will also get

Page 51

stuff caught in them and then it makes them slow down.
**Q. Okay. And so the -- when you -- at some point when you're talking with Jean, you were able to identify which cart she had been using; right?**
A. Yes.
**Q. Okay. And do you know if before -- and, again, you were the first employee that had spoken to her?**
A. Yes.
**Q. Do you --**
A. No.
**Q. Do you --**
A. She --
**Q. Who else, to your knowledge, spoke to her after she fell but before you talked to her?**
A. The person that radioed me. I believe somebody walked by the aisle, she waved them down. If I remember correctly, that person told someone with a walkie-talkie, Hey, there's someone down, and then they radioed me.
**Q. Do you know if the -- well, let me -- let me ask this: Do you know if the person that had been the first to put a dispatch on the radio, if they had spoken to Jean?**
A. I believe -- I don't believe they were the ones that spoke to her. If I remember correctly, somebody

Page 52

walked by, and it could have been another customer. Somebody walked by, but they're not the one that radioed me because then they went and told someone, and that's who radioed me, and so most likely, it was the person who was up at U-scan is probably because they couldn't go, so they radioed. That's what -- that's kind of what I was thinking. That's why it seems familiar.
**Q. So you didn't witness it, and you -- you know, so you don't personally have, you know, have seen it, but your understanding is a customer saw Jean and then told an employee who then sent the dispatch on the radio?**
A. Yes.
**Q. Okay. And so, again, when you were meeting with Jean, what do you remember her saying about how the fall happened?**
A. She -- what she stated was she was walking, the wheel locked up, and she fell on her hip, and that the cart had fallen on top of her.
**Q. When you went to see Jean, the cart was standing?**
A. Yes.
**Q. Okay. Do you know who had lifted it back onto its top?**
A. I don't recall that.

Page 53

**Q. Okay. Jean was sitting on the floor with her back to the aisle, or how would you describe the position she was in?**
A. She was sitting like this with her back to the aisle.
**Q. Do you -- what do you remember her saying to you about what she was feeling? If she said anything, what do you remember about that?**
A. I don't specifically recall.
**Q. Okay. I'm going back to page 1 of Exhibit 1.**
**We see under claimant name, we see caller name, Angela Padilla.**
**Do you know if on that day you were the only person who spoke with a Sedgwick representative?**
A. Yes.
**Q. And the caller phone number there, is that the number to the store?**
A. Yes, it is.
**Q. Okay. It says, "Client Number 1978."**
**Do you know what that means?**
A. I do not.
**Q. Okay. And do you know if that is Kroger is the client or Fred Meyer is the client, if that's the client number for the purposes --**
MS. FRANCO: Object to form.

Page 54

BY MR. ULMER:
**Q. -- of Kroger, if you know?**
A. I do not know.
**Q. Okay. Loss date, it happened in Washington; right?**
A. Yes.
**Q. Under here, it says, "Check for duplicate claim."**
**Loss date, Saturday December 23, 2023, that's the date that the incident happened on; right?**
A. Yes.
**Q. Lost time is reported at 1:55 p.m.**
**To your memory, does that seem roughly about the time it happened?**
A. I remember it was in the afternoon.
**Q. Okay. It says reported by phone, and so that's you calling in the claim?**
A. Yes.
**Q. It says, "Reporter type: Store manager."**
**That's Sedgwick's description of your title, you were the assistant home manager; correct?**
A. Yes.
**Q. Okay. Yeah, it says, "Location: Look up Contract No. 1978. Client: The Kroger Company. Unit name: Tacoma, Stevens address, 4050 South 19th."**

Page 55

**That's the address for that Fred Meyer store; correct?**
A. Yes.
**Q. Okay. Turning the page.**
**Under "Reporter information," it identifies you as the home store manager; correct?**
A. Yes.
**Q. Down under there at the last line of page 2 of Exhibit 1, it says, "Loss description: The customer was pushing cart when the wheel locked," next page up, "causing the customer to fall. The customer fell on her right hip and the cart fell on top of the customer. The customer has pain in her right hip joint, neck, and right hand. It is unknown if the customer sustained any injuries. The customer did not seek medical treatment."**
**Do you recall if this summary was something that you wrote that Sedgwick put in this claim form?**
A. Yes.
**Q. Okay. As the summary is described, does this seem like a summary you wrote?**
A. Yes.
**Q. Okay. And so in the summary, it says, "Customer has pain in her right hip joint, neck, and right hand."**
**Do you know if those are the -- if that was a description that Jean shared with you?**

Page 56

A. Yes, actually, I do remember that.
**Q. Okay. Do you remember if Jean mentioned if she could stand or if she communicated if standing was difficult? What do you remember --**
A. She --
**Q. -- about that?**
A. That's why I got her the chair. She did say that -- I don't recall if she said she couldn't stand or if it was difficult. It was somewhere along those, Well, okay, let's get you a chair.
**Q. Do you remember if Ken was the one that got the chair?**
A. It was Ken that got the chair.
**Q. Where did the chair come from? Was it in the office or in the back?**
A. Furniture pad.
**Q. Okay. It's a computer chair with wheels?**
A. No.
**Q. Okay.**
A. I don't think it was. It might have been one of the desk chairs. I know it came from the furniture pad, and it could have been -- I don't recall.
**Q. When you say "furniture pad," is there a section where --**
A. We sell furniture.

**Q. Yeah, but you have, like, you know, built items that are on display?**
A. Yeah, yes, it is.
**Q. And so Ken got a display chair and brought it to Jean?**
A. I thought he had gotten one of the dining room table chairs, but, again, that was a while ago. I don't -- the chair specific was not what I was thinking about.
**Q. Do you remember Jean at one point sitting onto a chair that was brought to her?**
A. Yes.
**Q. And do you remember at some point someone assisted Jean by pushing the chair for her to move?**
A. Maybe that's how Ken got her out to the car. Okay. I remember Ken was the one that took her out to the car. I just couldn't remember how. I was -- because I remember her husband had to drive around to pick her up.
**Q. And it was Ken that had assisted her to exit; correct?**
A. Yes.
**Q. You were filling out the paperwork to make the claim?**
A. I was looking over the paperwork at that point.



**Q. Okay.**
A. Making sure we had everything.
**Q. You were looking over the paperwork, spotting information that was needed to submit the claim. That's where you caught the last detail to go out to the car before she left to get the last bit of info; is that right?**
A. Yes.
**Q. Do you remember what it was that you ran out to get?**
A. I don't, but I remember it was important because I was a little irritated with Ken.
**Q. Okay. It says the customer did not seek medical treatment.**
**Do you remember asking her, you know, Do you need a paramedic? Do you need me to call 911?**
A. Yes.
**Q. What do you remember about that exchange?**
A. I asked her if she needed me to call someone. Usually, that's kind of what we say, meaning the paramedics. I don't recall -- I know her husband picked her up, but I -- that, I don't remember much more than that. I know she said she didn't need any assistance.
**Q. Okay. Do you -- back in December of 2023, do you remember if that Fred Meyer had like the little**



**customer carts where they can drive around in or like a wheelchair that's --**
A. Yeah, mart carts.
**Q. Okay. Do you remember Ken grabbing one of those?**
A. I don't recall.
**Q. Okay.**
A. Like I said, I didn't recall how he got her out there. I didn't fully remember that.
**Q. Okay. And -- and so do you remember one way or another if it was Ken that assisted Jean to exit as opposed to her leaving on her own in like a -- one of the carts, customer carts?**
A. I'm pretty sure Ken took her out. I don't recall how, but... (Pause.)
**Q. Okay. And when you left the store to grab that last detail to submit the claim, do you remember Ken still being with her?**
A. I don't recall that.
**Q. Okay.**
A. I believe her husband was out there.
**Q. All right. Kind of going down here, it says, "Date reported to Sedgwick: Saturday, December 23, 2023."**
**And so you submitted a personal injury claim the**



**same day; correct?**
A. Yes.
**Q. It says, "Time reported to Sedgwick: 5:16 p.m."**
**Do you know if that's the time that -- or let me ask this instead: What time do you remember faxing the incident report that you filled in -- or if you don't remember the specific time, you know, how long after you had filled it out that you faxed it?**
A. I don't recall, but something like that, if I can't get to it right away to call them, because it does take a little bit to talk to them, then I'll do it right before I leave, so... (Pause.)
**Q. When you made the call to Sedgwick, was this after Jean had left?**
A. Yes.
**Q. Okay. And so the loss time was reported at 1:15 p.m., and you said there had been interactions with Jean, and she was there for approximately 20 or so minutes?**
A. (Witness nods head.)
**Q. Would you say it was about half an hour from when she fell to when she's getting picked up by her husband?**
A. I would say it was probably around a half an hour.

**Q. Okay.**
A. I don't quite remember the time, how long it took. It takes me probably at least five minutes to go in and get it paperwork and get that all, and then it takes a while to get it all filled out, and so --
**Q. Okay.**
A. -- at least a half an hour.
**Q. Okay. The phone call you had with Sedgwick, do you remember how long after, you know, speaking with Jean that you made the call?**
A. I do not.
**Q. Okay. But you made the call, to your understanding, after she had left?**
A. Yes.
**Q. Okay. I turned it over to the third page -- or fourth page of Exhibit 1. You -- it says, "Home phone number," and then, "Date of birth."**
**Those are Jean's --**
A. Yes.
**Q. -- contacts; right?**
**Okay. Same injury description that we see here; correct?**
A. Yes.
**Q. All right. It says, "Cause of injury," it says, "Fall or slip in our building."**



**That's the category this was labelled as; right?**
A. Yes.
**Q. Okay. Down toward the bottom here, it says, "Is there a third party involved who may be responsible?" And it says, "No."**
**Is that something that you filled in the incident report, or, to your understanding, does that come from Sedgwick?**
A. This is --
MS. FRANCO: Objection to the form.
BY MR. ULMER:
**Q. Go ahead.**
A. This is them.
**Q. Okay. Meaning, you know, you weren't reporting that some other customer had caused a fall; right?**
A. I -- I believe they asked me, Was there anyone else involved.
**Q. Right.**
A. I answered no.
**Q. Got it.**
**It says, "Were pictures taken?" You indicated "No."**
**It's your understanding that no one took photos?**
A. No one took photos.
**Q. Okay. It says, "Is there video of the actual**



**incident?" And it says, "Yes."**
**Were you asked if this was on video?**
A. If I was asked, I would have said, I don't know.
**Q. Okay. Do you know where -- do you remember reporting in some way to Sedgwick that there was video footage of Jean?**
A. I didn't -- I did not.
**Q. Okay. And do you know where Sedgwick is getting that there was video of the accident?**
A. I do not.
**Q. Okay. And do you remember being asked, like, Does your store have video?**
A. I don't know if I would be asked that because all stores have -- where all the video cameras are, I couldn't tell you, so that's why I can't tell them whether or not there would be any video.
**Q. And on that day, you yourself didn't pull the footage; correct?**
A. No.
**Q. Okay. And the type of claim that you reported to Sedgwick was bodily injury?**
A. I don't give them any of that information. I give them exactly who they are, the information I have, what they told me happened, if I got medical assistance. That's all I gave them.



**Q. Okay. And then the next -- the last page of Exhibit 1, it says, "Was a sweep done prior to the incident?" "No." "Is there a sweep log that can be sent?" "No."**
**And so back in December 23, 2023, were there policies for, like, sweeping debris and such from the floors?**
A. Yes.
MS. FRANCO: Object -- sorry.
MR. ULMER: It's fine.
MS. FRANCO: I was late. Object to form.
You can answer.
MR. ULMER: You're too late.
MS. FRANCO: I know. Sorry. I was like.
THE WITNESS: Yeah, we actually have a top of the hour where you --
MR. ULMER: Yeah.
MS. FRANCO: -- walk the department.
MR. ULMER: We've been going for a little over an hour.
Do you need a five-minute break?
THE WITNESS: No, I'm good.
MR. ULMER: Laura, you good?
THE COURT REPORTER: I'm good.
MR. ULMER: Okay. Great.

BY MR. ULMER:
**Q. So were you asked when you were talking to Sedgwick if there was a log that employees had filled for that day indicating whether they swept the aisles or checked the aisles?**
A. No.
**Q. Okay. And so where they're filling "No," do you know if that was asked of you?**
A. No.
**Q. Do you know if employee logs logging when aisles are checked on, if that was a document that's created by employees of Fred Meyer?**
A. I don't know.
**Q. Okay. Employees do, like, aisle checks. Is that fair?**
A. Yes. Once an hour, we walk the department to see what needs to be cleaned up, recovered, that kind of thing.
**Q. On the day of the incident, do you have any memory of seeing a dirty floor or stuff on the floor?**
A. I do not.
**Q. Right. In the area where Jean had fallen, you know, did you see, like, debris, rocks, piles of hair, anything like that on the floor? Do you have any memory of that?**



A. No. That I would have remembered.
**Q. Right. Okay. And then down kind of towards the last half of the last page of Exhibit 1, there's your contact, there's a phone number for your work, and then your e-mail address; correct?**
A. Yes.
**Q. Do you remember having any e-mail communications with either Sedgwick or anyone about Jean's fall?**
A. I do not.
**Q. Meaning you do not remember one way or another if that happened?**
A. Usually -- e-mail, they don't usually contact me on. If they have questions, they phone. On the form I fill out, it asks what my hours of -- what days I'd be there at Fred Meyer and what hours, and so if they do need to contact me, they know when to get ahold of me.
**Q. After this claim was reported to Sedgwick, do you remember if you received some confirmation e-mail that a claim had been received?**
A. No.
**Q. Okay. After your initial call, did any representative from Sedgwick follow up with you, like providing you with this report?**
A. No.



