**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| JEAN LUBKEN and WILLIAM LUBKEN, husband and wife and their marital community,<br><br>Plaintiffs,<br><br>vs.<br><br>GATEKEEPER SYSTEMS, INC., a California corporation doing business in the State of Washington,<br><br>Defendant. | NO. 3:24-CV-05811-JCC<br><br>**PLAINTIFFS' TRIAL BRIEF** |

## I. INTRODUCTION

Plaintiffs Jean and William Lubken, by and through their undersigned counsel, submit this trial brief to the Court.

## II. FACTUAL BACKGROUND

### A. Plaintiff Jean Lubken's Fall Was Caused by Gatekeeper's Anti-Theft Wheel Locking Inside the Middle of the Store

On December 23, 2023, Robin Lubken was pushing a shopping cart inside a Fred Meyer store when the wheel of her shopping cart stopped abruptly, causing her to fall. On this day, she went to the store at approximately 1:50 p.m. to purchase a hand mixer. She was present at the store approximately five to ten minutes prior to the fall. She testified that the first shopping cart she tried to use "wouldn't move" so she selected another cart and proceeded into the store to find a hand mixer. The only item she had in her cart at the time of the fall was her purse.

At some point within the store, the cart stopped abruptly. As Mrs. Lubken's body was still in motion as the cart stopped, her right foot heel interacted with the cart causing her to fall onto her right side into the side aisle. The cart also fell on top of her as she fell. Mrs. Lubken laid on the ground for two minutes until another customer came across her, moved the shopping cart off of her, and went to get Fred Meyer staff.

When asked about her understanding about the cause of the fall, Mrs. Lubken clearly testified that the cart's wheel locking and causing a sudden halt is what caused her fall. She testified that although she is not in the profession of designing shopping carts, she knows that the cart stopped on the spot. She testified that there was nothing on the ground such as debris or gravel or sound that would have caused the shopping cart to abruptly brake. Her testimony about the shopping cart wheel locking was clear and unequivocal:

Q. So other than you experiencing that the cart halted are you aware of any other

information that the cart in any way malfunctioned?

[…]

A. What? The cart did malfunction. The cart did halt. The cart did lock.

Q. Other than the cart halting what caused you to believe that the cart malfunctioned?

A. Because it locked, and I couldn't move it, and then I had the following fall.

Q. You said you couldn't move the cart?

A. Yes.

Q. So the cart halted and then you subsequently tried to move it?

A. The cart locked. As I said before I was pushing the cart forward and it locked.

Q. Right. The cart came to a halt?

A. Correct.

Q. And then you fell over and the cart fell over; correct?

A. Yes.

Q. Okay. Did you ever receive or obtain any information that the cart locked in any way?

A. I know that the cart locked because I was the one experiencing it, and when it did so, I then could not move forward.

[…]

Q. Okay. We can go ahead. We can keep going.

A. Okay. Let's please do. I'm pushing the cart. The cart wheel locked. The cart itself locked. I don't know. I'm not an engineer as to whether it malfunctioned or what word you're having trouble with there, but I was in a situation where the cart locked and that is what happened ahead of the fall.

[…]

Q. Do you know why the cart stopped?

A. The system locked.

[…]

Q. So how do you know that the system locked?

A. It was unable to move, and I was propelled to the ground.

Fred Meyer home assistant manager Angela Padilla responded to Mrs. Lubken's fall. Immediately after the fall incident, Ms. Padilla filled out an incident report with Mrs. Lubken. Ms. Padilla wrote in the incident report that Mrs. Lubken reported that the shopping cart's wheel had locked up which caused her to be injured.

**B. Sean Kohles, An Expert in Mechanical Engineering and Biomechanics, Opines That Gatekeeper's Product is Unsafe, Flawed in Its Design, and Was the Only Plausible Cause of Mrs. Lubken's Fall**

Plaintiffs retained Sean S. Kohles, Ph.D., in this matter to inspect the subject product and premises. Dr. Kohles is a biomechanical engineer with fundamental training in engineering mechanics and bioengineering, disciplines that apply mathematics, physics, and engineering technologies toward the study of human and device function. He has published over 250 journal articles, conference papers, and book chapters describing Dr. Kohles' research in cell, tissue, joint, biomaterials, implant, body, and device biomechanical engineering. These articles describe the application of mechanical engineering, biomechanics, bioengineering, biomedical science, biostatistics, and epidemiology to living systems. He is an active member of eight professional societies, having achieved the honor of Fellow Grade in the American Institute for Medical and Biological Engineering (AIMBE) and the Biomedical Engineering Society (BMES).