**Q. Okay. Do you know if your incident report is still in the file somewhere?**
A. I do not.
**Q. Where is that stored?**
A. It --
MS. FRANCO: Object to form.
BY MR. ULMER:
**Q. To your memory.**
A. I imagine at the store, because once I send it off.
**Q. What I mean by that is, in your memory, when you created this incident report and faxed it, what do you remember doing with that document?**
A. Putting it in the LP's box.
**Q. And when you say "the LP's box," is there, like, some little office that LP is operating in that you stored in there, or... (Pause.)**
A. In what we call time and attendance room, there is a box, a box with little holes that say home, apparel, LP, HR. It went into their little file.
**Q. Okay. And do you know if that incident report is still in that file?**
A. LP would have picked it up. The process is for LP to pick it up, and then if they have any video, then they send it in, and after that, I do not know what



happens to it.
**Q. Okay. The paperwork you filled out, did you fill it out in the presence of Jean?**
A. Yes.
**Q. You were asking her questions, and as she's providing you information, you're writing into the incident report?**
A. Yes.
**Q. At any point, did you hand her the incident report?**
A. No.
**Q. Okay. And you said Ken filled out some parts of it?**
A. Yeah. When -- I left him for a few minutes to go do something, and he continued with the rest of it.
**Q. Do you remember what portion he had filled in?**
A. No, I do not.
**Q. Do you remember taking a look at the cart that Jean had used? And to clarify, when I say take a look, did you kind of push it around or kind of --**
A. I did not.
**Q. Okay. What do you remember about what happened with the cart?**
A. I don't recall. I know it had to have been taken out of the aisle, pushed out of the aisle. I

Page 69

don't recall exactly anything specifically about that at this point.
**Q. And so do you have a memory of you yourself pushing the cart?**
A. I did not.
**Q. Okay.**
A. I believe when I went to -- when I was looking over it -- and, again, this has been a while ago, I do believe I was looking over the report, realized what Ken had -- it was like on the last page, what Ken had forgot and left, and once I got that information, I don't remember -- I didn't go back to that aisle.
**Q. Do you have a memory of you touching the cart that Jean had used?**
A. I don't remember because I don't remember either way. It's not one of the specific things that I remember.
**Q. Do you remember inspecting the cart to see if it was -- if the wheels were functioning?**
A. I don't recall.
**Q. Do you remember witnessing Ken touch the cart?**
A. I don't know.
**Q. Okay. So I'll hand you Exhibit 3.**
**(Exhibit No. 3 marked.)**
MR. ULMER: You can hand me Exhibit 1.

Page 70

MS. FRANCO: Thank you.
MR. ULMER: Yeah.
MS. FRANCO: Sorry.
And so you said we went a little bit out of order. What is Exhibit 2 then?
MR. ULMER: Exhibit 2 is the subpoena duces tecum.
MS. FRANCO: Okay. The video is part of the report -- it's like a clip on Exhibit 1. Is that -- because you played the video earlier.
MR. ULMER: No, no, no. So Exhibit 1 is the claim. Exhibit 2 is the subpoena duces tecum.
MS. FRANCO: What about the video?
MR. ULMER: Exhibit 3 is the pleading I just handed her. I have a different document that I'll mark as Exhibit 4. The video is Exhibit 5.
MS. FRANCO: Okay.
MR. ULMER: Yeah.
MS. FRANCO: That's why I was confused. Thank you for clearing that up. I apologize.
MR. ULMER: So --
MS. RODRIGUEZ: And what did you represent Exhibit 3 is?
MR. ULMER: So Exhibit 3, I'll just read the pleading. It says, "Defendant Gatekeeper Systems,

Page 71

Inc.'s Request For Production to Defendant Fred Meyer Stores, Inc., With Responses Thereto," dated December 24th, 2024.
MS. RODRIGUEZ: Okay. Thank you.
BY MR. ULMER:
**Q. So these are Fred Meyer's responses to Gatekeeper's requests in this case.**
**Have you yourself looked at any of the requests that the parties have made in the case for --**
A. No.
**Q. -- document production or information?**
A. No.
**Q. Okay. And so you do not need to share any communications you've had with counsel, but prior to today's deposition, have you had meetings or calls with counsel?**
A. I have. I original got a few e-mails --
**Q. And, again, you don't need to share communications. I'm just asking --**
A. Yes or no.
**Q. -- if you've had conversations.**
A. Yes.
**Q. Okay. And how many?**
A. Two.
**Q. Two? Okay.**

Page 72

A. Yes.
**Q. All right. Do you remember the -- the date that the first conversation happened?**
A. What's the date on the -- when I was served.
**Q. The subpoena duces tecum?**
A. Yes.
MS. FRANCO: I think it was June 23rd, if I'm not mistaken.
MR. ULMER: Sometime in June.
MS. FRANCO: June 23rd. Oh, I'm so good.
THE WITNESS: Okay. So that was on a Saturday. I was off Sunday. So it was the Monday, June 25th, is when I called.
BY MR. ULMER:
**Q. Okay. So taking a look at Exhibit 3, I'm going to turn over to page 5.**
**Again, these requests and then the answers thereto you have not seen before; is that correct?**
A. Yes.
**Q. Okay. Request For Production No. 2 says, "Please produce for inspection the shopping cart involved in the incident." And the answer is, "Subject shopping cart was not preserved upon conclusion of investigation."**
**Is that accurate to you?**

A. Yes.
**Q. Okay. And who do you remember employed by Fred Meyer had, you know, looked over the cart that Jean had used?**
A. I don't recall.
**Q. Okay. Do you have a memory of looking over the cart?**
A. I do not recall that.
**Q. Okay. And you didn't -- you do not know whether Ken did or not?**
A. I don't.
**Q. Was this -- is there a general store manager for the Fred Meyer?**
A. For that location? Yes.
**Q. Do you know if that person was working that day?**
A. I -- I don't -- actually, most likely, yes. It was two days before Christmas, so Chad would have been there.
**Q. What's his last name?**
A. Peterson.
**Q. So Chad is the general store manager, or what's the title called?**
A. Store leader.
**Q. Do you remember having a conversation with him on the day of the incident about the incident?**



A. I probably, like, said there was an incident that happened in home. I sent over the paperwork. Again, it's two days before Christmas.
**Q. Okay. You do not know one way or the other, or you do not remember what employee had looked over the cart?**
A. I do not.
**Q. Okay. The cart was not set aside or, you know, preserved; right?**
A. Yes.
**Q. Okay. I'm going to hand you -- you can hand me that document. Now, this document has paperclips. Watch out for that.**
**(Exhibit No. 4 marked.)**
BY MR. ULMER:
**Q. Handing you Exhibit 4.**
MS. FRANCO: Thank you.
MR. ULMER: So, Brittney, Exhibit 4 is "Plaintiff's First Set of Interrogatories and Requests For Production to Defendant Fred Meyer Stores, Incorporated, and Answers and Responses Thereto," dated March 17, 2025.
MS. RODRIGUEZ: Okay. Thank you.
MR. ULMER: Yeah.
BY MR. ULMER:



**Q. Again, this is not a -- these are not requests or answers you've ever seen before; right?**
A. Yes.
**Q. Okay. Could you turn to page 8. Let me know when you're there. Take a look at the highlight.**
**Did you read that highlighted section on page 8?**
A. Yes.
**Q. Okay. So Interrogatory No. 5 -- interrogatory is a way for saying, like, a request for information -- asks for the name, address, and telephone number of persons or entity responsible for the control and maintenance of shopping carts in the Fred Meyer.**
**The answer given here by Fred Meyer is, "Codefendant Gatekeeper Systems, Inc., is the entity responsible for the control and maintenance of shopping carts in Fred Meyer."**
**What's your understanding about what services Gatekeeper offers Fred Meyer?**
MS. FRANCO: Object to the form.
THE WITNESS: I know we receive the wheels from them. I know someone comes in to put them on. I do not know the company at all, which one does it.
BY MR. ULMER:
**Q. What about the maintenance of the antilock device or the censors? Who does that maintenance?**



MS. FRANCO: Object to the form.
THE WITNESS: I have no idea.
BY MR. ULMER:
**Q. Okay. And so if there's -- like a repair that needs to be made, do you know how -- what that process is like to call in a repair?**
A. As far as the home department goes, we take them out to the cart graveyard. What happens to them after that, I have no idea. The home department doesn't have a lot to do with the carts. That's a different department.
**Q. Is there a department that handles, like, store facilities?**
A. Not --
**Q. And by facilities, I mean, like, the carts?**
A. Yeah, so there's not a specific department that does that. Different things fall under different departments. As far as the carts go, that is CCK. Those are the cashiers. That is their department.
**Q. What does CCK stand for?**
A. That's a good question.
**Q. Okay. And so which department -- let me ask this, I guess: Does that Fred Meyer store have, like, cart wranglers?**
A. Is that a parcel? Is that people that go out

and get the carts?
**Q. Yeah.**
A. That's parcel.
**Q. You call them parcels. Okay.**
A. Yeah. I'm like, What's a cart wrangler.
**Q. And so the employees who are working parcel, which department do they fall under?**
A. CCK.
**Q. CCK.**
**And in December of 2023, who was the either manager or assistant manager for the CCK department?**
A. I believe it was Joe. Don't ask me his last name.
**Q. Okay. Do you know if he was the manager or assistant?**
A. He was the manager.
**Q. And then do you remember anyone else under -- who worked under him?**
A. The manager now, it was the assistant manager at the time, and I can't for the life of me -- I can picture her, but I can't think of her name. So as far as -- as far as I know, the CCK manager would -- I'm not sure if they make the call for the repair or they go to the assistant store leader or the store leader and say, Hey, we need a work order on such and such carts.



**Q. And could you turn over to page 23.**
MS. FRANCO: There. Sorry.
THE WITNESS: I was like, Where is the numbers on them? I'm like --
MS. FRANCO: There very small on the bottom. That's my fault. I --
THE WITNESS: Where?
MR. FRANCO: If you --
MR. ULMER: There down there on the footer.
MS. FRANCO: Not to interrupt, but if you look -- so if you look, like, there right there.
THE WITNESS: Are you kidding me right now? Okay.
MS. FRANCO: I'm not. That's my fault. Sorry.
THE WITNESS: I'm over here counting pages. Awesome.
BY MR. ULMER:
**Q. And so --**
MS. FRANCO: I had to find them too.
BY MR. ULMER:
**Q. -- Request For Production 36 asks for the production of the cart and the anti -- antitheft device used by Jean, and the response was that Fred Meyer does not possess the cart or antitheft devices.**



**To your understanding, is that accurate?**
A. Could you rephrase that?
**Q. Yeah.**
**Do you know if anyone preserved the cart or the wheel that locks?**
MS. FRANCO: Object to form.
THE WITNESS: No.
BY MR. ULMER:
**Q. Okay.**
A. It's the response of shopping that I was like, what.
THE COURT REPORTER: What was that?
THE WITNESS: It's the response of shopping that I was like, what.
MR. ULMER: Why don't we go off the record for like five minutes. I think I need to find something else here.
THE VIDEOGRAPHER: Going off the record at 11:03 a.m.
(A break was taken from 11:03 a.m. to 11:15 a.m.)
THE VIDEOGRAPHER: We're back on the record at 11:15.
BY MR. ULMER:
**Q. Do you remember speaking with Jean's husband?**



A. I do not.
**Q. When you went to get more information to complete the incident report to send to the carrier, Sedgwick, do you remember speaking with Jean once she was in the car?**
A. I remember the car. I don't recall if she -- I can picture it both ways. I don't recall if she was in the car or not. Yeah, I'm not going to say for sure whether... (Pause.)
**Q. You -- do I have it right, though, what you remember is needing more information and exiting the store to get that from Jean?**
A. Yes.
**Q. Okay. What information specifically you needed you do not recall at that point?**
A. I do not recall. I just remember it was important, and it was on, like, the last page.
**Q. Do you remember Jean telling you that it was the -- well, strike that.**
**I asked you this before, but what did Jean -- what do you remember Jean telling you about how the cart caused her to fall?**
A. She said the cart locked up.
**Q. And what did she say about how that caused her to fall, though? And by that, I mean, the cart locked**

**up, and what do you remember her telling you about what happened next that led to the fall?**
A. I don't remember the specific of that. I remember telling me the cart locked up and she fell. I don't remember anything beyond that.
**Q. Was it your understanding that she tripped over the cart or something to that effect?**
A. It was my understanding, and, again, this could only be what I assumed, is that she was walking, it kind of jolted her and made her fall over.
**Q. Okay. And, you know, when -- when you're writing up the incident report and submitting the claim to Sedgwick, you were documenting that the cart was involved in the fall; correct?**
A. Yes.
**Q. And you -- did you tell Sedgwick that she claimed that the wheel had locked?**
A. Yes.
**Q. Do you remember -- do you remember telling Sedgwick if the wheel that locked was one with an antilock -- or antitheft lock?**
A. I don't believe they asked me that.
**Q. Okay. All right. And you, yourself, do not recall inspecting the cart?**
A. I do not.