Dr. Kohles has trained nearly 1,200 students in over 30 lecture-based courses relevant to biomechanics and bioengineering including fundamental courses in physics, mechanical engineering, biology, and design. His forensic practice has led to opinions in cases addressing injury biomechanics, medical device failure, consumer product failure, toxic tort, medical

malpractice, and criminal defense issues. Dr. Kohles is routinely qualified as an expert in mechanical & materials engineering, biomedical engineering, bioengineering, biomechanics, and clinical science in both civil and criminal courts at the circuit and federal levels (USA and Canada).

Dr. Kohles reviewed the documents exchanged in discovery, video recordings of the store from the date of the incident, Mrs. Lubken's medical records, deposition transcripts of witnesses, and documents produced in discovery. Additionally, Dr. Kohles conducted an inspection of the subject Fred Meyer store including a direct examination and testing of Fred Meyer's grocery carts and theft protection devices.

Included in the records Dr. Kohles reviewed included incident reports of prior injuries related to the subject product. This included over 400 pages of incident reports dated 2020 through 2026 occurring in the Fred Meyer stores located in Washington State relating to the subject product, documenting many reported injuries due to Gatekeeper's anti-theft wheel abruptly stopping. The many reported injuries are consistent with Mrs. Lubken's incident, where the shopping cart locked without warning causing bodily injuries to many customers. Included in the batch of incident reports are numerous incidents which occurred within the Fred Meyers store between the grocery store aisles and not at the exit doors, similar to Mrs. Lubken, which involved a cart suddenly stopping and causing injury.

Dr. Kohles' mechanical engineering, biomedical engineering, biomechanics, and clinical science conclusions are as follows:

1) Inspection, repair, and maintenance flaws associated with the grocery cart theft prevention system included:

a. Degradation associated with environmental exposures,

b. Inconsistent wheel battery charge,

c. Worn and damaged wheels including rolling surfaces,

d. Worn and damaged wheel brake mechanisms,

e. Spurious wireless signals throughout the store,

f. No evidence of wheel functional status inspection,

g. Inconsistent basic wheel performance including rolling and swiveling freedom;

2) Design, manufacturing, and functional flaws within the grocery cart theft-protection system included:

a. Inconsistent wireless signal responsiveness,

b. Delayed master to slave wheel interactions,

c. Inconsistent placement of lockable wheels,

d. Inconsistent permission time periods for cart use,

e. Differing normal and brake wheel material properties including wear resistance,

f. Lack of weatherproofing of brake wheel hubs;

3) The overall inconsistent nature of the grocery cart theft-prevention system created a consumer product that has been shown to cause injuries within any population of users;

4) Proper maintenance of an improved alternative design could have mitigated the hazardous nature of the at-issue product;

5) Minimal warnings were evident representing the hazardous nature of spontaneous cart wheel braking situations;

6) The biomechanical motions and forces experienced by Ms. Lubken including a dynamic impact load of ~903 pounds during her fall to the floor were directly responsible for causing her diagnosed traumatic injuries.

Dr. Kohles opines that Mrs. Lubken's "body experienced such trauma during the grocery cart's unexpected deviation from its pathway and her subsequent fall so as to have loaded her musculoskeletal and nervous tissues in a manner consistent with known injury mechanisms." Gatekeeper "designed and manufactured a product with functional flaws which

also directly contributed to the hazardous incident." Based on his review of the many similar injury complaints, "the product poses an unreasonable and unsafe hazard to any user" and that had a "full failure mode effects analysis had been conducted on the present functionality within the subject shopping environment prior to any hazardous event and in response to the many reported failures, the at-issue braking malfunction could have been predicted."

In support of his opinions and conclusions, Dr. Kohles performed an analysis of the incident mechanics and injury biomechanics as described in detail in his report. His analysis included a direct inspection of exemplar grocery carts and store environment as well as an exploration of the statistical variances and sensitivities associated with the known and assumed contributing variables. Overall, this approach demonstrated that the physical exposure to an inconsistently performing consumer product such as the product at issue in this case has the likelihood to cause the type of injuries sustained by Mrs. Lubken.