**Q. Do you know if that may have happened?**
A. It may have.
**Q. Okay.**
A. But... (Pause.)
**Q. And do you have any memory of talking with any employee who had looked at the cart and had made their own opinion about how the cart was working?**
A. It would have been between me and Ken. I don't recall us having a conversation.
**Q. Okay. Do you remember Jean or her husband coming back after the -- after she initially left to request to look at the cart?**
A. I don't remember that.
**Q. You -- strike that.**
**Do you remember being on shift and hearing that either Jean or her husband came back to the store?**
A. I don't recall that.
**Q. Okay. Ken, who was working that day, do you remember if his shift would carry on after 2 into the afternoon hour?**
A. Yes.
**Q. Okay. Do you remember talking with Ken about taking a look at that cart she was using?**
A. I do not.
**Q. Okay. When it comes to, like, shopping cart,**



**you know, maintenance, you know, a complaint about a cart, who in the store did you kind of report that information to?**
A. Like, if there's one specific cart, who do I go tell?
**Q. Like, if you have a -- you know, a cart that's not really working or looks really worn, whose job, from your understanding, would it be to do something about that?**
A. Well, like I said, it's usually the CCK manager. And, again, I don't remember if that person would call it in or if they report it to the assistant store leader to put in a work order.
**Q. Okay. And do you know why the cart that Jean had used wasn't set aside?**
A. I do not.
**Q. Okay. Any question that the cart was related to the fall that she experienced?**
A. Rephrase that, please.
**Q. Yeah.**
**Was it clear to you that the cart was related to her fall incident?**
A. Are you asking me if -- if I believe that this happened, or are you asking me if this is what she's telling me happened?



**Q. No, from -- at the point when you're making the incident report of her fall, was it clear to you that the -- that she was alleging that the cart was involved in that --**
A. Yes.
**Q. -- incident?**
**Okay. And she was -- she indicated to you that the wheel locked and that that was related to the fall?**
A. Yes.
**Q. Okay. And did she convey that the -- that something didn't work right? Meaning, did she say, like, The wheel didn't work, or something to that effect?**
MS. FRANCO: Object to form.
THE WITNESS: As far as I recall, she said the wheel locked up.
BY MR. ULMER:
**Q. Okay. Do you remember either yourself or any other employees of Fred Meyer telling Jean or her husband that the cart worked fine?**
A. I don't recall that. The way the cart works, again, watching the video, the cart does not lock up until it is a foot from the door. That cart was at least 25 feet away. I don't recall ever saying anything to her husband or anyone about the cart worked fine.

Page 85

There may have been a discussion with -- amongst us, but I don't recall.
**Q. Okay. And do you recall any employee of Fred Meyer or either yourself or a different employee telling Jean or her husband that they think it was a defective wheel?**
MS. FRANCO: Object to form.
THE WITNESS: I don't.
BY MR. ULMER:
**Q. That's not something you remember, you know, circulating among yourselves?**
A. No.
MS. FRANCO: Object to form.
BY MR. ULMER:
**Q. Okay. Do you -- to your understanding, back in December of 2023, was there a certain protocol for handling an injury incident like a fall?**
A. What exactly are you asking me?
**Q. Yeah. Is there training for Fred Meyer employees on how to respond to someone who claims they were injured in the store?**
MS. FRANCO: Object to form.
THE WITNESS: The people who respond to the calls are usually in management. It is something that we get taught along the way.

Page 86

BY MR. ULMER:
**Q. Is part of the training protocols for how to create an incident report?**
A. It's part of how we get trained along the way. When I call into Sedgwick and they ask me certain questions, they are to direct me most of the time on what I need to do next.
**Q. At the -- at the time when Jean fell and you're creating the incident report, did you already know that you needed to create an incident report?**
A. Yes.
**Q. And how were you trained on that? How did you know to do that?**
A. If there is any sort of incident, it's part of the management responsibility --
**Q. Okay.**
A. -- that we take care of the customer.
**Q. So it's either the department manager or one of the assistant managers that would be responsible for creating the incident report?**
A. Yes.
**Q. Okay. When it comes to helping a person that is injured in the store, is there training on the protocol for how to assist that customer or that person that is injured in the store?**

Page 87

MS. FRANCO: Object to form.
THE WITNESS: I mean, we -- we go through, like, first aid CPR-type training.
BY MR. ULMER:
**Q. Okay. Are all employees, like, trained on first aid protocol?**
A. We are trained on safety protocol.
**Q. Okay. When it comes to, you know, a person that's injured and, like, assisting them to, you know, walk or get up or exit the store, is that part of any type of training in the Fred Meyer?**
MS. FRANCO: Object to form.
THE WITNESS: I don't -- I don't -- I would think it would be common sense, but no --
BY MR. ULMER:
**Q. Well --**
A. -- I don't recall.
**Q. Right.**
A. Yeah.
**Q. Like, the idea of putting Jean onto a computer chair and wheeling her out, why did Ken do that?**
MS. FRANCO: Object to form.
THE WITNESS: You would have to ask him.
BY MR. ULMER:
**Q. Okay. To the extent that the -- a device was not functioning properly and was related to a personal injury, is there any training on, you know, how to respond to that type of incident in the store?**
MS. FRANCO: Object to form.
THE WITNESS: Could you rephrase that?
BY MR. ULMER:
**Q. Sure.**
**Jean alleges that the cart locked and then was related to her fall; right?**
A. Uh-huh.
**Q. Is that yes?**
A. Yes.
**Q. Yes.**
**Do you remember any training on, you know, we talked about documenting an incident, but do you -- do you remember any training on preserving, I guess, you know, material that might be related to a claim?**
A. No.
**Q. Okay. And so do you have any idea why the cart or the antilock wheel weren't preserved in addressing Jean's claim?**
MS. FRANCO: Object to form.
THE WITNESS: No.
BY MR. ULMER:
**Q. Okay. And the cart she was using or the wheel**

**that may have locked or not, that's gone; right?**
A. Yes.
MS. FRANCO: Object to -- object to form.
THE WITNESS: And, yeah, sorry.
MS. FRANCO: No, you're okay.
BY MR. ULMER:
**Q. Okay. And so there's no way for any of us to determine if the wheel was functioning properly; right?**
A. Right.
**Q. Because the wheel is gone; correct?**
A. Yes.
**Q. Do you know if anyone from Gatekeeper came to the store to take a look at the carts in response to Jean's fall?**
MS. FRANCO: Object to form.
THE WITNESS: I do not.
BY MR. ULMER:
**Q. Have you spoken to anyone that either works for Gatekeeper or represents Gatekeeper?**
A. No.
**Q. And to your knowledge, did Gatekeeper send anyone to take a look at your carts?**
MS. FRANCO: Object to form.
THE WITNESS: I do not know.
BY MR. ULMER:



**Q. And I should be a little more specific.**
**We talked about when Fred Meyer got those carts with the antilock wheels.**
**Do you remember any reps from Gatekeeper coming in to install the wheels or to do maintenance on the wheels?**
MS. FRANCO: Object to form.
THE WITNESS: I do not.
BY MR. ULMER:
**Q. Okay. To your knowledge, has Gatekeeper ever come to do any repairs or maintenance or inspections of the wheels?**
A. I do not know.
**Q. Do you know if any designated person in Fred Meyer has like a schedule for inspecting those antitheft wheels?**
A. I don't know.
MS. FRANCO: Object to form.
BY MR. ULMER:
**Q. Okay. You mentioned the graveyard.**
**What's the graveyard?**
A. It's where we push all the carts that don't work very well anymore.
**Q. Okay.**
A. They can have flat tires, meaning a part of the



tire is gone and it just goes bump, bump, bump, bump.
**Q. Okay. Is that physically located on the property --**
A. Yes.
**Q. -- in the Tacoma store?**
A. Yes.
**Q. Where is that?**
A. Back of the building.
**Q. Back of the building employees send the carts that are too worn for continued use?**
A. Usually what they do is they put them back there for someone to come later for maintenance.
**Q. Okay. And -- and by maintenance, if it's a wheel issue, it would be replacing the wheel?**
MS. FRANCO: Object to form.
BY MR. ULMER:
**Q. Would that be an example of the kind of maintenance?**
A. Yes.
**Q. Who does the maintenance?**
A. I do not know.
**Q. Okay. Would the -- you said an acronym for the department that would deal with the carts.**
**What was the acronym again?**
A. CCK.



**Q. CCK.**
A. Customer service something, I believe it is. Customer service.
**Q. I don't know what the "K" would be, but would the CCK department, to your knowledge, be involved in the maintenance of the carts?**
MS. FRANCO: Object to form.
THE WITNESS: Yes, as far as I know.
BY MR. ULMER:
**Q. Do you -- and do you know one way or another whether CCK had taken a look at the cart that Jean had used?**
MS. FRANCO: Object to form.
THE WITNESS: No.
BY MR. ULMER:
**Q. When I say CCK, I mean an employee that works within that department.**
**You don't know if they looked at that cart; right?**
A. No.
**Q. Do -- and have you had any conversations with anyone who works in the CCK department specifically about Jean or the cart she used?**
A. No.
**Q. Okay. Have you spoken to any coworkers of Fred**

Page 93

**Meyer about whether anyone knew if the cart worked or not that Jean had used?**
MS. FRANCO: Object to form.
THE WITNESS: No.
MR. ULMER: Okay. I'm going to go off record for two minutes.
THE VIDEOGRAPHER: Going off the record at 11:33.
(A break was taken from 11:33 a.m. to 11:35 a.m.)
THE VIDEOGRAPHER: We're back on the record at 11:35.
BY MR. ULMER:
**Q. The purpose of filing the incident report to the carrier is, you know, in the -- in anticipation of possible litigation relating to an injury claim; right?**
MS. FRANCO: Object to form.
THE WITNESS: I'm sorry. I missed the whole question.
BY MR. ULMER:
**Q. That's fair.**
A. I'm... (Pause.)
**Q. The reason for notifying Sedgwick of the personal injury claim is anticipation of possible litigation; right?**

Page 94

MS. FRANCO: Same objection to form.
THE WITNESS: Yes.
BY MR. ULMER:
**Q. Okay. Those are all the questions from me. Thank you. Some of the other attorneys, including the computer attorney may have a question.**
MS. FRANCO: You just made the comment the computer is going to do questions.
MR. ULMER: She's not AI. She's real.
MS. FRANCO: She's a computer attorney actually.
THE COURT REPORTER: Before we go off record, do you have any questions?
MS. FRANCO: I will have a few.
THE COURT REPORTER: Okay.
MS. FRANCO: Just a few.
MR. ULMER: Brittney might have questions.
Go ahead, Brittney.
MS. RODRIGUEZ: I don't have any questions. Thank you.
MS. FRANCO: All right.
E X A M I N A T I O N
BY MS. FRANCO:
**Q. Okay. Just a few to clarify some stuff.**
**So when you spoke with Ms. Lubken, was she able**

Page 95

**to clearly communicate and express her preferences about leaving the store?**
MR. ULMER: I'll object to form.
Go ahead.
THE WITNESS: Yes.
BY MS. FRANCO:
**Q. Okay. And do you recall whether Ms. Lubken declined emergency medical -- medical transport when you spoke with her?**
A. Yes. She declined medical attention.
**Q. Okay. And did she indicate that her family was coming to get her?**
A. That is what I recall.
**Q. So, to your knowledge, as a store employee, are store employees responsible for designing or maintaining or programming the antitheft mechanisms on shopping carts?**
A. No.
**Q. Okay. And, to your knowledge, as a Fred Meyer employee, do you have any control -- do you or any other employees have control over when those wheels lock up?**
A. No.
**Q. Okay. And on that day, had there been any reports or signs that the cart used by Ms. Lubken had been damaged or was malfunctioning prior to her use of**

Page 96

**it?**
A. No.
**Q. Okay. And then just a couple more.**
**Was the area in which Ms. Lubken fell clean and dry and free of any obstruction?**
A. As far as I remember, yes.
**Q. Okay. And do you recall whether there were any spills, debris, or tripping hazard on the floor in the vicinity that the incident occurred?**
A. I do not remember anything on the floor.
MS. FRANCO: That's all from me.
MR. ULMER: That raises nothing new for me. Thank you for your time.
THE WITNESS: Okay.
MR. ULMER: Good luck with catching your flight.
THE VIDEOGRAPHER: We're going off the record at 11:39, and this concludes this deposition for today.
(Reading and signing was requested pursuant to FRCP Rule 30(e).
(Deposition concluded at 11:39 a.m.)

C E R T I F I C A T E

STATE OF WASHINGTON
COUNTY OF KING

I, Laura L. Ohman, a Certified Shorthand Reporter in and for the State of Washington, do hereby certify that the foregoing transcript of the videotaped deposition of ANGELA PADILLA, having been duly sworn on July 23, 2025, is true and accurate to the best of my knowledge, skill, and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 6th day of August, 2025.