In an effort to assess cart kinematic performance during free-rolling and controlled wheel braking, testing was conducted within the at-issue Aisle #86 where Mrs. Lubken fell. Dimensions of the aisle were noted as 20.25 feet long and 5.4 feet wide. The flooring surface appeared to be polished concrete. A store-owned, Gateway Cart Key was used to engage the wheel brakes at prescribed moments. A velocity sensor (Stalker Sport Pro3 Radar Gun) was used to accurately determine cart release speeds at the moment of controlled wheel braking.

Approximately 12 total rolling tests were run from a random selection of three different small and large carts each. Carts were manually pushed down the aisle perpendicular to a floor marker and released just prior to that marker. Subjective cart speeds were maintained as consistently as possible in the range of ~2.5 to 3.5 miles per hour (3.7 to 5.1 feet per second). The overall inconsistent braking of a front wheel, back wheel, or both wheels led to variable

skid distance results:

- Small Cart frictional skidding (braking): 47 to 52 inches;
- Large Cart frictional skidding (braking): 34 to 51 inches.

During the brake and skid phase of motion, each cart consistently veered its movement pathway generally towards the side of the front Gateway wheel, whether mounted on the left or right side of the cart.

A review of the security room as well as an entrance arrangement also identified how the theft prevention system was arranged. The intended wheel brake deployment of any particular cartwheel would occur at the exits as a would-be thief would attempt to remove a cart beyond or without the system's 'permission' time period. Contrary to the intended design, Dr. Kohles opined that there were spurious wireless signals throughout the store and that the product displayed inconsistent wireless signal responsiveness and delayed master to slave wheel interactions. Dr. Kohles also took issue with the wheel hub braking mechanics, opining that the wheels as currently designed are set to brake instantly upon triggered deployment, which is a feature that becomes more variable and less controlled as the brake and wheel surface experiences wear and degradation, along with weakening individual battery strength. Dr. Kohles opines that there was a feasible alternative design by incorporating a tapered brake load response which can still assure eventual full-stop braking but over a longer distance and distance. This redesign suggestion could give the unsuspecting consumer an opportunity to cognitively alter their gait pattern in order to avoid injury, while still deterring theft of the cart and contents.

Dr. Kohles noted that in a recent published study, which queried the US Consumer Product Safety Commission's National Injury Surveillance System (NEISS) database,

identified 21,731 physical contact-related injuries occurring inside retail stores in 2012, and of those reported incidents, shopping carts were involved in 29.4% of the injury narratives with cart-related fractures referenced in 23.4% of those incidents. This statistically high ration of injuries caused by carts is exacerbated by the sudden braking of the subject anti-theft wheel. Dr. Kohles opines that the unexpected nature of the grocery cart wheel's braking along with an altered cart pathway limited any protective user reaction. In comparison, the quickest average time a non-distracted driver can evasively react to a roadway situation has been reported to be ~0.4 seconds. Thus, the comparative time-frames would have limited Mrs. Lubken's response time when controlling the cart to a similar time as her fall to the floor. Her instinctive reaction to continue grasping the grocery cart would not have prevented, slowed, or buffered her fall.

Dr. Kohles also ruled out other factors as not having contributed to Mrs. Lubken's fall. With respect to her physical health, Dr. Kohles reviewed Mrs. Lubken's medical records and in considering her medical history, opines that despite a previous total knee replacement and cervical spine fusion, Mrs. Lubken was fully functional with no restrictions in her daily activities. He finds that her reactive response during the incident was protective in nature.

He also considered alternatively plausible influences on the disrupted cart pathway as associated with the traumatic event. Dr. Kohles opines that no other biomedically plausible influences on her at-issue injury mechanisms were present, including previous knee or spine surgeries or any associated altered joint function. In addition, he found there to be no other mechanically plausible influences on the cart's abrupt braking or swerving were present, including floor debris, displaced shopping items, or random wheel hub resistance. Dr. Kohles concludes that the only reasonably plausible cause of the at-issue traumatic event was the hazard posed by the product itself and its abrupt braking mechanism.

## III. LIABILITY

Under Washington law, product manufacturers have a duty to provide a reasonably safe product. *See Anderson v. Dreis & Krump Manufacturing Corporation,* 48 Wn. App. 432, 440, 739 P.2d 1177 (1987). The WPLA imposes a duty upon product manufacturers to design products that are reasonably safe. RCW 7.72.030.

A product manufacturer like Gatekeeper is liable to claimants like Plaintiffs if:

> (1) "the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed" (**design defect**);
>
> (2) "the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was ... not reasonably safe because adequate warnings or instructions were not provided" (**failure to warn at the time of sale);** or
>
> (3) "the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction" (**construction defect**).