LAURA L. OHMAN, RPR, CCR 3186

My commission expires:
MARCH 2025

**A**

**a.m** 4:2,6 79:19,21 79:21 93:10,10 96:22
**Aaron** 36:24
**ability** 5:23 97:10
**able** 26:8 51:3 94:25
**accident** 63:9
**accurate** 72:25 79:1 97:10
**acquired** 43:25
**acronym** 91:22,24
**acting** 42:8
**action** 3:10 29:24
**actual** 62:25
**Adam** 36:24
**address** 5:10 35:9 42:9 54:25 55:1 66:6 75:10
**addressing** 88:20
**afternoon** 54:15 82:20
**age** 42:9
**ago** 57:7 69:8
**Aguilera** 2:15
**AHBRA** 2:9
**AhbraF@Scheer...** 2:12
**ahead** 15:17 20:5 62:12 94:18 95:4
**ahold** 66:17
**AI** 94:9
**aid** 87:3,6
**aisle** 10:12,14 17:12 35:5 47:12 48:2,3 48:5,6,9,12,17 49:22 51:16 53:2 53:5 65:14 68:25 68:25 69:12
**aisles** 10:2,4,8 17:10,18,18,22 38:6 65:4,5,10
**Alex** 19:15 31:22 31:23 32:5
**alleges** 88:8
**alleging** 84:3
**Allied** 20:7
**allowed** 20:16
**allows** 26:1 27:24
**Amala** 2:4
**ambulance** 47:9
**amount** 26:3,7 27:14 29:8
**Andrew** 2:3 4:17
**Angela** 1:18 3:1 4:7 5:1,9 53:12 97:8
**ANNE** 2:15
**answer** 5:24 7:12 20:4,5 64:12 72:22 75:13
**answered** 31:25 62:19
**answering** 6:6
**answers** 41:25 42:7 72:17 74:21 75:2
**anti** 78:23
**anticipation** 93:15 93:24
**antilock** 75:24 81:21 88:20 90:3
**antitheft** 12:12,20 22:10,11,23 23:17 26:6 29:9 50:10 50:12,15 78:23,25 81:21 90:15 95:16
**anybody** 42:10
**anymore** 90:23
**apologize** 26:23 70:20
**apparel** 9:23 67:20
**appear** 16:14
**appearance** 18:2
**Appearing** 2:14
**appending** 30:25
**approach** 28:16
**approximately** 60:18
**area** 28:16,17 65:22 96:4
**arrive** 19:8
**aside** 22:12 74:8 83:15
**asked** 18:22 32:16 32:20 35:11,12 41:24 45:25 49:10 58:19 62:16 63:2 63:3,11,13 65:2,8 80:20 81:22
**asking** 28:13 35:9 36:13 42:8 43:10 58:15 68:5 71:19 83:23,24 85:18
**asks** 31:6 42:9 66:15 75:10 78:22
**assist** 86:24
**assistance** 58:23 63:24
**assistant** 8:17,24 9:1,5 11:25 12:8 38:9,12,17,17 54:21 77:11,15,19 77:24 83:12 86:19
**assisted** 57:14,20 59:11
**assisting** 87:9
**assists** 5:25
**assume** 15:13 50:25
**assumed** 81:9
**attendance** 67:18
**attention** 30:24 95:10
**attorney** 94:6,10
**attorneys** 94:5
**Aubra** 4:20
**August** 97:12
**Aulmer@pcvala...** 2:6
**Avenue** 2:10,16
**Awesome** 78:17

**B**

**back** 8:15 10:10,25 12:3 14:9 15:7 21:17 25:18 35:10 35:12 39:7 46:6 52:23 53:2,4,10 56:15 58:24 64:5 69:12 79:22 82:11 82:16 85:15 91:8 91:9,11 93:11
**backing** 11:1
**bakery** 9:22
**based** 27:22
**basic** 45:25 47:10
**basically** 11:18,21 40:16 41:1 42:13 49:11
**beginning** 25:16
**behalf** 4:18,20,23
**believe** 13:8 14:16 14:16 31:23 38:3 47:2 48:25 51:15 51:24,24 59:21 62:16 69:7,9 77:12 81:22 83:23 92:2
**best** 5:23 6:17 44:22 97:10
**beyond** 81:5
**big** 25:2,2 28:17
**bigger** 24:22
**biggest** 42:22
**birth** 61:17
**bit** 21:9,16 23:3,7 58:6 60:11 70:4
**blank** 41:7
**bodily** 63:21
**boss** 11:7
**bottom** 25:25 26:1 62:3 78:5
**bought** 44:9
**box** 13:14 15:10 67:14,15,19,19
**Boy** 50:19
**break** 6:5,7 64:21 79:20 93:9
**breaks** 10:25
**Brittney** 2:15 4:22 15:21 30:15 39:17 39:20 74:18 94:17 94:18
**Brodriguez@agu...** 2:18
**brought** 25:16 57:4 57:11
**Buell** 4:12
**building** 61:25 91:8 91:9
**built** 25:25 57:1
**bump** 91:1,1,1,1
**business** 1:10,11,13
**busy** 33:13
**button** 25:8,11
**buy** 11:3 48:9
**bypass** 22:17

**C**

**C** 2:1 97:1,1
**C-r-y-d-e-r** 11:14
**CA** 2:17
**California** 1:12
**call** 9:3 27:9 35:24 42:16,18 45:5,8 45:16,18,21,24 46:7 47:9 58:16 58:19 60:10,13 61:8,10,12 66:22 67:18 76:6 77:4 77:23 83:11 86:5
**called** 31:25 40:17 41:24 72:13 73:22
**caller** 53:11,16
**calling** 45:6 54:17
**calls** 71:15 85:24
**camera** 17:12 18:5 19:4 22:21 48:13
**cameras** 16:15 17:2 17:8 18:24,25 19:3 49:1 63:14
**capacity** 7:14 18:9
**car** 35:16,19 57:15 57:17 58:5 80:5,6 80:8
**care** 86:17

**Carlta** 2:16
**carrier** 80:3 93:15
**carriers** 43:23
**carry** 82:19
**cart** 14:17 22:3,9 22:18,23 23:12,17 25:17,24 26:2,11 32:23 49:8,11,12 49:14,16,18,20 50:1,4,7,14,17,18 50:20,23 51:4 52:19,20 55:10,12 68:18,23 69:4,13 69:18,21 72:21,23 73:3,7 74:6,8 76:8 76:24 77:5 78:23 78:25 79:4 80:21 80:23,25 81:4,7 81:13,24 82:6,7 82:12,23,25 83:2 83:4,6,14,17,21 84:3,20,21,22,23 84:25 88:8,19,25 92:11,18,23 93:1 95:24
**carts** 12:13,15,21 13:2,18 14:1,2,3,8 15:16,18 21:19 22:9 24:23 25:13 25:14 27:13 28:23 50:9,12 59:1,3,13 59:13 75:12,16 76:10,15,18 77:1 77:25 89:13,22 90:2,22 91:9,23 92:6 95:17
**case** 4:11 6:12,16 6:19,23 7:2,4,10 9:4 12:11 16:12 18:23 30:24 31:13 31:15 42:17 71:7 71:9
**cash** 27:14 29:10 29:18
**cashier** 26:7
**cashiers** 11:1 76:19
**catching** 96:15
**categories** 31:1,6
**category** 62:1
**caught** 35:18 51:1 58:5
**cause** 24:7 61:24
**caused** 62:15 80:22 80:24
**causes** 14:21 28:4
**causing** 26:12,16 55:11
**CCK** 76:18,20 77:8 77:9,11,22 83:10 91:25 92:1,5,11 92:16,22
**CCR** 1:25 97:21
**censors** 75:25
**center** 7:23 9:22,25
**certain** 10:4 14:2 17:13 18:4 26:3,7 27:14 29:8 31:21 35:17 41:24 85:16 86:5
**Certified** 97:6
**certify** 97:7
**cetera** 31:7
**Chad** 73:17,21
**chain** 25:2
**chair** 35:7 47:5 56:7,10,12,13,14 56:17 57:4,8,11 57:14 87:21
**chairs** 56:21 57:7
**change** 37:16
**changed** 10:2
**changing** 41:18
**characterization** 21:23
**charge** 8:16,16 38:8 38:15,16
**check** 13:1 15:2 25:15,20 28:11 29:2 54:7
**checked** 35:13 65:5 65:11
**checks** 65:14
**child** 6:17,22
**choose** 15:17
**Christmas** 9:13 33:9,17 73:17 74:3
**chuckle** 50:18
**circulating** 85:11
**civil** 3:10 7:1,4,10
**claim** 3:8 32:8 39:15,21 40:18,19 41:1,14 42:25 45:1,3,19,20,21 46:10 54:8,17 55:17 57:24 58:4 59:17,25 63:20 66:18,20 70:12 81:12 88:17,21 93:16,24
**claimant** 46:9 53:11
**claimed** 81:17
**claims** 85:20
**clarify** 68:19 94:24
**clean** 96:4
**cleaned** 65:17
**cleaning** 34:11
**clear** 5:25 20:3 32:16 34:2 83:21 84:2
**clearance** 25:21
**clearing** 70:20
**clearly** 95:1
**clerk** 7:23 8:13,15
**click** 25:8
**client** 53:19,23,23 53:23 54:24
**clip** 23:16 70:9
**close** 15:15 26:6 28:12 29:5 30:8
**closers** 37:9
**Cochran** 2:4
**Codefendant** 75:14
**come** 14:24 36:13 36:18 37:8 50:19 56:14 62:8 90:11 91:12
**comes** 75:21 82:25 86:22 87:8
**coming** 37:3,6 82:11 90:4 95:12
**comment** 94:7
**commission** 97:23
**committed** 44:23
**common** 87:14
**communicate** 95:1
**communicated** 56:3
**communicates** 15:11 28:3,9
**communicating** 24:7
**communications** 66:8 71:14,19
**community** 1:6
**company** 19:23 20:7,11 43:25 54:24 75:22
**complaint** 83:1
**complete** 80:3
**completely** 22:12
**computer** 56:17 87:20 94:6,8,10
**concluded** 96:22
**concludes** 96:18
**conclusion** 72:23
**Confidential** 3:8 44:18
**configuration** 27:13
**confirmation** 66:19
**confused** 70:19
**contact** 47:19 49:13 66:4,13,17
**contacts** 61:20
**continued** 68:15 91:10
**contract** 19:22 54:24
**control** 25:5 75:11 75:15 95:20,21
**conversation** 72:3 73:24 82:9
**conversations** 71:21 92:21
**convey** 84:10
**copies** 30:16 39:10
**copy** 30:10 39:8,17
**corporation** 1:9,11 1:13
**correct** 12:9,22 16:20 21:19 22:4 22:24 23:5,13 31:20 46:13 50:10 50:19 54:21 55:2 55:6 57:21 60:1 61:22 63:18 66:6 72:18 81:14 89:10
**correctly** 51:17,25
**counsel** 4:14 20:3 31:13 71:14,16
**count** 8:8
**counting** 78:16
**COUNTY** 97:4
**couple** 21:8 22:17 29:14 48:25 96:3
**court** 1:1 4:10,15 5:21,25 64:24 79:12 94:12,15
**COVID** 13:9
**coworkers** 92:25
**CPR-type** 87:3
**create** 18:2 44:12 44:14 86:3,10
**created** 65:11 67:12
**creating** 86:9,20
**crew** 37:3
**criminal** 7:1,3
**Cryder** 11:12,23 38:11
**currently** 12:12
**customer** 15:3 18:3 21:18 22:11 23:4

23:12 26:5 28:22 29:9 31:17 34:17 42:3,11,21 46:9 47:13,16 52:1,10 55:9,11,11,12,13 55:14,15,22 58:13 59:1,13 62:15 86:17,24 92:2,3
**customers** 17:11,15 18:5,25 19:3,7 21:24 22:17,22 34:12,15,18 48:13 48:22

**D**

**damaged** 95:25
**damages** 7:5
**Dan** 37:4
**data** 41:5 43:5 46:2
**date** 1:24 5:18 8:19 12:18 13:6 37:13 40:25 45:5 46:3,7 46:7 54:4,9,10 59:23 61:17 72:2 72:4
**dated** 3:8,10,13,16 71:2 74:21
**day** 11:19,24 12:7 31:22,24 33:7,9 33:13,17,18 34:21 36:21,25 39:22 45:12 46:12 53:13 60:1 63:17 65:4 65:19 73:15,25 82:18 95:23 97:12
**days** 37:15 66:15 73:17 74:3
**De** 2:16
**deal** 91:23
**debris** 64:6 65:23 96:8
**December** 8:11,22 9:8 10:3,15 11:5 11:11 12:3,7 14:15 16:23 17:2 18:4 19:13 20:13 21:5 23:25 33:4 33:22 34:8,12,16 40:22 43:4 44:3 48:20 54:9 58:24 59:23 64:5 71:2 77:10 85:16
**decent** 34:21
**declined** 95:8,10
**defective** 85:5
**Defendant** 2:8,13 3:11,12,15 4:23 70:25 71:1 74:20
**Defendants** 1:14
**deli** 9:22
**department** 9:2,10 9:18,22,24,24 10:5,9,11,21 11:5 11:16 12:1 19:22 34:3,4,5 36:9,21 48:21 64:18 65:16 76:7,9,11,12,16 76:19,22 77:7,11 86:18 91:23 92:5 92:17,22
**departments** 9:20 9:21 76:18
**depicted** 21:14 22:16
**depicting** 16:22 18:25 32:18
**deposition** 1:16 3:1 3:10 4:7 5:14 6:9 6:13 7:10,13 71:15 96:18,22 97:8
**describe** 24:17 40:5 40:15 42:5 53:2
**described** 55:19
**description** 54:20 55:9,25 61:21
**descriptions** 42:10
**designated** 90:14
**designing** 95:15
**desk** 56:21
**detail** 58:5 59:17
**details** 6:15
**determine** 89:8
**device** 12:20 14:12 22:22 24:15,25 27:23 75:25 78:23 87:25
**devices** 28:8 29:24 78:25
**difference** 33:19
**different** 13:11 17:2 18:23 24:19 32:2 33:1 42:4 46:18,24 70:15 76:10,17,17 85:4
**difficult** 56:4,9
**digit** 44:24
**dining** 57:6
**direct** 11:6 86:6
**directly** 11:7
**dirty** 65:20
**discourage** 17:15 18:2
**discussion** 85:1
**dispatch** 36:2 38:25 51:22 52:11
**display** 23:16 57:2 57:4
**displayed** 22:3,21
**District** 1:1,2 4:10 4:10
**document** 31:2 39:6 40:5 41:12 41:15,21,22 42:20 43:7,13,17 44:11 44:12 65:11 67:13 70:15 71:11 74:12 74:12
**documenting** 81:13 88:15
**documents** 31:7,9 31:12 41:20
**doing** 1:9,11,13 10:24 16:2 34:10 34:14,17 35:11 67:13
**domestics** 10:22
**door** 13:2 24:21 25:18 28:12 84:23
**doors** 15:15
**doubt** 44:23
**drawing** 30:24
**drink** 29:4
**drive** 57:18 59:1
**drop** 21:2
**dry** 96:5
**duces** 30:23 70:6 70:12 72:5
**duly** 5:1 97:9
**duplicate** 54:7
**duration** 29:15
**duties** 8:25 11:25