RCW 7.72.030.

Here, the evidence establishes all of the elements of Gatekeeper's violations of the WPLA as to a design defect, construction defect, failure to warn, and causation as to Mrs. Lubken's fall as a result of the WPLA violations.

### 1. Construction Defect

RCW 7.72.030(2) provides:

> (2) A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW.

RCW 7.72.030(2)

"[T]here is no risk-utility balancing test required for this type of product liability claim."

*Falk v. Keene Corp.*, 113 Wn.2d 645, 653, 782 P.2d 974, 979 (1989). Rather, strict liability applies where the product at issue either: (1) does not operate as intended by the manufacturer's specifications, performance standards, or identical products; (2) does not conform with the manufacturer's express representations regarding how the device would operate; or (3) does not conform with the implied warranties of the manufacturer. *See, e.g.*, *West v. Ride the Ducks International, LLC*, 18 Wn. App. 2d 1013 (affirming jury verdict in favor of plaintiff on construction defect claim when plaintiff was thrown from a moving vehicle when the axle housing on the vehicle fractured).

Here, Gatekeeper's anti-theft wheel did not operate according to expected specifications, performance standards, or consistent with identical products. The intended wheel brake deployment of the device is to occur at the store exits if the device was not given "permission" to pass by the exit or when being taken off property. However, contrary to the intended performance of the product, the device locked in the middle of the store and away from the zones where the product was intended to be actuated. Dr. Kohles opines that the product is vulnerable to spurious wireless signals throughout the store and that the product displayed inconsistent wireless signal responsiveness and delayed master to slave wheel interactions. Dr. Kohles also found the brake mechanism in Gatekeeper's products performed inconsistent from one another despite being identical products. Accordingly, where the subject product did not perform consistent to its intended performance and where identical products fail to perform consistently, Gatekeeper's product demonstrates defects in its construction.

**2. Design Defect**

A manufacturer's liability for a defective design is established under RCW 7.72.030 in two distinct ways. *Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 326, 971 P.2d 500

(1999). "On the one hand, a plaintiff may attempt to establish liability by showing that, at the time of manufacture, the likelihood that the product would cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighed the manufacturer's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have had on the product's usefulness." *Id.*; RCW 7.72.030(1)(a)). "This is the so-called 'risk utility test.' " *Soproni*, 137 Wn.2d at 326. "Alternatively, a plaintiff may employ the 'consumer expectations' test, which requires the plaintiff to show that the product was 'unsafe to an extent beyond that which would be contemplated by the ordinary consumer.'" *Id*. at 326-27 (*citing Falk*, 113 Wn.2d at 654; RCW 7.72.030(3)).

The consumer expectations test recognizes that certain situations exist where the type of accident itself may establish a defect:

> "In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user."

*Pagnotta v. Beall Trailers of Or., Inc.*, 99 Wn. App. 28, 37, 991 P.2d 728 (2000). Relevant considerations under the consumer expectations test include "[t]he relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk." *Falk*, 113 Wn.2d at 649. Additionally, "'[i]n other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.'" *Id*.

The evidence in this case establishes Gatekeeper's violation of the WPLA under both the "risk-utility" theory and the "reasonable consumer expectation" theory. Dr. Kohles criticizes the wheel hub braking mechanics of the subject product, opining that the wheels as

currently designed are set to brake instantly upon triggered deployment, which is a feature that becomes more variable and less controlled as the brake and wheel surface experiences wear and degradation, along with weakening individual battery strength. As demonstrated by the over 400 pages of incident reports of substantially similar injuries suffered by customers using the subject product, the product as designed poses a clear hazard to the ordinary consumers of said product. The evidence presented establishes that the risk of harm was outweighed by a feasible alternative design. Dr. Kohles opines that Gatekeeper could have incorporated a tapered brake load response which can still assure eventual full-stop braking but over a longer distance and distance. He concludes that such a redesign could give the unsuspecting consumer an opportunity to cognitively alter their gait pattern in order to avoid injury.

**3. Failure to Warn**

RCW 7.72.030 states in pertinent part:

> A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe … because adequate warnings or instructions were not provided.

RCW 7.72.030(1).