**E**

**E** 2:1,1 5:5 94:22 97:1,1
**e-mail** 66:6,8,13,19
**e-mails** 71:17
**earlier** 70:10
**East** 5:11
**educate** 9:19
**effect** 81:7 84:13
**Eight** 7:17,18
**either** 11:23 12:12 37:21 66:9 69:15 77:10 82:16 84:18 85:4 86:18 89:18
**electronic** 25:3 41:6
**electronically** 41:5 41:8
**electronics** 9:25 24:12
**emergency** 95:8
**Emily** 11:12,23 12:4 36:23 38:11 38:23
**employed** 13:17,20 73:2
**employee** 7:14 25:7 25:20 31:21 32:22 36:12 43:5 47:19 51:7 52:11 65:10 74:5 82:6 85:3,4 92:16 95:14,20
**employees** 9:9,13 9:16 10:17 19:7 32:2 33:15 34:2,7 34:16 36:20 65:3 65:12,14 77:6 84:19 85:20 87:5 91:9 95:15,21
**entity** 75:11,14
**entrance** 16:17 22:8,10,18 23:22 26:11,14,15 27:8 27:12 28:9 29:6
**entrance/exit** 28:16
**entrances** 16:19 21:14 24:2 28:3 30:3,7
**envelopes** 41:17
**essentially** 45:1
**estimated** 8:19
**et** 31:7
**Eve** 9:13 33:9
**exact** 29:20
**exactly** 31:21 37:17 49:21 63:23 69:1 85:18
**EXAMINATION** 1:17 3:2,3
**examined** 5:2
**example** 91:17
**exchange** 58:18
**exhibit** 3:6 15:20 20:23,25 30:10,20 30:22,25,25 31:10 39:12,14,25 40:3 40:6,7,12 41:21 46:3 53:10 55:9 61:16 64:2 66:4 69:23,24,25 70:5 70:6,9,11,12,14 70:16,16,23,24 72:15 74:14,16,18

**EXHIBITS** 3:7
**exit** 21:6 25:21 27:5 27:8,12,18,25 28:9,20 29:9,25 57:20 59:11 87:10
**exiting** 25:13 80:11
**exits** 16:16,19 28:3 30:3
**experience** 29:23
**experienced** 83:18
**expires** 97:23
**exploitation** 6:17
**express** 95:1
**extent** 6:5 19:2 20:1,6 87:25

**F**

**F** 97:1
**face** 19:4
**facilities** 76:13,15
**facing** 16:15
**facts** 42:16
**fair** 21:23 65:15 93:21
**fall** 10:4,8 32:12,18 35:1 36:4 42:22 52:15 55:11 61:25 62:15 66:9 76:17 77:7 80:22,25 81:2,10,14 83:18 83:22 84:2,8 85:17 88:9 89:14
**fallen** 52:19 65:22
**familiar** 52:7
**family** 95:11
**far** 13:13 16:7 18:19,24 28:9,11 30:4 43:14 76:7 76:18 77:21,22 84:15 92:8 96:6
**fault** 78:6,14
**fax** 42:17 43:16,17 43:17,22 45:17,19
**faxed** 43:14 60:8 67:12
**faxes** 43:20
**faxing** 60:5
**feed** 41:19
**feeling** 53:7
**feet** 84:24
**fell** 32:24 49:9,12 49:12 50:18 51:14 52:18 55:11,12 60:22 81:4 86:8 96:4
**female** 36:3,7 39:1 45:14
**field** 7:23
**file** 67:2,20,22
**filed** 43:15
**filing** 93:14
**fill** 31:17 41:8,14 42:1,20 43:1,5,6 66:15 68:3
**filled** 41:22 43:3,4 60:6,8 61:5 62:6 65:3 68:2,12,16
**filling** 42:2 57:23 65:7
**find** 34:18 36:19 78:20 79:16
**fine** 5:13 64:10 84:20,25
**finish** 6:6
**first** 3:14 5:1 7:21 12:14 13:5 14:10 16:14 25:1 34:25 47:4,9,19,22 49:6 51:7,21 72:3 74:19 87:3,5
**five** 46:18,18 61:3 79:16
**five-minute** 64:21
**five-page** 39:21
**flat** 90:25
**flight** 96:16
**flip** 26:20
**floor** 9:6,16 34:8,16 47:7,24 49:5 53:1 65:20,20,24 96:8 96:10
**floors** 64:7
**floral** 8:15 9:22
**FOD** 21:6 27:5
**folks** 37:8
**follow** 66:23
**follows** 5:3
**food** 27:7 29:4
**foot** 28:19 84:23
**footage** 16:11 17:3 17:14,16 18:5 19:1,2 20:8,21 31:7,9 32:11,18 49:2 63:6,18
**footer** 78:9
**foregoing** 97:8
**forgot** 35:17 69:10
**form** 18:7 19:24 21:21,25 22:5 23:1,19 24:3,10 26:17 27:17 28:5 29:19 46:1 53:25 55:17 62:10 64:11 66:14 67:6 75:19 76:1 79:6 84:14 85:7,13,22 87:1 87:12,22 88:4,22 89:3,15,23 90:7 90:18 91:15 92:7 92:13 93:3,17 94:1 95:3
**forth** 21:17
**forward** 21:16
**four** 42:8
**fourth** 8:16 61:16
**frame** 10:15 16:14 29:7
**Franco** 2:9 4:20,20 16:2,6 18:7,11,14 18:17 19:24 21:1 21:21,25 22:5 23:1,19 24:3,10 26:17,22,25 27:17 28:5 29:19 30:11 30:14 38:18 39:9 39:16 40:6,13 53:25 62:10 64:9 64:11,14,18 67:6 70:1,3,8,13,17,19 72:7,10 74:17 75:19 76:1 78:2,5 78:8,10,14,20 79:6 84:14 85:7 85:13,22 87:1,12 87:22 88:4,22 89:3,5,15,23 90:7 90:18 91:15 92:7 92:13 93:3,17 94:1,7,10,14,16 94:21,23 95:6 96:11
**FRCP** 96:21
**Fred** 1:9 3:12,15 4:9 6:10 7:14,16 8:3,5,9,10 9:20 12:14 13:5,10,17 13:20 18:3 19:21 20:8,19 23:23 27:9 31:13 33:4 39:21 41:19 43:25 44:4 53:23 55:1 58:25 65:12 66:16 71:1,6 73:2,13 74:20 75:12,13,16 75:18 76:23 78:24 84:19 85:3,19 87:11 90:2,14 92:25 95:19
**free** 96:5
**freight** 11:2 34:14
**fresh** 9:21 41:9
**front** 14:9,9 40:23 41:21 44:18
**frustratingly** 21:18
**fuel** 9:25
**full** 5:7,24 13:2
**fully** 59:9
**functioning** 69:19 88:1 89:8
**functions** 9:1
**furniture** 56:16,21 56:23,25

**G**

**garden** 9:25 15:15 30:7 33:24
**gate** 30:7
**Gatekeeper** 1:12 2:13 3:11 4:23 13:12,13 70:25 75:14,18 89:12,19 89:19,21 90:4,10
**Gatekeeper's** 71:7
**gates** 15:17 30:8
**general** 8:25 73:12 73:21
**getting** 5:7 11:2 35:9,18 60:22 63:8
**give** 23:11 25:21 33:20 41:25 42:16 63:22,23
**given** 75:13
**giving** 10:25
**go** 13:1 15:1,2,5,17 17:24 20:5 24:22 25:15 26:2 29:2,3 35:7 41:17,18,19 43:20 44:17 47:5 49:4 52:6 58:5 61:3 62:12 68:15 69:12 76:18,25 77:23 79:15 83:4 87:2 93:5 94:12 94:18 95:4
**god** 38:18
**goes** 76:7 91:1
**going** 15:19 20:21 20:23,24 21:4,7,8 21:16 26:20 30:9 37:1 39:14 44:10 47:16 53:10 59:22 64:19 72:15 74:11 79:18 80:8 93:5,7 94:8 96:17

**good** 28:14 64:22 64:23,24 72:10 76:21 96:15
**goods** 10:1
**Gotcha** 44:16
**gotten** 57:6
**grab** 59:16
**grabbing** 59:4
**granted** 35:13
**graveyard** 76:8 90:20,21
**great** 33:21 64:25
**grocery** 9:23 16:17
**ground** 49:19
**groundwork** 33:3
**Group** 2:15
**guard** 24:21
**guess** 76:23 88:16
**guy** 25:16,17
**guys** 35:24

**H**

**hair** 65:23
**half** 29:5 60:21,24 61:7 66:3
**half-hour** 15:6
**hand** 30:12 39:14 39:18 48:7 55:14 55:23 68:9 69:23 69:25 74:11,11 97:11
**handed** 30:22 35:8 70:15
**handheld** 24:20
**Handing** 74:16
**handles** 76:12
**handling** 85:17
**handwrite** 42:7
**hang** 29:13
**happen** 10:7 29:13
**happened** 5:18 35:1 36:5 42:11 42:13 43:12 47:1 49:25 52:16 54:4 54:10,14 63:24 66:12 68:22 72:3 74:2 81:2 82:1 83:24,25
**happens** 42:25 68:1 76:8
**happy** 6:6
**hard** 19:18
**hazard** 96:8
**head** 25:4 60:20
**hear** 25:11
**heard** 39:5
**hearing** 47:15 82:15
**heavy** 50:20,24
**help** 9:19,19 39:10 43:5
**helped** 43:6
**helping** 34:12,15 34:17 35:16 86:22
**hereunto** 97:11
**Hey** 51:18 77:25
**high** 17:18
**highlight** 75:5
**highlighted** 75:6
**Hills** 2:17
**hip** 52:18 55:12,13 55:23
**hire** 20:16
**hired** 7:22 20:8
**history** 30:5
**hit** 21:7
**holes** 67:19
**holiday** 33:16,17
**holidays** 37:15
**home** 7:23 8:13,15 8:16,18,24,24 9:1 9:2,3,5,18,24 10:1 10:5,8,11,13 11:5 11:8,9,15 12:1,8 27:10,10,11 34:2 34:4,5 36:8,21 38:11,12 48:20 54:21 55:6 61:16 67:19 74:2 76:7,9
**honest** 50:17
**hour** 29:5 60:21,25 61:7 64:16,20 65:16 82:20
**hours** 37:11 66:15 66:16
**housewares** 10:22 35:6 48:5,8,17
**HR** 67:20
**husband** 1:5 35:15 57:18 58:21 59:21 60:23 79:25 82:10 82:16 84:20,25 85:5

**I**

**idea** 26:18 28:1 76:2,9 87:20 88:19
**IDENTIFICATI...** 3:7
**identifies** 55:5
**identify** 4:14 50:3 51:3
**image** 16:14
**imagine** 67:9
**immediately** 47:16
**important** 58:11 80:17
**impossible** 23:18
**Inc.'s** 3:12 71:1
**incident** 12:4 14:15 14:17 31:17 39:22 40:18 42:3,21 43:1,3 44:19,21 45:17 46:7,13 54:10 60:6 62:7 63:1 64:3 65:19 67:1,12,21 68:7,9 72:22 73:25,25 74:1 80:3 81:12 83:22 84:2,6 85:17 86:3,9,10 86:14,20 88:3,15 93:14 96:9
**includes** 9:24
**including** 94:5
**Incorporated** 74:21
**INDEX** 3:2,6
**indicate** 95:11
**indicated** 62:21 84:7
**indicating** 65:4
**indication** 47:12
**individuals** 12:21
**info** 58:6
**information** 45:23 45:25 46:4 55:5 58:4 63:22,23 68:6 69:11 71:11 75:9 80:2,11,14 83:3
**initial** 66:22
**initially** 82:11
**injured** 85:21 86:23,25 87:9
**injuries** 55:15
**injury** 42:25 45:2 59:25 61:21,24 63:21 85:17 88:2 93:16,24
**input** 11:19
**inputted** 41:5 46:3
**inside** 16:15 30:6
**inspecting** 69:18 81:24 90:15
**inspection** 72:21
**inspections** 90:11
**install** 90:5
**installed** 12:13,25 13:18 14:1,1,4 26:15
**installing** 12:15 13:5,22 14:10,12
**instant** 44:20
**instructed** 20:4
**insurance** 31:18
**intended** 24:1
**interacted** 34:21
**interactions** 60:17
**interior** 16:23
**internal** 19:21
**interrogatories** 3:15 74:19
**interrogatory** 75:8 75:8
**interrupt** 6:1 78:10
**investigation** 72:24
**involved** 6:22 46:10 62:4,17 72:22 81:14 84:3 92:5
**irritated** 58:12
**issue** 91:14
**issues** 12:11
**items** 34:18 57:1

**J**

**Jean** 1:4 32:23 34:22 45:9 46:10 46:12,16,23 47:21 47:24 49:4 50:14 51:3,23 52:10,15 52:20 53:1 55:25 56:2 57:5,10,14 59:11 60:14,18 61:10 63:6 65:22 68:3,19 69:14 73:3 78:24 80:4 80:12,18,20,21 82:10,16 83:14 84:19 85:5 86:8 87:20 88:8 92:11 92:23 93:2
**Jean's** 61:18 66:9 79:25 88:21 89:14
**job** 7:21 8:14,25 10:23,23 26:22 83:7
**Joe** 77:12
**joint** 55:13,23
**jolted** 81:10
**July** 1:24 4:1,6 97:9
**June** 72:7,9,10,12