Under Washington law, a plaintiff may establish liability by using either a risk-utility test or a consumer expectation test for both design defect and failure to warn claims. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 818 P.2d 1337 (1992) (*en banc*) (failure to warn claim); *Falk v. Keene Corp.*, 113 Wn.2d 645, 782 P.2d 974 (1989) (*en banc*) (design defect claim). Although RCW 7.72.030 uses the term "negligence," strict liability is the applicable standard for a failure to warn or a design defect claim maintained under RCW 7.72.030(a) or (b). *Ayers*, 117 Wn.2d at 765, 818 P.2d 1337. However, for failure to warn claims involving a danger that becomes known after manufacture, a negligence standard is

applied. *Ayers*, 117 Wn.2d at 765, 818 P.2d 1337.

To determine whether a warning is adequate requires an analysis of the warnings as a whole and the language used in the package insert. *Laisure-Radke v. Par Pharm., Inc.*, 426 F. Supp. 2d 1163, 1172 (W.D. Wash. 2006) (*citing Estate of LaMontagne v. Birstol-Myers Squibb*, 127 Wn. App. 335, 344, 111 P.3d 857 (2005). The court must examine the meaning and context of the language and the manner of expression to determine if the warning is accurate, clear and consistent and whether the warning portrays the risks involved. *Martin v. Hacker*, 83 N.Y.2d 1, 10–11, 628 N.E.2d 1308, 607 N.Y.S.2d 598 (1993); *cf. Little v. PPG Indus., Inc.*, 92 Wn.2d 118, 594 P.2d 911 (1979) (determining the adequacy of a warning by examining whether the warning sufficiently attracted the attention of the product users and informed them of the dangers of the product).

As already described extensively herein, the subject product engages in abrupt braking which has caused many injuries to many customers. Dr. Kohles concluded that the product is unsafe in part due to the unexpected and sudden nature of the braking mechanism which poses a hazard in that customers using said product may not expect the sudden change and alter their gait in time to respond. Particularly in the situation of Mrs. Lubken's fall due to a brake actuation occurring within the store, there is no evidence presented that any warnings were displayed on the cart used by Mrs. Lubken suggesting that the cart may experience an abrupt stop at any moment anywhere within the store. Moreover, Gatekeeper did not raise this issue nor present

## IV. CAUSATION AND DAMAGES

The "WPLA incorporates common law principles of proximate cause." *Scott v. Amazon.com, Inc.*, 583 P.3d 1155, 1160 (2026). Here, Mrs. Lubken testified clearly and

unequivocally that the shopping cart wheel locked abruptly and caused her fall. Her fall is consistent to the many fall injuries sustained by Fred Meyer customers who, like Mrs. Lubken, were injured due to the abrupt braking of the subject device. Dr. Kohles considered alternative plausible causes to Mrs. Lubken's fall, including biomedical conditions or mechanical influences such as debris or conditions in the environment, and concluded that the only reasonably plausible cause of the fall was the hazard posed by the product itself and its abrupt braking mechanism.

As a direct result of the fall, Mrs. Lubken suffered significant injuries. She went to St. Joseph's Hospital in Tacoma following the incident. There, providers took x-rays and identified the femoral fracture and then she ended up having open reduction internal fixation the next day. She was discharged to a nursing facility for rehabilitation for almost 11 days and through the Christmas holidays. Following her discharge home, she had several months of physical therapy. Plaintiffs' medical expert, Dr. Gary Schuster, finds that Mrs. Lubken sustained significant injuries which impact her overall activities of daily living, and will testify that Mrs. Lubken sustained the following injuries and/or conditions:

> 1. Closed right subcapital femoral neck fracture with minimal anterior displacement and impaction. There was apex anterior angulation of the fracture. Status post open reduction internal fixation of right hip fracture with cephalomedullary nail to stabilize the fracture secondary to the fall of 12/23/2023 on a more probable than not basis.
>
> 2.Constant right hip pain, with sharp pains with motion. Objective findings of the hip injury include the initial x-rays; surgical findings; loss of range of motion, including flexion 124 degrees, abduction 44 degrees, adduction 35 degrees, internal rotation 26 degrees, external rotation 24 degrees, and extension 15 degrees; antalgic gait; atrophy of the right thigh of 38 cm versus 39.

As Plaintiffs have viable claims against Gatekeeper under the WPLA, they may bring claims for loss of spousal consortium. Loss of consortium is typically thought of as a loss of

society, affection, assistance and conjugal fellowship, and loss or impairment of sexual relations in the marital relationship. *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 773, 733 P.2d 530, 536 (1987). "In Washington, either a husband or wife may recover for loss of consortium when that person's spouse is injured." *Id*. A party may maintain a consortium claim when their spouse is injured as a result of a manufacturer's violation of the WPLA. *Erickson v. Pharmacia LLC*, 5 Wn.3d 585, 597, 578 P.3d 306, 314 (2025), *as amended on denial of reconsideration* (Jan. 21, 2026) ("Following two days of deliberations, the jury found for Erickson on all four WPLA claims. The jury awarded compensatory damages of $15 million to Erickson, $17 million to Marquardt, $18 million to Leahy, and $150,000 to Leahy's spouse for loss of consortium due to Leahy's injuries.")