**K**

**K** 92:4

**keep** 36:13 39:8,10
**Ken** 35:7,16 36:21 38:4,5,13,25 39:3 43:6,6,8 47:2,3,5 56:11,13 57:4,15 57:16,20 58:12 59:4,11,14,17 68:12 69:9,10,21 73:10 82:8,18,22 87:21
**Ken's** 37:19
**key** 24:16,24 25:3
**kidding** 78:12
**kind** 9:3,5 11:4,21 16:5 22:22 23:16 33:2 35:2,9 44:17 48:13 49:24 50:17 50:22 52:6 58:20 59:22 65:17 66:3 68:20,20 81:9 83:2 91:17
**kinds** 24:19
**KING** 97:4
**KitchenAids** 48:16
**knew** 93:1
**know** 6:5,15 7:12 10:2,7,7,8 13:9,13 15:1,9,9,13 17:9 17:13,14 18:19 19:2,8,8,9,9,17 20:1,6,7 22:15 25:4 26:6,12,15 27:22 28:2,8,16 28:18 29:15,16,20 29:23 30:4 31:8 32:2,10,15,17 33:12,16,18 34:17 34:20 35:5,10,10 36:4 37:4,21 40:4 41:5 42:24,25 43:14 44:22,23 46:25 47:4,8,8,18 48:4,16 49:1 50:21 51:6,20,21 52:8,9,23 53:13 53:20,22 54:2,3 55:24 56:21 57:1 58:15,21,23 60:4 60:7 61:9 62:14 63:3,4,8,13 64:14 65:8,10,13,23 66:17 67:1,21,25 68:24 69:22 73:3 73:9,15 74:4,8 75:4,20,21,22 76:5 77:14,22 79:4 81:11 82:1 83:1,1,6,14 85:10 86:9,13 87:8,9 88:2,14,17 89:12 89:24 90:13,14,17 91:21 92:4,8,10 92:18 93:15
**knowledge** 18:13 29:8 33:16 51:13 89:21 90:10 92:5 95:14,19 97:10
**known** 37:23
**Kroger** 1:10 43:23 43:25 44:4 53:22 54:2,24
**Kroger/Fred** 2:8 4:21

**L**

**L** 1:25 37:22,23 97:6,21
**La** 2:16
**labelled** 62:1
**Laguna** 2:17
**laptop** 15:22 26:21
**late** 64:11,13
**Laura** 1:25 64:23 97:6,21
**Law** 2:15
**lay** 33:2
**lead** 8:15
**leader** 11:21 73:23 77:24,24 83:12
**leading** 33:17
**leads** 10:23
**learned** 34:25
**leave** 19:9 25:23 26:8 60:12
**leaving** 59:12 95:2
**led** 81:2
**left** 14:9 21:6 27:4 28:23 31:19 45:9 45:10 58:6 59:16 60:14 61:13 68:14 69:11 82:11
**left-hand** 16:18 49:23
**let's** 5:7 21:15 36:22 44:17 56:10
**life** 77:20
**lift** 23:5,12
**lifted** 52:23
**line** 55:8
**listed** 31:10
**litigation** 93:16,25
**little** 17:10,21 21:9 21:16 23:3,7 24:20,24 25:3,5 33:2 42:6 58:12 58:25 60:11 64:19 67:16,19,20 70:4 90:1
**located** 15:10 27:23 91:2
**location** 26:13 49:21 54:23 73:14
**locations** 29:25
**lock** 13:1 14:19,21 15:6,7,11,16,18 23:22 24:1,7,12 26:13,16 27:13 28:4,15,17,23 29:6,17,25 30:8 81:21 84:22 95:21
**locked** 22:4,10,13 22:19 23:13 25:14 25:18,19 49:8,11 50:25 52:18 55:10 80:23,25 81:4,17 81:20 84:8,16 88:8 89:1
**locking** 22:23 26:8 26:11 27:25 29:10 30:3,6,16
**locks** 23:17 79:5
**log** 64:3 65:3
**logging** 65:10
**logs** 65:10
**long** 6:4 7:16 29:16 46:15 60:7 61:2,9
**longer** 14:25 46:22
**look** 20:23 30:10 33:20 40:23 41:20 44:10 54:23 68:18 68:19 72:15 75:5 78:11,11 82:12,23 89:13,22 92:11
**looked** 50:16 71:8 73:3 74:5 82:6 92:18
**looking** 16:13 39:21,25 40:1 46:6 57:25 58:3 69:7,9 73:6
**looks** 25:5 40:16 41:25 42:4 83:7
**loss** 17:7 19:5,14,21 20:19 39:15 54:4 54:9 55:9 60:16
**Lost** 54:12
**lot** 9:4 10:13 11:17 11:22 17:23 24:21 76:10
**LP** 17:6,25 18:16 31:19,21,23 32:3 67:16,20,23,24
**LP's** 67:14,15
**Lubken** 1:4,5 4:8 34:22 46:10 94:25 95:7,24 96:4
**Lubken's** 32:11
**luck** 96:15
**lunches** 11:1

**M**

**M** 5:5 94:22
**maintaining** 95:15
**maintenance** 75:12 75:15,24,25 83:1 90:5,11 91:12,13 91:18,20 92:6
**making** 23:18 58:2 84:1
**male** 45:14
**malfunctioning** 95:25
**manage** 12:2
**management** 85:24 86:15
**manager** 8:18,20 8:24 9:1,3 11:8,9 11:25 12:8 31:23 38:12,12 54:19,21 55:6 73:12,21 77:11,11,14,16,19 77:19,22 83:10 86:18
**managers** 86:19
**mandatory** 37:14
**manikin** 17:19
**manipulating** 22:22
**March** 74:22 97:24
**marital** 1:5
**mark** 70:15
**marked** 15:20 20:25 30:20 39:12 69:24 74:14
**mart** 59:3
**material** 88:17
**matter** 4:8
**Maxa** 2:3 4:19
**Mazzuca** 37:4
**mean** 31:25 35:21 38:6 67:11 76:15 80:25 87:2 92:16
**meaning** 44:14 49:16 58:20 62:14 66:11 84:11 90:25

**means** 38:9 53:20
**meat** 9:22
**mechanisms** 95:16
**medical** 55:15 58:13 63:24 95:8 95:8,10
**meet** 49:4
**meeting** 52:14
**meetings** 71:15
**Melody** 2:20 4:12
**memory** 10:8 13:10 34:21 44:24 54:13 65:20,24 67:8,11 69:3,13 73:6 82:5
**mentioned** 28:21 56:2 90:20
**merchandise** 13:3
**merely** 17:14
**message** 47:12
**met** 49:14
**Meyer** 1:9 2:8 3:12 3:15 4:9,21 6:10 7:14,16 8:3,5,9,10 9:20 12:14 13:5 13:10,17,20 18:4 19:21 20:8,20 23:23 27:9 31:13 33:4 39:21 41:19 44:1,4 53:23 55:1 58:25 65:12 66:16 71:1 73:3,13 74:20 75:12,13,16 75:18 76:23 78:24 84:19 85:4,19 87:11 90:2,15 93:1 95:19
**Meyer's** 71:6
**middle** 22:18
**military** 7:3
**minutes** 35:14 46:19,19 60:19 61:3 68:14 79:16 93:6
**missed** 93:18
**mistaken** 72:8
**mixers** 48:7
**mode** 23:13 27:24
**Monday** 72:12
**monitor** 17:7
**move** 23:5,12,18 49:16 57:14
**moving** 22:24

**N**

**N** 2:1 5:5,5 94:22 94:22
**name** 4:12 5:8 11:13 19:16 36:11 37:19 39:2 42:8 53:11,11 54:25 73:19 75:10 77:13 77:21
**named** 32:5
**names** 32:5,6 36:20
**nature** 6:12
**near** 27:23 49:16
**nearby** 49:14
**neck** 55:13,23
**need** 6:5,15 9:6 41:9 47:9 58:16 58:16,23 64:21 66:17 71:13,18 77:25 79:16 86:7
**needed** 11:20 41:14 58:4,19 80:14 86:10
**needing** 80:11
**needs** 65:17 76:5
**negative** 32:17
**new** 37:6 96:12
**Nick** 36:24
**night** 34:14 37:3,16
**nightshift** 37:8
**nods** 60:20
**normal** 37:17 42:3 50:9
**normal-size** 50:6
**note** 20:22 21:3
**noted** 4:9
**notes** 39:20
**notice** 40:19 47:11
**notification** 35:3 36:7
**notified** 35:4,20 39:3
**notifying** 93:23
**number** 4:11 9:9 31:12 35:5 40:18 42:9,17 43:18 44:19,20,24 45:3 45:19,20,22 48:4 53:16,17,19,24 61:17 66:5 75:10
**numbers** 10:12,14 78:4

**O**

**O** 5:5 94:22
**o'clock** 37:2,7,16
**o0o-** 4:3
**oath** 5:2
**object** 19:24 20:4 21:21,25 22:5 23:1,19 24:3,10 27:17 28:5 29:19 53:25 64:9,11 67:6 75:19 76:1 79:6 84:14 85:7 85:13,22 87:1,12 87:22 88:4,22 89:3,3,15,23 90:7 90:18 91:15 92:7 92:13 93:3,17 95:3
**objection** 18:7 20:5 26:17 62:10 94:1
**oblige** 6:6
**observation** 28:19
**observed** 29:12
**obstruction** 96:5
**obtaining** 31:14
**occasionally** 20:3
**occupied** 11:24
**occurred** 12:4 96:9
**offers** 75:18
**office** 17:25 30:23 56:15 67:16
**official** 8:22
**Oh** 13:8 23:9 33:11 33:14,23 34:4 37:3,5 38:18 40:9 48:9 72:10
**Ohio** 1:9,11
**Ohman** 1:25 97:6 97:21
**okay** 5:18,20 6:2,3 6:8,12,19,22 7:4,7 7:12,16 8:7,13 9:8 10:15 12:3,11 13:17,25 14:4,18 15:19 16:6,19,22 17:1,5 18:1,11 19:13,19 20:3,15 20:18 22:15,15 23:9,15,22 24:6 24:14,17 25:12 26:5,10,24 27:4,8 27:11 28:2,21 29:1 30:2,5,9,18 31:6,12 32:5,8,14 32:20 33:1,15 34:10,16,20,24 36:1,11,15 37:2 37:10 38:5,11,16 38:25 39:9,19,23 42:19,24 43:3,7 43:10,16,22 44:3 44:3,8,16,23 45:5 45:8,11,16,21 46:2,6,9,20 47:23 48:12,24 49:4 50:6,14,19 51:2,6 52:14,23 53:1,10 53:19,22 54:4,16 54:23 55:4,19,22 56:2,10,17,19 57:16 58:1,13,24 59:4,7,10,16,20 60:16 61:1,6,8,12 61:15,21 62:3,14 62:25 63:4,8,11 63:20 64:1,25 65:7,14 66:2,22 67:1,21 68:2,12 68:22 69:6,23 70:8,17 71:4,13 71:23,25 72:11,15 72:20 73:2,6,9 74:4,8,11,23 75:4 75:8 76:4,22 77:4 77:14 78:13 79:9 80:14 81:11,23 82:3,10,18,22,25 83:14,17 84:7,10 84:18 85:3,15 86:16,22 87:5,8 87:25 88:19,25 89:5,7 90:10,20 90:24 91:2,13,22 92:25 93:5 94:4 94:15,24 95:7,11 95:19,23 96:3,7 96:14
**once** 5:17 20:5 29:17 39:18 42:14 42:14 65:16 67:9 69:11 80:4
**ones** 12:25 14:9 17:7 42:23 51:24
**online** 41:16,18
**open** 15:17
**operate** 20:8
**operating** 67:16
**operation** 22:23
**opinion** 42:13 82:7
**opposed** 59:12
**ORAL** 1:17
**order** 26:8 40:10 70:5 77:25 83:13
**organizing** 34:11
**original** 71:17
**outside** 30:6
**overlooking** 35:17
**oversee** 9:9
**oversees** 11:17