The Washington State Supreme Court in *Erickson* likewise held that exemplary damages may be recovered where the court applies the laws of the defendant's state under choice of law principles. Gatekeeper is based in California. "[P]unitive damages are available under California law if a plaintiff proves 'by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'" *Meier v. City of Brisbane*, No. 21-CV-05504-DMR, 2022 WL 523327, at *6 (N.D. Cal. Feb. 22, 2022); Cal. Civ. Code § 3294(a). "Malice includes the willful and conscious disregard of the rights or safety of others." *Id*. (citing Cal. Civ. Code § 3294(c)(1)) (internal quotations omitted).

In *Erickson*, the Washington Supreme Court affirmed a jury's award of punitive damages against Pharmacia LLC ("Monsanto") relating to a toxic exposure to polychlorinated biphenyls and claims brought under the WPLA. The Court acknowledged the State's precedent in permitting punitive damages against defendants residing in other states, including California:

> We first awarded punitive damages under the laws of a different state in *Kammerer*. There, California residents filed claims against a Washington

> corporation for fraud and breach of contract in connection with a violation of a patent licensing agreement negotiated in California. 96 Wash.2d at 418, 635 P.2d 708. California law permitted punitive damages whereas Washington law did not. *Id*. at 421, 635 P.2d 708. In determining which state's law to apply, we reasoned that California's interest "in deterring fraudulent activities by corporations having a substantial business presence within its borders" outweighed Washington's interest in protecting corporations that commit fraud. Id. at 422, 635 P.2d 708 (quoting *Kammerer v. W. Gear Corp.*, 27 Wash. App. 512, 520-21, 618 P.2d 1330 (1980)). We held that "a Washington court can award punitive damages under the law of California." *Id*. at 423, 635 P.2d 708.

*Erickson v. Pharmacia LLC*, 5 Wn.3d 585, 627, 578 P.3d 306, 329 (2025), *as amended on denial of reconsideration* (Jan. 21, 2026).

## V. ISSUES REMAINING OUTANDING

As the Court knows, since the filing of the parties' motions *in limine*, Plaintiffs arrived at a partial settlement with Fred Meyer and Kroger. While Defendant Gatekeeper intends to argue comparative fault against those settled parties, the Court should preclude reference to the fact that claims were brought against Fred Meyer and Kroger, nor should evidence of Plaintiffs' partial settlement be admissible. FRE 408. Plaintiffs likewise request that the case caption be amended to reflect the remaining defendant in the case for purposes of trial.

## VI. CONCLUSION

Plaintiffs look forward to presenting this case at trial.

//

//

//

//

//

//

RESPECTFULLY SUBMITTED this 10th day of September, 2026.

**PFAU COCHRAN VERTETIS AMALA, PLLC**

By *<u>/s/ Darrell L. Cochran</u>*
Darrell L. Cochran, WSBA No. 22851
Andrew S. Ulmer, WSBA No. 51227

909 A Street, Suite 700
Tacoma, WA 98402
Main: (253) 777-0799
Fax: (253) 627-0654
E-mail: darrell@pcvalaw.com

## CERTIFICATE OF SERVICE

I, **Andrew S. Ulmer,** hereby declare under penalty of perjury under the laws of the United States and the State of Washington that I am employed at Pfau Cochran Vertetis Amala PLLC and that on today's date I served the foregoing via **ECF** by directing delivery to the following individuals:

Jennifer L. Crow
Ahbra Franco
Sheer Law, PLLC
2101 Fourth Ave, Suite 830
Seattle, WA 98121
Jen@scheer.law; ahbraf@scheer.law; josephm@sheer.law; shiloha@scheer.law

***Counsel for Defendant Fred Meyer Stores, Inc. and The Kroger Co.***

Scott La Salle
The Aguilera Group, APLC
1201 Pacific Ave, Suite 600
Tacoma, WA 98402
slasalle@aguileragroup.com

***Counsel for Defendant Gatekeeper Systems, Inc.***

DATED this 10th day of September, 2026.

Andrew S. Ulmer