**owned** 44:4

**P**

**P** 2:1,1
**p.m** 20:24 21:1,5 21:15 22:9,16 23:4,11 54:12 60:3,17
**Pacific** 8:17
**pad** 56:16,21,23
**Padilla** 1:18 3:1 4:7 4:8 5:1,9 39:25 53:12 97:9
**page** 3:3,7 30:25 40:23 44:18 46:6 53:10 55:4,8,10 61:15,16 64:1 66:4 69:10 72:16 75:4,6 78:1 80:17
**pages** 42:8 78:16
**Paige** 2:3 4:19
**pain** 55:13,23
**paperclips** 74:12
**paperwork** 9:4 11:18 31:17 35:8 35:13,17 57:23,25 58:3 61:4 68:2 74:2
**paramedic** 58:16
**paramedics** 58:21
**parcel** 76:25 77:3,6
**parcels** 24:20 77:4
**parent** 6:21,22 43:25
**parking** 24:21
**part** 16:8 31:19 70:8 86:2,4,14 87:10 90:25
**parties** 71:9
**parts** 43:5,6 68:12
**party** 6:19 19:23 20:7 62:4
**passed** 30:16
**passing** 25:13 29:10,17
**Patty** 36:22
**Pause** 11:22 21:10 30:17 34:1 42:1 48:19 59:15 60:12 67:17 80:9 82:4 93:22
**pending** 6:7
**people** 10:25 11:2 13:2 29:13 37:6 76:25 85:23
**period** 9:12 10:4 13:4 35:14
**person** 11:6 36:16 45:11 46:9 50:22 51:15,17,21 52:4 53:14 73:15 83:11 86:22,24 87:8 90:14
**personal** 18:9 42:24 45:2 59:25 88:1 93:24
**personally** 31:8 46:12 52:9
**persons** 75:11
**perspective** 34:25
**Peterson** 73:20
**Pfau** 2:4
**Phet** 36:23
**phone** 38:4 42:9 53:16 54:16 61:8 61:16 66:5,14
**Phonetically** 37:25
**photographing** 32:23
**photographs** 32:21
**photos** 31:9 62:23 62:24
**physical** 30:16
**physically** 23:5,12 23:18 25:7 26:2 91:2
**pick** 57:19 67:24
**picked** 58:21 60:22 67:23
**picture** 77:21 80:7
**pictures** 17:21 62:21
**piles** 65:23
**place** 8:8 23:17
**placed** 14:7
**Plaintiff's** 3:14 74:19
**plaintiffs** 1:7 2:2 4:18
**plan** 11:18
**play** 15:19,23 20:21 21:7,9,16 31:14
**played** 16:10 70:10
**playing** 21:11 23:8
**pleading** 70:14,25
**please** 4:14 43:17 72:21 83:19
**PLLC** 2:4,9
**podium** 17:20,21
**point** 10:11 17:1,9 24:8 47:6 49:13 49:25 51:2 57:10 57:13,25 68:9 69:2 80:15 84:1
**policies** 64:6
**portion** 68:16
**position** 53:3
**possess** 78:25
**possible** 93:16,24
**potential** 42:24
**precipice** 9:13
**preferences** 95:1
**presence** 68:3
**present** 2:20 4:18
**preserved** 72:23 74:9 79:4 88:20
**preserving** 88:16
**pretty** 9:2 34:9 35:12 59:14
**prevent** 12:21
**preventing** 13:2 22:24
**prevention** 17:7 19:5,14,22 20:19
**print** 41:17
**printed** 35:8
**printers** 43:20
**prior** 64:2 71:14 95:25
**pro-** 17:15
**probably** 5:20 21:7 34:6 46:17,18 52:5 60:24 61:3 74:1
**proceeding** 7:1
**process** 67:23 76:5
**procure** 13:10
**produce** 9:22 31:15 72:21
**produced** 31:13
**production** 3:12,15 71:1,11 72:20 74:20 78:22,23
**programming** 95:16
**pronounce** 19:18
**properly** 88:1 89:8
**property** 12:21 91:3
**protocol** 85:16 86:23 87:6,7
**protocols** 86:2
**provide** 5:24 45:2
**provided** 13:12 46:4
**providing** 13:15 44:21 66:24 68:6
**proximity** 26:7
**pull** 63:17
**pulls** 35:16
**purchase** 29:4
**purpose** 12:20 93:14
**purposes** 53:24
**pursuant** 96:21
**push** 21:18 22:12 22:19 25:11,19 68:20 90:22
**pushed** 25:17 68:25
**pushing** 55:10
57:14 69:4
**put** 17:17 39:1,7 51:22 55:17 75:21 83:13 91:11
**putting** 10:24 67:14 87:20

**Q**

**question** 5:24 6:7 17:6 19:10 20:6 28:14 32:16 33:1 41:9 76:21 83:17 93:19 94:6
**questions** 21:8 33:21 35:9 36:13 41:24 42:6,13,18 47:10 50:23 66:14 68:5 86:6 94:4,8 94:13,17,19
**quite** 19:17 32:1 37:23 46:25 50:17 61:2

**R**

**R** 2:1 97:1
**radio** 14:23 51:22 52:12
**radioed** 51:15,19 52:2,4,6
**raises** 96:12
**ran** 35:18 58:9
**range** 28:8
**rare** 29:12
**reach** 28:15
**reached** 47:4,5
**read** 41:23 70:24 75:6
**reading** 49:9 96:20
**ready** 41:17
**real** 94:9
**realized** 35:17 69:9
**really** 19:18 50:23 83:7,7
**Realtime** 4:12
**reason** 93:23

**reasons** 42:19
**recall** 12:3 13:4 14:12,14 35:5 36:3,4 44:20 46:25 47:1 48:16 48:17 50:2,16 52:25 53:9 55:16 56:8,22 58:21 59:6,8,15,19 60:9 68:24 69:1,20 73:5,8 80:6,7,15 80:16 81:24 82:9 82:17 84:15,21,24 85:2,3 87:17 95:7 95:13 96:7
**receive** 19:1 75:20
**received** 16:11 18:22 31:12 32:8 32:9 35:2 66:19 66:20
**record** 4:5,15 5:8 18:18 21:3 79:15 79:18,22 93:6,7 93:11 94:13 96:18
**recorded** 18:3,6,20 32:11 41:2 49:2
**recording** 17:3,14 17:16,24 19:11
**records** 31:1 36:19
**recovered** 65:17
**register** 27:14 28:11 29:11,18
**registers** 25:25 27:20,23
**relate** 31:9
**related** 6:10 83:17 83:21 84:8 88:1,9 88:17
**relating** 7:10 93:16
**relation** 11:15
**relaying** 45:23
**release** 26:4
**remain** 15:4
**remember** 5:18 8:19 10:14 12:6 12:14,18,18 13:6 13:6 17:3 18:4 19:14,17 20:10 32:22 33:7,13 34:20 35:2 36:1,8 36:11,20 38:14 42:2 43:12 45:6 45:11,14,23 46:15 46:23 47:15,23,25 48:1,3,4,6,9,10,10 48:14,21 49:6,8 49:18,21 50:6,24 51:16,25 52:15 53:6,8 54:15 56:1 56:2,4,11 57:10 57:13,16,17,18 58:9,11,15,18,22 58:25 59:4,9,10 59:17 60:5,7 61:2 61:9 63:4,11 66:8 66:11,19 67:13 68:16,18,22 69:12 69:15,15,17,18,21 72:2 73:2,24 74:5 77:17 79:25 80:4 80:6,11,16,18,21 81:1,3,4,5,19,19 82:10,13,15,19,22 83:11 84:18 85:10 88:14,16 90:4 96:6,10
**remembered** 66:1
**remind** 18:8
**reminded** 37:14
**remodel** 10:10,12 10:13
**remote** 24:25 25:5
**Renee** 5:9
**repair** 76:4,6 77:23
**repairs** 90:11
**Repeat** 13:19
**rephrase** 79:2 83:19 88:5
**replacing** 91:14
**report** 3:8 11:6,7 39:15,21 42:3 43:1,3 45:17 60:6 62:7 66:24 67:1 67:12,21 68:7,10 69:9 70:9 80:3 81:12 83:2,12 84:2 86:3,9,10,20 93:14
**reported** 1:25 19:2 40:18 41:2 54:12 54:16 59:23 60:3 60:16 63:20 66:18
**reporter** 4:15 5:21 5:25 54:19 55:5 64:24 79:12 94:12 94:15 97:6
**reporting** 4:13 62:14 63:5
**reports** 95:24
**represent** 70:22
**representative** 53:14 66:23
**represents** 89:19
**reps** 90:4
**request** 71:1 72:20 75:9 78:22 82:12
**requested** 96:20
**requests** 3:12,15 71:7,8 72:17 74:19 75:1
**resets** 10:24
**respond** 85:20,23 88:3
**response** 78:24 79:10,13 89:13
**responses** 3:13 71:2 71:6 74:21
**responsibility** 26:25 86:15
**responsible** 62:4 75:11,15 86:19 95:15
**responsive** 31:9
**rest** 68:15
**restocking** 34:11,13
**reverse** 21:16 23:7
**right** 5:7 6:9 9:12 9:15 14:10 16:1 16:10,24 17:19,20 17:20 20:21,23 21:13 22:8,13,18 22:19 28:21 30:9 30:15 33:5 38:2 38:10,22 39:4,6 40:6 41:22 42:5 44:10,14 46:7,10 51:4 54:5,10 55:12,13,14,23,23 58:7 59:22 60:10 60:11 61:20,24 62:1,15,18 65:22 66:2 72:2 74:9 75:2 78:11,12 80:10 81:23 84:11 87:18 88:9 89:1,8 89:9 92:19 93:16 93:25 94:21
**right-hand** 49:23
**rocks** 65:23
**Rodriguez** 2:15 4:22,22 15:24 16:5,7 26:19 30:18 39:19,23 70:22 71:4 74:23 94:19
**role** 11:15,25 31:14
**room** 57:6 67:18
**roughly** 9:15 22:9 28:19 54:13
**RPR** 1:25 97:21
**Rule** 96:21
**rules** 5:20
**run** 9:2,3 38:24
**running** 19:14

**S**

**S** 2:1
**S-m-i-t-t-l-i-n-g** 38:3
**safety** 87:7
**Saturday** 33:22 34:8 36:17,24 54:9 59:23 72:12
**saw** 13:15 52:10
**saying** 5:22 52:15 53:6 75:9 84:24
**says** 21:6 27:4 44:18,19 45:5 53:19 54:7,16,19 54:23 55:9,22 58:13 59:22 60:3 61:16,24,24 62:3 62:5,21,25 63:1 64:2 70:25 72:20
**schedule** 37:14 90:15
**Scheer.Law** 2:9
**screen** 15:22 16:13 17:15,21 48:13
**screens** 17:10,13,17 18:5 48:21
**seal** 97:11
**season** 15:15 33:24
**Seattle** 2:11
**second** 25:1 33:20 38:9 47:5
**seconds** 21:6,15 22:9 23:4,11 26:3
**secretive** 19:6 32:1
**section** 56:23 75:6
**security** 16:15 17:2 18:23,23 19:23 20:7,8,9
**Sedgwick** 3:8 31:18 32:9 40:17 41:24 43:18,22 44:21 45:2,6,8,16,21 46:4 53:14 55:17 59:23 60:3,13 61:8 62:8 63:5,8 63:21 65:3 66:9 66:18,23 80:4 81:13,16,20 86:5 93:23
**Sedgwick's** 54:20

**see** 13:14 16:4,7,18 17:19 20:17 21:15 21:17 22:11 23:3 23:6,12,22 25:14 26:10,21 28:22 36:22 41:4 42:12 48:22 52:20 53:11 53:11 61:21 65:17 65:23 69:18
**seeing** 16:22 17:15 21:24 22:16,21 29:24 35:2 47:23 65:20
**seek** 55:15 58:13
**seen** 29:13,24 31:2 52:9 72:18 75:2
**sees** 17:23
**self-checkout** 11:2 27:20
**sell** 56:25
**send** 67:9,25 80:3 89:21 91:9
**sends** 47:11
**sense** 87:14
**sent** 31:18 32:9 36:7 47:5 52:11 64:4 74:2
**served** 30:23 31:5 72:4
**service** 15:3 34:17 92:2,3
**services** 75:17
**set** 3:14 74:8,19 83:15 97:11
**share** 34:24 71:13 71:18
**shared** 55:25
**sheet** 42:6
**shift** 11:24 12:5,8 33:7 37:12,17 82:15,19
**shirked** 26:25
**shopping** 12:13 28:22 72:21,23 75:12,15 79:10,13 82:25 95:16
**short** 35:15,22
**Shorthand** 97:6
**shot** 16:13
**show** 9:3 17:11 38:24
**showed** 18:5 32:11 48:13
**showing** 19:3 23:15
**shows** 17:21
**side** 16:17,18 22:19 48:1 49:23,23
**signing** 96:20
**signs** 95:24
**similar** 5:20
**sit** 15:6 26:3
**sitting** 27:14 47:7 48:1 49:19,23 53:1,4 57:10
**situation** 43:1
**situations** 11:23
**six** 37:5
**sized** 50:9
**skill** 97:10
**slash** 30:3
**slip** 42:22 61:25
**slow** 51:1
**small** 50:8,17 78:5
**smaller** 14:17 50:7 50:9
**Smith** 37:25
**Smithing** 37:22
**Smithling** 37:20,25
**somebody** 51:15,25 52:2
**sooner** 11:20
**Sorensen** 4:12
**Sorenson** 2:20
**sorry** 4:8 5:12 8:2 13:19 26:22 40:2 40:13 64:9,14 70:3 78:2,15 89:4 93:18
**sort** 19:13 24:11 27:24 86:14
**South** 54:25
**speaking** 47:6 49:24 50:3 61:9 79:25 80:4
**specific** 13:6 57:8 60:7 69:16 76:16 81:3 83:4 90:1
**specifically** 48:10 49:20 53:9 69:1 80:14 92:22
**spectating** 4:18
**Speculation** 26:19
**speed** 21:9
**spell** 11:13 37:21
**spent** 46:15
**spills** 96:8
**spoke** 45:11 46:12 46:24 51:13,25 53:14 94:25 95:9
**spoken** 51:7,22 89:18 92:25
**sports** 10:22
**spotting** 58:3
**stand** 13:1 15:2 25:15,20 27:6 28:12 29:3 56:3,8 76:20
**standard** 35:12
**standing** 17:19,22 17:23 49:18 50:21 52:21 56:3
**Starbucks** 15:5 16:18 28:22,24 29:3,5
**start** 5:7 20:22 21:4 35:8 45:5 46:7
**started** 8:9,13 12:15 13:18,22 14:10
**starting** 21:4
**state** 1:10,11,13 18:17 97:3,7
**stated** 52:17
**States** 1:1 4:9
**stay** 29:4
**steeling** 12:22
**step** 11:25 12:2
**Stevens** 7:25 54:25
**sticker** 39:6 40:8
**stock** 10:25
**store** 7:24 9:17,23 11:21 12:14 14:25 14:25 15:4,8,10 16:15,20,23 17:10 25:23 26:8 29:24 30:6 34:3,6,9 35:1 42:25 45:9 48:19 53:17 54:19 55:1 55:6 59:16 63:12 67:9 73:12,21,23 76:12,23 77:24,24 80:12 82:16 83:2 83:12 85:21 86:23 86:25 87:10 88:3 89:13 91:5 95:2 95:14,15
**store's** 13:18
**stored** 67:4,17
**stores** 1:9 3:12,16 4:9 63:14 71:2 74:20
**straight** 43:20
**Street** 1:19 2:4 5:11
**strike** 23:24 29:15 80:19 82:14
**strive** 50:13
**stuff** 35:10 40:16 51:1 65:20 94:24
**subdepartment** 10:21
**Subject** 72:22
**submit** 16:11 30:22 58:4 59:17
**submitted** 59:25
**submitting** 81:12
**subpoena** 3:9 30:17 30:23,25 32:21 70:6,12 72:5
**Suite** 1:19 2:5,10 2:16
**summary** 55:16,19 55:20,22
**Sunday** 72:12
**supervising** 9:14 10:20
**supervisor** 11:5
**sure** 10:24 28:18 36:19 58:2 59:14 77:23 80:8 88:7
**sustained** 55:14
**swear** 4:15
**sweep** 64:2,3
**sweeping** 64:6
**swept** 65:4
**sworn** 5:2 97:9
**Systems** 1:12 2:13 3:11 4:23 70:25 75:14

**T**

**T** 5:5 94:22 97:1,1
**table** 57:7
**Tacoma** 1:3,20 2:5 4:1,11 5:11 8:1,3 9:20 54:25 91:5
**take** 6:7 7:12 20:24 23:12 24:20 25:7 37:21 39:7 42:17 44:10 60:11 68:19 75:5 76:7 86:17 89:13,22
**taken** 1:19,24 5:14 6:13 7:13 16:14 62:21 68:25 79:20 92:11 93:9
**takes** 61:3,5
**talk** 60:11
**talked** 51:14 88:15 90:2
**talking** 46:16 51:3 65:2 82:5,22
**tapes** 18:23
**taught** 85:25
**team** 10:13,16,19
**technology** 14:23

28:2
**tecum** 30:23 70:7 70:12 72:5
**telephone** 75:10
**television** 15:22
**tell** 11:18 17:4 32:7 37:17 48:18 63:15 63:15 81:16 83:5
**telling** 49:7 80:18 80:21 81:1,4,19 83:25 84:19 85:4
**template** 41:7 42:6
**testified** 5:3 7:9
**testify** 3:9
**Thank** 18:18 39:16 70:1,20 71:4 74:17,23 94:5,20 96:13
**theft** 17:15,18 18:2
**thereto** 3:13 71:2 72:18 74:21
**thing** 25:2 31:16 65:18
**things** 10:19 31:6 31:14 32:20 34:10 35:18 40:10 69:16 76:17
**think** 6:4,17 14:10 19:15 31:22 42:9 48:23 56:20 72:7 77:21 79:16 85:5 87:14
**thinking** 25:4 39:9 52:7 57:8
**third** 8:16 19:22 20:7 35:7 38:5,8 38:15,16 61:15 62:4
**thought** 36:16 42:14 57:6
**three** 18:23,23 31:10 32:4,9 38:6 46:17,24 48:23
**time** 4:6 9:12 10:3 10:15 11:4 12:4 12:13 13:4,6,22 17:1,9 19:15 20:13 23:16 26:7 27:15 29:6,9,21 31:16 35:14 36:25 37:6,7 38:8 40:17 46:19 54:12,14 60:3,4,5,7,16 61:2 67:18 77:20 86:6 86:8 96:13
**timeframe** 9:8
**times** 5:16 17:23 29:14 35:11 46:18 46:18,24
**timestamp** 20:24 21:5,17 22:15 23:4,11
**tiny** 24:24 50:18
**tire** 91:1
**tires** 90:25
**title** 7:21 8:22 38:14 54:20 73:22
**titles** 8:14
**today** 96:19
**today's** 71:15
**told** 42:15 46:23 47:1,2,2,3 49:11 51:17 52:3,11 63:24
**top** 21:6 27:4 52:19 52:24 55:12 64:15
**topics** 31:10
**total** 46:15
**touch** 69:21
**touching** 69:13
**toys** 10:22
**track** 20:8
**trained** 86:4,12 87:5,7
**training** 85:19 86:2 86:23 87:3,11 88:2,14,16
**transcript** 6:1 97:8
**transmission** 15:10
**transport** 95:8
**treatment** 55:15 58:14
**trial** 7:9
**tried** 25:19
**trigger** 14:20
**triggers** 15:4,7
**tripped** 81:6
**tripping** 96:8
**true** 97:9
**try** 6:1 22:18
**trying** 21:18 22:12 22:17
**turn** 15:14,17,22 72:16 75:4 78:1
**turned** 61:15
**Turning** 55:4
**two** 8:8 14:4 16:19 24:19 37:11 48:23 48:23 71:24,25 73:17 74:3 93:6
**type** 6:16 25:1,1 34:18 54:19 63:20 87:11 88:3
**types** 10:19

**U**

**U-scan** 27:18 28:12 52:5
**Uh-huh** 10:18 11:10 88:10
**Ulmer** 2:3 3:4 4:17 4:17 5:6 15:21 16:1,9 18:10,12 18:15,21 19:25 21:2,12,22 22:2,7 23:2,10,21 24:5 24:13 26:20,24 27:1,3,21 28:7 29:22 30:12,15,19 30:21 38:21 39:8 39:13,17,20,24 40:7,10,11,14 54:1 62:11 64:10 64:13,17,19,23,25 65:1 67:7 69:25 70:2,6,11,14,18 70:21,24 71:5 72:9,14 74:15,18 74:24,25 75:23 76:3 78:9,18,21 79:8,15,24 84:17 85:9,14 86:1 87:4 87:15,24 88:6,24 89:6,17,25 90:9 90:19 91:16 92:9 92:15 93:5,13,20 94:3,9,17 95:3 96:12,15
**understand** 18:1,13 18:24
**understanding** 14:18,20 23:23,25 24:6,14 25:12 26:5 27:22 30:2 32:10 44:6 46:2 49:25 52:10 61:13 62:7,23 75:17 79:1 81:6,8 83:8 85:15
**Understood** 6:25 18:10 19:10
**Unit** 54:24
**United** 1:1 4:9
**University** 8:8
**unknown** 55:14
**unlock** 15:4 24:22 25:11
**unlocked** 15:5
**unlocks** 24:15 25:3 27:19 29:3
**unpaid** 13:3
**use** 91:10 95:25
**usually** 14:8,9 47:9 58:20 66:13,13 83:10 85:24 91:11

**V**

**vacuum** 48:17
**various** 34:10
**vendors** 13:11
**versus** 4:8,8
**Vertetis** 2:4
**vicinity** 96:9
**video** 3:17 15:19,25 16:11 21:4,4,6,8 21:11,14,18 22:11 22:17 23:8,16 25:16 27:1 28:23 31:19 62:25 63:2 63:5,9,12,14,16 67:24 70:8,10,13 70:16 84:22
**video-recorded** 4:7
**VIDEOCONFE...** 1:16
**Videographer** 2:20 4:5 27:2 79:18,22 93:7,11 96:17
**videos** 31:13 32:21
**videotaped** 1:16 3:1 97:8
**videotapes** 32:9
**videotaping** 32:23
**visually** 47:25
**voice** 39:1
**vs** 1:8

**W**

**WA** 2:5,11
**waiting** 12:19
**walk** 8:14 25:10 48:11 64:18 65:16 87:10
**walked** 49:22 51:16 52:1,2
**walkie** 35:4,20,24 36:2,8 39:1 47:11 47:16
**walkie-talkie** 35:21 51:18
**walking** 13:2 17:11 52:17 81:9
**want** 15:21,23 18:8 30:11 39:10 48:11
**wanted** 18:17

**Washington** 1:2,10 1:12,13,20 4:1,10 54:4 97:3,7
**wasn't** 13:14 35:6 35:14 36:5 38:25 83:15
**watch** 15:23,24 21:8 25:16 74:13
**watching** 19:6,7,9 21:13 84:22
**waved** 51:16
**way** 6:10 18:1 21:9 23:5,13 32:17 59:10 63:5 66:11 69:16 74:4 75:9 84:21 85:25 86:4 89:7 92:10
**ways** 80:7
**we'll** 6:4
**we're** 4:5 5:21 15:19 16:22 20:23 21:13,24 22:15,16 22:21 30:16 39:20 44:10 79:22 93:11 96:17
**We've** 64:19
**week** 33:18
**went** 8:15 35:7 52:3 52:20 67:20 69:7 70:4 80:2
**weren't** 62:14 88:20
**Western** 1:2 4:10
**wheel** 12:12 14:4 14:13,17 22:11,23 23:17 25:8,21 26:6 27:24 29:9 29:17 50:10,12,15 52:18 55:10 79:5 81:17,20 84:8,12 84:16 85:6 88:20 88:25 89:8,10 91:14,14
**wheelchair** 59:2
**wheeling** 87:21
**wheels** 13:11,11,18 13:23,25 14:5 15:11 24:1,7 25:10 26:2,10 28:4,10,15,17 50:16,24,25 56:17 69:19 75:20 90:3 90:5,6,12,16 95:21
**WHEREOF** 97:11
**wife** 1:5
**WILLIAM** 1:4
**witness** 4:16 5:1 6:20 15:23 18:19 22:1,6 23:9,20 24:4,11 26:18 27:18 28:6 29:20 30:13 38:19 40:9 42:10 52:8 60:20 64:15,22 72:11 75:20 76:2 78:3,7 78:12,16 79:7,13 84:15 85:8,23 87:2,13,23 88:5 88:23 89:4,16,24 90:8 92:8,14 93:4 93:18 94:2 95:5 96:14 97:11
**witnessing** 69:21
**wondering** 19:1
**work** 7:24 8:9,13 14:19,23 15:12 18:16 25:9 32:2 34:18 36:17 37:15 37:15 66:5 77:25 83:13 84:11,12 90:22
**worked** 7:16,23 8:10 11:22 16:23 77:18 84:20,25 93:1
**working** 9:16,18 10:16 29:23 31:21 31:24 33:4,16 34:7 36:21,22 73:15 77:6 82:7 82:18 83:7
**works** 23:17 24:15 84:21 89:18 92:16 92:22
**world** 19:5,6
**worn** 83:7 91:10
**worries** 30:14
**Wow** 36:22
**wrangler** 77:5
**wranglers** 76:24
**write** 42:14
**writing** 43:8 68:6 81:12
**wrong** 31:20 46:21
**wrote** 40:22 55:17 55:20

**X**

**X** 5:5 94:22

**Y**

**yeah** 8:2,6 9:18 10:14 12:2,2 16:5 16:17 18:14 19:5 23:7 25:1,10 28:14 30:12,14,19 31:4,5 33:14,23 33:25 35:23,25 37:5 38:1,1,19,19 39:16 40:9,24 41:1,10,11,18 43:11 44:25 48:9 48:11,20 54:23 57:1,3 59:3 64:15 64:17 68:14 70:2 70:18 74:24 76:16 77:2,5 79:3 80:8 83:20 85:19 87:19 89:4
**year** 13:7,7 37:4
**years** 7:17,18 13:15 37:24

**Z**

**Zoom** 2:14

**0**

**1**

**1** 3:8 39:12,14,25 40:3,7,12 41:21 46:3,6 53:10,10 55:9 61:16 64:2 66:4 69:25 70:9 70:11
**1:15** 60:16
**1:44** 21:5
**1:45** 20:24 21:1,15 22:9,16
**1:46** 23:4,11
**1:55** 54:12
**10** 9:15 10:16 26:3
**11:03** 79:19,21
**11:15** 79:21,23
**11:33** 93:8,10
**11:35** 93:10,12
**11:39** 96:18,22
**12** 5:19
**12/23/2023** 3:8
**12/24/2024** 3:13
**13** 5:19
**15** 9:15 10:16 22:9 26:3 33:25 34:2 44:23 46:19
**155** 37:1
**17** 74:22
**180** 34:6
**1978** 53:19 54:24
**19th** 7:25 54:25

**2**

**2** 3:9 30:10,20,22 37:1,2,7 40:6 55:8 70:5,6,12 72:20 82:19
**20** 3:17 35:14 60:18
**200** 34:6
**2008** 44:9
**2013** 5:19
**2017** 7:19,22 8:10
**2019** 13:8
**2023** 8:11,23 9:8 10:3,16 11:5,11 12:3,7 14:15 16:24 17:2 18:4 19:13 20:13 21:5 23:25 33:5,22 34:8,17 40:22 43:4 44:3 48:20 54:9 58:24 59:24 64:5 77:10 85:16
**2024** 8:21 71:3
**2025** 1:24 4:1,6 74:22 97:9,12,24
**206.666.3075** 2:11
**23** 1:24 4:1 10:15 12:3,7 14:15 16:24 21:5 33:4 33:22 34:8,16 40:22 43:4 54:9 59:23 64:5 78:1 97:9
**23046** 2:16
**23rd** 4:6 24:1 34:12 72:7,10
**24th** 71:3
**25** 21:15 84:24
**253.948.0232** 2:6
**25th** 72:13

**3**

**3** 3:11 69:23,24 70:14,23,24 72:15
**3/17/2025** 3:16
**3:24-CV-05811-J...** 1:6 4:11
**30** 3:10
**30(e)** 96:21
**300** 2:16
**3186** 1:25 97:21
**33** 23:11
**36** 78:22
**3860** 2:10
**39** 3:8

**4**

**4** 3:14 33:8 37:10 37:18 70:16 74:14 74:16,18
**404** 5:11
**4050** 54:25
**41** 21:5
**49** 23:4

**5**

**5** 3:4,17 15:20 20:23,25 70:16 72:16 75:8
**5:16** 60:3
**5th** 2:10

**6**

**6** 33:8 37:10,17
**6/23/2025** 3:10
**62nd** 5:11
**69** 3:13
**6th** 97:12

**7**

**700** 1:19 2:5
**701** 2:10
**714.384.6600** 2:17
**72nd** 8:17
**74** 3:16

**8**

**8** 37:16 75:4,6
**813** 5:11

**9**

**9:26** 4:2
**9:27** 4:6
**909** 1:19 2:4
**911** 58:16
**92653-1577** 2:17
**98104** 2:11
**98402-4413** 2:5
**98408** 5:11